UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05CV10216-JLT

CARLOS PINEDA, ET AL.
     Plaintiffs

v.

DANIEL KEELER, ET AL.
     Defendants

## DEFENDANTS DANIEL KEELER, DENNIS HARRIS, JOSEPH R. WATTS AND JOSEPH P. TOOMEY'S LOCAL RULE 56.1 STATEMENT OF FACTS AND SUPPORTING DOCUMENTATION[1]

Pursuant to L.R. 56.1, Defendants Daniel Keeler, Dennis Harris, Joseph R. Watts, Joseph P. Toomey, William J. Gallagher, Edward Gately and Janie Busby submit the following statement of undisputed material facts.[2] Defendants state Plaintiffs, Carlos Pineda and Alexandra Perez ("Plaintiffs"), cannot adduce any evidence to support their claims of civil rights violations, specifically violation of 42 U.S.C. § 1983 — Fourth and Fourteenth Amendments.

## I. Chase of murder suspect into Plaintiffs' apartment

### A. Officer William J. Gallagher

1. On April 28, 2003, Officer William J. Gallagher (Officer Gallagher) was patrolling area D-4, Back Bay/South End, when he received a radio call for a shooting. See Exhibit C,

---

[1] All of the supporting documentation attached hereto are true and accurate copies. See Exhibit A, Affidavit of Attorney Thomas R. Donohue.

[2] These facts are deemed undisputed for purposes of Defendants' Motion for Summary Judgment only.

Gallagher Depo., p. 5, lines 7-10; p. 7, lines 23 and 24; p. 8, lines 1-7 and 18-24; p. 9, lines 5 and 6.

2.    Officer Gallagher and his partner Officer Patrick Foley proceed to the scene, looking for a white van, as suspects were seen leaving in a white van.  See Exhibit C, Gallagher Depo., p. 9, lines 7-14; p. 24, lines 1-4; p. 10, lines 5 and 6.

3.    On the way there, they were stopped by a motorist who told the officers that a white Honda was traveling with the white van and told them where they might be able to catch the white Honda.  See Exhibit C, Gallagher Depo., p. 9, lines 7-24.

4.    The officers found the white Honda traveling on Cass Boulevard and followed it.  See Exhibit C, Gallagher Depo., p. 10, lines 17-24; p. 11, line 1.

5.    Officers Gallagher and Foley observed the white Honda back into a parking space and the driver exited the car.  The officers then activated the police cruiser's overhead lights, got out and approached the Honda.  See Exhibit C, Gallagher Depo., p. 11, lines 4-21.

6.    When the driver saw the officers, he got back into the driver's seat and sped away at 50-60 miles per hour, and the officers followed.  See Exhibit C, Gallagher Depo., p. 11, lines 19-24; p. 12, lines 1 and 2; p. 13, lines 18 and 19.

7.    Officer Gallagher called on the radio and informed the dispatcher that they were chasing a car that could be involved in the shooting at Albany and Mass.  See Exhibit C, Gallagher Depo.,

p. 12, lines 5-10.

8.    During the chase through police areas D-4, B-2 and B-3, Officers Gallagher and Foley were passed by many other officers, who were in faster cruisers and familiar with those sections of the city.  See Exhibit C, Gallagher Depo., p. 13, lines 2-13.

9.    By the time Officers Gallagher and Foley reached the parked white Honda, only Officer Coin [sic] and one young female were present by the vehicle.  See Exhibit C, Gallagher Depo., p. 14, lines 14-24; p. 15, lines 17-20.

10.    By the time Officers Gallagher and Foley reached the white Honda, there were also "countless" police cars present. See Exhibit C, Gallagher Depo., p. 14, lines 21-24; p. 15, line 1.

11.    Two other suspects from the white Honda has gotten away.  See Exhibit C, Gallagher Depo., p. 15, lines 22-24; p. 16, 1 and 2.

12.    Officers Gallagher and Foley then stayed with the white Honda for 20 to 30 minutes, until they were ordered to secure the apartment.  See Exhibit C, Gallagher Depo., p. 16, lines 7-13; p. 17, lines 16-19.

13.    Officer Gallagher did not recognize the voice on the radio who gave that order.  See Exhibit C, Gallagher Depo., p. 16, lines 14-22.

14.    Officers Gallagher and Foley stayed in the apartment and were told not to let anyone into one bedroom, in case a

warrant was needed. *See* Exhibit C, Gallagher Depo., p. 21, lines 21-24; p. 22, lines 1-8.

15. Later, Detective Dennis Harris brought Carlos Pineda back to the apartment and told that officers that they could not leave yet. Officers then called Sergeant Detective Keeler, who told the officers that they could leave. *See* Exhibit C, Gallagher Depo., p. 24, lines 21-24; p. 25, lines 1-24; p. 26, lines 1-7.

16. Officer Gallagher only saw Sergeant Joseph Watts out in front of Plaintiffs' apartment building. *See* Exhibit C, Gallagher Depo., p. 28, lines 23 and 24; p. 29, line 1.

**B.    Officer Andrew Fay**

17. While on patrol on April 28, 2003, Officer Fay received a radio call and became involved in a car pursuit of a murder suspect driving a white Honda. *See* Exhibit D, Fay Depo., p. 9, lines 4-24; p. 10, lines 1-17.

18. At one point during this lengthy high speed chase, Officer Fay became the lead car, following directly behind the suspect white Honda. *See* Exhibit D, Fay Depo., p. 10, lines 18-24; p. 11, lines 1-24; p. 12, lines 1-24.

19. At some point, Officer Coyne passed Officer Fay to become the lead car. *See* Exhibit D, Fay Depo., p. 11, lines 5-9.

20. After a lengthy chase, the white Honda went into the Franklin Housing project. *See* Exhibit D, Fay Depo., p. 12, lines 17-24.

21. Shandon Road is a one way street that loops and leads

into the Franklin Hill Housing Project.   As the white Honda traveled on Shandon Road, Officer Fay left pursuit to go the wrong way in order to block the Honda's path.   See Exhibit D, Fay Depo., p. 14, lines 3-11.

22.   When Officer Fay arrived at the white Honda, it was parked, its doors were open and Officer Coyne was with a female. See Exhibit D, Fay Depo., p. 14, lines 12-24.

23.   At this time, numerous officers had arrived and Officer Coyne was pointing in the direction where two suspects fled. Officer Fay did not see the suspects flee, but he and other officers spanned out to search the area.   See Exhibit D, Fay Depo., p. 15, lines 2-13.

24.   While Officer Fay looked for the suspects on the roof, he heard on the radio that that the suspects were on the second floor.   See Exhibit D, Fay Depo., p. 15, lines 16-24; p. 16, lines 1 and 2.

25.   When Officer Fay arrived at Plaintiffs' apartment, there were officers standing at the door and inside the apartment.   See Exhibit D, Fay Depo., p. 16, lines 3-10; p. 29, lines 2 and 3.

26.   At the apartment, Officer Fay was directed to the back bedroom, where a suspect may be hiding.   On his way into the apartment, Officer Fay noticed a man in dressed in boxer shorts at the door.   See Exhibit D, Fay Depo., p. 17, lines 7-24; p. 18, lines 1-5.

27.   In the back bedroom, Officer Fay, with Officer James Coyne, found a man [Norberto Serrano] dressed in a tee shirt and underwear hiding in the closet.  See Exhibit D, Fay Depo., p. 21, lines 1-5; p. 34, lines 11-16.

28.   Officer Fay handcuffed this man.  See Exhibit D, Fay Depo., p. 21, line 24.

29.   The only time Officer Fay saw Pineda was when he passed him on the way into the apartment.  See Exhibit D, Fay Depo., p. 22, lines 12 and 13.  When Officer Fay brought the suspect out of the apartment, Pineda was already gone from the location.  See Exhibit D, Fay Depo., p. 22, lines 14 and 15.

30.   Officer Fay walked the suspect [Serrano] out of the apartment with a Boston Housing officer and placed Serrano into the back of a Boston Housing Police cruiser.  See Exhibit D, Fay Depo., p. 31, lines 4-8.

31.   Officer Fay was in Plaintiffs' apartment for two to four minutes, maximum.  See Exhibit D, Fay Depo., p. 29, line 24; p. 30, lines 1-3.


## II.   Police arrive at Plaintiffs' apartment

### A. Plaintiffs Carlos Pineda (Pineda) and Alexandra Perez (Perez)

32.   At the time of the incident, April 28, 2003, Plaintiffs Pineda and Perez lived at One Shandon Road, also known as 11 Fermoy Heights.  See Exhibit E, Pineda depo., p. 8; lines 2-5; p.

28, lines 19-23; p. 36, lines 6-12.

33.  Pineda owned a white Honda Civic.  See Exhibit E, Pineda depo., p. 37; lines 9-12.

34.  At this time, a homeless acquaintance named Norberto Serrano had been staying with Pineda.  See Exhibit E, Pineda depo., p. 43; lines 3-7; p. 47, lines 11-14.  In addition to Serrano, Plaintiffs' two children and Perez's father also lived there.  See Exhibit F, Perez depo., p. 15, lines 16-18.

35.  Pineda was awakened by a knocking on his front door. See Exhibit E, Pineda depo., p. 71, lines 3-12.

36.  When Pineda first got up, he looked out the window and saw lights and noticed that his car was not where he last parked it.  See Exhibit E, Pineda depo., p. 71, lines 13-20; p. 75, lines 1-23.

37.  Pineda heard "Boston Police Department," so he opened the apartment door.  See Exhibit E, Pineda depo., p. 71, lines 9-13.

38.  Pineda asked the officers about his car.  See Exhibit E, Pineda depo., p. 72, lines 3-6; p. 91, lines 3-14.

39.  At this time, Pineda claims that he was grabbed, thrown against a wall, handcuffed and taken to police vehicle.  See Exhibit E, Pineda depo., p. 72, lines 6-16.

40.  Pineda claims that people were pointing at him and saying "that's him."  See Exhibit E, Pineda depo., p. 72, lines 16-20.

41.   Pineda was walked to and placed in a Boston Police cruiser.  See Exhibit E, Pineda depo., p. 103, lines 7-11.  At this time, according to Pineda, his wife Alexandra Perez, was still in the apartment, his children were sleeping, and his father-in-law was in his bedroom.  See Exhibit E, Pineda depo., p. 105, lines 8-17.

42.   According to Perez, she was awakened by sounds outside - sirens and officers talking out loud.  She then saw lights but not police cars.  At this time, Perez noticed that their car was missing.  See Exhibit F, Perez depo., p. 52, lines 7-24; p. 53, lines 1-24.  Perez then woke up Pineda and told him that their car is missing.  See Exhibit F, Perez depo., p. 54, lines 9-13.

43.   From the living room, Perez heard footsteps coming up the stairs and then heard knocking on the door.  See Exhibit F, Perez depo., p. 54, lines 21-24; p. 55, line 1; p. 56, lines 13-22.

44.   Perez told Pineda that someone was knocking on the door and then Pineda went to open the door.  Perez followed Pineda and stood behind him.  See Exhibit F, Perez depo., p. 57, lines 3-11.

45.   According to Perez, Pineda opened the door and said that their car was missing.  The police asked it is "A white Honda Civic?"  Pineda replied "yes" and then the police grabbed him, pushed him against the wall and handcuffed him.  See Exhibit F, Perez depo., p. 57, lines 12-16; p. 64, lines 13-24; p. 65, lines 1-24.

8

46.   When Pineda was taken to the police station, Perez says that, while her kids were sleeping, officers entered her apartment and a "black African-American female cop" took her information and threatened her with the Department of Social Services.  See Exhibit F, Perez depo., p. 73, lines 10-12; p. 75, lines 12-14; p. 76, 11-14.

47.   Perez's father was saying "the boy, the boy," so Perez went into her son's room she found Norberto Serrano hiding behind a door.   The police were also there apprehending Serrano.   See Exhibit F, Perez depo., p. 83, lines 10-17; p. 85, lines 12-18; p. 86, lines 18-24; p. 87, lines 1-3.

48.   Serrano was then taken out in handcuffs.  See Exhibit F, Perez depo., p. 93, lines 21-24.  At this point, officers were looking for a gun.  See Exhibit F, Perez depo., p. 95, lines 20-24; p. 96, lines 1-3.

49.   Offices looked through drawers, closets, laundry, mattresses, the couch and toys.  See Exhibit F, Perez depo., p. 109, lines 3-8; p. 110, lines 1-4; p. 112, lines 5 and 15-17.

50.   The officers were present for approximately 2-3 hours.  See Exhibit F, Perez depo., p. 116, lines 16-18.   Two male Caucasian officers stayed in the apartment after the rest left and told Perez that they were to look after the apartment while they waited for a warrant.  See Exhibit F, Perez depo., p. 106, lines 8-15; p. 146, lines 17-24; p. 147, lines 1-21.

51.   Pineda claims that he was then put in a police wagon

and taken to a police station, where he was placed in a cell. See Exhibit E, Pineda depo., p. 73; lines 1-4.

52.    When Pineda was brought to the police station, he was dressed in a tank top shirt and boxer shorts.    See Exhibit E, Pineda depo., p. 15; lines 8-15.    See Exhibit F, Perez depo., p. 154, lines 1-6.

### III. Plaintiffs cannot identify officers who responded to their apartment

53.    Pineda cannot describe the officers who grabbed and placed him in handcuffs.    See Exhibit E, Pineda depo., p. 84; lines 14-17.    He does not even know the officers' color, race, ethnicity, hair color, gender or whether an officer had facial hair.    See Exhibit E, Pineda depo., p. 83; lines 6-23; p. 87, lined 1-18; p. 100, lines 18-24; p. 101, line 1.

54.    When Pineda opened the door, Perez does not recall what any of the officers at the door looked like.    See Exhibit F, Perez depo., p. 58, lines 11-15.

55.    Pineda does not know who took him out of the building. He does not know this individual's gender, height, race, ethnicity or whether there was more than one officer involved. See Exhibit E, Pineda depo., p. 102, lines 7-16.

56.    According to Pineda, there were officers other than from the Boston Police, who were involved, including the Boston Housing Police.    See Exhibit E, Pineda depo., p. 80; lines 18-24; p. 81, lines 1-20.

57.   After the incident, Perez found out that there were Boston Housing Police and State Police at her apartment.   See Exhibit F, Perez depo., p. 59, lines 2-9.  She remembers seeing a State Trooper in her apartment.  See Exhibit F, Perez depo., p. 79, lines 2 and 3.

58.   Pineda confirms that he was present for Sgt. Det. Keeler's deposition and that he had not seen him before.  Pineda did not recognize Keeler from the incident.   See Exhibit E, Pineda depo., p. 158, lines 6-21.  Likewise, Perez was at Sgt. Det. Keeler's deposition and had not seen him before, and she did not see him in her apartment or the night of the incident.  See Exhibit F, Perez depo., p. 189, lines 6-23.

## IV.   Pineda at area B-3 police station

59.   According to Pineda, once at the police station, he was placed in a cell, handcuffs were removed, brought into a room, given pants, finger-printed, and then taken home by Detective Harris, but not in a police car.  Pineda was not photographed. See Exhibit E, Pineda depo., p. 120, lines 12-14; p. 122, lines 16-24; p. 127, lines 18-24; p. 156, lines 20-21; p. 157, lines 9-18.

60.   When brought into a room with Detective Harris, Pineda does not recall much about what was said.  He remembers a murder and his car being mentioned.  See Exhibit E, Pineda depo., p. 122, lines 20-24; p. 123, lines 7-17; p. 124, lines 6-24; p. 125, lines 1-18.

**V.    Pineda returns to apartment**

61.    Detective Harris brought Pineda home, explained to him that everything had been cleared, and apologized. See Exhibit F, Perez depo., p. 152, lines 1-24; p. 153, lines 1-11.

62.    Harris and Pineda shook hands. See Exhibit F, Perez depo., p. 152, lines 1-24; p. 153, lines 1-11.

63.    Officers present at that time said that they were waiting for a warrant. See Exhibit E, Pineda depo., p. 130, lines 13-22; p. 139, lines 18-20.

**VI.    Norberto Serrano took Plaintiffs' white Honda without permission**

64.    Serrano entered Pineda's apartment while Pineda and Perez were sleeping and, without permission, took the Honda car keys from Pineda's pants, which were hanging in the closet. See Exhibit E, Pineda depo., p. 50, lines 6-22; p. 58, lines 5-12.

65.    Prior to this incident, Serrano had never used Pineda's car before. See Exhibit E, Pineda depo., p. 49, lines 16-19; p. 50, lines 5-9.

66.    Serrano later apologized to Pineda for taking his car without permission. See Exhibit E, Pineda depo., p. 50, lines 6-22; p. 51, lines 23-24. Serrano also apologized to Perez. See Exhibit F, Perez depo., p. 123, lines 21-24; p. 124, lines 1-12.

67.    Pineda was "really upset" and "mad" at Serrano, who was yelling and screaming "I'm sorry." See Exhibit E, Pineda depo.,

p. 53, lines 19-24; p. 54, lines 1-20; p. 55, lines 9-24. Nevertheless, after the incident, Pineda and Serrano remained friends. See Exhibit F, Perez depo., p. 125, lines 4-24; p. 126, lines 1-17.

## VII. Perez gave consent for search of apartment

68. At some point, Perez gave consent to let the officers search her apartment, "I told them, 'Go ahead. Do what you want. There's no guy here.'" Perez said this to a Spanish detective she cannot name. See Exhibit F, Perez depo., p. 148, lines 17-24; p. 149, lines 1-3.

## VIII. Defendant Sergeant Detective Daniel Keeler (Sgt. Det. Keeler)

69. Sgt. Det. Keeler was on duty and received a call for a shooting on April 28, 2003. Sgt. Keeler went to the scene and learned that two people had been shot. See Exhibit G, Keeler Depo., p. 5, lines 4-24.

70. Sgt. Det. Keeler then left the scene and went to the hospital. At the hospital, Keeler received a call regarding the shooting investigation and as a result, traveled to Shandon Road [Fermoy Heights]. See Exhibit G, Keeler Depo., p. 7, lines 1-20.

71. When Sgt. Det. Keeler arrived, there were a number of officers there. See Exhibit G, Keeler Depo., p. 8, lines 19-22.

72. Sgt. Det. Keeler had a brief conversation with the officers about the vehicle pursuit of the suspects and then left for Dorchester, where he conducted additional investigation. See

Exhibit G, Keeler Depo., p. 9, lines 1-12; p. 12, lines 1-8; p. 13, lines 1-13.

73. Sgt. Det Keeler was present at Shandon Road for approximately five or so minutes. See Exhibit G, Keeler Depo., p. 28, lines 1-6.

74. Sgt. Det. Keeler never entered Plaintiffs' apartment. See Exhibit G, Keeler Depo., p. 20, lines 4-7; p. 23, lines 12-14.

75. Sgt. Det. Keeler did not order Plaintiffs or anyone to be arrested at Shandon Road and did not order anyone to be taken from that area to a police station. See Exhibit G, Keeler Depo., p. 25, lines 21-24; p. 26, lines 1-4.

76. Sgt. Det. Keeler never took command of the Shandon Road scene. His sole direction was to Detective Harris to determine if there was any connection between the chase and the homicide. See Exhibit G, Keeler Depo., p. 27, lines 2-16; p. 58, lines 5-21.

77. At Sgt. Det. Keeler's deposition, Keeler did not recognize Plaintiffs Carlos Pineda or Alexandra Perez, who were both present during the deposition. See Exhibit G, Keeler Depo., p. 28, lines 10-24; p. 29, lines 1 and 2.

78. At Keeler's deposition, Plaintiff Carlos Pineda volunteered that he did not recognize Sgt. Det. Keeler. See Exhibit G, Keeler Depo., p. 28, lines 13-14.

79. Sgt. Det. Keeler did not see any individuals placed in

handcuffs or put into police cruisers.   See Exhibit G, Keeler
Depo., p. 34, lines 13-16.

## IX.   Defendant Detective Dennis Harris (Det. Harris)

80.   On April 28, 2003, Det. Harris, was on call and was
directed by Sgt. Det. Keeler to the Franklin Hill development
[location of Plaintiffs' apartment] to investigate a murder that
occurred at Berkeley and Albany Streets.   See Exhibit H, Harris
depo., p. 11, lines 11-24; p. 16, lines 2-24; p. 18, lines 18-23;
p. 19, lines 1-3.

81.   Upon arriving at the Franklin Hill development, Det.
Harris learned that two people had been taken from an apartment
and were taken to area B-3 to be interviewed.   See Exhibit H,
Harris depo., p. 20, lines 8-20.

82.   In order to get a better understanding of the
investigation, Det. Harris then went up to view Plaintiffs'
apartment.   He had been ordered by Sgt. Keeler to conduct the
interviews of the people removed to area B-3, to see if they if
they were connected to the homicide.   See Exhibit H, Harris
depo., p. 27, lines 14-19; p. 38, lines 23-24; p. 39, lines 1-20.

83.   In Plaintiffs' apartment, Det. Harris noticed police
officers, two small children and a woman.   Det. Harris does not
know whether the apartment had been searched by officers and did
not observe a search going on.   See Exhibit H, Harris depo., p.
21, lines 11-24; p. 23, lines 1-17.

84.   It appeared to Det. Harris that the apartment has been

"frozen." See Exhibit H, Harris depo., p. 24, lines 5-6.  He did
not freeze it.  See Exhibit H, Harris depo., p. 33, lines 18-23.

85.  Det. Harris does not know who was in charge when he
arrived.  See Exhibit H, Harris depo., p. 26, lines 15-18.  No
action was needed by Det. Harris at Plaintiffs' apartment.  See
Exhibit H, Harris depo., p. 31, lines 12-22.

86.  Pineda was already in custody at B-3 prior to Det.
Harris' arrival. Det. Harris did not personally determine whether
there was probable caused to detain him.  As a homicide
detective, it was Det. Harris' job to conduct the interviews.
See Exhibit H, Harris depo., p. 46, lines 10-24.

87.  At area B-3, Det. Harris first questioned Luis Cruz
a/k/a Norberto Serrano and then questioned Carlos Pineda.  See
Exhibit H, Harris depo., p. 54, lines 7-14.  Det. Harris did not
see Pineda until he was brought into the interrogation room.  See
Exhibit H, Harris depo., p. 57, lines 15-17.

88.  After questioning, Det. Harris determined that Pineda
was not involved in either the homicide or the motor vehicle
chase. See Exhibit H, Harris depo., p. 58, lines 9-11.  Pineda
was then given some additional clothes, because he was wearing
boxer shorts and a tank top shirt, and driven home.  See Exhibit
H, Harris depo., p. 59, lines 5-12.

89.  Pineda was not booked.  See Exhibit H, Harris depo., p.
91, lines 19-23.

**X.    Defendant Sergeant Joseph P. Toomey (Sgt. Toomey)**

90.    On the night of the incident, Sgt. Toomey responded to a radio call at Fermoy Heights because of a vehicle pursuit related to a homicide. See Exhibit I, Toomey depo., p. 14, lines 2-18.

91.    Sgt. Toomey and Sgt. Watts left the B-3 police station and drove together to the scene. See Exhibit I, Toomey depo., p. 14, lines 19-24; p. 15, lines 1-4.

92.    Sgt. Toomey and Sgt. Watts were the patrol supervisors of area B-3. See Exhibit I, Toomey depo., p. 42, lines 7-9.

93.    Patrol supervisors supervise the patrol officers patrolling on the street. See Exhibit I, Toomey depo., p. 13, lines 2-24.

94.    When they arrived at the scene, Plaintiffs' apartment, there was already a supervisor in control. Sgt. Toomey cannot remember who this supervisor was. See Exhibit I, Toomey depo., p. 17, lines 5-17; p. 18, lines 6-14. This supervisor was on the air earlier in the pursuit of the white Honda Civic. See Exhibit I, Toomey depo., p. 19, lines 3-13.

95.    There were many officers at Plaintiffs' apartment when Sgt. Toomey arrived, many from other districts. See Exhibit I, Toomey depo., p. 38, lines 23-24; p. 39, lines 1-10; p. 62, lines 2-3.

96.    Supervisors on the scene include, Sergeant Gus Frangie, Sergeant Haseeb Hosein, Sergeant Robert Sheets, Sgt. Watts and

17

Sgt. Toomey.  See Exhibit I, Toomey depo., p. 25, 4-10.

97.  Sgt. Watts and Sgt. Toomey were the sergeants from B-3.
See Exhibit I, Toomey depo., p. 28, lines 17-18.

98.  Sgt. Toomey did not see Pineda and does not know if he
was arrested.  See Exhibit I, Toomey depo., p. 35, lines 19-24;
p. 36, lines 1-4.  Sgt. Toomey has no knowledge of Pineda being
in handcuffs.  See Exhibit I, Toomey depo., p. 37, lines 10-15.
See also Exhibit I, Toomey depo., p. 46, lines 10-13.

99.  Officer Gallagher wrote the police report because he
started the pursuit of the white Honda Civic.  Accordingly, Sgt.
Toomey did not write a report.  See Exhibit I, Toomey depo., p.
29, lines 6-22; p. 43, lines 9-19.

100. While in Plaintiffs' apartment, Sgt. Toomey heard a
supervisor say that the apartment is going to be frozen, so, Sgt.
Toomey ordered the officers out of the apartment.  See Exhibit I,
Toomey depo., p. 63, lines 4-21.

101. At this time, Sgt. Toomey spoke to Sgt. Frangie and
Sgt. Sheets at the door.  He asked if they needed assistance and
indicated that they needed help clearing the scene.  See Exhibit
I, Toomey depo., p. 63, lines 22-24; p. 64, lines 1-14.

102. After, Sgt. Toomey left the building he instructed
officers to get into their cruisers to free the streets up.  See
Exhibit I, Toomey depo., p. 64, lines 18-24.

103. At the scene, Sgt. Toomey did not see anyone under
arrest or in handcuffs.  Sgt. Toomey heard a broadcast that

prisoners were to be bought to area B-3.    See Exhibit I, Toomey depo., p. 64, line 24; p. 65, lines 1-12.

104. Sgt. Toomey does not know if a protective sweep or a search of the apartment was done prior to his arrival but he did not observe either while he was at Plaintiffs' apartment.    See Exhibit I, Toomey depo., pp. 66-69.

105. At most, Sgt. Toomey was in Plaintiffs' apartment for approximately five minutes.    See Exhibit I, Toomey depo., p. 71, lines 9-15.

106. While at Plaintiffs' apartment, other than officers, Sgt. Toomey only saw a Spanish woman and an older Spanish man. See Exhibit I, Toomey depo., p. 65, lines 16-20.

107. Sgt. Toomey did not see Det. Harris or Sgt. Det. Keeler during the evening.    See Exhibit I, Toomey depo., p. 61, lines 15-20.

## XI.  Sergeant Joseph R. Watts (Sgt. Watts)

108. On the night of this incident, Sgt. Watts was working as a patrol supervisor in area B-3, Mattapan.    See Exhibit J, Watts depo., p. 8, lines 13-15; p. 9, lines 2-7.

109. Due to a call about a car chase of a murder suspect, Sergeants Watts and Toomey got into a marked cruiser and headed toward the chase.    See Exhibit J, Watts depo., p. 11, lines 8-24; p. 12; lines 1-20; p. 14, lines 1-4.

110. Sergeants Watts and Toomey picked up the chase and got in back of all the other police in pursuit.  They were the last

car, where they remained until the white Honda stopped at Fermoy heights. See Exhibit J, Watts depo., p. 14, lines 5-24; p. 15, lines 1-13.

111. When they arrived, Sgt. Toomey saw a lot of police officers he did not know running into 11 Fermoy Heights. See Exhibit J, Watts depo., p. 15, lines 20-24; p. 16, lines 1-4.

112. Sgt. Watts then went into Fermoy Heights but he did not see any suspects run inside. See Exhibit J, Watts depo., p. 16, lines 19-21; p. 18, lines 7-10.

113. After entering the building, Sgt. Watts eventually went into Plaintiffs' apartment. See Exhibit J, Watts depo., p. 18, lines 16-19.

114. When Sgt. Watts arrived at the apartment there were numerous police officers and supervisors already there. See Exhibit J, Watts depo., p. 19, lines 1-5; p. 59, lines 5-7.

115. Sgt. Watts did not see anyone at the apartment door and did not see anyone in the hallway, other than police officers. See Exhibit J, Watts depo., p. 20, lines 11-16.

116. Sgt. Watts did not see anyone who had been arrested and did not ever see anyone arrested in Plaintiffs' apartment. See Exhibit J, Watts depo., p. 21, lines 18-24; p. 24, lines 19-21.

117. Sgt. Watts was only in Plaintiffs' apartment for a matter of minutes. See Exhibit J, Watts depo., p. 22, lines 4-6.

118. He then resumed patrol. See Exhibit J, Watts depo., p. 62, lines 20-22.

119. When Sgt. Watts left Plaintiffs' apartment there were still officers present. <u>See</u> <u>Exhibit J</u>, Watts depo., p. 22, lines 18-21.

120. Sgt. Watts remembers a protective sweep, looking in rooms, but did not see a search while at the apartment. <u>See</u> <u>Exhibit J</u>, Watts depo., p. 28, lines 17-22; p. 29, lines 2-4; p. 30, lines 5-8.

121. Sgt. Watts did not give any orders regarding Plaintiffs' apartment and officers did not ask him questions about what to do. <u>See</u> <u>Exhibit J</u>, Watts depo., p. 31, lines 16-24; p. 32, lines 1-4.

122. Sgt. Watts may have called in a freeze of the apartment. <u>See</u> <u>Exhibit J</u>, Watts depo., p. 40, p. 19-24; p. 41, line 2.

123. Only months after the incident did Sgt. Watts learn that anyone was handcuffed and taken out of Plaintiffs' apartment. <u>See</u> <u>Exhibit J</u>, Watts depo., p. 54, lines 6-11.

Respectfully submitted,
DEFENDANTS, JOSEPH P. TOOMEY,
and JOSPEH WATTS,DANIEL KEELER,
AND DENNIS HARRIS

William F. Sinnott
Corporation Counsel

By their attorneys:

/s/ Helen G. Litsas
Helen G. Litsas, BBO# 644848
Special   Assistant   Corporation
Counsel
Law Office Of Helen G. Litsas
38 Main Street
Saugus, MA 01906
(781) 231-8090

Thomas Donohue, BBO# 643483
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the
ECF system and served on all parties on on June 18, 2007.

/s/ Thomas Donohue
Thomas Donohue