UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05CV10216-JLT

CARLOS PINEDA, ET AL.
    Plaintiffs

v.

DANIEL KEELER, ET AL.
    Defendants

## DEFENDANTS DANIEL KEELER'S AND DENNIS HARRIS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]

## I.   INTRODUCTION

Defendants Daniel Keeler ("Sgt. Det. Keeler") and Dennis Harris ("Det. Harris") should be granted summary judgment because, as a matter of law, discovery produced no facts to support actionable claims against them. In his complaint, Plaintiff Carlos Pineda ("Pineda") alleges "defendant police officers and in particular defendant Officers Daniel Keeler and Dennis Harris arrested and detained him without probable cause in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution." Pineda further claims that excessive force was used during his arrest. Finally, both Pineda and Alexandra Perez ("Perez") allege that defendants conducted an unreasonable search of their apartment. See Exhibit B, Plaintiff's Complaint, Docket, paper no. 1. Sergeants Keeler and Harris move for summary judgment on all counts because (1)

Plaintiffs fail to satisfy the requisite elements of their claims; and because (2) qualified immunity applies.

## II.    ARGUMENT

### A.    Sergeants KEELER and HARRIS Are Entitled To Summary Judgment Because No Genuine Issue Of Material Fact Exists with respect to plaintiff' claims.

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may, at any time, move for a summary judgment in the party's favor. If the Defendant's "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," the Defendant is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>see also</u> <u>Pure Distrib., Inc. v. Baker</u>, 285 F.3d 150 (1st Cir. 2002).

Summary judgment is appropriate when Plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof. <u>See</u> <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 805-06 (1999).

### B. Because SERGEANTS keeler AND harris Did Not Conduct, Order Or In Any Way Participate in Pineda's Arrest, they are entitled to summary judgment on Pineda's Unlawful Arrest AND EXCESSIVE FORCE Claims.

Sergeants Keeler and Harris did not violate Pineda's Fourth

---

[1] Defendants Keeler and Harris hereby incorporate Defendants Daniel Keeler, Dennis Harris, Joseph R. Watts And Joseph P. Toomey's Local Rule 56.1 Statement Of Facts And Supporting Documentation.

[2] Plaintiffs' complaint contains three counts against Sergeants Keeler and Harris: (1) Count I: Violation of 42 U.S.C. § 1983 by Individual Defendants; (2) Count II: Violation of 42 U.S.C. § 1983 by supervisors Watts and Toomey; and (3) Count III: Violation of M.G.L. c. 12, §11I by Individual Defendants.

Amendment right to be free from an unreasonable seizure because neither officer was involved in Pineda's seizure. See Anderson v. Creighton, 483 U.S. 635, 643 (1987). Similarly, neither officer violated Pineda's Fourth Amendment's protection against excessive force. See Jarrett v. Town of Yarmouth, 309 F.3d 54, 61 (1st Cir. 2002) (citing U.S. Const. amend. IV and the right to protection against "unreasonable seizures").

### 1. Sergeant Keeler Did Not Conduct, Order Or In Any Way Participate In Pineda's Arrest.

In order for Sergeant Keeler to have arrested Pineda in violation of his Constitutional rights, he must have been the person to have conducted Pineda's seizure. Cf. Landrigan v. City of Warwick, 628 F.2d 736, 743 (1st Cir. 1980). It is undisputed on the summary judgment record, however, that Sgt. Keeler had no involvement in Pineda's arrest. In fact, Plaintiffs Pineda and Perez cannot identify Keeler as Pineda's arresting officer nor did they even identify or recognize him as an officer participating in the events of that evening. At Keeler's deposition, Plaintiff Pineda volunteered that he did not recognize Sgt. Det. Keeler. See Exhibit G, Keeler Depo., p. 28, lines 13-14. Additionally, at Pineda's deposition, Pineda confirms that he was present for Sgt. Det. Keeler's deposition and that he had not seen him before. Pineda did not recognize Keeler from the incident. See Exhibit E, Pineda depo., p. 158, lines 6-21. Likewise, Perez was at Sgt. Det. Keeler's deposition

and had not seen him before, and acknowledges that she did not see him in her apartment or at any point during the night of the incident.  See Exhibit F, Perez depo., p. 189, lines 6-23.

Sgt. Keeler's role at the scene was extremely limited and short-lived.  When Sgt. Det. Keeler arrived at the Plaintiffs' apartment, there were a number of officers already present.  See Exhibit G, Keeler Depo., p. 8, lines 19-22. Sgt. Det. Keeler had a brief conversation with the officers about the vehicle pursuit of the suspects and then left for Dorchester, where he investigated another aspect of the case.  See Exhibit G, Keeler Depo., p. 9, lines 1-12; p. 12, lines 1-8; p. 13, lines 1-13. Sgt. Det Keeler was present on the same street as Plaintiffs' apartment for approximately five or so minutes.  See Exhibit G, Keeler Depo., p. 28, lines 1-6.  At no point during those five minutes did Sgt. Det. Keeler ever enter Plaintiffs' apartment. See Exhibit G, Keeler Depo., p. 20, lines 4-7; p. 23, lines 12-14.

Moreover, Sgt. Det. Keeler did not order Plaintiffs or anyone to be arrested nor did he order anyone to be taken from that area to a police station.  See Exhibit G, Keeler Depo., p. 25, lines 21-24; p. 26, lines 1-4. Additionally, Sgt. Det. Keeler never took command of the Shandon Road scene.  His sole direction was to Detective Harris to determine if there was any connection between the vehicle pursuit and the homicide.  See Exhibit G, Keeler Depo., p. 27, lines 2-16; p. 58, lines 5-21. Furthermore,

Sgt. Det. Keeler did not see any individuals placed in handcuffs or put into police cruisers. See Exhibit G, Keeler Depo., p. 34, lines 13-16.

The uncontroverted summary judgment record establishes that Sgt. Det. Keeler did not seize Pineda nor did he conduct, order, or in any way participate in Pineda's arrest. Moreover, Pineda himself fails to even identify Sergeant Keeler as his arresting officer. Accordingly, Plaintiff cannot prevail on his claims against Sgt. Det. Keeler.

## 2. Sergeant Harris Did Not Conduct, Order Or In Any Way Participate In Pineda's Arrest.

The summary judgment record establishes that Sgt. Harris also did not conduct, order or otherwise participate in Pineda's arrest. Strikingly, Plaintiffs fail to identify Sgt. Harris as the arresting officer as Pineda cannot describe the officers who grabbed and placed him in handcuffs. See Exhibit E, Pineda depo., p. 84; lines 14-17. He does not even know the officers' color, race, ethnicity, hair color, gender or whether an officer had facial hair. See Exhibit E, Pineda depo., p. 83; lines 6-23; p. 87, lined 1-18; p. 100, lines 18-24; p. 101, line 1.

Harris' limited interaction with Pineda on the evening of the incident occurred only after Pineda had been arrested. On April 28, 2003, Det. Harris, a detective in the homicide unit, received a telephone call from Sgt. Det. Keeler directing him to the Franklin Hill development [location of Plaintiffs' apartment]

to investigate a murder that had occurred at Berkeley and Albany Streets.  See Exhibit H, Harris depo., p. 11, lines 11-24; p. 16, lines 2-24; p. 18, lines 18-23; p. 19, lines 1-3. Upon arriving at that location, Det. Harris learned that two people had been taken from an apartment and were taken to area B-3 to be interviewed.  See Exhibit H, Harris depo., p. 20, lines 8-20.

Before leaving for the interview, Det. Harris visited Plaintiffs' apartment and noticed police officers, two small children and a woman inside. Det. Harris does not know whether the apartment had been searched by officers and did not observe a search going on.  See Exhibit H, Harris depo., p. 21, lines 11-24; p. 23, lines 1-17.  While it appeared to Det. Harris that the apartment has been "frozen," see Exhibit H, Harris depo., p. 24, lines 5-6,  he did not freeze it.  See Exhibit H, Harris depo., p. 33, lines 18-23. Det. Harris does not know who was in charge when he arrived.  See Exhibit H, Harris depo., p. 26, lines 15-18.  Moreover, no action was needed by Det. Harris at Plaintiffs' apartment.  See Exhibit H, Harris depo., p. 31, lines 12-22.

Pineda was already in custody at B-3 prior to Det. Harris' arrival. Det. Harris did not personally determine whether there was probable caused to detain him.  As a homicide detective, it was Det. Harris' job to simply conduct the interviews of the suspects.  See Exhibit H, Harris depo., p. 46, lines 10-24.

Under these circumstances, Sergeant Harris did not commit any constitutional violation and is therefore entitled to summary

judgment.

## C.  NO CONSTITUTIONAL VIOLATION OCCURRED BECAUSE PROBABLE CAUSE SUPPORTED PINEDA'S ARREST.

In addition to Plaintiffs' failure to establish Sergeant Keeler and Harris' involvement in Pineda's arrest, Plaintiffs' Fourth Amendment claim cannot prevail because the summary judgment record establishes that probable cause supported Pineda's arrest. In order to establish a Fourth Amendment violation, Pineda's seizure would have to be without probable cause. See Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992). Pineda, however, cannot satisfy this requirement. "Probable cause is a relatively low threshold, defined 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [and that] were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" White v. Marblehead, 989 F. Supp. 345, 348 (D. Mass.1997) (quoting Rivera, 979 F.2d at 263.). An arrest is "deemed objectively reasonable unless there clearly was no probable cause at the time the arrest was made" when an arrest is challenged on the basis of lack of probable cause, Sheehy v. Town of Plymouth, 191 F.3d 15, 19 (1st Cir. 1999).

Here, not only was Pineda's arrest objectively reasonable, but there was also ample probable cause for Pineda's arrest. The summary judgment record establishes that there was reasonably

trustworthy information to believe that Pineda was involved in the homicides that evening. On the night of Pineda's arrest, multiple officers had pursued Pineda's fleeing white Honda believing it to be involved in the homicides. See Exhibit X, Fay Depo., p. 9, lines 4-24; p. 10, lines 1-17; p. 10, lines 18-24; p. 11, lines 1-24; p. 12, lines 1-24. After quickly exiting Pineda's white Honda, two of these murder suspects fled and at least one ran into Plaintiffs' apartment. See Exhibit X, Fay Depo., p. 12, lines 17-24; p. 15, lines 2-24; p. 16, lines 1 and 2; p. 17, lines 7-24; p. 18, lines 1-5. When the suspect was found hiding in Pineda's apartment, he, like Pineda, was dressed in boxer shorts and a tee shirt. See Exhibit X, Fay Depo., p. 17, lines 7-24; p. 18, lines 1-5; p. 21, lines 1-5; p. 34, lines 11-16. Moreover, when Pineda opened the door for the officers, he immediately inquired about his white Honda. See Exhibit X, Pineda depo., p. 71; lines 9-20; p. 72; lines 3-6; p. 91, lines 3-14; p. 75, lines 1-23.

Additionally, Perez even acknowledges that when Pineda opened the door and stated that their car was missing, the police asked is it, "A white Honda Civic?" Pineda then replied affirmatively: "Yes." See Exhibit X, Perez depo., p. 57, lines 12-16; p. 64, lines 13-24; p. 65, lines 1-24.

Given this totality of circumstances, probable cause existed for officers to believe not only that Pineda had occupied the white Honda that had fled police, but also that Pineda had been

involved in the homicides of that evening.  Accordingly, Pineda's arrest was lawful, thereby warranting summary judgment in favor of Sergeants Watts and Toomey.

### D.  SERGEANTS KEELER AND HARRIS ARE ALSO ENTITLED TO QUALIFIED IMMUNITY.

The First Circuit has explained that qualified immunity "protects public officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether a public official has violated a clearly established right, a court asks "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).

Sergeants Keeler and Harris are entitled to qualified immunity.  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341.  The law provides immunity for reasonable errors because "officials should not err always on the

side of caution" out of a fear of civil suit.    See Davis v. Scherer, 468 U.S. 183, 196 (1984).

Here, no evidence exists establishing that either sergeant's actions rose to the level of gross incompetence or to a deliberate, knowing violation of the law.    As discussed supra, neither detective participated in Pineda's arrest, and in any event, probable cause reasonably supported Pineda's arrest. The First Circuit has made clear that as long as probable cause reasonably exists on the facts, qualified immunity must not be denied. See Sheehy v. Town of Plymouth, 191 F.3d 15, 19 (1st Cir. 1999) (omitting citations); see also Vargas-Badillo v. Diaz-Torres, 114 F.3d 3, 7 (D. Puerto Rico 1997) (granting qualified immunity in case where evidence for arrest was "not very strong").

Qualified immunity is also appropriate here because nothing in the record exists to support any contention that either Sergeant Detective Keeler, Sergeant Harris, or a reasonable officer could have known that at the time of Plaintiff's arrest that said arrest was unlawful, especially since neither Keeler nor Harris participated in the arrest and neither was aware that Pineda had been arrested until after it had occurred. See supra. Moreover, "[t]his type of discretionary judgment call [making an arrest], made routinely by peace officers, must be protected from the chilling effect of personal liability." Vargas-Badillo v. Diaz-Torres, 114 F.3d 3, 7 (D. Puerto Rico 1997).    Overall,

nothing in the summary judgment record supports a conclusion that would take Sergeant Keeler or Harris out of their entitlement to qualified immunity.

### E.   SERGEANTS KEELER AND HARRIS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNREASONABLE SEARCH CLAIM.

Plaintiffs' unreasonable search claim fails for several reasons. As discussed supra, Sergeants Keeler and Harris served either no role or a limited one at Plaintiffs' apartment. Moreover, they did not participate in any search or protective sweep and therefore committed no constitutional violation. See

Exhibit G, Keeler Depo., p. 20, lines 4-7; p. 23, lines 12-14;. p. 27, lines 2-16; p. 58, lines 5-21; Exhibit H, Harris depo., p. 21, lines 11-24; p. 23, lines 1-17; p. 24, lines 5-6; p. 33, lines 18-23.

Additionally, the summary judgment record establishes that Plaintiff Perez voluntarily consented to the police search of Plaintiffs' apartment. Furthermore, the "hot pursuit" and exigent circumstances doctrines permitted officers to conduct the warrantless search of Plaintiffs' apartment.

### 1. Perez Gave Consent To Search The Apartment.

Plaintiff's Fourth Amendment rights were not violated because Perez gave voluntary consent to search their apartment. See United States v. Patrone, 948 F.2d 813, 815 (1st Cir. 1991). Consent is voluntary when it is given knowingly and intelligently

and without coercion.  United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000).  Perez voluntarily gave consent to let the officers search their apartment, as she admitted at her deposition: "I told them, 'Go ahead.  Do what you want.  There's no gun here.'"  See Exhibit X, Perez depo., p. 148, lines 17-24; p. 149, lines 1-3.  Such knowing and voluntary consent by Perez does not give rise to any constitutional violation.

### 2. Additionally, No Warrant Was Even Necessary To Search Plaintiffs' Apartment Because Both Probable Cause And Exigent Circumstances Existed.

The Fourth Amendment was not violated because there was probable cause to believe a crime had been committed and exigent circumstances existed involving fleeing, armed murder suspects. See United States v. Wilson, 36 F.3d 205, 208 (1st Cir. 1994). The First Circuit has held that exigent circumstances include either hot pursuit of a felon or the threat of danger to the public or police. United States v. Wihbey, 75 F.3d 761, 766 (1st Cir.1996).  Both circumstances are present here.

When an officer is in hot pursuit of a fleeing felon, the officer may enter a private home without first obtaining a warrant in order to arrest that felon. United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993).  Here, it is undisputed that officers were in hot pursuit of three murder suspects fleeing in Pineda's white Honda when they entered Pineda's apartment.  After a lengthy chase, two of the three suspects fled the white Honda by foot and ran into Plaintiffs' building, and one entered

Plaintiffs' apartment and hid in a closet. See Exhibit X, Fay Depo., p. 9, lines 4-24; p. 10, lines 1-24; p. 11, lines 1-24; p. 12, lines 1-24; p. 15, lines 2-24; p. 16, lines 1 and 2; p. 17, lines 7-24; p. 18, lines 1-5. Accordingly, a "hot pursuit" existed and permitted the warrantless search.

Additionally, there was no constitutional violation because officers reasonably believed that a delay to obtain a warrant could result in harm to the public or police. Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1 Cir. 1999); see also United States v. Weems, 322 F.3d 18, 21 (1st Cir. 2003) (information that defendant was armed and violent constituted exigent circumstances sufficient to permit warrantless entry) Here, officers had every reason to believe any delay to obtain a warrant could result in harm to the public or police. They had just witnessed a multiple shooting murder suspect flee and enter Plaintiffs' apartment. See Exhibit X, Fay Depo., p. 9, lines 4-24; p. 10, lines 1-24; p. 11, lines 1-24; p. 12, lines 1-24; p. 15, lines 2-24; p. 16, lines 1 and 2; p. 17, lines 7-24; p. 18, lines 1-5. Accordingly, such search was constitutionally proper.

### 3. The Summary Judgment Record Also Establishes That The Scope Of The Search/Protective Sweep Was Proper.

Since officers lawfully entered Plaintiffs' apartment, they were entitled to a protective sweep for persons and weapons. Officers are entitled to a protective sweep of a dwelling so long as there is a reasonable suspicion that there may be individuals

in that dwelling that may pose a danger to police or others. Maryland v. Buie, 494 U.S. 325, 327 (1990); United States v. Martins, 413 F.3d 139 (1st Cir. 2005). The scope of the protective sweep extends to any place where a person may be found and lasts as long as reasonably necessary to dispel the danger. See id. Also, the scope of a protective sweep may extend to anywhere a weapon may be hidden if police are not certain that all dangerous individuals have been removed from the house. United States v. Paradis, 351 F.3d 21, 29 (1st Cir. 2003).

Here, officers believed that an armed and fleeing murder suspect had entered Plaintiffs' apartment. As Perez acknowledges, officers were looking for a gun. See Exhibit X, Perez depo., p. 95, lines 20-24; p. 96, lines 1-3. To that end, officers looked through drawers, closets, laundry, mattresses, the couch and a group of toys. See Exhibit X, Perez depo., p. 109, lines 3-8; p. 110, lines 1-4; p. 112, line 5 and 15-17. Officers also located and secured the two individuals they believed to have fled police and whom they suspected committed the homicide, and thereafter, only two male officers stayed in the apartment to wait for a search warrant. See Exhibit X, Perez depo., p. 146, lines 17-24; p. 147, lines 1-21.

Given these circumstances, the search and/or protective sweep was lawful.

### F.   Count III Of Plaintiffs' Complaint Also Fails.

Count III of Plaintiff's complaint alleges violations of the

Massachusetts Civil Rights Act ("MCRA") against Sergeants Toomey and Watts.  The MCRA and §1983 are parallel statutes, coextensive with each other.  <u>See</u> <u>Batchelder v. Allied Stores Corp.</u>, 393 Mass. 819, 822-23 (1985); <u>Canney v. Chelsea</u>, 925 F. Supp. 58, 68 (1st Cir. 1996). As detailed above, Sergeants Toomey and Watts did not violate Plaintiff's constitutional rights. Because Plaintiffs cannot succeed in their allegations under §1983, their MCRA claim must also fail as a matter of law.  Moreover, there is nothing in the record to support any constitutional violation by means of threats, intimidation or coercion. <u>See</u> M.G.L. c. 12, §11I.

## III. <u>CONCLUSION</u>

Based on the foregoing reasons, Sergeants Keeler and Harris request that summary judgment enter in their favor on all counts of Plaintiffs' complaint with prejudice.

**DEFENDANTS REQUEST ORAL ARGUMENT FOR THIS MOTION**

Respectfully submitted,

DEFENDANTS, DANIEL KEELER, and
DENNIS HARRIS,

William F. Sinnott
Corporation Counsel

By their attorneys:

/s/ Helen G. Litsas
Helen G. Litsas, BBO# 644848
Special   Assistant   Corporation
Counsel
Law Office Of Helen G. Litsas
38 Main Street
Saugus, MA 01906
(781) 231-8090

Thomas Donohue, BBO# 643483
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA  02201
(617) 635-4039

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the
ECF system and will therefore be sent electronically to the
registered participants as identified on the Notice of Electric
Filing (NEF) and paper copies will be sent to those indicated as
non-registered participants on June 18, 2007.

/s/ Thomas Donohue
Thomas Donohue

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05CV10216-JLT

CARLOS PINEDA, ET AL.
     Plaintiffs

v.

DANIEL KEELER, ET AL.
     Defendants

## AFFIDAVIT OF ATTORNEY THOMAS R. DONOHUE

I, Thomas R. Donohue, hereby state and depose as follows:

1.   I am counsel of record for the Defendants in the above-captioned matter, and make this affidavit on personal knowledge in support of the Defendants' Motion for Summary Judgment.

2.   I hereby certify that the exhibits attached to Defendants' Local Rule 56.1 Statement of Facts and Supporting Documentation are true and accurate copies.

Signed under the pains and penalties of perjury this 14th day of June 2007.

/s/ Thomas R. Donohue
Thomas R. Donohue

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CARLOS PINEDA and ALEXANDRA PEREZ, )
    Plaintiffs,              ) C.A. No._____
                                 )
v.                            )

DANIEL KEELER, DENNIS HARRIS, JOSEPH R. )
WATTS, JOSEPH P. TOOMEY, WILLIAM J. )
GALLAGHER, EDWARD GATELY, JANINE )
BUSBY, and the CITY OF BOSTON, )
    Defendants            )

**COMPLAINT**

1. This is an action for money damages for the violation of the plaintiffs' constitutional rights brought pursuant to 42 U.S.C. §1983 and M.G.L. c.12, §11I. Plaintiff Carlos Pineda alleges that defendant police officers and in particular defendant Officers Daniel Keeler and Dennis Harris, arrested and detained him without probable cause in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution. The plaintiff further alleges that the defendant police officers used excessive force against him during their arrest. Defendants also conducted an unreasonable search of the plaintiffs' apartment.

The City of Boston is liable to the plaintiff for failing to supervise and train its subordinate police officers on the appropriate and legal procedures of seizing, arresting and detaining suspects and the use of force. It has tolerated a custom and practice in which individuals are detained, seized, and/or arrested without probable cause. In addition, the City of Boston has a custom of not punishing officers who violate the constitutional rights of citizens. Its Internal Affairs Division has a long history of inaction and of covering up misconduct by officers. Thus, officers feel that they can violate the rights of citizens with impunity.

1

## JURISDICTION

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§1331 and 1343 and pendant jurisdiction of state claims.

## PARTIES

3. Plaintiff Carlos Pineda is a resident of Boston and the Commonwealth of Massachusetts.

4. Plaintiff Alexandra Perez is a resident of Boston and the Commonwealth of Massachusetts.

5. Defendant Daniel Keeler was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in his individual capacity.

6. Defendant Dennis Harris was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in his individual capacity.

7. Defendant Joseph R. Watts was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in his individual capacity.

8. Defendant Joseph Toomey was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in his individual capacity.

9. Defendant William Gallagher was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in his individual capacity.

10. Defendant Edward Gately was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in his individual capacity.

11. Defendant Janine Busby was a duly appointed police officer employed by the City of Boston at all times relevant to the complaint and is sued in her individual capacity.

2

12. Defendant City of Boston is a municipality duly authorized under the law of the Commonwealth of Massachusetts.

## FACTS

13. In April 28, 2003, a person was shot at a Mobil gas station in Boston.

14. The police believed that the shooter was in a white Honda.

15. The police followed a white Honda, but the wrong one.

16. The Honda stopped at 11 Fenway Heights in Boston

17. The police traced the driver to apartment #81, where the Plaintiffs lived.

18. Plaintiff Pineda answered the police knock at his door where he was greeted by several police officers with guns drawn.

19. Plaintiff Pineda noticed that his car was not where he had parked it and asked the police if they had seen it.

20. The defendants responded by accusing Plaintiff Pineda of driving the "white Honda". They grabbed him.

21. They slammed him against a wall twice.

22. The defendants removed the driver of the white Honda from the apartment after arresting him in front of a small child. He had borrowed Plaintiff Pineda's car without his permission.

23. Plaintiff Alexandra Perez attempted to get her children, but a white male officer and a black female officer would not let her protect her children. Instead, they held her in the kitchen. Defendant Busby asked if she had a record. She replied that she "had a good one." Defendant Busby then said, "not for long" and threatened to call DSS.

3

24. The defendants, with guns drawn, searched the apartment. They flipped over mattresses, threw clothes on the floor, opened bureau drawers, dumped trash on the floor, searched under beds, and removed boxes from closets, all without obtaining a warrant.

25. The defendants started the search before asking for permission to search.

26. Finally, the defendants handcuffed and led Plaintiff Pineda out of the apartment in his underwear in front of the news cameras.

27. Television news reports showing Plaintiff Pineda under arrest and in handcuffs were continuously shown on all of the major channels over a two-day period.

28. Plaintiff Pineda was put in a cell at the police station.

29. After a few hours, Plaintiff Pineda was released without charges.

## FIRST COUNT
## VIOLATION OF 42 U.S.C. § 1983 BY INDIVIDUAL DEFENDANTS

30. The Plaintiffs restate and reallege the allegations in paragraphs 1 through 29 and incorporates said paragraphs herein as paragraph 30.

31. By the actions described in paragraphs 1 through 30, the individual defendants deprived Plaintiffs of the following rights in violation of 42 U.S.C. §1983 and of their Fourth and Fourteenth Amendment Rights as guaranteed by the United States Constitution:

    a.    Freedom from an unreasonable seizure of Plaintiff Pineda's person.

    b.    Freedom from the use of excessive and unreasonable force on Plaintiff Pineda.

    c.    Freedom from arrest without probable cause of Plaintiff Pineda;

    d.    Freedom from unreasonable searches of the apartment of Plaintiff Pineda and Perez.

4

## SECOND COUNT
## VIOLATION OF 42 U.S.C. §1983 BY DEFENDANTS WATTS AND TOOMEY.

32. The plaintiff restates and realleges paragraphs 1 through 31 and incorporates said paragraphs herein as paragraph 32.

33. Defendants Watts and Toomey were supervisors on the night in question at the scene of the incidents.

34. These defendants were deliberately indifferent to the rights of the Plaintiffs by failing to adequately supervise the individual defendants who they knew or should have known were engaging in violations of the Plaintiffs' constitutional rights. Their conduct demonstrated tacit approval of the individual unconstitutional practices. Complaints against these officers were sustained by the Boston Police Department after an Internal Affairs investigation.

## THIRD COUNT
## VIOLATION OF 42 U.S.C. §1983 BY DEFENDANT CITY OF BOSTON

35. The plaintiff restates and realleges paragraphs 1 through 34 and incorporates said paragraphs herein as paragraph 35.

36. The defendant City of Boston has a custom and policy of deliberate indifference to the rights of its citizens:

a. By failing to adequately train their police officers on the proper use of force and arrest procedures.

b. By failing to adequately train, supervise, and discipline officers who are prone to using excessive force.

c. By failing to have an internal affairs procedure that is effective.

5

### FOURTH COUNT
## VIOLATION OF M.G.L. c. 12, §11I BY INDIVIDUAL DEFENDANTS.

37. The plaintiffs restate and reallege paragraphs 1 through 36 and

incorporates said paragraphs herein as paragraph 37.

38. By the actions described in paragraphs 1 though 37, the individual defendants

violated the Plaintiffs' civil rights provided for in M.G.L. c.12, §11I by threats, intimidation, and

coercion.

WHEREFORE, the plaintiff requests this Court to:

1. Award compensatory damages against the defendants jointly and severally;

2. Award punitive damages against the individual defendant police officers of the City of

Boston;

3. Award costs of this action, including reasonable attorneys' fees, to the plaintiffs;

4. Award any such other relief as this Court may deem necessary and appropriate.

A jury trial is hereby demanded.

> Respectfully submitted,
> The Plaintiffs Carlos Pineda
> and Alexandra Perez,
> By their attorneys,
>
> Stephen Hrones (BBO No. 242860)
> Jessica D Hedges (BBO No. 645847)
> HRONES GARRITY & HEDGES LLP
> Lewis Wharf–Bay 232
> Boston, MA 02110-3927
> T)617/227-4019

Dated: February _____, 2005

# Exhibit C

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CARLOS PINEDA and            \*

ALEXANDRA PEREZ,             \*

      Plaintiffs,        \*

Vs.                          \* C.A. No. 05-10216JLT

DANIEL KEELER, DENNIS        \*

HARRIS, JOSEPH R. WATTS,     \*

JOSEPH P. TOOMEY, WILLIAM \*

J. GALLAGHER, EDWARD         \*

GATELY, JANINE BUSBY,        \*

and the CITY OF BOSTON,      \*

      Defendants.        \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF:  WILLIAM J. GALLAGHER


HRONES, GARRITY & HEDGES

Lewis Wharf Bay, Suite 232

Boston, Massachusetts

June 8, 2007                 12:08 p.m.


Dawn L. Halcisak

Certified Shorthand Reporter

# WILLIAM J. GALLAGHER
## June 8, 2007

2  (Pages 2 to 5)

<table>
<tr><td colspan="2">Page 2</td></tr>
<tr><td>1</td><td>APPEARANCES:</td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td>Representing the Plaintiff:</td></tr>
<tr><td>4</td><td>LAW OFFICES OF HRONES, GARRITY & HEDGES</td></tr>
<tr><td>5</td><td>Lewis Wharf Bay, Suite 232</td></tr>
<tr><td>6</td><td>Boston, MA  02110</td></tr>
<tr><td>7</td><td>(617) 227-4019   FAX: (None provided)</td></tr>
<tr><td>8</td><td>BY: STEPHEN HRONES, ESQUIRE</td></tr>
<tr><td>9</td><td>E-mail: (None provided)</td></tr>
<tr><td>10</td><td></td></tr>
<tr><td>11</td><td>Representing the Defendant:</td></tr>
<tr><td>12</td><td>LAW OFFICES OF CITY OF BOSTON</td></tr>
<tr><td>13</td><td>Law Department</td></tr>
<tr><td>14</td><td>One City Hall Square</td></tr>
<tr><td>15</td><td>Boston, MA  02201</td></tr>
<tr><td>16</td><td>(617) 635-4039   FAX: (617) 635-3199</td></tr>
<tr><td>17</td><td>BY: THOMAS R. DONOHUE, ESQUIRE</td></tr>
<tr><td>18</td><td>E-mail: thomas.donohue@cityofboston.gov</td></tr>
<tr><td>19</td><td></td></tr>
<tr><td>20</td><td></td></tr>
<tr><td>21</td><td></td></tr>
<tr><td>22</td><td></td></tr>
<tr><td>23</td><td></td></tr>
<tr><td>24</td><td></td></tr>
</table>

Page 4

1    THE WITNESS: Officer William
2  Gallagher, G-A-L-L-A-G-H-E-R.
3    MR. DONOHUE: Same stipulations as
4  the Sergeant Watts?
5    MR. HRONES: No objections. Save
6  until the time for trial, except to the
7  form of the question, and motions to
8  strike --
9    MR. DONOHUE: -- reserved until the
10  time of the trial. The witness will have
11  30 days to resign and waive the Notary.
12
13
14    EXAMINATION BY MR. HORONES:
15
16    Q.   Officer, have you ever given a
17  deposition before?
18    A.   No.
19    Q.   If you don't understand my
20  question, just tell me and I'll rephrase it.
21    A.   Okay.
22    Q.   If you don't tell me you don't
23  understand, I'll assume you did.
24      Now, your counsel may make

Page 3

1             INDEX
2
3  WITNESS:      WILLIAM J. GALLAGHER
4
5  EXAMINATION BY:          PAGE:
6  Mr. Hrones              6
7
8
9
10  EXHIBIT:            PAGE:
11      (None offered)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1  objections, so when I ask you a question -- and
2  before you answer, just hesitate a bit in case
3  he wants to object. But even if he objects you
4  can still answer the question, unless he tells
5  you not to specifically.
6    A.   Okay.
7    Q.   What is your name, please?
8    A.   William Gallagher.
9    Q.   You're a Boston police officer?
10    A.   Yes, sir.
11    Q.   How long have you been a Boston
12  police officer?
13    A.   Since '96.
14    Q.   And where are you stationed now?
15    A.   D-4.
16    Q.   Are you a patrolman?
17    A.   Yes, sir.
18    Q.   Where were you born?
19    A.   Dorchester.
20    Q.   Where did you go to high school?
21    A.   B.C. High, Boston College High.
22    Q.   You graduated from there?
23    A.   Yes.
24    Q.   Any education after that?

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**WILLIAM J. GALLAGHER**
**June 8, 2007**

3 (Pages 6 to 9)

| Page 6 |
|---|
| 1      A.   Yes. |
| 2      Q.   And where was that? |
| 3      A.   Boston College. |
| 4      Q.   How many years were you in there? |
| 5      A.   Four. |
| 6      Q.   So you graduated from Boston |
| 7   College? |
| 8      A.   Yes. |
| 9      Q.   Was that directly after high |
| 10   school? |
| 11      A.   Yes. |
| 12      Q.   Then what did you do? |
| 13      A.   I went to work.  You know, a couple |
| 14   jobs here and there. |
| 15           Gone to police academy, got my |
| 16   Master's Degree. |
| 17      Q.   In what? |
| 18      A.   Criminal Justice. |
| 19      Q.   Was that after you've been a police |
| 20   officer? |
| 21      A.   Yes. |
| 22      Q.   Under that special program they |
| 23   have? |
| 24      A.   Correct. |

| Page 7 |
|---|
| 1      Q.   Are you married? |
| 2      A.   Yes. |
| 3      Q.   Any children? |
| 4      A.   Yes. |
| 5      Q.   So when did you graduate from |
| 6   college? |
| 7      A.   1984. |
| 8      Q.   And you started as a policeman |
| 9   when? |
| 10      A.   '96. |
| 11      Q.   So what did you do in those 12 |
| 12   years? |
| 13      A.   I worked for Ryder Truck Rental. |
| 14      Q.   Doing what? |
| 15      A.   Managed the office; sales. |
| 16      Q.   And then what? |
| 17      A.   Gone into the police. |
| 18      Q.   Oh, you worked for quite a period |
| 19   there? |
| 20      A.   Yes. |
| 21      Q.   Where are you stationed now? |
| 22      A.   D-4. |
| 23      Q.   D-4.  And where were you at the |
| 24   time of this incident? |

| Page 8 |
|---|
| 1      A.   Working at D-4. |
| 2      Q.   D-4. |
| 3           Now, turn your attention to |
| 4   April 28, of 2003.  Do you remember the incident |
| 5   that occurred when there was a shooting and a |
| 6   chase of a white car? |
| 7      A.   Yes. |
| 8      Q.   Did you prepare for coming in here |
| 9   by reviewing anything? |
| 10      A.   Yes. |
| 11      Q.   What did you review? |
| 12      A.   The -- the 1-1 police report. |
| 13      Q.   Did you testify -- did you give a |
| 14   statement to the internal affairs? |
| 15      A.   I believe so, yes. |
| 16      Q.   Did you review that? |
| 17      A.   No. |
| 18      Q.   So when did you become involved in |
| 19   the chase? |
| 20      A.   We initiated it. |
| 21      Q.   You initiated it.  How did that |
| 22   come about? |
| 23      A.   We were in route to the call. |
| 24      Q.   What call? |

| Page 9 |
|---|
| 1      A.   The shooting. |
| 2      Q.   So you got a call that there had |
| 3   been a shooting? |
| 4      A.   It wasn't our call. |
| 5      Q.   You heard it over the radio? |
| 6      A.   Correct. |
| 7      Q.   What did you do then? |
| 8      A.   We proceeded to the scene.  On the |
| 9   way there, we were stopped by a motorist that |
| 10   asked us if we were looking for a white mini |
| 11   van.  We said, "Yes, we're looking for a white |
| 12   van."  And she said, "It's with a white Honda, |
| 13   it's down on Cass Boulevard.  You might be able |
| 14   to catch it now." |
| 15           We turned our car right on Tremont |
| 16   Street where Mass. Ave. -- returned -- proceeded |
| 17   out to Cass Boulevard, took a left on Cass, |
| 18   headed out toward the Southeast Expressway, and |
| 19   coming towards us was a white Honda. |
| 20      Q.   Was it a van? |
| 21      A.   No.  It was a Honda. |
| 22      Q.   What did the person say as to what |
| 23   they'd seen that you might be interested in? |
| 24      A.   She asked us if we were looking for |

# WILLIAM J. GALLAGHER
## June 8, 2007

4  (Pages 10 to 13)

---

**Page 10**

1  a white van.
2  Q.    Was the white van one of the --
3  were the guys charged with a murder in a white
4  van?
5  A.    Suspects were seen leaving the
6  scene in a white van.
7  Q.    And when they stopped the white
8  van, not the Honda later on, what -- let me
9  change that.
10  When they stopped the guys who were
11  charged with the murder, were they in a white
12  van?
13  A.    I wasn't there.
14  Q.    You weren't involved at all with
15  that?
16  A.    I wasn't involved in that, no.
17  Q.    In any event, you see a white
18  Honda?
19  A.    Yes.
20  Q.    And what's it doing?
21  A.    It's traveling towards us on Cass
22  Boulevard, but it's all by itself, there's not a
23  white mini van with it.
24  Q.    And what did you do?

---

**Page 11**

1  A.    We followed it.
2  Q.    Was it speeding?
3  A.    No.
4  Q.    Did you try to pull it over?
5  A.    It took a left on Curr way, which
6  is off Cass Boulevard on the District 2 side --
7  Q.    Right.
8  A.    -- of Boston, and we followed it to
9  Curr Way. The car backed into a parking space
10  which is on the street, and myself, and my
11  partner hit the lights in the car. We activated
12  the overhead lights we got out of the car and
13  started to approach the Honda.
14
15          (Cell phone interruption)
16
17  Q.    (By Mr. Hrones) And what happened
18  then?
19  A.    The driver who had exited the car,
20  was standing by car. He saw us. He got back
21  into the driver's seat.
22  Q.    Go ahead.
23  A.    And he sped away down towards
24  Shawmut Ave. over to Cottage Street.

---

**Page 12**

1  Q.    You followed him.
2  A.    Yes, we did.
3  Q.    Was anyone else following him?
4  A.    No, not at that time.
5  Q.    Did others join you later?
6  A.    Yes. I was on the radio that night
7  my partner was driving, and I informed the
8  dispatcher that we were chasing a car that could
9  possibly be involved in a shooting down at
10  Albany and Mass.
11  Q.    Did you see who was driving?
12  A.    I didn't, no. My partner got a
13  good look, but I did not.
14          THE REPORTER: Your partner got a
15  good look?
16          THE WITNESS: Yes.
17  Q.    (By Mr. Hrones) Who is your
18  partner?
19  A.    Patrick Foley (phonetic).
20  Q.    He was in the same police cruiser?
21  A.    Correct.
22  Q.    He got a good look?
23  A.    Correct.
24  Q.    And did he identify him later on as

---

**Page 13**

1  the driver?
2          MR. DONOHUE: Objection.
3          THE WITNESS: I don't know for
4  sure. I wasn't -- I was there, but I do
5  not recall that incident.
6  Q.    So the white Honda stopped at some
7  point?
8  A.    Yes.
9  Q.    On it's own?
10  A.    I wasn't there when it stopped. We
11  were in a procession of cars that were
12  following.
13  Q.    Was it --
14  A.    I did not actually see the stop.
15  Q.    -- was it speeding after it took
16  off?
17  A.    Yes.
18  Q.    How fast was it going?
19  A.    Sixty, fifty.
20  Q.    So what happened when the car
21  stopped?
22          MR. DONOHUE: Objection.
23          Go ahead and answer.
24          THE WITNESS: I wasn't there, so --

---

**WILLIAM J. GALLAGHER**
**June 8, 2007**

5 (Pages 14 to 17)

| Page 14 |
| --- |

1  like I said.
2      Q.    (By Mr. Hrones) You were right
3  behind it, weren't you?
4      A.    No. The car that we were driving
5  in was an older model, and my partner did not
6  know that section of the city that well, and we
7  were actually being cut off by other police cars
8  from different districts that had the primary
9  part of the chase. We were back -- we could
10  have been back ten cars, for all I know. All I
11  could see was a string of blue lights going down
12  the street we followed the rest of the traffic
13  until we arrived at the scene.
14      Q.    And what did you see when you got
15  to the scene where the automobile was -- the
16  white Honda?
17      A.    There was another officer, and
18  there was a young female there.
19      Q.    Just one other officer?
20      A.    At that point.
21      Q.    How many police cars were there at
22  that point?
23      A.    Countless.
24      Q.    Oh, countless?

| Page 15 |
| --- |

1      A.    Yeah.
2      Q.    And where were the officer's from
3  those cruisers?
4      A.    I don't know, sir. I'm guessing
5  they were chasing the suspect, but.
6      Q.    So you saw an officer with a young
7  woman?
8      A.    Correct.
9      Q.    Where did you see them?
10      A.    They were standing next to a white
11  Honda.
12      Q.    And what did you do at that point?
13      A.    We got out of our car. We went
14  over to the car. We looked at the car and we
15  told the officer this was the car that we were
16  chasing.
17      Q.    What officer was that you talked
18  to?
19      A.    Officer Coin (phonetic).
20      Q.    Coin.
21      And what happened then?
22      A.    He informed us that this female was
23  in the car, and she was the only one that did
24  not get away, and he caught her.

| Page 16 |
| --- |

1      Q.    Well, who got away?
2      A.    The other people in the car.
3      Q.    Who are the other people in the
4  car?
5      A.    I wasn't -- I wasn't -- I don't
6  know who got out.
7      Q.    So what did you do then?
8      A.    We stayed at the car.
9      Q.    For how long?
10      A.    Twenty minutes to half an hour.
11      Q.    And then where did you go?
12      A.    We were ordered by a superior to go
13  upstairs to the -- to the apartment.
14      Q.    What superior ordered?
15      A.    I'm not sure, sir.
16      Q.    You're from D-4?
17      A.    Yes. It wasn't one of ours, I know
18  that. I didn't recognize the voice on the
19  radio.
20      Q.    Oh, someone on the radio ordered
21  you up there?
22      A.    Yes.
23      Q.    Someone who was in the apartment?
24      A.    I don't know.

| Page 17 |
| --- |

1      Q.    Someone just contacted you,
2  specifically?
3      A.    We initiated the chase, so I
4  thought that they might have thought it was our
5  responsibility to babysit the apartment.
6      Q.    So did you go up to the apartment?
7      A.    Yes, sir.
8      Q.    And what did you see?
9      A.    There were several people in the
10  apartment: A female; there was an infant; a
11  smaller child, probably about three or four
12  years of age, and a senior. I'm not sure if she
13  was male or female.
14      Q.    And did you see a young man there?
15      A.    No, sir.
16      Q.    So what happened when you got in
17  the apartment?
18      A.    We were ordered to secure the
19  apartment.
20      Q.    By whom?
21      A.    By the superior officer.
22      Q.    Who?
23      A.    I don't know, sir.
24      Q.    When there are more than one

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# WILLIAM J. GALLAGHER
## June 8, 2007

6 (Pages 18 to 21)

**Page 18**

1  superior officer's on the scene, is it the
2  superior officer in the particular district
3  where you are that is the patrol supervisor in
4  charge?
5       MR. DONOHUE:  Objection to form.
6       THE WITNESS:  I wouldn't know, sir.
7  I'm not -- I don't have the rank to know.
8    Q.   (By Mr. Hrones)  You don't know?
9    A.   I don't know the protocol.
10   Q.   Who is in charge when you have more
11  than one supervisor in a particular district?
12   A.   I don't recall, sir.
13   Q.   So what did you see?
14   A.   Basic apartment, project apartment.
15  It's in the Franklin Hill Housing Projects.
16  Kind of beat up, dirty.
17   Q.   Was -- was there a search going on?
18   A.   No, sir.
19   Q.   Was a protective sweep going on?
20   A.   Not while we were there.
21   Q.   What did you see when you were
22  there?
23       MR. DONOHUE:  Objection.
24       THE WITNESS:  We saw -- like I

**Page 19**

1  said, we saw a couple individuals inside.
2  There was basic living quarters.
3    Q.   (By Mr. Hrones)  Did you see someone
4  in handcuffs being taken out?
5    A.   No, sir.
6    Q.   You didn't see the driver of the
7  car being taken out?
8       MR. DONOHUE:  Objection.
9       THE WITNESS:  No, sir.
10   Q.   (By Mr. Hrones)  Did you learn that
11  someone had been found in that apartment?
12   A.   After the fact, yes.
13   Q.   What did you learn?
14   A.   That the individual that was
15  driving the motor vehicle that we were chasing,
16  I was told, ran upstairs to that apartment.
17   Q.   And were you told he was arrested
18  in that apartment?
19   A.   I was told they took him into
20  custody. I'm not sure if he was arrested.
21   Q.   So how long would you estimate it
22  took from the time you went in the apartment to
23  the time the first officers went in?
24       MR. DONOHUE:  Objection.

**Page 20**

1       THE WITNESS:  I don't know, sir.
2    Q.   (By Mr. Hrones)  You didn't see the
3  officers when you arrived, chasing after the
4  suspect?
5    A.   That's correct.
6    Q.   So what, if anything, did you do in
7  that apartment?
8    A.   Had some conversation with the
9  people inside.
10   Q.   What people?
11   A.   The lady in particular, the mother
12  of the child.
13   Q.   You talked to her?
14   A.   Yes.
15   Q.   What did she say?
16   A.   She told me that the gentleman
17  driving the car was staying at the apartment,
18  and that she had gone to bed and the gentleman
19  must have taken the keys from her husband's
20  jacket and borrowed the car without her
21  knowledge or consent.
22   Q.   Did you ask anything about her
23  husband.
24   A.   No.

**Page 21**

1    Q.   Did she say anything about her
2  husband?
3    A.   No.
4    Q.   Did you learn anything about the
5  husband being taken away in handcuffs?
6    A.   She had told me that her husband
7  was there, and he had actually came back in the
8  apartment later, and we had talked to him.
9    Q.   After he had been taken down to B-3
10  to be interrogated?
11   A.   I don't know where he went sir.
12   Q.   But he came back with Harris didn't
13  he?  Detective Harris?
14   A.   I think that was his name.
15   Q.   And you were still there?
16   A.   Correct.
17   Q.   How many officers were still there?
18   A.   Two.
19   Q.   You were just told to stay there
20  and --
21   A.   We were told to stay there, and
22  there was a room that they didn't want anyone to
23  go into.
24   Q.   What room was that?

**WILLIAM J. GALLAGHER**
**June 8, 2007**

7 (Pages 22 to 25)

## Page 22

1    A.   It was one of the bedrooms.
2    Q.   Did they say why they didn't?
3    A.   In case they needed a warrant.
4  They wanted us to freeze the apartment. They
5  thought they might have to go back. They just
6  told us no one was to --
7    Q.   Did they come back with a warrant?
8    A.   No.
9    Q.   But there was one bedroom they said
10 to just freeze?
11   A.   Don't let anyone in, correct.
12   Q.   They didn't tell you that's where
13 the suspect was found?
14   A.   No.
15   Q.   Did you see any search going on?
16   A.   No.
17   Q.   Did you talk to the old man that
18 was there?
19   A.   I think he only spoke Spanish, sir.
20 I don't recall. We did help him put a bed back
21 together in the bedroom, and helped him with
22 some things in the house because --
23       THE REPORTER: Helped him, what?
24       THE WITNESS: Helped him move some

## Page 23

1  things around the house. We kind of felt
2  he needed some help.
3       THE REPORTER: Okay.
4    Q.   (By Mr. Hrones) What about the
5  bedroom?
6    A.   He asked us to move something in
7  the bedroom, through the Misses, I believe it
8  was his daughter.
9    Q.   Move? Move?
10   A.   Furniture.
11   Q.   Do you know why he wanted you to
12 move?
13   A.   It was all through her, sir. Like
14 I said, "he spoke Spanish."
15   Q.   Who was assigned to secure the
16 apartment with you?
17   A.   Officer Foley (phonetic).
18   Q.   And he is from D-4?
19   A.   Correct.
20   Q.   And what happened to your partner,
21 who was in the automobile with you?
22       MR. DONOHUE: Objection.
23       THE WITNESS: I don't understand
24 the question.

## Page 24

1    Q.   (By Mr. Hrones) Who was in the
2  automobile with you when you were chasing the
3  Honda?
4    A.   Officer Foley (phonetic).
5    Q.   Oh, Officer Foley. Okay. Sure.
6         Now, was he with you when you ran
7  up to the apartment?
8    A.   We didn't run -- yes.
9    Q.   He was with you when you went?
10   A.   Yes.
11   Q.   And who were you relieved by?
12   A.   I believe it was Sergeant Detective
13 Keeler.
14   Q.   And they brought Mr. Pineda back?
15   A.   No. He stayed sometime after that.
16   Q.   Even though you were relieved by
17 Detective Keeler?
18   A.   Detective Keeler just brought back
19 the -- the gentleman who lived in apartment.
20       MR. DONOHUE: Objection.
21   Q.   (By Mr. Hrones) Pineda? Are you
22 sure it's he that brought him back? Are you
23 sure it was Keeler, who brought him back?
24   A.   No. It was the other name you

## Page 25

1  said.
2    Q.   Harris?
3    A.   Harris.
4    Q.   So you were relieved by Keeler or
5  Harris?
6    A.   I believe we were relieved by
7  Keeler, but he did not come back to the
8  apartment.
9    Q.   At what point did he relieve you?
10   A.   We had to call to see if we were
11 all set, probably a half an hour later when
12 Detective Harris got back, the suspect was in
13 the apartment that lived there.
14   Q.   So did you talk to Keeler before --
15   A.   Yes.
16   Q.   -- the suspect was brought back, or
17 after?
18       THE REPORTER: Did you say, "yes"
19 in between that?
20       THE WITNESS: No. After. After.
21   Q.   (By Mr. Hrones) And what did Harris
22 say when he brought him back?
23   A.   I don't recall. It wasn't too
24 much. He asked if we were done and if we could

# WILLIAM J. GALLAGHER
## June 8, 2007

8 (Pages 26 to 29)

| Page 26 |
| --- |

1  leave. And he said, "Not yet." And that was
2  basically, it.
3      Q.    So then Keeler called and said you
4  could?
5      A.    We had -- I believe we had to call
6  and talk to Sergeant Keeler, and he told us we
7  could leave.
8      Q.    So you secured the apartment?
9      A.    Correct.
10     Q.    At what point was that?
11     A.    When we were ordered to do so by
12  that superior officer. I do not know. About
13  half an hour after we arrived on scene.
14     Q.    Were you the only ones left?
15     A.    When, sir?
16     Q.    When you were asked to secure the
17  apartment?
18     A.    No, sir.
19     Q.    There were still officers there?
20     A.    Yes.
21     Q.    Do you know why you were asked to
22  secure?
23     A.    I don't know, sir.
24          I can guess that we initiated the

| Page 27 |
| --- |

1  chase, so they assumed they would have us do it.
2      Q.    Were there any supervising parole
3  [sic] officers there?
4      A.    Parole, sir?
5      Q.    No. Patrol.
6          MR. DONOHUE: Objection to form.
7          THE WITNESS: Yes.
8      Q.    (By Mr. Hrones) Who was there?
9      A.    Sergent John Pels. He works at
10  District 4. He was our squad sergeant.
11     Q.    How do you spell that?
12     A.    P-E-L-S.
13     Q.    He was there at the scene?
14     A.    He was -- we summonsed him to the
15  scene. He came to the scene.
16     Q.    Anyone else there?
17     A.    That I know? I don't -- I never
18  worked in that district. I know some of the
19  faces, but I don't know a lot of the names.
20     Q.    The patrol supervisors weren't all
21  from that district, were they?
22     A.    No.
23     Q.    Did you have others from District
24  4?

| Page 28 |
| --- |

1      A.    No. He was the only one.
2      Q.    And he wasn't the one that gave you
3  directions?
4      A.    No -- I would have known that?
5          THE REPORTER: I would have known
6  that?
7          THE WITNESS: Correct. I would
8  have known that.
9      Q.    (By Mr. Hrones) Do you know
10  Sergeant Toomey?
11     A.    No, sir. I don't.
12     Q.    Now, could you identify any of the
13  supervisors that responded?
14     A.    I believe one of them was Sergeant
15  Watts.
16     Q.    Did you know him?
17     A.    I recognized his face. I don't
18  know him personally.
19     Q.    Why did you recognize his face?
20     A.    I believe his sister was married to
21  an officer that worked at our station some years
22  ago.
23     Q.    Where did you see Sergeant Watts?
24     A.    It wasn't inside. He must have

| Page 29 |
| --- |

1  been -- I seen him out front somewhere.
2      Q.    The search was conducted for a
3  firearm?
4      A.    I don't know, sir. I wasn't there.
5      Q.    Did you tell internal affairs that
6  it was?
7      A.    I wasn't there for that.
8      Q.    No -- but didn't you say that
9  internal affairs -- a search of the apartment
10  was conducted for a firemen, but he was not
11  present when the search occurred?
12     A.    If I did, sir, that was --
13         MR. DONOHUE: I object. I object
14  to the form of the question.
15         Are you asking if he remembers what
16  he said to internal affairs? Just to be
17  clear on the question.
18     Q.    (By Mr. Hrones) Do you remember
19  saying that to internal affairs?
20     A.    No, sir.
21     Q.    Well, what was -- how did you learn
22  that there was a search conducted for a weapon?
23     A.    I would have been told by other
24  officers.

**WILLIAM J. GALLAGHER**
**June 8, 2007**

9 (Pages 30 to 33)

## Page 30

1  Q.  But you didn't see the search being
2  conducted?
3  A.  That's correct.
4  Q.  Was the apartment in disarray?
5  MR. DONOHUE: Objection.
6  THE WITNESS: I would say yes, and
7  no. I mean, the living conditions
8  weren't -- I mean it was -- there was old
9  food lying around, and there was toys and
10  stuff on the floor. It was tough to say
11  what would have been a search, and what
12  would actually be -- how would be the best
13  way to phrase it -- how people lived.
14  Q.  (By Mr. Hrones) Was there evidence
15  of a search?
16  A.  I don't know, sir. You know, I
17  can't actually say yes, because I'm not even
18  sure where they searched it. They did search.
19  Q.  But you told internal affairs that
20  there might have been disarray caused by the
21  results of the search?
22  MR. DONOHUE: Objection.
23  THE WITNESS: If that's what it
24  says, sir.

## Page 31

1  Q.  (By Mr. Hrones) You're not denying
2  you said that?
3  A.  No. I just don't know.
4
5  (Off record discussion)
6
7  Q.  (By Mr. Hrones) What was your call
8  Number?
9  A.  Delta 102.
10  Q.  Delta 102?
11  A.  It would be, D-102 A.
12  Q.  And what's the number of Foley?
13  THE REPORTER: And what's the
14  number, what?
15  THE WITNESS: It would be --
16  THE REPORTER: Hold on, please. I
17  need to get the question.
18  What's the number of Foley?
19  Q.  (By Mr. Hrones) No. What's your
20  number, call number?
21  A.  D-102 A, is the unit number. It's
22  a two-man car.
23  Q.  Oh.
24  A.  His number is the same.

## Page 32

1  Q.  Oh. His number is the same, so
2  it's not you, personally? It's the car --
3  A.  The car.
4  MR. DONOHUE: Just wait until the
5  attorney's finish.
6  THE WITNESS: Yes.
7  Q.  (By Mr. Hrones) Do you know who
8  D-435 is --
9  A.  No.
10  Q.  -- A? That would be a supervisor
11  wouldn't it?
12  A.  No. That will be a patrol car.
13  Q.  Do you know who D-34 is?
14  A.  No. The numbers change every
15  shift -- that's not someone's call sign, per
16  say.
17  MR. DONOHUE: You've answered the
18  question.
19  Q.  (By Mr. Hrones) Oh, wait I have
20  them -- it's been marked --
21  MR. HRONES: Where are the other
22  exhibits from the last deposition?
23  THE REPORTER: Right here, sir.
24  Q.  (By Mr. Hrones) You're not

## Page 33

1  Charlie. What do they call "D"?
2  A.  D.
3  Q.  "C" is Charlie. And you made out
4  an incident report in this case?
5  A.  Yes.
6  Q.  And why was it -- why was that,
7  that you made it out?
8  A.  I was a passenger.
9  Q.  Passenger in what?
10  A.  Delta 102.
11  Q.  But why were you the one of all the
12  officers on the scene that made out an incident
13  report?
14  A.  We initiated the chase of the white
15  Honda.
16  Q.  Did someone order you to make that
17  report?
18  A.  No.
19  Q.  Do you know any other reports that
20  were made out?
21  A.  A Form 26.
22  Q.  By whom?
23  A.  By myself.
24  Q.  You did a Form 26?

# WILLIAM J. GALLAGHER
## June 8, 2007

10 (Pages 34 to 37)

## Page 34

1     A.   Right.
2     Q.   Did anyone else do any reports that
3 you know of?
4     A.   I don't know.
5     Q.   You don't know?
6     A.   No.
7     Q.   When did Foley positively identify
8 the driver, as Bruce?
9         MR. DONOHUE: Objection.
10        THE WITNESS: I'm not sure, sir.
11     Q.   (By Mr. Hrones) How do you know he
12 did do that?
13     A.   He told me.
14     Q.   Now, officers spoke to the husband,
15 Carlos Pineda?
16         MR. DONOHUE: No objection.
17     Q.   (By Mr. Hrones) Did officers --
18        THE REPORTER: Did he answer?
19       MR. DONOHUE: No.
20     Q.   (By Mr. Hrones) -- did officers
21 speak to Pineda -- Carlos Pineda?
22     A.   That's the guy from the car?
23     Q.   No. The husband of the woman that
24 was in the apartment.

## Page 35

1     A.   Yes.
2     Q.   Did officers speak to the husband?
3     A.   I spoke to him when he came back to
4 the apartment.
5     Q.   Oh, then?
6     A.   Then.
7     Q.   Did anyone speak to him beforehand,
8 that you know of?
9     A.   No. I wasn't there, sir.
10     Q.   And what did he tell you?
11     A.   I don't recall, sir.
12     Q.   Did he complain about anything?
13     A.   No.
14     Q.   Did he mention anything about being
15 interrogated at B-3?
16     A.   No.
17     Q.   He didn't complain about being
18 taken out in his boxer shorts?
19     A.   No.
20     Q.   Did you say anything to T.V.
21 cameras there?
22     A.   No.
23     Q.   Let me show you that photo and see
24 if you recognize who's in that.

## Page 36

1     A.   (Witness viewing document) No.
2     Q.   Okay. Do you see a black officer
3 with a mustache or a beard? You don't recognize
4 him?
5     A.   (Witness viewing document) I
6 don't.
7     Q.   What about the white officer?
8 There's another picture.
9     A.   This picture is a blowup of this
10 one (indicating)?
11     Q.   Yeah. It's from that one, exactly.
12     Well, those are different shots
13 during the T.V --
14     A.   I don't recognize the officer.
15        MR. HRONES: I have nothing
16 further.
17        MR. DONOHUE: I don't have any
18 questions.
19
20      (Deposition concluded at 12:39 p.m.)
21
22
23
24

## Page 37

1    I, DAWN L. HALCISAK, a Notary Public, do
2 hereby certify that WILLIAM J. GALLAGHER
3 appeared before me, satisfactorily identified
4 himself, on the 8th day of June, 2006, at the
5 offices of HRONES, GARRITY & HEDGES, Lewis Wharf
6 Bay, Suite 232, Boston, MA., and was by me duly
7 sworn to testify to the truth and nothing but
8 the truth as to his knowledge touching and
9 concerning the matters in controversy in this
10 cause; that he was thereupon examined upon his
11 oath and said examination reduced to writing by
12 me; and that the statement is a true record of
13 the testimony given by the witness, to the best
14 of my knowledge and ability.
15    I further certify that I am not a relative
16 or employee of counsel/attorney for any of the
17 parties, nor a relative or employee of such
18 parties, nor am I financially interested in the
19 outcome of the action.
20    WITNESS MY HAND this 10th day of June, 2007.
21
22
23 Dawn L. Halcisak   My Commission expires:
24 Notary Public     October 2, 2009

# WILLIAM J. GALLAGHER
## June 8, 2007

11 (Pages 38 to 40)

| Page 38 | Page 40 |
|---|---|
| 1 Today's date:  June 10, 2007 | 1         CORRECTION SHEET |
| 2 To:      STEPHEN HRONES, ESQ. | 2 DEPONENT:  WILLIAM J. GALLAGHER |
| 3 Copied to:    THOMAS R. DONOHUE, ESQ. | 3 CASE:     PINEDA VS. KEELER |
| 4 From:      Dawn L. Halcisak | 4 DATE TAKEN:  JUNE 8, 2007 |
| 5 Deposition of:  WILLIAM J. GALLAGHER | 5 ************************************* |
| 6 Taken:      JUNE 8, 2007 | 6 PAGE / LINE /  CHANGE OR CORRECTION AND REASON |
| 7 Action:     PINEDA | 7 ************************************* |
| 8            vs. | 8     ____/___/_____ |
| 9         KEELER | 9     ____/___/_____ |
| 10 | 10    ____/___/_____ |
| 11     Enclosed is a copy of the deposition of | 11    ____/___/_____ |
| 12 WILLIAM J. GALLAGHER.  Pursuant to the Rules of | 12    ____/___/_____ |
| 13 Civil Procedure, Mr. Gallagher has thirty days | 13    ____/___/_____ |
| 14 to sign the deposition from today's date. | 14    ____/___/_____ |
| 15     Please have Mr. Gallagher sign the enclosed | 15    ____/___/_____ |
| 16 signature page.  If there are any errors, please | 16    ____/___/_____ |
| 17 have him mark the page, line and error on the | 17    ____/___/_____ |
| 18 enclosed correction sheet.  He should not mark | 18    ____/___/_____ |
| 19 the transcript itself.  This addendum should be | 19    ____/___/_____ |
| 20 forwarded to all interested parties. | 20    ____/___/_____ |
| 21     Thank you for your cooperation in this | 21    ____/___/_____ |
| 22 matter. | 22    ____/___/_____ |
| 23 | 23    ____/___/_____ |
| 24 | 24    ____/___/_____ |

| Page 39 | |
|---|---|
| 1         UNITED STATES DISTRICT COURT | |
| 2         DISTRICT OF MASSACHUSETTS | |
| 3 **************************** | |
| 4 CARLOS PINEDA and        * | |
| 5 ALEXANDRA PEREZ,       * | |
| 6     Plaintiff,    * | |
| 7 Vs.         * C.A. No. 05-10216JLT | |
| 8 DANIEL KEELER, DENNIS    * | |
| 9 HARRIS, JOSEPH R. WATTS, * | |
| 10 JOSEPH P. TOOMEY, WILLIAM * | |
| 11 J. GALLAGHER, EDWARD     * | |
| 12 GATELY, JANINE BUSBY,    * | |
| 13 and the CITY OF BOSTON,  * | |
| 14     Defendants.   * | |
| 15 **************************** | |
| 16     I, WILLIAM J. GALLAGHER, do hereby | |
| 17 certify, under the pains and penalties of | |
| 18 perjury, that the foregoing testimony is true | |
| 19 and accurate, to the best of my knowledge and | |
| 20 belief. | |
| 21     WITNESS MY HAND, this_____day of_____, | |
| 22 2007. | |
| 23 | |
| 24        WILLIAM J. GALLAGHER | |

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# Exhibit D

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-1-216JLT


* * * * * * * * * * * * * * * * * * * * * *

CARLOS PINEDA and ALEXANDRA PEREZ,                    *

        Plaintiffs,                                       *

        vs.                                               *

DANIEL KEELER, DENNIS HARRIS, JOSEPH R. WATTS,        *

JOSEPH P. TOOMEY, WILLIAM J. GALLAGHER,               *

EDWARD GATELY, JANINE BUSBY, and the CITY OF          *

BOSTON,                                               *

        Defendants.                                       *

* * * * * * * * * * * * * * * * * * * * * *


DEPOSITION OF:  OFFICER ANDREW FAY


LAW OFFICE OF HRONES, GARRITY & HEDGES

Lewis Wharf Bay, Suite 232

Boston, Massachusetts 02110

June 5, 2007                    2:41 p.m. -  4:07 p.m.


KATHRYN K. GIANNO

COURT REPORTER

# OFFICER ANDREW FAY
## June 5, 2007

2  (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 | STEPHEN HRONES, ESQ. |
| 4 | HRONES, GARRITY & HEDGES |
| 5 | Lewis Wharf Bay, Suite 232 |
| 6 | Boston, MA 02110 |
| 7 | Tel.: 617.227.4019 |
| 8 |  |
| 9 | Representing the Defendants: |
| 10 | THOMAS R. DONOHUE, ASSISTANT CORPORATE COUNSEL |
| 11 | LAW DEPARTMENT, CITY OF BOSTON |
| 12 | Room 615, City Hall |
| 13 | One City Hall Square |
| 14 | Boston, MA 02201 |
| 15 | Tel.: 617.635.4039  Fax: 617.635.2012 |
| 16 | Email: thomas.donohue@cityofboston.gov |
| 17 |  |
| 18 | Also Present: |
| 19 | Erin Schopperle, Law Student |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 4 |
|---|---|
| 1 | MR. HRONES:  Do you want the usual |
| 2 | stipulations? |
| 3 | MR. DONOHUE:  I'll reserve all objections |
| 4 | except as to the form of the question, I'll |
| 5 | reserve those objections until the time of |
| 6 | trial. |
| 7 | MR. HRONES:  Okay. |
| 8 | MR. DONOHUE:  The witness will have 30 |
| 9 | days to read and sign, waive the notary. |
| 10 | MR. HRONES:  Waive the notary, okay. |
| 11 |  |
| 12 | OFFICER ANDREW FAY, |
| 13 | Deponent, having first been duly sworn, deposes and states |
| 14 | as follows: |
| 15 |  |
| 16 | EXAMINATION BY MR HRONES: |
| 17 |  |
| 18 | Q.  What is your name, please? |
| 19 | A.  Police Officer Andrew Fay, F-A-Y, last |
| 20 | name. |
| 21 | Q.  What's your profession? |
| 22 | A.  I am a police officer assigned to area B-2 |
| 23 | Boston Police Department. |
| 24 | Q.  How long have you been there? |

|  | Page 3 |
|---|---|
| 1 | I N D E X |
| 2 | WITNESS: OFFICER ANDREW FAY |
| 3 |  |
| 4 | EXAMINATION |
| 5 | MR. HRONES          4 |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 | EXHIBITS |
| 10 | 1   Photograph Showing Two Police Officers and an |
| 11 | Individual Between Them |
| 12 | 2   Photograph |
| 13 | 3   Statement from  Police Officer Andrew Fay |
| 14 | to Captain Albert Goslin |
| 15 | 4   Radio Log Beginning at 3:20:19 Ending at 3:53:02 |
| 16 | 5   Radio Log |
| 17 | 6   Radio Log Beginning at 3:26:17 |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 5 |
|---|---|
| 1 | A.  Approximately eight years. |
| 2 | Q.  What were you before that? |
| 3 | A.  Boston Municipal Police Officer. |
| 4 | Q.  And before that? |
| 5 | A.  College student. |
| 6 | Q.  Where were you born? |
| 7 | A.  Boston, Jamaica Plain. |
| 8 | Q.  Where did you go to high school? |
| 9 | A.  Brookline High School. |
| 10 | Q.  And after that? |
| 11 | A.  Norwich University. |
| 12 | Q.  Did you graduate? |
| 13 | A.  No. |
| 14 | Q.  When did you leave there? |
| 15 | A.  1982. |
| 16 | Q.  Is that a four-year school? |
| 17 | A.  Yes. |
| 18 | Q.  And at what point did you leave? |
| 19 | A.  After the first year. |
| 20 | Q.  Why did you leave? |
| 21 | A.  I joined the United States Army. |
| 22 | Q.  How long were you in the Army? |
| 23 | A.  Still currently serving, 25 years plus. |
| 2-4 | Q.  Oh, the reserves now? |

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

OFFICER ANDREW FAY
June 5, 2007

3 (Pages 6 to 9)

| Page 6 |
|---|
| 1    A.  National Guards. |
| 2    Q.  How long were you on active duty? |
| 3    A.  All total? |
| 4    Q.  Yes. |
| 5    A.  Approximately four years. |
| 6    Q.  Did you originally go in the regular Army. |
| 7    A.  No. |
| 8    Q.  You went in through the reserves? |
| 9    A.  Yes, sir. |
| 10    Q.  What's your rank? |
| 11    A.  Sergent First Class, E-7. |
| 12    Q.  So, what did you do full-time after |
| 13  leaving Norwich? |
| 14    A.  I was a cook, then I went to the police |
| 15  academy in 1989. |
| 16    Q.  Where were you a cook? |
| 17    A.  Various restaurants in the Boston area, |
| 18  also the Hyatt Regency in Cambridge. |
| 19    Q.  What was after '82? |
| 20    A.  Yes, sir. |
| 21    Q.  And you were a cook for about five or six |
| 22  years? |
| 23    A.  Yes. |
| 24    Q.  Then you went to the academy? |

| Page 7 |
|---|
| 1    A.  Boston Police Academy, yes, sir. |
| 2    Q.  How long were you a Boston Municipal |
| 3  Police Officer? |
| 4    A.  Approximately ten years. |
| 5    Q.  When did you become a Boston Police |
| 6  Officer? |
| 7    A.  I was appointed in 1997. |
| 8    Q.  That was before -- I don't know whether |
| 9  they have now brought the two together? |
| 10    A.  Yes, sir, there was a merge. |
| 11    Q.  But that wasn't then? |
| 12    A.  No, sir.  I am one of the few people who |
| 13  actually went through the exact same Boston Police |
| 14  Academy twice and graduated, and that was |
| 15  approximately nine-months long. |
| 16    Q.  Congratulations.  Are you married? |
| 17    A.  Yes, sir. |
| 18    Q.  How long have you been married? |
| 19    A.  Eighteen years. |
| 20    Q.  Any children? |
| 21    A.  Four children. |
| 22    Q.  Have you ever been disciplined while you |
| 23  were in the police department? |
| 24    A.  Have I been suspended? |

| Page 8 |
|---|
| 1    Q.  Disciplined in any way. |
| 2    A.  I received two I.E.D. complaints -- well, |
| 3  three I.E.D. complaints against me in the course of |
| 4  my time in the Boston police.  All of which have |
| 5  been unsustained. |
| 6    Q.  What about the Boston Municipal Police? |
| 7    A.  No. |
| 8    Q.  So you haven't had any discipline? |
| 9    A.  No, sir. |
| 10    Q.  Where are you stationed now? |
| 11    A.  Area B-2 Roxbury. |
| 12    Q.  Is that where you were at the time of this |
| 13  incident? |
| 14    A.  Yes. |
| 15    Q.  How long have you been there? |
| 16    A.  I've been there ever since I graduated the |
| 17  police academy; so, approximately ten years. |
| 18    Q.  What's your rank? |
| 19    A.  Patrolman. |
| 20      MR. DONOHUE:  At some point I may object |
| 21  to the question, so give me a chance. |
| 22    Q.  If he objects, wait a minute and then |
| 23  answer, unless he tells you not to.  And if you |
| 24  don't understand a question, let me know.  I'll |

| Page 9 |
|---|
| 1  assume if you don't tell me you don't understand it, |
| 2  you do understand it. |
| 3    A.  Very good, sir. |
| 4    Q.  Now, do you remember the incident back in |
| 5  April of 2003, I believe, that's the subject of this |
| 6  deposition? |
| 7    A.  Yes, I vaguely remember it, yes. |
| 8    Q.  Was there a murder that took place? |
| 9    A.  I believe it was a double shooting, one |
| 10  resulted in a homicide, yes, sir. |
| 11    Q.  When did you come on duty that night? |
| 12    A.  I came on 11:45 p.m. that night. |
| 13    Q.  And do you have a partner? |
| 14    A.  No, sir. |
| 15    Q.  At that time did you have a partner? |
| 16    A.  No, sir. |
| 17    Q.  Were you in a cruiser by yourself? |
| 18    A.  Yes, sir. |
| 19    Q.  How did it come about that you became |
| 20  involved in that incident? |
| 21      MR. DONOHUE:  Object to the form. |
| 22    A.  We had gotten, over the radio, a |
| 23  description of a car that was wanted in a drive-by |
| 24  shooting that happened in the South End part of |

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**OFFICER ANDREW FAY**
**June 5, 2007**

4 (Pages 10 to 13)

|  | Page 10 |
|---|---|
| 1 | Boston. They gave a description of a white Honda, I |
| 2 | don't recall the plate or if one was given. They |
| 3 | said anywhere from two to three occupants were in |
| 4 | the vehicle. |
| 5 |     I then heard on the radio that a |
| 6 | District 4 South End had a crash up on Dewitt |
| 7 | Drive, I believe which was in Roxbury on our |
| 8 | district, and it was possibly the suspect motor |
| 9 | vehicles. I started towards that area to backup the |
| 10 | officers. Just as I approached, the car took off. |
| 11 | One of the officers were getting out of the car. |
| 12 |     Q.  Was this the white car? |
| 13 |     A.  Yes, sir. I assumed a chase following |
| 14 | this car. I radioed the plate number, which right |
| 15 | now I can't remember the plate number. There were |
| 16 | three occupants in the car, male or female, I |
| 17 | couldn't really tell. But it was a white Honda. |
| 18 |     Q.  Were you directly behind? |
| 19 |     A.  Yes, sir. Started up Rugglers Street, |
| 20 | took a left onto Washington Street, right onto Mia |
| 21 | Casa Boulevard, another right onto Massachusetts |
| 22 | Avenue. |
| 23 |     Q.  Were there any other officers behind you? |
| 24 |     A.  Probably about that time there were |

|  | Page 11 |
|---|---|
| 1 | several other officers behind me. |
| 2 |     Q.  For a while you were the — |
| 3 |     A.  I was the lead car, yes, sir. |
| 4 |     Q.  The only car for a while? |
| 5 |     A.  Yes, sir, right up until Columbia Road and |
| 6 | Dudley Street. At that time, Officer Coyne, |
| 7 | C-O-Y-N-E, took over the pursuit. I was still |
| 8 | radioing the information and our location while we |
| 9 | were pursuing the vehicle. |
| 10 |     Q.  What is your number? |
| 11 |     A.  Bravo 453 Alpha, that's the name of my |
| 12 | unit. Officer Coyne was D Bravo 454. |
| 13 |     Q.  What's his, 454? |
| 14 |     A.  Yes. |
| 15 |     Q.  Was he alone in his vehicle? |
| 16 |     A.  Yes, he was. |
| 17 |     Q.  Did you continue to follow the white car? |
| 18 |     A.  Yes, sir. |
| 19 |     Q.  Where did you follow it to? |
| 20 |     A.  We were involved in a pursuit, we had our |
| 21 | lights and siren on and we were going at a speed |
| 22 | greater than reasonable. |
| 23 |     Q.  Like what? |
| 24 |     A.  Probably around 50 or 60 miles an hour at |

|  | Page 12 |
|---|---|
| 1 | one point. |
| 2 |     Q.  What about the white car? |
| 3 |     A.  We were trying to catch up to it. |
| 4 |     Q.  What happened then? |
| 5 |     A.  We followed the car up Columbia Road, took |
| 6 | a left onto Blue Hill Avenue, went into the Matapan |
| 7 | area, took a right onto Harvard Street. |
| 8 |     Q.  How far were you behind? |
| 9 |     A.  I was one car behind. |
| 10 |     Q.  Had you always been one car behind? |
| 11 |     A.  Yes, sir, right up to the end of the |
| 12 | chase. |
| 13 |     Q.  Behind the white car? |
| 14 |     A.  Yes, sir. There was the white car, |
| 15 | Officer Coyne's car and my car. |
| 16 |     Q.  How did it come about Coyne was ahead you? |
| 17 |     A.  Just passed me. I was probably driving |
| 18 | and talking on the radio at once. It's usually |
| 19 | safer for an officer to drive rather than talk. |
| 20 |     Anyway, we at this point took the |
| 21 | right onto Harvard and then another right onto |
| 22 | Franklin Hill Avenue. And the car went into |
| 23 | Franklin Hill Housing project. |
| 24 |     Q.  One moment, did you review anything before |

|  | Page 13 |
|---|---|
| 1 | coming in here? |
| 2 |     A.  Yes, sir. |
| 3 |     Q.  What did you review? |
| 4 |     A.  I reviewed my Form 26 and the paperwork |
| 5 | saying what times I have. As a matter of fact, that |
| 6 | sheet right there, that's what I have. |
| 7 |     Q.  This one here (indicating)? |
| 8 |     A.  Yes. |
| 9 |     Q.  What about your Internal Affairs |
| 10 | statement? |
| 11 |     A.  I reviewed that with Mr. Donohue. |
| 12 |     MR. HRONES:  Do you have the Form 26? |
| 13 |     MR. DONOHUE:  I do. |
| 14 |     MR. HRONES:  With you? |
| 15 |     MR. DONOHUE:  I don't know if I have it |
| 16 | with me. |
| 17 |     MR. HRONES:  Can you check, because it was |
| 18 | sent to me, but I misplaced it. |
| 19 |     A.  That seems to be the big thing, they |
| 20 | misplaced mine. |
| 21 |     MR. DONOHUE:  You're here to answer |
| 22 | questions, not to help. |
| 23 |     MR. HRONES:  Off the record. |
| 24 | |

# OFFICER ANDREW FAY
## June 5, 2007

5 (Pages 14 to 17)

## Page 14

1          (Off the record.)
2
3          Q.  So at some point did you arrive at an
4    address where you stopped?
5          A.  Yes, sir, Officer Coyne continued
6    following the car. Shandon Road is one way street
7    that goes into Franklin Hill Housing project and
8    does a loop and comes out on the other side of
9    Franklin Hill. I went to the other end of Shandon
10   Road and came up one way the wrong way in order to
11   block the vehicle, if necessary.
12          The car was already stopped by the
13   time I pulled up to, I believe it was 38 Shandon
14   Road. I don't really remember the exact address.
15          Q.  Where was Officer Coyne?
16          A.  Officer Coyne was with a female at that
17   time. The car doors of the white Honda were open.
18          Q.  When you arrived on the scene he had
19   already --
20          A.  He was with a white female.
21          Q.  So he arrived before you did?
22          A.  Oh, yes, sir, at the conclusion, yes.
23          Q.  Because you took another route in order to
24   block the path?

## Page 15

1          A.  Yes, sir.
2          Q.  Were there any other police cars there at
3    that time?
4          A.  At this time, just about -- a lot of other
5    police officers were coming to assist.
6          Q.  What's the first thing you saw?
7          A.  Officer Coyne was pointing in the
8    direction where two suspects fled. He said one was
9    a female and one was a male.
10          Q.  You didn't see them flee?
11          A.  No, sir. At this time, myself and
12   responding officers just spanned out and started
13   searching the area.
14          Q.  Did you find anything?
15          MR. DONOHUE:  Objection.
16          A.  At one point I was on the roof of -- I
17   don't recall the address at this time, but I heard
18   on the radio that they were on the second floor.
19          Q.  Who's they?
20          MR. DONOHUE:  Please don't interrupt the
21   witness; let him finish.
22          A.  Other officers had knocked on the door. I
23   don't know how they got in the door, the door was
24   open and they said the suspect was possibly in one

## Page 16

1    of the bedrooms. I came down off the room and went
2    into the apartment.
3          Q.  Let's break this up a bit. So you didn't
4    see the officers go in?
5          A.  No, sir, the door was already open.
6          Q.  So how did you know the door was open?
7          A.  The door as open, officers were standing
8    outside the door. There was also a few officers
9    inside the apartment. There was a gentleman clad
10   only in boxer shorts at the door.
11          Q.  That's when you arrived?
12          A.  Yes, sir.
13          Q.  But there were people there before you
14   arrived?
15          A.  Oh, yes.
16          Q.  Do you know how many officers were there
17   before?
18          A.  Approximately four to six.
19          Q.  Was Officer Coyne there?
20          A.  Yes, sir, he was. Whether or not he was
21   inside or outside, I don't know.
22          Q.  How many officers where outside?
23          A.  I don't know. By the time I made entry
24   into the apartment, Officer Coyne was with me.

## Page 17

1          Q.  You don't know whether he joined you
2    before you went in or when you went in?
3          A.  He joined me as we were inside the
4    apartment.
5          Q.  You both came there independently?
6          A.  Yes, sir.
7          Q.  The gentleman at the door in his shorts,
8    what did you notice about him?
9          A.  That was clad only in boxer shorts. He
10   was a Hispanic male, 30 to 40 years old.
11          Q.  Anything on his upper torso?
12          A.  Not that I recall, no.
13          Q.  Did you talk to him?
14          A.  No.
15          Q.  Was anyone talking to him?
16          A.  I don't recall. I went right by him, I
17   didn't pause at all.
18          Q.  Where was he?
19          A.  He was by the doorway. He was
20   perpendicular to the doorway.
21          Q.  Was he in handcuffs?
22          A.  No, sir.
23          Q.  Did you have any idea whether the driver
24   of the car was in the apartment?

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

OFFICER ANDREW FAY
June 5, 2007

6 (Pages 18 to 21)

| Page 18 |
|---|
| 1    A. We were directed to the back bedroom, one |
| 2 of the back bedrooms where they said the suspect was |
| 3 probably hiding. |
| 4    Q. Who said that? |
| 5    A. One of officers. |
| 6    Q. They hadn't already gone after him? |
| 7    MR. DONOHUE: Objection. |
| 8    A. No. |
| 9    Q. Do you know why they hadn't already gone |
| 10 after him? |
| 11    A. I don't know, sir. |
| 12    Q. Was there a sergeant on the scene -- |
| 13 strike that. |
| 14       Was there a supervising officer on |
| 15 the scene? |
| 16    MR. DONOHUE: Objection. |
| 17    A. I'm not sure at this time. There were |
| 18 uniformed sergeants and there was also plain clothes |
| 19 sergeants. |
| 20    Q. Who was your supervising sergeant? |
| 21    A. Sergeants for B-2 that night were Sergeant |
| 22 Haseem Hossein, H-A-S-E-E-M, and Hossein is H-O-S -- |
| 23    Q. H-O-S-S-E-I-N. |
| 24    A. And Sergeant Dave Sheets and Sergeant Guss |

| Page 19 |
|---|
| 1 Frangie. |
| 2    Q. What about Sergeant Watts? |
| 3    A. Sergeant Watts is a B-3 supervisor. |
| 4    Q. Was this within the jurisdiction of B-3? |
| 5    A. Yes, sir. |
| 6    Q. What about Sergeant Toomey? |
| 7    A. I believe Sergeant Toomey is also a B-3 |
| 8 supervisor. |
| 9    Q. Now when the incident involves B-3 and |
| 10 there are sergeants there from B-3 and other |
| 11 jurisdictions, who's in charge? |
| 12    MR. DONOHUE: Objection. |
| 13    A. I believe the supervisor of that district |
| 14 is in charge. |
| 15    Q. If there's two supervisors, are they both |
| 16 in charge? |
| 17    MR. DONOHUE: Objection. Just so it's |
| 18 clear for the record, this is not a 30 (b) (6) |
| 19 witness, you're only asking him about his |
| 20 understanding of policies and procedures of the |
| 21 Boston Police Department. He's not here to |
| 22 speak on behalf of the -- |
| 23    MR. HRONES: Oh, yeah, he's not a expert, |
| 24 no. |

| Page 20 |
|---|
| 1    A. As far as if there's two sergeants on the |
| 2 scene from the same district who has more authority, |
| 3 I believe they both have the same authority. If |
| 4 they tell me to do something, I do it. |
| 5    Q. It's not a matter of tenure? |
| 6    A. No, not that I know of. |
| 7    Q. So you'd be taking orders from them? |
| 8    A. Yes, as a superior officer. |
| 9    Q. No, rather than from the B-2 sergeants? |
| 10    A. I would be taking orders from all of them. |
| 11 If they contradicted, then I probably would seek |
| 12 some kind of clarification. |
| 13    Q. So you went in the apartment? |
| 14    MR. DONOHUE: Objection. |
| 15    A. Yes, sir. |
| 16    MR. HRONES: What's wrong with that? |
| 17 Leading? |
| 18    MR. DONOHUE: You already asked him that. |
| 19    Q. What did you do once you got in? |
| 20    A. Again, we were directed to one of the back |
| 21 bedrooms. The first bedroom I entered was the |
| 22 left-hand side bedroom as you're looking at the |
| 23 apartment from the front door. It was a baby's |
| 24 room, a small child's room. There was a small child |

| Page 21 |
|---|
| 1 sleeping in a crib. At this time we saw movement |
| 2 and Officer Coyne and I saw movement in a closet |
| 3 with the door open, the closet was there. And then |
| 4 we saw a man in a tee shirt and underwear hiding in |
| 5 the closet. |
| 6    Q. Were your guns drawn? |
| 7    A. No, too many officers and there were small |
| 8 children. |
| 9    Q. But you thought that might be the |
| 10 murderer? |
| 11    A. Could have been. |
| 12    Q. But you still didn't have your guns drawn? |
| 13    A. No, not at that time. |
| 14    Q. He could have been armed for all you know? |
| 15    A. Discretion is a better part of -- I didn't |
| 16 believe that firearms needed to be drawn at that |
| 17 time. |
| 18    Q. Did anyone have their firearms drawn that |
| 19 you know of? |
| 20    A. I don't recall anyone having their firearm |
| 21 drawn. |
| 22    Q. What did you do relative to this |
| 23 individual? |
| 24    A. I put handcuffs on the individual. |

**OFFICER ANDREW FAY**
**June 5, 2007**

7 (Pages 22 to 25)

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  Officer Coyne collected his clothing.
2      Q.  Excuse me, let me stop you there.  How did
3  you know this was the individual that had been
4  driving the automobile?
5      A.  Based on the fact that he was sweating
6  profusely and hiding in a small child's room and
7  taking his clothes off and was trying to hide them
8  under other clothes.  I took him into custody as a
9  possible suspect to be identified later.
10      Q.  What about the guy at the door in the
11  shorts, was he trying to hide?
12      A.  The only time I saw him was when I passed
13  him in that brief moment.
14      Q.  When you went out with the suspect --
15      A.  He wasn't there.
16      Q.  Were there any other officers that had
17  gone at that point?
18      A.  I don't know who was with him at that
19  point.
20      Q.  Did you see a woman in there?
21      A.  Yes.
22      Q.  Did you talk --
23      A.  No, I did not talk to anyone.
24      Q.  Did you see an old man?

**Page 24**

1  I handcuffed him for my safety and other officers'
2  safety.
3      Q.  But there were other senior officers there
4  at that time?
5      A.  At that time yes, sir.
6      Q.  Did you check with them as to what to do
7  with this suspect?
8      A.  Yes, sir.  Because of the number of police
9  cars present, mine was blocked in.  I sought
10  guidance from one of the supervisors as to the
11  closest police car that was not blocked in.  It was
12  a Boston Housing Police Officer and a Boston Housing
13  cruiser that was not.  He was placed in the back of
14  the police car at that time.
15      Q.  Did you talk to any supervisor before you
16  left the apartment?
17      A.  I probably talked to either Sergeant
18  Sheets or Sergeant Hussein.
19      Q.  What would you be talking to them about?
20      A.  "What do I do with him?  Are we waiting
21  for detectives?  Are we waiting for Homicide or
22  what?"
23      Q.  Did you talk to the B-3 supervisor?
24      A.  I may have had contact with Sergeant

**Page 23**

1      A.  I don't recall seeing an old man.
2      Q.  Did you see children?
3      A.  Yes, sir, I saw at least one child.  That
4  was the child sleeping in the bed.
5      Q.  You didn't see a second child?
6      A.  I don't recall.
7      Q.  Was a search made at the apartment?
8      A.  I don't know.  I took the suspect into
9  custody and took them right out of the apartment as
10  soon as I put the handcuffs on him.
11      Q.  But you weren't involved in any search?
12      A.  No, sir.
13      Q.  And you're not sure whether other people
14  --
15      A.  I'm not sure.
16      Q.  Who authorized you to take this man into
17  custody?
18      A.  Again, he was not under arrest; he was a
19  possible suspect.
20      Q.  But he was handcuffed?
21      A.  Yes, sir.
22      Q.  Who authorized you to handcuff --
23      A.  Nobody authorized me, sir.  Based on my
24  observations that he could be a suspect in a murder

**Page 25**

1  Toomey.
2      Q.  But he was in charge, was he not?
3      MR. DONOHUE:  Objection.
4      A.  At the time, I don't know who was taking
5  over as the officer in charge.
6      Q.  But it was either Toomey or Watts?
7      A.  If it was a District 3 sergeant, I believe
8  it was, yes.
9      Q.  So you were authorized to take the
10  handcuffed person out of the apartment?
11      MR. DONOHUE:  Objection.
12      A.  It's not a question of being authorized;
13  it's just taking them out of the scene and
14  de-escalating any kind of situation.
15      Q.  Was he under arrest?
16      A.  No.
17      Q.  Was he handcuffed?
18      A.  Yes.
19      Q.  Was he in a position to leave?
20      A.  No.
21      Q.  What's your definition of an arrest?
22      A.  Arrest is taking the freedom of somebody
23  else in order to answer for a crime.
24      Q.  This person's freedom was restricted,

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**OFFICER ANDREW FAY**
**June 5, 2007**

8  (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|
| 1  wasn't it? | 1  what had -- |
| 2     A.  He was being detained only because he was | 2        MR. DONOHUE:  Objection. |
| 3  a possible suspect in a homicide. | 3     A.  Yes, sir. |
| 4     Q.  So how would you describe his position if | 4     Q.  Wait until I finish the question.  You |
| 5  he wasn't under arrest? | 5  still would have taken him into custody? |
| 6     A.  He wasn't free to go until he was cleared | 6     A.  Yes, this was based on Officer Coyne's |
| 7  of that. | 7  observation that this was the person he saw running. |
| 8     Q.  So he wasn't free to go? | 8     Q.  He told you that? |
| 9     A.  No. | 9     A.  Yes, sir. |
| 10     Q.  So at what point was he put under arrest, | 10     Q.  When did he tell you that? |
| 11  if he was? | 11     A.  I don't recall, but I remember him saying |
| 12     A.  I don't have that information, I believe | 12  this is the guy. |
| 13  District 4 people initiated the chase, arrested him, | 13     Q.  You mean when he saw him he said that? |
| 14  I think he was transported by a wagon, from what | 14     A.  It's possible, I'm not quite sure. |
| 15  district I don't know, to B-3.  He had my handcuffs | 15     Q.  Do you know how anyone knew that that |
| 16  on, that was the last I saw of him or my handcuffs | 16  particular individual had gone into that apartment? |
| 17  for a month. | 17        MR. DONOHUE:  Objection. |
| 18     Q.  So under what authority do you have to | 18     A.  I don't know. |
| 19  take someone into custody and handcuff them without | 19     Q.  You got a radio call while you were on the |
| 20  making an arrest? | 20  roof, didn't you? |
| 21     A.  The fact that I'm a police officer and if | 21     A.  Radio call for? |
| 22  I believe this person could be a harm to myself or | 22     Q.  From other officers? |
| 23  others that he could be detained, handcuffed or not, | 23     A.  Yes, well, the radio said that the suspect |
| 24  until it could be proven that he's not involved in | 24  was possibly on the second floor apartment. |

| Page 27 | Page 29 |
|---|---|
| 1  any sort of crime. | 1     Q.  Did they name the particular apartment? |
| 2     Q.  Did you have probable cause to take him | 2     A.  I can't recall.  As I said, when I came |
| 3  into custody? | 3  off the roof officers were already inside. |
| 4     A.  Yes, I believe Officer Coyne saw him flee | 4     Q.  When you went in, were they looking for |
| 5  from the car and gave a description of the clothing | 5  the individual in the apartment? |
| 6  which he recovered in the apartment that was next to | 6        MR. DONOHUE:  Objection. |
| 7  the suspect. | 7     A.  When they made entry, I believe I arrived |
| 8     Q.  Apart from any murder, he had violated the | 8  just as they were making entry.  They were talking |
| 9  law by trying to get away from the police? | 9  to this gentleman in the boxer shorts, I just went |
| 10     A.  Yes, sir, driving erratically, running red | 10  right by him. |
| 11  lights, operating in a dangerous manner. | 11     Q.  So the officers where talking to this |
| 12     Q.  So you had a basis to arrest him? | 12  person? |
| 13     A.  Yes. | 13     A.  I believe they were. |
| 14     Q.  Based on that, what he had done there? | 14     Q.  Was Officer Foley there? |
| 15     A.  Yes, sir. | 15     A.  I don't know who Officer Foley is. |
| 16     Q.  So you were not just taking him into | 16     Q.  Do you know what officers were there? |
| 17  custody for the murder, were you? | 17     A.  I vaguely remember very few. |
| 18     A.  At that point in time, I was just taking | 18     Q.  Anyone from Direct 2 that you know? |
| 19  him into custody as a possible suspect in a | 19     A.  At this time I can't recall who was there, |
| 20  homicide.  Whether or not Officer Coyne thought | 20  who was on shift that night. |
| 21  otherwise, I don't know. | 21     Q.  So you know more of the District Two guys |
| 22     Q.  But if there was no murder involved or | 22  than District Three? |
| 23  nothing to do with an alleged murder, you still | 23     A.  Yes, sir. |
| 24  would have taken that person into custody based on | 24     Q.  So, how long did it take you from the time |

**OFFICER ANDREW FAY**
**June 5, 2007**

9 (Pages 30 to 33)

| Page 30 |
| --- |

1  you entered until the time you marched the suspect
2  out?
3     A.  It could be two to four minute max.
4     Q.  When you took him out, you didn't see the
5  other individual in the shorts?
6     A.  No, sir.
7     Q.  Do you know what happened to him?
8     A.  I do not, sir.
9     Q.  Did you ever find out what happened to
10 him?
11    A.  No, sir.
12    Q.  Do you know why he was in that apartment?
13    A.  No, sir.
14    Q.  So what did you do after that?
15    MR. DONOHUE: Objection.
16    MR. HRONES: Let me rephrase the question.
17    Q.  Did you take any individual to the
18 station?
19    A.  To the police station?
20    Q.  Yes.
21    A.  No, sir. I stood by while the Honda was
22 towed. I then --
23    Q.  Where was the handcuffed person at that
24 time?

| Page 31 |
| --- |

1     A.  I believe he was taken to B-3.
2     Q.  Do you know who took him?
3     A.  No.
4     Q.  But you were with the housing police
5  officer?
6     A.  He helped me escort the person down the
7  stairs and I placed him in the back of the Boston
8  police housing cruiser.
9     Q.  Let me show you this photograph and see
10 whether you can identify the officers involved in
11 the photograph.
12    MR. DONOHUE: That's Exhibit 5 from
13 Harris's deposition?
14    MR. HRONES: Well, I'm going to remark it.
15    A.  No, I don't recognize anyone from this
16 photo.
17    Q.  Do you see there's, apparently, a black
18 officer with a beard?
19    A.  Yes, sir.
20    Q.  You don't recognize him?
21    A.  No.
22    Q.  Did you know any black officer with a
23 beard that was there that night?
24    A.  I don't recall anyone.

| Page 32 |
| --- |

1     Q.  What about the other gentleman?
2     A.  The other gentleman meaning right here,
3  sir, (indicating)?
4     Q.  Yes.
5     A.  I don't know, sir, I can't --
6     MR. HRONES: Could this be marked as
7  Exhibit 2. It's a photograph relative to the
8  incident that night.
9
10    (Exhibit No. 1, Photograph
11    Showing Two Police Officers and
12    an Individual Between Them.)
13
14    MR. HRONES: To identify it further, it's
15 showing two police officers and an individual
16 between them.
17    Q.  Do you recognize the individual in between
18 them?
19    A.  Not at this time, sir, I don't.
20    Q.  You don't recognize him as the person at
21 the door?
22    A.  No, sir.
23    Q.  Let me show you this photograph and see if
24 you can identify that person?

| Page 33 |
| --- |

1     A.  No, I have no idea who that is. It's
2  really too fuzzy for me to identify anyone from it.
3     Q.  This is a photograph of an individual, it
4  appears to be the white individual in the other
5  pictures that was just marked.
6
7     (Exhibit No. 2, Photograph.)
8
9     MR. HRONES: Can we take a little break, I
10 have to get another picture.
11
12    (Off the record.)
13
14    Q.  Now, when you make out a Form 26, what do
15 you do with it?
16    A.  I give it to my district supervisor,
17 lieutenant at the desk.
18    Q.  Did you try to find it when you were asked
19 for it?
20    A.  Yes.
21    Q.  And you couldn't find it?
22    A.  No.
23    Q.  Did you finally find it?
24    A.  Yes.

**OFFICER ANDREW FAY**
**June 5, 2007**

10 (Pages 34 to 37)

| Page 34 |
|---|
| 1    Q.  Where did you finally find it? |
| 2    A.  On the bottom of a locker I keep very old |
| 3  reports and other things I have. |
| 4    Q.  But the district superintendent, as far as |
| 5  you know, didn't have it? |
| 6    A.  I gave it to him, yes.  Whether or not -- |
| 7  what he did after that, I do not know. |
| 8    Q.  Now who was with you when you ushered out |
| 9  the individual you put in handcuffs? |
| 10    A.  Boston Housing Police Officer. |
| 11    Q.  Where was Officer Coyne? |
| 12    A.  Officer Coyne, I believe, he went back |
| 13  down to his police car to put the clothing that was |
| 14  recovered into a bag. |
| 15    Q.  Did he enter the bedroom with you? |
| 16    A.  Yes. |
| 17    Q.  Were you there when homicide arrived? |
| 18    A.  Yes. |
| 19    Q.  Did you see Detective Keeler? |
| 20    A.  Sergeant Keeler, yes. |
| 21    Q.  Did you talk to him? |
| 22    A.  Yes. |
| 23    Q.  What did he say to you? |
| 24    A.  Something to the effect of, "Can you take |

| Page 35 |
|---|
| 1  this person..." I believe it was a female Officer |
| 2  Coyne had on the other side of the car, "... to |
| 3  homicide so we can question her." |
| 4    Q.  He talked to you about the girl? |
| 5    A.  Yes, sir. |
| 6    Q.  Did you take her to homicide? |
| 7    A.  I did. |
| 8    Q.  At the direction of Sergeant Keeler? |
| 9    A.  Yes, sir. |
| 10    Q.  At what point did he arrive on the scene? |
| 11    A.  This was after I had already placed the |
| 12  person into the Boston Housing Police cruiser. |
| 13  Time-wise, I'd say ten minutes after that, but it |
| 14  could have been more, it could have been less. |
| 15    Q.  Did you see Sergeant Detective Harris? |
| 16    A.  I don't recall seeing him. |
| 17    Q.  Did Sergeant Detective Keeler order the |
| 18  individual you took out of the building to B-3? |
| 19    A.  I don't know. |
| 20    Q.  Do you know why he went to B-3 and the |
| 21  woman went to homicide? |
| 22    A.  The woman was only being questioned as a |
| 23  possible witness, I believe, at that time. |
| 24    Q.  But that makes a difference as to where |

| Page 36 |
|---|
| 1  the person is taken? |
| 2    A.  Well, because it was a homicide, it was |
| 3  homicide's jurisdiction and that's where they |
| 4  conduct interviews. |
| 5    Q.  Why would the other two be to B-3? |
| 6    A.  I don't know. |
| 7    Q.  Who took the woman into custody? |
| 8      MR. DONOHUE:  Objection. |
| 9    A.  Which woman? |
| 10    Q.  The only woman that was taken into |
| 11  custody. |
| 12    A.  She was never taken into custody. |
| 13    Q.  She was never taken into custody? |
| 14    A.  No, sir.  I took her to homicide; she was |
| 15  questioned; I stood by and then drove her home. |
| 16    Q.  Was she free to leave? |
| 17    A.  I drove her home. |
| 18    Q.  Before you drove her home? |
| 19    A.  I don't know if she was or not. |
| 20  Apparently, she agreed to come to homicide, police |
| 21  headquarters, with us because she was not handcuffed |
| 22  and I did not have to coerce her. |
| 23    Q.  Who asked her to come? |
| 24    A.  I believe Sergeant Detective Keeler. |

| Page 37 |
|---|
| 1    Q.  What does it mean to take someone into |
| 2  custody? |
| 3      MR. DONOHUE:  Objection, you asked that. |
| 4      MR. HRONES:  No, that was arrest, what |
| 5  does it mean to arrest. |
| 6    A.  To take someone into custody? |
| 7    Q.  Yes. |
| 8    A.  To deprive somebody of their freedom to |
| 9  leave. |
| 10    Q.  Did you review your report, your Form 26? |
| 11    A.  You asked me that earlier, yes, I did. |
| 12    Q.  Do you remember in that report that -- |
| 13  Police Officer Coyne, is it? |
| 14    A.  Yes, sir. |
| 15    Q.  -- had taken a female into custody?  Do |
| 16  you remember saying that in your report? |
| 17    A.  Yes, sir.  At the end of the chase he had |
| 18  a female.  Whether or not she was in custody or not, |
| 19  she was probably placed in handcuffs at that time |
| 20  because she was the only person around the suspect |
| 21  vehicle. |
| 22    Q.  So she was placed in handcuffs? |
| 23    A.  I believe she was, sir. |
| 24    Q.  But not when you took her to the station? |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

OFFICER ANDREW FAY
June 5, 2007

16 (Pages 58 to 60)

| Page 58 | Page 60 |
|---|---|
| 1  Date:            June 06, 2007 | 1              CORRECTION SHEET |
| 2  To:             Thomas R. Donohue, Esq. | 2   DATE TAKEN:    June 5, 2007 |
| 3  Copied to:      Stephen Hrones, Esq. | 3   CASE: IN RE:  PINEDA V CITY OF BOSTON |
| 4  From:           Kathryn K. Gianno | 4   DEPONENT:    OFFICER ANDREW FAY |
| 5  Deposition of:   Officer Andrew Fay | 5 |
| 6  Taken:          June 05, 2007 | 6  ************************************** |
| 7  Action:         PINEDA vs. CITY OF BOSTON | 7  Page/Line/Correction and Reason |
| 8 | 8  ************************************** |
| 9      Enclosed is a copy of the deposition | 9  ——/——/—————————————— |
| 10  of OFFICER ANDREW FAY, taken on JUNE 05, 2007, | 10  ——/——/—————————————— |
| 11  in the above-entitled action. | 11  ——/——/—————————————— |
| 12      The deponent has thirty days to sign the | 12  ——/——/—————————————— |
| 13  deposition from the date of its submission to the | 13  ——/——/—————————————— |
| 14  deponent, which is the above date. | 14  ——/——/—————————————— |
| 15      Have the deponent sign the enclosed signature | 15  ——/——/—————————————— |
| 16  page.  Any errors should be marked by page, line and | 16  ——/——/—————————————— |
| 17  error on the enclosed correction sheet, and forwarded | 17  ——/——/—————————————— |
| 18  to all interested parties.  Please do not mark the | 18  ——/——/—————————————— |
| 19  transcript itself. | 19  ——/——/—————————————— |
| 20      Thank you for your cooperation. | 20  ——/——/—————————————— |
| 21 | 21  ——/——/—————————————— |
| 22 | 22  ——/——/—————————————— |
| 23 | 23  ——/——/—————————————— |
| 24 | 24  ——/——/—————————————— |

Page 59

```
 1          UNITED STATES DISTRICT COURT
 2           DISTRICT OF MASSACHUSETTS
 3   CIVIL ACTION NO.: 05-1-216JLT
 4
 5   * * * * * * * * * * * * * * * * * * * * * * * * *
 6   CARLOS PINEDA and ALEXANDRA PEREZ,        *
 7        Plaintiffs,                          *
 8        vs.                                  *
 9   DANIEL KEELER, DENNIS HARRIS, JOSEPH R. WATTS, *
10   JOSEPH P. TOOMEY, WILLIAM J. GALLAGHER,   *
11   EDWARD GATELY, JANINE BUSBY, and the CITY OF *
12   BOSTON,                                   *
13        Defendants.                          *
14   * * * * * * * * * * * * * * * * * * * * * * * * *
15
16
17        I, OFFICER ANDREW FAY, do hereby certify,
18   under the pains and penalties of perjury, that the
19   foregoing testimony is true and accurate, to the
20   best of my knowledge and belief.
21        WITNESS MY HAND, this     day of
22        , 2007.
23   _____
24   OFFICER ANDREW FAY
```

# Exhibit E

Page 1

VOLUME:        I

PAGES:      1-169

EXHIBITS:     1-2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS      C.A. NO. 05-10216JLT

*****************************************

CARLOS PINEDA and ALEXANDRA PEREZ,      *

      Plaintiffs,      *

v.      *

DANIEL KEELER, DENNIS HARRIS,      *

JOSEPH R. WATTS, JOSEPH P. TOOMEY,      *

WILLIAM J. GALLAGHER, EDWARD GATELY,      *

JANINE BUSBY, and THE CITY OF BOSTON,  *

      Defendants.      *

*****************************************

      DEPOSITION of CARLOS PINEDA, a witness

called on behalf of the Defendants, taken pursuant

to the Massachusetts Rules of Civil Procedure

before Marie T. Williams, Professional Court

Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at the City of

Boston Law Department, City Hall, Room 615,

Boston, Massachusetts, Wednesday, May 17, 2006,

commencing at 10:48 a.m.

Page 2

```
1           APPEARANCES
2
3    Stephen Hrones, Esquire
4    Hrones and Garrity
5    Lewis Wharf - Bay 232
6    Boston, Massachusetts  02110-3927
7    (617)227-4019
8    rhones@masscrimnallawyer.com
9        Counsel for the Plaintiffs
10
11   Helen Litsas, Esquire
12   City of Boston Law Department
13   City Hall, Room 615
14   Boston, Massachusetts  02201
15   (617)635-4040
16   helen.litsas@cityofboston.gov
17       Counsel for the Defendants
18
19   Also Present:
20   Alexandra Perez, Plaintiff
21   Susan M. Weise, Chief of Litigation, City of
22       Boston Law Department
23
24
```

Page 3

```
1             INDEX
2    WITNESS      DIRECT CROSS REDIRECT RECROSS
3    CARLOS A. PINEDA
4    (By Ms. Litsas)    4
5    (By Mr. Rhones)      163
6
7
8
9          EXHIBITS
10   NO.              PAGE
11   1 - Diagram of Apartment.......................64
12   2 - Diagram of Outside of Apartment...........105
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1            PROCEEDINGS
2            CARLOS A. PINEDA, first having been
3    properly identified and duly sworn, under oath,
4    deposes and says as follows:
5    DIRECT EXAMINATION BY MS. LITSAS:
6    Q.  Good morning, Mr. Pineda.  My name is Helen
7        Litsas, and I represent the defendants in
8        this action.  And with me is Susan Weise who
9        is also an attorney for the defendants.
10           Just before we begin, I want to
11   apologize to you and Ms. Alexandra Perez and
12   Mr. Rhones who is also here today.  There was
13   a glitch with the court reporting office and
14   the scheduling, and so there was a delay in
15   beginning this morning.  And so I just want
16   to extend my apologies on behalf of myself
17   and the defendants.
18           MS. LITSAS:  I think we're ready to
19   begin.  Just a couple of ground rules, Mr.
20   Rhones.  I assume all objections, except as
21   to form, are reserved until the time of
22   trial?
23           (Mr. Rhones nods.)
24           MS. LITSAS:  And does the witness
```

Page 5

```
1    want to read and sign before a notary, or do
2    you waive the notary?
3            MR. RHONES:  Waive the notary.
4    He'll read and sign.
5            MS. LITSAS:  Okay.  And motions to
6    strike are reserved until the time of trial?
7            MR. RHONES:  Yeah, fine.
8    Q.  And Mr. Pineda, just for the record, you have
9        no problems speaking English?
10   A.  No.
11   Q.  Have you ever had your deposition taken
12       before, Mr. Pineda, such as this with a
13       stenographer transcribing your statement and
14       another attorney asking you questions?
15   A.  No.
16   Q.  Let me just give you some ground rules before
17       we start in terms of taking today's
18       deposition.
19           I'm going to be asking you
20       questions; you're going to be answering.  And
21       in order for a record to be transcribed, the
22       stenographer needs to hear your verbal
23       answer; so if you nod or gesture, she's not
24       able to record that on this transcript.  So
```

2 (Pages 2 to 5)

## Page 6

1  if you just articulate your answers and speak
2  loud enough for her to hear, that would be a
3  huge help.
4      Do you understand that?
5  A.  I understand.
6  Q.  At any time if you'd like to take a break,
7  I'd be more than happy to provide a break to
8  you.  However, if there is a question that is
9  pending, I ask that you answer the question
10  first and then take the break.
11      If you don't understand any
12  questions that I ask you, please don't
13  hesitate to ask and I will rephrase the
14  question for you.  Otherwise, I'm going to
15  expect that you answer the question.
16      If at any point, as I said, you
17  need to take a break, just let me know.  I
18  will require you to answer the question
19  that's pending though before.
20      Do you understand those
21  instructions?
22  A.  I understand.
23  Q.  Great.  What did you do to prepare for
24  today's deposition, Mr. Pineda?

## Page 7

1  A.  (No verbal response.)
2  Q.  Did you do anything?
3  A.  No.
4  Q.  Did you review any documents?
5  A.  Yes.
6  Q.  What documents did you review?
7  A.  Boston Police Department, Internal Affairs --
8  it was an interview.
9  Q.  The Internal Affairs interview that you gave
10  with the Boston Police Department?
11  A.  That's correct.
12  Q.  Did you review any other documents other than
13  that?
14  A.  No.
15  Q.  Just for the record, could you just state
16  your name?
17  A.  Carlos A. Pineda.
18  Q.  Could you also state your address?
19  A.  1980 Dorchester Ave., Apartment No. 202.
20  Q.  Who lives with you at that address?
21  A.  My mom.
22  Q.  Is that in Dorchester?
23  A.  Dorchester.
24  Q.  How long have you lived at that address?

## Page 8

1  A.  About a year.
2  Q.  Where did you live previously?
3  A.  One Shandon Road.
4  Q.  Is that also known as 11 Fermoy Heights?
5  A.  That is correct.
6  Q.  And before that address, where did you live?
7  A.  That's kind of like a long time ago.
8  Q.  How long did you live at One Shandon Road?
9  A.  Close to four years.
10  Q.  And you lived at your current address for the
11  past year?
12  A.  Yes.
13  Q.  And you live with your mother at that
14  address?
15  A.  Yes.
16  Q.  Do you live with anybody else at that
17  address?
18  A.  No.
19  Q.  Do you have any children, Mr. Pineda?
20  A.  Two.
21  Q.  What are their names and ages?
22  A.  Damien Pineda, he's currently five going on
23  six; and Leilani Pineda, she's currently
24  three going on four.

## Page 9

1  Q.  Who was their mother?
2  A.  Alexandra Perez.
3  Q.  Do you have any other children other than
4  those two children?
5  A.  No.
6  Q.  What is your current marital status,
7  Mr. Pineda?
8  A.  Still married but legally -- or going through
9  a separation.
10  Q.  Are you legally separated?
11  A.  No.
12  Q.  Are you planning on getting divorced?
13  A.  I haven't discussed that yet.
14  Q.  Does your legal separation have anything to
15  do with this particular case?
16  A.  Somewhat.
17  Q.  In what way?
18  A.  Emotionally, personally.
19  Q.  Could you please explain that.
20  A.  After this happened, it sort of affected me
21  emotionally because, for two years I couldn't
22  get a job because everybody looked at me like
23  I was a criminal.
24  Q.  What do you mean by that?

3  (Pages 6 to 9)

Page 14

1   Q.  Do you remember if he came to you and asked
2       you about the news footage?
3   A.  He pulled me into the room.
4   Q.  What room?
5   A.  They just have a little room where you go and
6       talk to the father's advocate and things like
7       that.
8   Q.  Is that something that you regularly did at
9       the day-care center?
10  A.  Yes.
11  Q.  How often would you do that?
12  A.  I'd say about once or twice a week maybe.
13  Q.  And what did he say to you when he pulled you
14      into the room?
15  A.  Nothing.  He just called me over; and from
16      there, I really don't remember the
17      conversation.
18  Q.  Do you remember the subject matter of the
19      conversation?
20  A.  Yes.
21  Q.  And what was the subject matter?
22  A.  In regards to the news footage.
23  Q.  And had you seen the news footage?
24  A.  Yes.

Page 15

1   Q.  What did you see on the news footage?
2   A.  Me getting thrown -- put into the back of a
3       police car.  And they only showed my face, no
4       one else's.
5   Q.  What was your appearance in that news
6       footage?
7   A.  As a suspect.
8   Q.  How were you dressed?
9   A.  I was in my boxers.
10  Q.  And did you have a shirt on?
11  A.  Probably -- yeah, I had a little -- I
12      wouldn't say really a shirt, if you could
13      even call it that.
14  Q.  Was it a tank top?
15  A.  Yes, yeah.
16  Q.  Were you in handcuffs in the news footage?
17  A.  Yes.  Yes, I was.
18  Q.  And was there anyone else in the news footage
19      with you?  Any other officers or --
20  A.  Yeah, the officer that put me in the car.  I
21      don't really recall too much about that.  I
22      just know that I saw the news footage.  An
23      officer put me in the back of the car.
24  Q.  Do you know what channel on the news this was

Page 16

1       on?
2   A.  Channel 5, 6, 7 and Fox 25; and I think 10
3       too.
4   Q.  And did you see the news footage on all of
5       these stations, or was there one particular
6       station?
7   A.  I believe Channel 7 was the one, because I
8       didn't have cable at that time as far as I
9       can remember.
10  Q.  Did anyone else see the news footage with
11      you?
12  A.  Yes.  Alexandra Perez and also the -- just
13      the kids.  Just us because we were there.  My
14      father-in-law actually.
15  Q.  What's your father-in-law's name?
16  A.  Jose Perez.
17  Q.  Could you spell that for me?
18  A.  Last name, P-e-r-e-z; first name, J-o-s-e.
19  Q.  Your children were the other people who
20      watched the news footage with you?
21  A.  Yes.
22  Q.  Was there anybody else other than those
23      people?
24  A.  No.  Because I didn't turn on the TV until

Page 17

1       after the two officers that were there left.
2   Q.  And that was on the night of the incident on
3       April 28, 2003?
4   A.  That is correct.
5   Q.  And how many times did you see the news
6       footage?
7   A.  It was repetitive.  I can't even count how
8       many times.  It just kept showing up on TV.
9   Q.  How many times during the course over the
10      next few days did you see the news footage?
11  A.  Every day.
12  Q.  Were you working at that time?
13  A.  At that time I was unemployed, but I was
14      doing a side job for a friend of mine.
15  Q.  Who was your friend that you were doing a
16      side job for?
17  A.  His name is Larry Prior.
18  Q.  And can you spell that for me?
19  A.  L-a-r-r-y; Prior, P-r-i-o-r, I believe.
20  Q.  Do you know what his address is?
21  A.  11 Pearl Street.
22  Q.  In what neighborhood?
23  A.  Dorchester, Mass.
24  Q.  And does he still live at that address?

5 (Pages 14 to 17)

## Page 26

1    I think. I started East Coast Aero Tech -- I
2    can't really remember before that. I'm
3    sorry.
4  Q.  No, that's okay. So you don't recall where
5    you worked before Alleghenny in December of
6    2004?
7  A.  No, I don't. I think I was in school really.
8  Q.  What school were you in?
9  A.  I think I was East Coast Aero Tech because I
10    had taken a leave of absence, I believe. I'm
11    trying to remember if it was that. I'm
12    sorry.
13  Q.  That's okay. You had mentioned that you had
14    taken a leave of absence. Was that from East
15    Coast Aero Tech school?
16  A.  Yes. Yes, I took a leave of absence from
17    East Coast Aero Tech.
18  Q.  And when did you take a leave of absence?
19  A.  I don't even remember the date.
20  Q.  Was it after this incident or before this
21    incident?
22  A.  It was after.
23  Q.  And why did you take the leave of absence?
24  A.  Financial reasons.

## Page 27

1  Q.  What do you mean by financial?
2  A.  Money. I needed money.
3  Q.  You needed to pay tuition. Were you having
4    difficulty paying tuition?
5  A.  I was having difficulty paying bills.
6  Q.  And had you been going to East Coast Aero
7    Tech school full time or part time?
8  A.  Full time.
9  Q.  And what program were you in specifically?
10  A.  When I took a leave of absence, I believe I
11    was in the airframe phase or electrical
12    phase. I'm trying to remember. I think I
13    was in the electrical phase.
14  Q.  And what position did you want to obtain
15    after graduation from East Coast Aero Tech?
16  A.  I wanted to be an aircraft mechanic.
17  Q.  And do you still want to be an aircraft
18    mechanic?
19  A.  Yes. If I had the opportunity, I'd finish.
20  Q.  How many years had you finished at East Coast
21    Aero Tech?
22  A.  I really wouldn't say years, because part
23    time it takes three years to graduate. Full
24    time it only takes 18 months. So I was going

## Page 28

1    full time, and then had switched to part time
2    to see if I can maintain working and school;
3    and it just became extremely difficult.
4  Q.  And was this before the incident or after the
5    incident?
6  A.  After the incident.
7  Q.  How many months had you completed of the
8    full-time program?
9  A.  I'm not exactly sure. I would have to
10    actually go back --
11  Q.  Look at your records?
12  A.  Yeah.
13  Q.  When you were full time at East Coast Aero
14    Tech, were you working simultaneously?
15  A.  No.
16  Q.  How were you supporting yourself financially?
17  A.  For the first couple of months, I believe I
18    was collecting unemployment, yes.
19  Q.  Where were you living at the time you were at
20    East Coast Aero Tech?
21  A.  One Shandon Road, which is 11 Fermoy Heights.
22  Q.  When you were living with Alexandra Perez?
23  A.  Yes.
24  Q.  And your two children at that time?

## Page 29

1  A.  Yes.
2  Q.  Was Alexandra Perez working at that time?
3  A.  Yes.
4  Q.  And what position did she hold?
5  A.  Medical assistant.
6  Q.  Where was she working at that time?
7  A.  I believe South Boston Community Health
8    Center.
9  Q.  And was she working full time?
10  A.  Yes.
11  Q.  Prior to East Coast Aero Tech, had you had
12    any other education, high school?
13  A.  GED at Parker Hill/Fenway.
14  Q.  And where's that located?
15  A.  I believe next to Mission Hill. I don't know
16    the address. Again, I'd have to look through
17    my ...
18  Q.  When did you get your GED?
19  A.  I can't even remember.
20  Q.  It's 2006. Would it have been more than 10
21    years ago?
22  A.  No.
23  Q.  More than five years ago?
24  A.  It'd probably be a little bit less than five.

8  (Pages 26 to 29)

Page 34

1  A.  No.
2  Q.  Other than this incident?
3  A.  That is correct.
4  Q.  I'm sorry.  I'm backtracking a little bit.  I
5      had asked you before what had you done for
6      preparation for today's deposition.  You said
7      you had reviewed some documents?
8  A.  Yeah.
9  Q.  And that was an IA interview that you had
10     given?
11 A.  Yes.
12 Q.  Had you reviewed anything else?
13 A.  No.
14 Q.  Had you talked to anybody about today's
15     deposition?
16         MR. RHONES:  Except his lawyer.
17 Q.  Excluding communications with your attorney.
18 A.  No.
19 Q.  Did you talk to Alexandra, your wife?
20 A.  Not today.
21 Q.  While we were waiting for today's deposition,
22     you and Alexandra were going over some
23     papers; isn't that right?
24 A.  Just she went over her paper and I went over

Page 35

1      mine.  That's about it.
2  Q.  Did you talk about today's deposition?
3  A.  No.  We just talked about the time that we
4      had to meet up here, and that's about it.
5  Q.  Did you talk to your father-in-law, Jose
6      Perez, before today's deposition?
7  A.  No.
8  Q.  Did you talk to anybody, a friend of yours or
9      family, before today's deposition?
10 A.  No.
11 Q.  Are you currently taking any medication?
12 A.  No.
13 Q.  Have you taken any drugs or alcohol prior to
14     today's deposition?
15 A.  No.
16 Q.  What about within the past 24 hours?
17 A.  No.
18 Q.  Is there anything that would affect your
19     ability to testify today truthfully?
20     Anything that would inhibit your ability to
21     testify truthfully?
22 A.  No.
23 Q.  Is there anything that would affect your
24     ability to remember, recall events today?

Page 36

1  A.  Only time.
2  Q.  Other than the time that has lapsed, there's
3      nothing else that would affect your ability
4      to remember?
5  A.  No.
6  Q.  I just want to turn, if we can, to your
7      address at 11 Fermoy Heights.  You had lived
8      at that address for about four years prior to
9      this incident?  The incident occurred on
10     April 28, 2003; is that right?
11 A.  No.  During that time, I lived there about
12     three years because my son was born in 2000.
13 Q.  How long had you been there that day at that
14     particular address?  What had you done during
15     that day?
16 A.  I had gone to work for Larry Prior there that
17     day.  I was tired.  I came home.  I fell
18     asleep with my wife, and my kids were in the
19     bed.  I put everybody to bed early because I
20     was tired.  I really didn't want to do
21     anything or nothing.
22 Q.  What time had you gone to work that day?
23 A.  I think I went in around eight o'clock.  I
24     came back home -- I don't really remember the

Page 37

1      time that I came back home.  But if I guess,
2      I say probably like around -- anytime from
3      four o'clock maybe, three o'clock.  I'm not
4      really sure what time I got home that day.
5  Q.  So you had left the house around
6      eight o'clock to go to work for Larry Prior?
7  A.  Roughly.  I'm not sure if I left at eight or
8      earlier.
9  Q.  And how did you get there?
10 A.  I took my car.
11 Q.  And what kind of car did you have?
12 A.  White Honda Civic.
13 Q.  And was this the same car that was later
14     involved during the course of the evening
15     with Norberto Serrano?
16 A.  Yeah, from what I was told.  Yes.
17 Q.  So the white Honda Civic, was that a car that
18     you owned?
19 A.  Me and my wife owned it.  Because I mean we
20     really put work into that car together, so I
21     wouldn't say that I owned it.  That wouldn't
22     be right.
23 Q.  Were you on the registration?
24 A.  No.

10 (Pages 34 to 37)

Page 42

1   A.  Like your friends do a favor, you give them a
2       beer type of thing.
3   Q.  So why did you leave work that day?  Were you
4       finished or did you decide to go --
5   A.  I decided to call it quits because I was very
6       tired.
7   Q.  And that was about three o'clock or four
8       o'clock?
9   A.  Yeah, something like that.
10  Q.  What did you do when you left Larry Prior?
11  A.  I went straight home.  Norberto went
12      elsewhere.  I don't know where he went.  I
13      dropped him off -- I don't even remember
14      where I dropped him off.  I know he just
15      asked me to drop him off somewhere, so I did.
16          So I went home, took care of the
17      kids for a little while; and then, I don't
18      know, I just went to bed early that day.  I
19      was just really, really tired.
20  Q.  When you had gone to Larry Prior's, had
21      Norberto come with you in the white Honda or
22      did Norberto meet you there?
23  A.  I don't know -- I think, yeah, he did come
24      with me actually.

Page 43

1   Q.  So you drove him to Larry Prior's?
2   A.  Yes.
3   Q.  And had Norberto been staying at your house
4       prior to that night?
5   A.  Well, he was homeless so he sort of asked me
6       if he could stay for a few days.  So I kind
7       of said yeah.  So, yeah, he was.
8   Q.  And how long had he been staying there prior
9       to that, prior to that night?
10  A.  I don't know the exact length of time, but
11      I'd say probably the most a few days, maybe
12      even a week.  I'm not even sure really to be
13      honest with you.
14  Q.  Where had he been living before that time?
15  A.  Practically in the streets.
16  Q.  How long had he been on the streets for?
17  A.  I didn't bother to ask him.  He just asked me
18      for a favor and I said okay.
19  Q.  Was he working, other than for Larry Prior?
20  A.  I don't know.
21  Q.  Had you worked with Norberto before that day?
22  A.  No.  Because me and Norberto were sort of
23      like -- it was a friendship that we saw each
24      other every once and a while, and we just

Page 44

1       hung out together.  And then I saw the
2       opportunity he might get some work since he
3       was already homeless, so I kind of offered it
4       to him; and Larry said okay.
5   Q.  And that was a couple of days before the
6       incident?
7   A.  That is correct.
8   Q.  And where had you seen him?
9   A.  See, the thing about Norberto, he's a very
10      good friend and everything, but he tends to
11      disappear and reappear.  I mean ...
12  Q.  So how would you contact him?  Would you call
13      him by phone?
14  A.  No, I would actually get lucky and spot him.
15  Q.  In the neighborhood?
16  A.  Yeah.
17  Q.  You had mentioned prior to today's deposition
18      that he had -- he was also related by blood?
19  A.  No, not by blood.
20  Q.  He was related by marriage?
21  A.  It's kind of strange.  I really don't know
22      how to explain it, but very good family
23      members sort of like got married between the
24      family.  I haven't seen them or anything.

Page 45

1       But the family members weren't even close
2       family members, so I sort of met him through
3       that -- after that.
4   Q.  At a family function or something like that?
5   A.  No.  Actually, he was a very good friend of
6       mine.  And we were talking, asked some
7       questions and stuff like that.  And then he
8       mentioned a name that seemed familiar for me.
9       And I asked him, Is she married to -- I can't
10      even remember my cousin's name.  I'm sorry.
11          So from there on it was, like, okay
12      that means we're cousins then.  And I'm like
13      okay.  We kind of, like, hit it off, like, as
14      friends years before that.
15  Q.  How many years had you known Norberto before
16      the incident?
17  A.  I don't know the exact length of time.  But I
18      would say definitely more than a year and a
19      half or two.
20  Q.  And had you socialized before that night of
21      the incident?
22  A.  Before the night of the incident, we just had
23      a nice day at work.  That's it.  We were
24      tired.  He just told me to drop him off.  And

12  (Pages 42 to 45)

Page 46

1     I told him okay.
2   Q. Did you hang before -- did you hang as
3     friends before the night of the incident? I
4     guess is my question.
5   A. Yeah.
6   Q. What would you do?
7   A. Nothing. We just being with all low-riders,
8     talking trash, and stuff like that, you know.
9   Q. What's a low-rider?
10   A. A low-rider is a vehicle that's just dropped
11     to the ground. I'm really a fanatic with
12     cars.
13   Q. And who owns the -- did you own the low-
14     rider?
15   A. The Civic was low.
16   Q. So it was a low-rider?
17   A. Yes, I would call it.
18   Q. And so you guys would just hang out in the
19     car?
20   A. Not in the car. I mean, I say we would
21     socialize with the rest of the guys that had
22     low-riders and stuff like that.
23   Q. And who were some of the other people you
24     socialized with?

Page 47

1   A. I don't know them by name-name, but I do know
2     them by nicknames.
3   Q. And what are their nicknames?
4   A. Jaycee. And then the rest of them I don't
5     even recall because I haven't seen them in
6     years.
7   Q. Did you do anything else with Norberto other
8     than hang out as low-riders and working
9     together? Did you do anything else?
10   A. Video games. That's about it.
11   Q. Did you know Norberto by any other name other
12     than Norberto Serrano?
13   A. Well, we kind of called him Lui. That's
14     about it.
15   Q. And how do you spell that?
16   A. L-u-i.
17   Q. Was he also known as Lui Cruz?
18   A. I wouldn't know.
19   Q. So you just called him Lui. Was there any
20     other name other than Lui and Norberto did
21     you know him as?
22   A. Norbi.
23   Q. How do you spell that?
24   A. N-o-r-b-i.

Page 48

1   Q. And was there any other name other than --
2   A. No. Because I mean, the entire family called
3     him Norbi.
4   Q. Norbi?
5   A. Yeah. So they just sort of -- you know.
6   Q. So Norbi, Lui, and Norberto. Were there any
7     other names other than those three names?
8   A. No.
9   Q. Did you work together the entire time on the
10     night of the incident with Norberto?
11   A. I wouldn't say the night. The day --
12   Q. I mean, on the day of the incident, did you
13     do anything else other than work for Larry
14     Prior?
15   A. No.
16   Q. Did you leave at the same time?
17   A. Yeah, we did, but I dropped him off
18     somewhere. He went his own way, and I went
19     home. So I really didn't like being outside.
20     I just wanted to go home.
21   Q. And did you recall where you dropped him off
22     at?
23   A. No. I just dropped him off right down the
24     street from the place by the T. I think he

Page 49

1     took -- I think it was like where the bus
2     stop goes, where the 16 is in Dudley Square,
3     whatever.
4   Q. Did he ask you to go with him?
5   A. Yeah. But I was like, no, I don't want to go
6     outside today. I want to go home.
7   Q. And do you know what he was doing?
8   A. No.
9   Q. Did he have a key to your car?
10   A. No.
11   Q. How many sets of keys to your Honda Civic did
12     you have?
13   A. Two.
14   Q. Who had the other set other than yourself?
15   A. That would be Alexandra.
16   Q. Did he ever use your car before?
17   A. No. Well, not that I remember. I'm not
18     sure, but I don't think he did. Not at least
19     on my watch.
20   Q. So you don't recall whether or not he had
21     used your car before or not?
22   A. No.
23   Q. Do you know if he had a license?
24   A. That I didn't know.

13 (Pages 46 to 49)

Page 50

1  Q.  You don't know if he had a license or not?
2  A.  No, I never asked.
3  Q.  Had you ever seen him drive a car?
4  A.  Yeah.
5  Q.  Had he ever driven your car?
6  A.  Not with me present. I don't really know if
7     he's ever driven my car prior to that night
8     because that night he didn't have permission
9     to drive my car.
10 Q.  Do you know if he drove your car that night?
11 A.  From what everybody tells me, yeah.
12 Q.  How did he get the keys to your car?
13 A.  Well, he told me he took them.
14 Q.  Where did he take them from?
15 A.  I had them in my pants, which I believe were
16    hanging in the closet, I think. I don't
17    know. He just told me that he took them out
18    of the pants because -- well, it was the day
19    after the accident he actually contacted me.
20    I asked him, "How did you get the keys to my
21    car?" He's like, "No, I took 'em man." And
22    he apologized and everything.
23 Q.  And did he say anything else to you about the
24    incident?

Page 51

1  A.  He did, but I don't remember exactly what he
2     said to me.
3  Q.  Did you talk to him about anything that
4     happened that evening?
5  A.  Over the phone, yeah, I was asking questions.
6  Q.  And what kind of questions did you ask him?
7  A.  I sort of asked, like, where did he take the
8     car. And responded to me, but I don't
9     remember what he said.
10 Q.  And did you ask him any other questions other
11    than "Where did you take the car"?
12 A.  No. That's actually the only question that I
13    can remember right now that I asked him.
14 Q.  Did you talk to him at any other point other
15    than the day after the incident about what
16    had happened?
17 A.  It wasn't the day after the incident. I
18    don't remember exactly how many days it was
19    or when exactly it was, but he did call me
20    from jail.
21 Q.  Where was that?
22 A.  That I don't know.
23 Q.  What did he say to you when he called you?
24 A.  The first thing he did was apologize.

Page 52

1  Q.  And then anything else other than apologize?
2  A.  I don't remember what the conversation was
3     about.
4  Q.  After the incident did he return to your
5     house and stay with you?
6  A.  No.
7  Q.  Do you know where he went?
8  A.  No. I actually didn't see him -- actually,
9     you know what, I didn't see him for almost a
10    year and a half probably.
11 Q.  After the incident?
12 A.  Yeah.
13 Q.  Did he ever tell you that he had seen the
14    news footage?
15 A.  As far as I knew he was locked up. That's
16    all I know.
17 Q.  "Locked up," you mean incarcerated?
18 A.  Yes.
19 Q.  And do you know what he was incarcerated for?
20 A.  He didn't tell me any details.
21 Q.  Did you ever visit him in jail?
22 A.  No.
23 Q.  Do you know where he lives now?
24 A.  He's deceased.

Page 53

1  Q.  And how long has he been deceased for?
2  A.  The cops aren't even really sure, but it
3     happened sometime last year during the
4     summer.
5  Q.  And do you know what happened to him?
6  A.  They didn't release any details.
7  Q.  Do you know how he became deceased? Was he
8     involved in a shooting or anything of that
9     nature?
10 A.  I know it wasn't a shooting. Again, I don't
11    know too many details about that incident.
12 Q.  How would you describe your relationship with
13    him prior to the incident on April 28, 2003?
14 A.  I don't know. He was just a really nice guy.
15    I mean, we were always laughing or working.
16    I really don't have anything negative to say
17    about him, except for that day.
18 Q.  And why do you say that?
19 A.  As far as I know I was upset. That's one of
20    the biggest emotions that I do remember, that
21    I was really upset that night.
22 Q.  And you were upset at him?
23 A.  Yeah.
24 Q.  And why were you upset at him?

14 (Pages 50 to 53)

Page 54

1  A.  I don't know.  Because I immediately guessed
2     that it was his fault that this stuff was
3     happening.  I don't even know what my
4     emotions were that night.  I just know I was
5     upset.  I was tired, half asleep; and they
6     took me out of my house.
7  Q.  Why did you guess it was his fault when that
8     was happening?
9  A.  Because he apologized outside.  I didn't see
10     him, but he was just yelling "I'm sorry" or
11     whatever.
12  Q.  When did he apologize to you?  Was it that
13     night?
14  A.  I just heard him screaming "I'm sorry."
15     That's about it.
16  Q.  Did you have any other idea why it would have
17     been his fault that you were involved in this
18     incident?
19  A.  No, that's the only reason why I sort of got
20     mad at him.
21  Q.  Did you know if he had been involved in any
22     other incidents or had any other involvement
23     with the police before that night?
24  A.  I have no knowledge of that.

Page 55

1  Q.  Did he talk to you about any of that?
2  A.  No.  It was kind of difficult to get him to
3     talk about his personal life.  The only thing
4     we really just talked about is, you know, guy
5     stuff, the regular stuff, what guys usually
6     talk about.
7  Q.  And what's that?
8  A.  Cars.
9  Q.  You said that he had apologized, or he was
10     screaming outside.  Was that outside 11
11     Fermoy Heights?
12  A.  That's correct.
13  Q.  And that was on the night of the incident?
14  A.  Yes.
15  Q.  And where was he at that time?
16  A.  I couldn't see him because I was facing the
17     car when they were putting me in.
18  Q.  But you heard his voice?
19  A.  Yes.
20  Q.  Did he say anything else to you other than
21     I'm sorry?
22  A.  No.
23  Q.  Did you say anything to him?
24  A.  I don't recall.

Page 56

1  Q.  You had said earlier that you had come home
2     around three or four o'clock that day?
3  A.  (The witness nods.)
4  Q.  And who was home when you arrived?
5  A.  My wife and my two kids.
6  Q.  And was there anybody else with you?
7  A.  Father-in-law.
8  Q.  Was he living with you at that time?
9  A.  Yes.
10  Q.  How long had he been living with you that
11     time?
12  A.  I don't recall the length of time.  That's
13     one thing --
14  Q.  Was it more than a couple of days?
15  A.  Yeah, it was more than a couple of days.
16  Q.  And had he lived with you before?
17  A.  See the thing is that he had a stroke.
18  Q.  I'm sorry to hear that.
19  A.  Yeah, so we kind of decided to take care of
20     him.  So I really don't remember how long he
21     stayed with us, but it was a little while
22     ago.  Because he was actually starting to
23     recover during those times.
24  Q.  How long had he had a stroke before the

Page 57

1     incident?
2  A.  I don't remember the exact dates.  I'm sorry.
3  Q.  Was it more than a week?
4  A.  It was way more than a week.  That's for
5     sure.
6  Q.  Was it more than a month?
7  A.  Yes.
8  Q.  Was it more than a couple of months?
9  A.  It was somewhere around that timeframe, I
10     believe.
11  Q.  Where had he been living before that time?
12  A.  I don't know the address.
13  Q.  Was he living close by in Massachusetts?
14  A.  Yeah, he was close by.
15  Q.  Was he married at that time?
16  A.  As far as I know, no.
17  Q.  Was he living with anybody else other than
18     with you and your wife?
19  A.  I'm not really sure.  See the thing about me
20     is that I really don't want to get into
21     people's personal lives because everybody has
22     their own issues.  So I always tend to keep
23     to myself.
24  Q.  Was there anybody else other than your wife,

15 (Pages 54 to 57)

Page 58

1    your father-in-law, and your two children at
2    your house when you arrived back home?
3    A.  No.  Because like I said, I dropped off
4        Norberto earlier.
5    Q.  Did Norberto ever come back?
6    A.  I guess to take the keys to my car.
7    Q.  And did you remember when that was?
8    A.  No.  Because I was asleep actually.
9    Q.  So you didn't see him return to the house?
10   A.  No.
11   Q.  Did you hear him return to the house?
12   A.  No.
13   Q.  Where did you live in 11 Fermoy Heights?  Was
14       it an apartment complex?
15   A.  Apartment complex.
16   Q.  And how many doors did you have to that?
17   A.  Just one door.
18   Q.  And was that the front door?
19   A.  Yes.
20   Q.  What kind of door was it?  Was it a door that
21       made noises?
22   A.  No, it's not a noisy door.  I just know the
23       door is made out of metal and it closes.
24   Q.  Did you have any locks on your door?

Page 59

1    A.  No, I had left it unlocked because, again, he
2        had asked me to stay for a few days.  You
3        know what I mean?
4    Q.  Had you not given him a set of keys?
5    A.  I think he probably had my keys.  I'm not
6        sure.  Because I had my keys on the dashboard
7        of the vehicle -- well, not on the dashboard
8        but in the glove compartment because my wife
9        was home so there was no need for me to, you
10       know.
11   Q.  So you left your keys to the car on the
12       dashboard?
13   A.  No, not to the car; the keys to the
14       apartment.
15   Q.  Okay.  I'm sorry.  So the keys to the
16       apartment were in the keys in the dashboard
17       in your car?
18   A.  It was the glove compartment.
19   Q.  In the glove compartment.  Is that what you
20       usually did?
21   A.  Yeah.
22   Q.  And why did you do that?
23   A.  No, just in case I ever get locked out or
24       something, I'll be able to get in.

Page 60

1    Q.  And the keys to your car were not on the same
2        keys as the keys to your house?
3    A.  Not to my knowledge.  I didn't put them
4        together at any time.
5    Q.  You had never put them together?
6    A.  No.
7    Q.  So you took the keys to your car inside to
8        the house?
9    A.  Yeah.
10   Q.  And what did you do when you came home around
11       3:00 or 4:00?
12   A.  I just took off my clothes because they were
13       dirty.  I'm not sure if I took a bath or not,
14       but I changed into my boxers and my little
15       tank top.  Sat down with my kids, watched a
16       little TV.  You know, put my daughter to bed,
17       put my son to bed.  Because my daughter was
18       only about -- she wasn't even six months old
19       yet.
20   Q.  What did you do after that?
21   A.  We all just went to bed.
22   Q.  Do you remember what time you went to bed?
23   A.  I don't remember the exact time.  That's the
24       only thing.

Page 61

1    Q.  Was it eight o'clock?
2    A.  Close to it, yeah.
3    Q.  Did everybody go to bed at the same time?
4    A.  First we put the kids to bed, and then we
5        just lied down on the bed, and we fell asleep
6        gradually.
7    Q.  Could you just tell me a little bit about
8        your apartment at 11 Fermoy Heights?
9    A.  Okay.  A little hallway where you enter the
10       door.  There's a kitchen on the left, and the
11       living.  And then my son and my daughter's
12       bedroom, then our bedroom; and then the
13       bedroom where we allowed our father-in-law to
14       stay, you know, after the medical condition.
15   Q.  So you had three bedrooms?
16   A.  That's correct.
17   Q.  One bathroom?
18   A.  Yes.
19   Q.  One kitchen and a living room?
20   A.  Yes.
21   Q.  Is there any way you can just do for me a
22       favor and just draw a diagram?  It will just
23       be easier for me to picture.  And use the
24       whole piece of paper.

16 (Pages 58 to 61)

Page 70

1    Q.   And where was your wife going to go the next
2         day?
3    A.   I don't remember -- I don't think she was
4         working during that time. I'm not really
5         sure.
6    Q.   Do you know what time your father-in-law went
7         to bed that day?
8    A.   My father-in-law -- I hate talking about
9         that. I'm sorry. That was a bit of a scare
10        during the time he had that stroke. But
11        after the stroke he kind of just stayed in
12        the room at all times. He really didn't come
13        out that often.
14             So I wouldn't be able to guess if
15        he went to sleep or he was awake or anything
16        like that, you know. So, I mean, to me if
17        you asked me if he was sleeping, I would say
18        yes because I wouldn't be really sure; but
19        I'd be taking a guess.
20   Q.   After you went to bed around eight o'clock,
21        did you wake up at any point after that other
22        than --
23   A.   No. Only when they knocked.
24   Q.   So what happened when they -- who knocked?

Page 71

1    A.   I believe it was the Boston Police Department
2         that knocked.
3    Q.   And they knocked on your front door?
4    A.   Yes.
5    Q.   And what happened? What did you do?
6    A.   I woke up. They were knocking pretty loud.
7         So I kind of like just woke up, got up to
8         answer the door to see what was going on.
9             They're like, "Boston Police
10        Department." I was like, "Huh." I found
11        that kind of weird. So I opened the door.
12        They had the guns out.
13             And from there, I really don't
14        remember much until I was -- I was just --
15        yeah. When I got up, I looked outside the
16        window because, you know, they were knocking
17        pretty loud. I saw lights. So I looked
18        outside the window really quick. My car
19        wasn't there. So I started, you know, to
20        think, you know, "What's going on?"
21             So I kind of went over there,
22        opened the door. They were asking me a bunch
23        of questions. I don't remember the questions
24        either. They really didn't talk to me

Page 72

1    really. They just asked -- see that's the
2    problem.
3         I'm really kind of shady about
4    remembering because I really don't remember
5    much about what happened, except for the fact
6    that I think I asked in regards to my car.
7    They just grabbed me, threw me against the
8    wall; and then they threw me against the wall
9    face first. Then they just cuffed me after
10   that. And then they just took me down.
11   Q.   What happened after that?
12   A.   That's when I was being brought down to the
13        vehicle. He apologized or whatever, yelling
14        out loud. I was thrown in the vehicle --
15   Q.   Who apologized?
16   A.   Norberto. And then they put me in the
17        vehicle. And I sort of recall everybody just
18        pointing fingers at me saying, "Yeah. He's
19        the one that was driving the car. That's
20        him. That's him."
21             And then again, mind you, I was in
22        boxers barefooted. I only had, like, a
23        little tank top on. They moved me into a
24        wagon, again, on foot, walking about a block

Page 73

1    to the other side; and they threw me in the
2    wagon. And that's when they took me to P-3.
3         And from there, I was just -- they
4    threw me in a cell. No questions. Nothing.
5    No answers.
6         MR. RHONES: What was the question?
7    What happened next?
8         MS. LITSAS: What happened next?
9    Q.   And what happened after you were in the cell?
10   A.   I was just in the cell for a while.
11        MR. RHONES: Put your hand down. I
12   can't hear.
13        THE WITNESS: Oh, I'm sorry.
14   A.   I was just in a cell for a while.
15   Q.   Do you know how long?
16   A.   No, I really don't; but I know it was more
17        than an hour. I'd say about a few hours,
18        couple of hours. I don't know.
19   Q.   Did you have a watch on?
20   A.   No.
21   Q.   Was there a clock in the area?
22   A.   I couldn't see it. There was just one little
23        window and that's all.
24   Q.   Were there any bars on the cell?

19 (Pages 70 to 73)

Page 74

1  A. No, there were no bars. Just a metal door,
2     an empty cell, and one window.
3  Q. And what happened after that?
4  A. I was brought out hours later, and he was
5     apologizing to me.
6  Q. Who was apologizing to you?
7  A. I could hear him yelling out the other cell.
8  Q. Who?
9  A. Norberto. I can't remember the detective's
10    name. That's the only problem. I can't even
11    remember the questions he asked me or
12    anything. I just knew that I was released,
13    they took my fingerprint. And then they just
14    took me back home. The house was a mess, and
15    there was two cops waiting there.
16 Q. Who took your fingerprints?
17 A. I don't know the name of the officer, much
18    less remember what he looked like.
19 Q. Can we just backtrack a little bit --
20 A. Yeah.
21 Q. -- Carlos? You said you had heard a knock on
22    the door.
23 A. Mm-hmm.
24 Q. Is that the first noise that you had heard?

Page 75

1  A. Yes.
2  Q. Had you been sleeping prior to that?
3  A. Yes.
4  Q. Was there anybody with you at that time?
5  A. Just my wife sleeping next to me.
6  Q. Was she sleeping at that time?
7  A. Yes.
8  Q. You said you heard a knock. Was it more than
9     one knock?
10 A. I don't know. They probably were knocking
11    there for a while. Because I was in a deep
12    sleep.
13 Q. Do you know what time this was approximately?
14 A. No.
15 Q. And they're knocking on your front door?
16 A. Yes.
17 Q. And what did you do when you heard the
18    knocking?
19 A. I lifted my head. Saw lights out the window.
20    Looked outside the window. Didn't see my
21    car. Went to answer the door.
22 Q. What was your wife doing at that time?
23 A. She was sleeping.
24    MR. RHONES: Can we have just a

Page 76

1     break? I've got to go to the men's room.
2        MS. LITSAS: Yeah. Sure. That's
3     no problem.
4        (A short break was taken.)
5        MS. LITSAS: Okay.
6  Q. Carlos, I think before the break, I was
7     asking you about the knock on the door?
8  A. Yeah.
9  Q. That's right. And you had heard a knock.
10    And what happened after you did that -- you
11    heard a knock? You woke up?
12 A. Yeah.
13 Q. And did Alexandra wake up also?
14 A. Not really sure because I just went to answer
15    the door. I think she woke up after. I
16    think so.
17 Q. When did you look out the window?
18 A. As soon as I got up because I was just seeing
19    flashes of lights.
20 Q. And what kind of flashes?
21 A. Like red and blue flashes.
22 Q. How many cars did you see out there?
23 A. I can't give you an exact number. There's
24    always cars out there.

Page 77

1  Q. Was it a parking lot outside your window?
2  A. It's kind of got a little public street, and
3     there's a little parking and stuff for cars
4     and stuff like that.
5  Q. Were there police cars?
6  A. I didn't get to see the police cars because I
7     guess they were further down from my view.
8     But I did not see my car there, and that's
9     when I went to the door.
10 Q. Were you able to see your car from the window
11    before?
12 A. Yeah.
13 Q. And why's that? Did you park in the same
14    place every time?
15 A. Yeah.
16 Q. And so you were able to see your car through
17    that bedroom window?
18 A. Yeah. And it wasn't there.
19 Q. And it wasn't there?
20 A. No.
21 Q. Why did you look to see if your car was
22    there?
23 A. I don't know. Because there's a tow truck
24    usually that tows cars.

20 (Pages 74 to 77)

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 78

1  Q.  On that particular location?
2  A.  Yeah.
3  Q.  And did you have a resident sticker?
4  A.  I don't remember if I did or not.  But my car
5     got towed plenty of times from there.
6  Q.  Why did it get towed?
7  A.  Because I know those times I didn't have a
8     resident sticker.  So I can't remember
9     whether I had it or not.  But it kind of like
10    stays with you, you know, things keep
11    happening to you.  You know what I mean?
12 Q.  What was that street location outside your
13    window?
14 A.  That's called actually Shandon Road.
15 Q.  Shandon Road?
16 A.  Yeah.
17 Q.  Did you park on the street or in a parking
18    lot area?
19 A.  A little mini parking space.
20 Q.  And when you looked out the window, you
21    didn't see your car?
22 A.  No.
23 Q.  And what did you think happened to it?
24 A.  I thought it probably got towed or something

Page 79

1     by the towing company?
2  Q.  And what were the red lights that you saw?
3  A.  I only saw the lights.  I didn't see the
4     vehicles or nothing like that.
5  Q.  Did you see any flashing lights?
6  A.  Yes.
7  Q.  What did the flashing lights belong to?
8  A.  If I had to guess, I'd say a cop car.
9  Q.  What did you do after you looked out the
10    window?
11 A.  I just briefly looked out the window real
12    quick.  My car's not there.  They probably
13    towed it.  That's the first thing that came
14    to my head.
15        And then I went to go answer the
16    door right away because they kept on
17    knocking, you know.
18 Q.  Was there a place where you could see, a peek
19    hole, through your door to see who was there?
20 A.  Yeah.  But I really didn't even bother.  I
21    just asked, "Who is it?"
22 Q.  And what did they say?
23 A.  "Boston Police."  So I opened the door.  They
24    were there with their guns held.

Page 80

1  Q.  And had Boston Police ever been to your house
2     before?
3  A.  Not while I've been there.
4  Q.  Had the Boston Police ever been to your
5     house, not at Fermoy Heights, but at any
6     other location before?
7  A.  I don't know.  I wouldn't pay attention to
8     things like that.
9  Q.  So you wouldn't know --
10 A.  See the thing is, I don't hang around that
11    area either.  All I really do is just work
12    and come home and spend time with the family.
13 Q.  And on that night when the police opened the
14    door or when you opened the door, who was
15    standing there at the door?
16 A.  A bunch of cops.
17 Q.  What did they look like?
18 A.  Right now I wouldn't be able to describe them
19    to be honest with you.
20 Q.  Were they Boston Police officers?
21 A.  I don't think it was just Boston Police
22    officers because there were different types
23    of uniforms.
24 Q.  What type of uniforms were there?

Page 81

1  A.  I wouldn't be able to describe that either
2     right now.
3  Q.  Was it Boston Housing?
4  A.  I think so.
5  Q.  And what type of uniforms did they have?
6  A.  I wouldn't be able to give you details.
7     That's the only problem.
8  Q.  Had you seen what Boston Housing Police
9     looked like before that night?
10 A.  Well, you see them riding around in the cars
11    and stuff like that, yeah.  But again, I
12    really can't describe it.  It's kind of hard
13    for me to remember every little detail.
14 Q.  Was there any State Police there as well at
15    the front door?
16 A.  That I don't -- that I don't know.  That I'm
17    not sure of.
18 Q.  So there were more than Boston Police
19    officers there?
20 A.  Yes.
21 Q.  Have you filed any lawsuits other than
22    against the Boston Police?
23 A.  I guess that's --
24 Q.  Like the Boston Housing Authority or the

21 (Pages 78 to 81)

Page 82

```
 1        State Police?
 2   A.   I guess not.
 3   Q.   No?
 4   A.   No.
 5   Q.   And why's that?
 6   A.   Because as far as I know I was arrested by a
 7        Boston Police officer.  And they're the ones,
 8        you know, that threw me against the wall --
 9        and both.
10   Q.   How do you know that?
11   A.   Because the guy that was -- I can't remember
12        his face either.  The thing is that his badge
13        said Boston Police Department.  That's the
14        first thing that I looked at.
15             The first thing they did is just
16        threw me against the wall first and just
17        started pointing fingers.  And then they just
18        grabbed me and threw me against the other
19        wall, which is in the hallway.  If you want
20        any description as to that, that's about all
21        I remember.  The rest of that I didn't -- I
22        mean, all I know is I just landed face first
23        against that other wall.
24   Q.   And this was a male police officer that was
```

Page 83

```
 1        doing --
 2   A.   That is correct.
 3   Q.   -- that was doing this to you?  What did he
 4        look like?  Can you just describe for me what
 5        he looked like?
 6   A.   I really can't even remember exactly what he
 7        looked like.  I'm sorry.
 8   Q.   Was he Caucasian?  African-American?
 9        Hispanic?
10   A.   I'm trying to recall.  I mean, a lot of
11        things from that night are kind of like a bit
12        of a blur, especially during that time.
13   Q.   Was he tall or short?
14   A.   I guess he was a little taller than me.  I'm
15        not sure.
16   Q.   Did he have any facial hair?
17   A.   I did not pay attention to that either.
18   Q.   What color hair did he have?
19   A.   I think it was -- okay.  I don't really
20        remember that.
21   Q.   So you don't know if he had black hair, blond
22        hair, brown hair?
23   A.   No.
24   Q.   Do you know if he was wearing a uniform?
```

Page 84

```
 1   A.   That I'm sure of, yes.
 2   Q.   And what kind of -- color uniform did he
 3        have?
 4   A.   Color, I really don't know because the light
 5        was kind of dim.  I mean, the light was on
 6        and everything, but I was half asleep.  You
 7        know, just got up.  I can't tell you that
 8        I'll be able to remember every little thing,
 9        like colors and stuff like that.  It's like
10        waking up in the morning; you need a cup of
11        coffee.
12             MR. RHONES:  Is there a question?
13        What's the question?
14             MS. LITSAS:  I asked him, What did
15        he look like?
16             THE WITNESS:  Yeah, and I don't
17        know.
18             MR. RHONES:  Okay.  Well, just
19        answer the question.
20   Q.   You had mentioned something about seeing a
21        Boston Police badge?
22   A.   Yeah.
23   Q.   Did you see it on this particular individual
24        that you were talking about earlier?
```

Page 85

```
 1   A.   I wouldn't say it was a badge.  It was like a
 2        patch -- I'm sorry -- but, yeah.
 3   Q.   So you don't remember what he looked like in
 4        terms of his facial hairs or his hair color,
 5        correct?
 6   A.   That's correct.
 7   Q.   And you don't remember what he looks like in
 8        terms of if he's tall or short?
 9             MR. RHONES:  Already answered.
10   Q.   Is that right?  I'm just trying to
11        understand.
12   A.   I think he was taller than me.
13   Q.   And you don't remember if he was Caucasian or
14        Hispanic?
15   A.   No.  Because he threw me against the wall.
16        That's the first thing they did.
17   Q.   But you remember seeing a badge?
18   A.   Yeah.  Because his hand was just like that --
19   Q.   And for the record, what you've done --
20   A.   -- against my chest.
21   Q.   -- is you've put your hand out and stretched
22        it out --
23   A.   No.  He stretched his hand out against my
24        chest when he pushed me the first time
```

22 (Pages 82 to 85)

Page 86

1   against the wall. And then he just pushed me
2   again, face first, right away and that's when
3   they took me out. So I was unable to look
4   back or anything like that, if that's what
5   you want to know?
6   Q. And the badge, was this on his right arm or
7   his left arm?
8   A. Okay, that I'm not sure of either.
9   Q. Let's backtrack a little bit. When you're at
10   the door, and you open the door -- you heard
11   a knock. Did you also hear "Boston Police"?
12   A. After I asked who it was.
13   Q. What did they say, the person behind the
14   door?
15   A. No, they didn't say -- all I heard is "Boston
16   Police" and I opened the door.
17   Q. And you had said that there were several
18   officers at the door. It was Boston Police,
19   State Police, and Boston Housing Authority
20   possibly?
21       MR. RHONES: Objection.
22   Q. Is that right?
23   A. Yeah.
24   Q. Do you remember what any of them looked like,

Page 87

1   specifically in terms of their ethnicity?
2   Were they Caucasian? Hispanic? African-
3   American?
4   A. I wouldn't be able to say.
5   Q. Do you know if they were tall or short?
6   A. There were different people there, so they
7   could have been tall or short, anything, I
8   mean.
9   Q. But you don't remember any specifically?
10   A. No, not at the moment.
11   Q. Do you remember what color hair any of the
12   officers had that were at the door?
13   A. No.
14   Q. Do you remember if they were male and female
15   or just male or just female?
16   A. Don't recollect.
17   Q. So they could have been male and female?
18   A. Yeah, they could have been.
19   Q. How many officers were at the door?
20   A. I don't know.
21   Q. Was it more than one?
22   A. Yes.
23   Q. More than two?
24   A. That is correct.

Page 88

1   Q. More than three?
2   A. Yes.
3   Q. More than ten?
4   A. I wouldn't go that far.
5   Q. More than five?
6   A. I don't know because I didn't count them.
7   Q. So more than three but less than ten?
8   A. Yes.
9   Q. You had said that they had their guns drawn;
10   is that correct?
11   A. That is correct.
12   Q. And what do you mean by that?
13   A. The guns are out. That's the only thing I
14   looked at.
15   Q. Where were the guns located? By their side?
16   A. No. They had their guns out in their hands.
17   Q. Can you show me and demonstrate for me how
18   the guns were drawn?
19   A. (Demonstrating.)
20       They were standing up with the guns
21   drawn, facing down.
22   Q. So for the record, what you've demonstrated
23   is the gun that was being held in their hands
24   was pointed down --

Page 89

1   A. That is correct.
2   Q. -- to the ground; is that correct?
3   A. I wouldn't say they were to the ground. I
4   say at an angle.
5   Q. At an angle, but it was towards the ground;
6   isn't that right?
7   A. That is correct.
8   Q. Did all of the officers have their guns
9   drawn, or was it just the officer at your
10   door?
11   A. I don't know how many of them had their guns
12   drawn.
13   Q. So it's possible that not all of them had
14   their guns drawn?
15   A. Could be a possibility. Because I only
16   looked to the right. I immediately saw the
17   gun. That's when I started to get scared.
18   Q. Why were you scared?
19   A. Guns. Why else would I be scared?
20   Q. What else did you notice about the officers
21   other than their holding guns?
22   A. I'm sorry. When I saw the gun, I panicked.
23   That's about it.
24   Q. Did you say anything to them?

23  (Pages 86 to 89)

Page 90

1  A. They just asked me a simple question, but I
2      know I was nervous as soon as I saw the gun.
3      So I was a little. And then I just -- I
4      think I asked them -- yeah, I asked them
5      about my car, if they had seen it, because my
6      car wasn't there; and that's when they just
7      grabbed me and threw me against the wall.
8      They didn't ask me any questions or nothing
9      after that. That I'm sure of.
10  Q. So they identified themselves as Boston
11     Police?
12  A. Yes.
13  Q. And was it more than one person or just one
14     officer who identified themselves as Boston
15     Police?
16  A. I really only heard one voice before I opened
17     the door.
18  Q. And when you opened the door, did they say
19     anything else to you?
20  A. I don't remember.
21  Q. Did they ask you any questions?
22  A. I know they asked me questions, but I don't
23     even remember what they were.
24  Q. You don't remember what questions they asked

Page 91

1      you at the door?
2  A. No.
3  Q. Do you remember -- why did you ask them about
4      your car?
5  A. Because when I woke up, I did not see my car
6      outside.
7  Q. Did you think that they knew where your car
8      was?
9  A. I really don't know why I asked. I just
10     asked because my car was missing. It could
11     have been possible that somebody towed it.
12     It could have been possible that they towed
13     it. As far as I know right then, then I was
14     panicked the minute I saw guns.
15  Q. And did they answer your question about your
16     car?
17  A. No. They just grabbed me, threw me against
18     the wall.
19  Q. And when they grabbed you, are you talking
20     about more than one officer or one officer?
21  A. As far as I know it was more than one officer
22     that grabbed me. But one officer said -- I'm
23     sure -- actually, you know what, I can't even
24     say to be honest with you without -- I mean,

Page 92

1      I can't really give you a definite answer.
2  Q. So you don't know if it was more than one
3      officer that had grabbed you initially at the
4      door?
5  A. Yes, that is correct.
6  Q. And how long had you been at the door before
7      an officer had grabbed you?
8  A. It was more than a few seconds.
9  Q. And when you say an officer grabbed you, what
10     do you mean by that?
11  A. Well, the first thing that I do remember is
12     just being pulled out of my apartment,
13     slammed against the first wall which is right
14     next to my door. And then everybody was just
15     pointing fingers. And then I got thrown
16     against the other wall face first, and I was
17     handcuffed.
18  Q. And when you say pulled out of your
19     apartment, did a person pull your arm, your
20     shoulder? What part of your body did they
21     pull?
22  A. I think it was my shirt. Yeah, they pulled
23     my shirt.
24  Q. What color tank top?

Page 93

1  A. I don't remember what color it was.
2  Q. And were you wearing anything else other than
3      that?
4  A. My boxers. Nothing else.
5  Q. Did you have any sneakers or shoes on?
6  A. No.
7  Q. And so the person took your tank top and
8      pulled your tank top?
9  A. (The witness nods.)
10  Q. And in what direction did they pull it?
11  A. Forward direction and then I was just slammed
12     against the wall.
13  Q. Towards themselves?
14  A. Yeah.
15  Q. Did they grab any part of your body other
16     than the shirt?
17  A. Well, when they pulled me against the wall,
18     they just pushed me against my chest real
19     hard, and I was just -- they were just
20     holding me there. And then they grabbed
21     again.
22  Q. And so the officer -- so it's just one person
23     that's pulling your shirt initially?
24  A. I can't say it was one person. Like I told

24 (Pages 90 to 93)

Page 94

1    you, again, I'm a little bit faint about that
2    night in regards to after that because again
3    I was distraught.
4  Q.  So is it possible that it was more than one
5    person that pulled your shirt initially?
6  A.  Could be a possibility.  I don't really
7    remember too much details about that night.
8  Q.  I understand, but you understand we're
9    here --
10 A.  Yes.
11 Q.  -- to talk about this, so as best as you can
12   remember.
13        So what happened after your shirt
14   was pulled?  What happened next?
15 A.  I was pushed against the wall.
16 Q.  Who pushed you?  The same person that was
17   pulling your shirt?
18 A.  I'm not even sure.  There's too many cops.  I
19   was pulled out of my apartment, panicked.  Of
20   course, I'm going to panic.  And they pushed
21   me against the wall, point fingers, throw me
22   against the other side of the wall face
23   first, and handcuffed --
24 Q.  And what wall did they -- let's just --

Page 95

1        MR. RHONES:  No, wait.  You
2    interrupted him.
3        MS. LITSAS:  I'm sorry.
4        THE WITNESS:  I'm sorry about that.
5        MS. LITSAS:  That's okay.
6  Q.  After your shirt was pulled, you said that
7    they took you outside.  Was that outside your
8    apartment?  And there was a wall next to your
9    apartment?
10 A.  Yeah.
11 Q.  Can you just draw a diagram for me?
12 A.  This is actually the easiest one you're going
13   to ask me to draw today.  It's just a big
14   box.  This is the hallway.  This is the
15   neighbor's door.  This is the neighbor's
16   door, and this is my door.
17 Q.  Can you just make a label saying your door?
18 A.  Mm-hmm.
19 Q.  Okay.
20 A.  And this is like the thing for the hallway.
21   Going down the stairs.
22 Q.  Can you just put "hallway to stairs," please.
23 A.  (Witness marking diagram.)
24        Pulled me out.  Slapped me against

Page 96

1    this wall.
2  Q.  Can we just take it step by step so that --
3  A.  Yeah.
4  Q.  So the officers are initially at your door,
5    which you've labeled "my door," is that
6    correct, on the picture?
7  A.  Mm-hmm.
8  Q.  And just point for me, don't mark it, just
9    point for me where you're taken after your
10   shirt is pulled.
11 A.  (Witness indicates.)
12 Q.  So can you just mark an "X" for me?
13 A.  (Witness marking document.)
14 Q.  And the "X" denotes where you were taken
15   after your shirt is pulled; is that right?
16 A.  This is where they pushed me into the wall,
17   yes.
18 Q.  And so is this more than one officer or one
19   officer that's taking --
20        MR. RHONES:  Asked and answered.
21 Q.  -- you over here to the wall?
22 A.  See, by that time I was already panicked.  I
23   just know everybody was pointing a finger at
24   me.

Page 97

1  Q.  Who's everybody?
2  A.  The cops.  Everybody was saying, "That's him.
3    That's the guy."  This is what I'm
4    remembering from that night.  There was a lot
5    of emotion during that time.
6  Q.  And is there a wall here?
7  A.  Yeah.
8  Q.  Next to your apartment?
9  A.  Yeah, there's just a little thing.
10 Q.  And they don't take you here?
11 A.  No.  They pushed me against this wall.
12 Q.  Okay.  And so you were pulled with your
13   shirt, and then you were pushed?
14 A.  Yes.
15 Q.  What do you mean by pushed?
16 A.  So they pulled my shirt, bring me out, and
17   then throw me against this side of the wall.
18 Q.  And was your back against the wall?
19 A.  Yes.
20 Q.  Was this the same officer that had pulled
21   your shirt that pushed you against the wall?
22 A.  That's the thing, I really can't say.  During
23   that transition, I just panicked.
24 Q.  Is the person saying anything to you at this

25 (Pages 94 to 97)

| Page 98 | Page 100 |
|---|---|
| 1  point? | 1  A.  I just felt pain. |
| 2  A.  All they're saying is pointing fingers, | 2  Q.  And where did you feel pain? |
| 3     "That's the guy." | 3  A.  In my face and in my arms. |
| 4  Q.  And did you say anything to them? | 4  Q.  And what kind of pain was it? |
| 5  A.  I just -- I don't remember even what I said. | 5  A.  If somebody was, like, you know, sort of, |
| 6     I know I said something, but I can't remember | 6     pushing hard against your body and at the |
| 7     what I said. | 7     same time pulling your arms kind of like -- |
| 8  Q.  And then what happens after you're against | 8     you know, like somebody grabs your arm from |
| 9     the wall? | 9     your back, sort of like. |
| 10 A.  They almost immediately throw me against the | 10 Q.  Your face was facing the wall and then your |
| 11    wall where the hallway is.  We were going | 11    arms were taken and put behind your back; is |
| 12    down the stairs face first. | 12    that right? |
| 13 Q.  Can you just put an "X2" -- | 13 A.  That is correct. |
| 14 A.  Yeah. | 14 Q.  And then what happened after that? |
| 15 Q.  -- where that is?  And put a number "2" next | 15 A.  They handcuffed me. |
| 16    to it. | 16 Q.  How many people handcuffed you? |
| 17 A.  (Witness marking document.) | 17 A.  I don't know.  Again, I can't see. |
| 18 Q.  And what you've drawn is an X and a number 2. | 18 Q.  Were you able to see who was handcuffing you? |
| 19    And what does that location show? | 19 A.  No, no. |
| 20 A.  That's the location that shows when they | 20 Q.  Do you know if it was a male person or a |
| 21    pushed me again into the wall; but this time | 21    female? |
| 22    it was, you know, face first? | 22 A.  That I don't know. |
| 23 Q.  What is the distance between X and X2? | 23 Q.  Do you know if that individual is Caucasian |
| 24 A.  I can't even say it was even 7 feet.  It was | 24    or African-American? |

| Page 99 | Page 101 |
|---|---|
| 1     way less than 7 feet. | 1  A.  I couldn't see. |
| 2  Q.  Do you know why they took you from this wall | 2  Q.  Do you know if that officer was a Boston |
| 3     to the second wall? | 3     Police officer or a Boston Housing officer? |
| 4  A.  No.  Because the minute they threw me against | 4  A.  Well, from what I saw in the video, when they |
| 5     this wall face first, that's when they | 5     put me in it was a Boston Police officer. |
| 6     handcuffed me.  I don't know why.  They | 6  Q.  But what I'm talking about is at location |
| 7     didn't answer any questions or nothing.  They | 7     number 2.  You don't know who it was that put |
| 8     didn't even read me my rights or anything. | 8     the handcuffs on you? |
| 9  Q.  And was the same person -- taking you to X -- | 9  A.  No. |
| 10    the first location, also at the second | 10 Q.  And what happens after your handcuffs were |
| 11    location? | 11    put on? |
| 12 A.  That I don't know because there was a lot of | 12 A.  They practically dragged me down the stairs. |
| 13    confusion for me really.  I mean right here | 13    I wouldn't say walked. |
| 14    I'm panicked.  Here I'm hysterical because I | 14 Q.  Is this more than one person or two people? |
| 15    don't know what's going on.  And then over | 15 A.  Again, I'm looking forward.  I can't see |
| 16    here I'm being handcuffed, and I don't even | 16    behind me.  And I'm panicked.  I mean -- |
| 17    know why. | 17 Q.  So you're walking down the stairs first? |
| 18 Q.  Which direction do you face at X2? | 18 A.  Yeah. |
| 19 A.  That's -- I believe it's facing towards the | 19 Q.  And then who is behind you? |
| 20    little park at 11 Fermoy Heights. | 20 A.  I believe the cops. |
| 21 Q.  Is your face facing the wall? | 21 Q.  But you don't know who exactly? |
| 22 A.  Yes. | 22 A.  No, I don't know exactly. |
| 23 Q.  And are you pushed or grabbed in any way at | 23 Q.  And you're taken down the stairs.  How many |
| 24    X2? | 24    flights of stairs? |

26  (Pages 98 to 101)

## Page 102

1   A.  It was three floors, two sets before you get
2       to each floor.
3   Q.  And is anyone holding you at that point --
4   A.  Yes.
5   Q.  -- going down the stairs?
6   A.  Yeah.
7   Q.  And how were they holding you?
8   A.  They were holding by my arm.
9   Q.  Is it more than one person?
10  A.  I wouldn't be able to tell you.
11  Q.  Do you know what that person looked like?
12  A.  No.
13  Q.  You don't know if they were tall or short;
14      Caucasian, African-American or Hispanic; male
15      or female?
16  A.  No.
17  Q.  Your arm is being grabbed; is that correct?
18  A.  That is correct.
19  Q.  Is any other part of your body being held by
20      any person going down the stairs?
21  A.  Just my shoulder.  Hands against my shoulder
22      and my arm being grabbed.
23  Q.  So someone is touching your shoulder and your
24      arm?

## Page 103

1   A.  Mm-hmm.
2   Q.  And do you know if it's the same person or a
3       different person?
4   A.  I don't know.
5   Q.  And how long does that -- how long is someone
6       holding your neck and your arm?
7   A.  Probably until I got down the stairs, and
8       then just grabbed my arm.  And they walked me
9       over to the car and put me in the cruiser.
10  Q.  What kind of cruiser was it?
11  A.  It was Boston Police.
12  Q.  And did they say anything to you at any point
13      during the time that you're at location
14      number 2 to the cruiser?
15  A.  I don't recall.  They could have possibly
16      said something, but nothing that would
17      explain the situation, much less tell me --
18  Q.  And do you know, did you say anything to them
19      at this point, at any point you're at
20      location number 2 --
21  A.  The only thing I could think of I would say
22      is, "Why am I being arrested?"
23  Q.  And did you get any answer?
24  A.  That I'm sure that I didn't.

## Page 104

1       MR. RHONES:  I didn't hear that
2   answer.  What?
3       THE WITNESS:  No, I didn't get an
4   answer.
5   Q.  Did you ask that question?  Do you remember
6       asking that question?
7   A.  Yes, I do actually.
8   Q.  And when did you ask that question?
9   A.  I believe I started asking -- I believe.  I'm
10      not sure.  Because again, I was just not
11      exactly -- how do you say? -- calm.  I think
12      I started asking the minute I was handcuffed.
13  Q.  What was the time span between the time they
14      opened the door, or you opened the door,
15      until the time that you were handcuffed?
16  A.  I wouldn't be able to give you a correct
17      answer.
18  Q.  Is it more than a minute?
19  A.  I really wouldn't know.
20  Q.  Less than a minute?
21  A.  I'd be guessing, honestly.
22  Q.  What's your best guess?
23  A.  My best guess, anywhere between 45 seconds to
24      maybe 70 seconds.

## Page 105

1   Q.  During the time that you're out at location
2       X --
3       MS. LITSAS:  Could we have this
4   marked as the next exhibit.
5       (Diagram of the Outside of the
6       Apartment marked Deposition Exhibit
7       No. 2.)
8   Q.  At the time that you're at location X,
9       where's your wife, Alexandra Perez?
10  A.  As far as I know, she was still inside the
11      apartment.
12  Q.  Where were your children?
13  A.  They were sleeping because I left them
14      sleeping.
15  Q.  And where was your father-in-law?
16  A.  I didn't see him in the living room, so he
17      must have been in his bedroom.
18  Q.  Where was Norberto Serrano?
19  A.  I didn't even really know whether he was home
20      or not.
21  Q.  So you don't know where anyone was other
22      than --
23  A.  That is correct.
24  Q.  How many officers do you think were at

27 (Pages 102 to 105)

Page 118

1 Q. Did you see anybody else that you knew from
2    the neighborhood?
3 A. No.
4 Q. Did anybody come and talk to you?
5 A. No.
6 Q. When you arrived, where did you go -- strike
7    that.
8        What police station did you go to?
9 A. I don't know the name of the station
10   honestly. I know the -- I know that it was
11   the one that was Morton Street and Blue Hill.
12 Q. How long did it take to get there?
13 A. I wouldn't be able to give you a time. I was
14   just really disoriented.
15 Q. Was it more than five minutes?
16 A. About five minutes. I don't know. I'm just
17   guessing really.
18 Q. If you had to guess, it would be about five
19   minutes?
20 A. Yeah.
21 Q. What happened when you arrived at the police
22   station?
23 A. Two cops actually took me out this time.
24 Q. What are you wearing at the time that you're

Page 119

1    taken out of the --
2 A. Boxers and a tank top.
3 Q. At any point during the time that the police
4    arrive at your door, did you ask for any
5    clothing?
6 A. They didn't even give me a chance to speak,
7    much less answer any questions.
8 Q. Did you ask for any clothing?
9 A. I was panicked, so to be honest with you, I
10   don't even know that I had the chance to ask
11   for clothing.
12 Q. So you don't recall asking for any clothing?
13 A. No, I don't.
14 Q. But you had asked about being arrested?
15 A. Yes. The first thing that came into my mind.
16   Nobody answered me or anything.
17 Q. So two officers took you out of the paddy
18   wagon at the police station?
19 A. Yes.
20 Q. And did they say anything to you?
21 A. No, I was just asking what's going on. And
22   again, my questions go unanswered. I
23   couldn't see them, because, again, they were
24   behind me. And they were just walking me.

Page 120

1 Q. So you don't know what they looked like?
2 A. No.
3 Q. Do you know if they were male or female?
4 A. Male.
5 Q. And do you know if they were Caucasian,
6    African-American, or another ethnicity?
7 A. I don't know because again I didn't see them.
8 Q. And you don't know their height --
9 A. No.
10 Q. -- or weight?
11 A. (The witness shakes his head.)
12 Q. Where are you taken when you first get into
13   the police station?
14 A. To the cell, and they close the door.
15 Q. And what did the cell look like?
16 A. I wouldn't say it was a brick cell, but it
17   was like stone and painted. The floor was
18   painted, I think, too. I'm not sure. Then
19   there was a little bench.
20 Q. Were there any bars on the --
21 A. No.
22 Q. -- cell?
23 A. No, bars.
24 Q. Was there a door?

Page 121

1 A. One door.
2 Q. Did it have a window?
3 A. A small window.
4 Q. Were there any other windows?
5 A. No.
6 Q. Did they say anything to you when you were
7    placed in the cell?
8 A. No.
9 Q. Did anybody say anything to you when you were
10   placed in the cell?
11 A. No.
12 Q. Were you still in handcuffs at that point?
13 A. I was in handcuffs actually for a while I
14   think. I'm not really sure when they took
15   the handcuffs off. Because again, it sort of
16   turns into a blur again.
17 Q. Do you recall having handcuffs on while you
18   were in the cell?
19 A. I don't recall. I just recall the pain
20   that -- well, it did hurt even after they
21   took the handcuffs. But I still felt the
22   pain throughout the whole day. That's one
23   thing I can assure you of.
24 Q. And this is pain in your hands?

31 (Pages 118 to 121)

Page 122

```
 1   A.  Not my hands, but my wrists.
 2   Q.  Your wrists.  How long are you in the cell
 3       before the next thing happens?
 4   A.  I'm not really sure of a time.
 5   Q.  What are you thinking when you are in the
 6       cell?
 7   A.  Why on the earth am I here?
 8   Q.  What happens next after that?
 9   A.  I don't know.  Hours go by and then they
10       finally open the door.  From there, I don't
11       really remember much.  I just know that I was
12       brought into a room, and then I was -- and
13       they took my fingerprints, and then I was
14       dropped off at the house.  And there were two
15       officers there.
16   Q.  Who opened the door initially to the cell?
17   A.  I'm not even sure.
18   Q.  Was it an officer?
19   A.  Yes.
20   Q.  And you're taken to a nearby room?
21   A.  Yes.
22   Q.  What happens in the room?
23   A.  That's the thing.  I don't really recall
24       exactly what happened in that room.
```

Page 123

```
 1   Q.  Were there officers in the room?
 2   A.  I didn't see anybody in uniform in that room,
 3       honestly.
 4   Q.  Was there anyone in plain clothes?
 5   A.  Yes.
 6   Q.  How many people?
 7   A.  I'm not -- that's the thing.  I'm not sure.
 8       I think it was either one or two people in
 9       that room?
10   Q.  And do you know what their names were?
11   A.  I think one of them -- his last name, I
12       think, was Harris.  I'm not sure.
13   Q.  And do you know the name of anybody else?
14   A.  No.
15   Q.  Was there anybody else in the room other than
16       you and these two individuals?
17   A.  No.
18   Q.  Was there anybody in the cell with you at the
19       time that you were in the cell?
20   A.  No.
21   Q.  Did you ask for anything while you were in
22       the cell?
23   A.  I was talking, but nobody was listening.
24   Q.  What were you saying?
```

Page 124

```
 1   A.  Why am I here?  Can somebody please answer my
 2       question?
 3   Q.  While you were in the room with the other --
 4       they were both male?
 5   A.  Yes.
 6   Q.  The men in plain clothes, did they ask you
 7       any questions?
 8   A.  Yeah.  I'm trying to remember what the
 9       questions were.  I can't really recollect
10       what were they asking me or telling me.  I
11       just know they said, I think -- all I know is
12       I remember them talking about some kind of
13       murder happening.  That's about it.
14   Q.  What did they say about the murder?
15   A.  They didn't go into any type of detail.  They
16       said that people were killed or whatever.  I
17       don't know.
18   Q.  Did you say you knew anything about that?
19   A.  How would I know anything about that?  But
20       no.
21   Q.  Did you say anything to them about your car?
22   A.  Yeah, I asked them.  My car was taken.  I
23       just want to know if, you know, has something
24       with me being arrested or something like
```

Page 125

```
 1       that.
 2   Q.  And what did they say to you?
 3   A.  That I'm not really -- I know they told me
 4       that they did take my car or whatever, but I
 5       don't remember.  He told me why, but I can't
 6       remember exactly why they took my car.
 7   Q.  And who said that?
 8   A.  I believe Harris.
 9   Q.  Did you ask them questions about Norberto?
10   A.  No, I didn't ask him any questions in regards
11       to him.
12   Q.  Did you ask any questions about your wife?
13   A.  I don't really remember the conversation that
14       went down there.  I just know one or two
15       details.
16   Q.  And what are those one or two details?
17   A.  What I just mentioned in regards to the
18       murder and my car.
19   Q.  And do you remember how long you were in that
20       room for --
21   A.  No.
22   Q.  -- for questions?
23       Did you sign anything during that
24       time?
```

32  (Pages 122 to 125)

Page 126

```
 1   A.  I don't recall signing anything.
 2   Q.  Did you fill out any forms?
 3   A.  I just know I -- the only thing I can
 4       remember during that time is maybe putting my
 5       fingerprints on a piece of paper and then
 6       going home.
 7   Q.  Was that in the room?
 8   A.  No, that was not in the room.
 9   Q.  When did that happen?
10   A.  Right before they took me home.
11   Q.  So after you're in the room with these two
12       men, you're taken where?
13   A.  Taken to the -- not the -- like, some kind of
14       desk which is, like, right next to the cell
15       where I was at.  And they just put my
16       fingerprint on that, and then I'm taken home.
17   Q.  Were the same individuals who were with you
18       in the room also the same individuals with
19       you at the place where your fingerprints were
20       taken?
21   A.  Just Harris.  I'm not sure if the other guy
22       was behind me or something.  I just wanted to
23       get the hell out of there.
24   Q.  At any point did they tell you about why you
```

Page 127

```
 1       were at that location?
 2   A.  I think they wanted to ask me questions or
 3       something.
 4   Q.  And did you answer the questions?
 5   A.  As far as I know I did.
 6   Q.  At any point did they give you any clothing?
 7   A.  They gave me a pair of pants; but no socks,
 8       no shirt, nothing like that.  Just a pair of
 9       pants.
10   Q.  Did you wear the pants?
11   A.  Of course.  It's freezing outside.
12   Q.  When were you given the pants?
13   A.  Right as I was going out the door.
14   Q.  After leaving the police station?
15   A.  No, right before I was stepping out the door.
16   Q.  After your fingerprints were taken, is
17       that -- what happened after that point?
18   A.  That's when they gave me the pants because I
19       was walking out the door.  Put on the pants.
20       Got into a vehicle.  I can't say -- it wasn't
21       a cop car.  I know that for sure.  And I was
22       brought home.
23   Q.  Do you remember who drove you home?
24   A.  Harris.
```

Page 128

```
 1   Q.  And did you have any conversation with Harris
 2       during your ride home?
 3   A.  Not that I really recall.
 4   Q.  And what are you thinking at this point?
 5   A.  What do you mean "thinking at this point"?
 6   Q.  When you are in the car with Harris.
 7   A.  I don't even think I was thinking to be
 8       honest with you.  I was just stressed out
 9       from the whole thing.
10   Q.  Why were you stressed out?
11   A.  I was sleeping, got taken.  I say pretty much
12       mistreated, blamed for something that they
13       said that I did when I was, you know, at
14       home, you know, resting; and you know, taken
15       to a cell, practically arrested for no
16       reason, much less motive, much less even
17       without my knowledge.
18   Q.  Why do you say that you were mistreated?
19   A.  I mean, how you going to grab a guy that was
20       in boxers, first of all, slam me against the
21       wall twice, and the second time in the face;
22       and then taken outside in the middle of
23       practically a cold day with no socks, no
24       shoes, nothing, just a pair of boxers and a
```

Page 129

```
 1       tank top.  I mean, how am I not supposed to
 2       panic?  How am I not supposed to be stressed
 3       about it?
 4   Q.  Did Detective Harris drive you directly to
 5       your house?
 6   A.  Yes.
 7   Q.  What happens when you get there?
 8   A.  I go upstairs.  My house is a mess.
 9       Everything's practically flipped.  The beds
10       are flipped.  I see that the potty in my
11       son's room was flipped, so there was, you
12       know, baby -- how do you say the word without
13       being too -- well, baby pooh all over the
14       floor, you know, including his bed's
15       everywhere.  I mean, the room -- the child's
16       room is a mess.  The bedroom is a mess.  I
17       mean, the house wasn't like that.
18   Q.  How did you typically keep your house?
19   A.  I kept it pretty neat.
20   Q.  And who maintained the house?
21   A.  My wife did.
22   Q.  Did you help out in any --
23   A.  Yes.
24   Q.  -- cleaning?
```

33  (Pages 126 to 129)

Page 130

1   A.  Yes.
2   Q.  And how many times did you clean it a week?
3   A.  I don't know.  Between both of us, I think we
4      both, you know, put our hands on it at least
5      twice a week.
6   Q.  And how old were your kids at that time?
7   A.  Again, my son --
8   Q.  Six months and --
9   A.  No.  My daughter was not even six months old,
10     and my son was turning -- I think, yeah, he
11     was turning three that year.  It was two
12     thousand -- yeah.
13  Q.  And when you came to the apartment, did
14     Detective Harris say anything to you?
15  A.  I think he said something but I can't
16     remember exactly what he said to me.  I do
17     remember that the two officers that were
18     there did say to me that they were waiting
19     for a warrant or something to search the
20     house.  I remember me making a smart comment.
21     "How are you going to wait for a warrant if
22     you guys already did?"
23  Q.  Did they say anything to you after you said
24     that?

Page 131

1   A.  No.
2   Q.  And who were these two officers that --
3   A.  I don't know their names, but they were
4      Caucasian.
5   Q.  And do you know if they were Boston Police
6      officers?
7   A.  Boston Police officers.
8   Q.  Do you know what their names were?
9   A.  No.
10  Q.  Do you know what their badge numbers were?
11  A.  No.
12  Q.  Were there any other officers in your
13     apartment at that time?
14  A.  No.
15  Q.  Where was your wife?
16  A.  I don't know where she was until I came into
17     the house when she came up to me.
18  Q.  Where was your father-in-law?
19  A.  I don't know.  I guess he was just either in
20     his room or the living room.  I'm not really
21     sure where he was at that time.
22  Q.  And where were your children at that time?
23  A.  My children were both awake.  My son came up
24     to me, and that's about it.  They were with

Page 132

1      me once I got there.
2   Q.  And when you got there, did your wife say
3      anything to you?
4   A.  She was upset.
5   Q.  And why do you say that she was upset?
6   A.  The incident, of course.  Why else?  They
7      flipped the house over.
8   Q.  Can you just explain to me what you mean by
9      that?
10  A.  Everything that happened, period.  After
11     that, she told me a little bit of what
12     happened; that she was being harassed and
13     everything.  They were asking her dumb
14     questions like where's the gun and stuff
15     like.  She gets into a little bit of detail.
16     We didn't get too into it because that night
17     was enough for me.  I didn't want to talk
18     about it at that point.  So I mean, that's as
19     much as I know.
20  Q.  Did you tell her anything about what happened
21     to you?
22  A.  I really didn't talk that night to be honest
23     with you.
24  Q.  Do you remember what time you came home?

Page 133

1   A.  No, I don't.
2   Q.  When you told me that she told you about
3      being harassed, what did you mean by that?
4   A.  I can't remember exactly what she told me,
5      but she just told me that the cop was asking
6      her stupid questions, insinuating things.
7      That's about it.
8   Q.  Did she say that she was hurt in any way?
9   A.  I don't recall anything like that being said.
10  Q.  When you say "asking stupid questions," what
11     do you mean by that?
12  A.  "Where's the gun at?"  Stuff like that.
13  Q.  Any other questions other than that?
14  A.  I don't remember at this point.  I'm sorry.
15  Q.  Did she tell you anything else about what had
16     happened that night?
17  A.  I kind of cut the conversation short because
18     I just didn't want to hear it.
19  Q.  So that's a, no, she didn't tell you anything
20     else about that night?
21  A.  No.
22  Q.  Did your father-in-law tell you about what
23     had happened?
24  A.  I didn't even talk to him about it.  I just

34 (Pages 130 to 133)

Page 138

1  Q.  So you didn't see any doctor after the
2      incident?
3  A.  No.
4  Q.  Did you see anybody else, any other
5      professional following the incident?
6  A.  No.
7  Q.  You had said earlier that your wife had told
8      you more details about what had happened?
9  A.  Mm-hmm.
10  Q.  What is it that she told you?
11  A.  That the lady was just, you know, saying all
12      DYS and stuff.  You know, like, threatening
13      her.
14  Q.  And who's this that was threatening her.
15  A.  I don't know the officer's name.  Again, we
16      didn't get into too much details, but she did
17      give me some details on a few things.  So I
18      mean, as far as I remember, that's actually
19      what I can remember from what she had told
20      me.
21  Q.  Was there anything else that she told you
22      other than this officer asking her about DYS?
23  A.  No.  She just told me that they went through
24      everything.

Page 139

1  Q.  Who went through everything?
2  A.  The officers.
3  Q.  And who were these officers?
4  A.  I don't know whether they were police --
5      Boston Police or something else.  That I
6      don't know.
7  Q.  Did she say anything else to you other than
8      that?
9  A.  Not that I can think of at the moment.
10  Q.  After you came home and you met your wife,
11      did Detective Harris stay or did he leave?
12  A.  I really don't know if he stayed.  I think he
13      left.  I'm not sure if he stayed or not.
14  Q.  And how long did he stay, if you can recall?
15  A.  It wasn't even -- not even a minute.
16  Q.  And did he give you anything or tell you
17      anything after he left?
18  A.  No.  He just told me about the warrant.  They
19      were waiting to see if they could get a
20      warrant or whatever.  I'm like, whatever.
21  Q.  Did he say anything else other than that to
22      you?
23  A.  I don't think so.
24  Q.  Did he make any apologizes or give you his

Page 140

1      business card?
2  A.  He just gave me a business card.
3  Q.  And what did he say to you when he gave you
4      the business card?
5  A.  I don't recall really.
6  Q.  Did you ever use the business card and call
7      him, call him that night?
8  A.  Yes.  I called him in regards to the vehicle,
9      to find out where it was.
10  Q.  And when did you call him?
11  A.  I think two or three days, maybe, later.
12  Q.  And what did he say?
13  A.  He told me the location.  I went to take it
14      out, and I remember paying for it.
15  Q.  And how much did it cost?
16  A.  Almost $200.
17  Q.  And where was it located?
18  A.  Close to Mattapan Station I think.
19  Q.  Did you ever talk to Norberto about the
20      towing fee?
21  A.  Again, I didn't see him for like a year and
22      half practically after that --
23  Q.  After the incident?
24  A.  Yeah.

Page 141

1  Q.  After you returned home and talked to your
2      wife on the night of the incident, did you go
3      back to sleep?
4  A.  I don't know.  I just started watching -- I
5      don't know if I was watching TV or a movie
6      really.  I just stayed quiet that night.  I
7      really just stayed quiet.
8  Q.  And what did your wife do during this time?
9  A.  She was putting Leilani, my daughter, to bed,
10      back to sleep.
11  Q.  What was your father-in-law doing at that
12      time?
13  A.  That I don't know.  I wasn't even paying
14      attention to my surroundings.  I just had my
15      son in my hands, and just tried to calm down.
16  Q.  And what did you do next?
17  A.  I probably fell asleep because that's about
18      all I can remember from that day.
19  Q.  And did you do anything the next day?
20  A.  I don't know if I did something or not.  I
21      know I was supposed to go to work and I
22      didn't.
23  Q.  You didn't go to work the next day?
24  A.  No.

Page 154

1    were leasing that?  Was it Section 8?
2  A.  Yeah, it's kind of like a housing thing.
3  Q.  Who was on the Section 8 application?  Was it
4    you or your wife?
5  A.  It was my wife.
6  Q.  At some point Alexandra woke up after the
7    knock; is that right?
8  A.  I believe so, yes.
9  Q.  Was that when you were at the door?
10 A.  No.
11 Q.  Do you recall where she was at the time that
12   you were at the door?
13 A.  She was still in the room.
14 Q.  She was still in your bedroom?
15 A.  Yes.
16 Q.  At what point did she come out?
17 A.  I never saw her come out.
18 Q.  You didn't see her -- did you see her at any
19   point after you had left --
20 A.  I don't recall seeing her at any point after
21   that.
22 Q.  Was the last person who used your car before
23   you went to bed you or Alexandra?
24 A.  As far as I know it was me.

Page 155

1  Q.  Did you have any idea why the officers were
2    there at your door?
3  A.  No idea.
4  Q.  What were you thinking the reason was that
5    they were there?
6  A.  I wasn't thinking.
7  Q.  Did you get any badge numbers or cards from
8    any of the officers other than Detective
9    Harris?
10 A.  No.
11 Q.  At any point did you tell the officers that
12   you had not driven the car that night?
13 A.  I wasn't even given a chance to really.
14 Q.  So you had never told them that?
15 A.  (No verbal response.)
16 Q.  You have to answer for the --
17 A.  Oh, I'm sorry.  No.
18 Q.  Do you recall anything about an officer with
19   spiky hair?
20 A.  I don't really remember anything.
21 Q.  When the handcuffs were placed on you, what
22   are you thinking at that point?
23 A.  What the hell's going on?
24 Q.  Anything else?

Page 156

1  A.  Why am I being arrested?
2  Q.  Anything else other than that?
3  A.  No.
4  Q.  Was it raining outside?  What was the weather
5    like when you --
6  A.  I don't remember.
7  Q.  Do you know a Martha Jiminez?
8  A.  Huh?
9  Q.  A Martha Jiminez?
10 A.  No.
11 Q.  Had you ever heard of her before?
12 A.  No.
13 Q.  Were you ever booked at the police
14   station?
15 A.  I've never been arrested before, so I
16   wouldn't even know what booking is.
17 Q.  Your fingerprints were just taken?
18 A.  Yeah, and some information, I think, I had to
19   fill out.  I'm not sure.
20 Q.  Was your photograph ever taken?
21 A.  I don't think so.
22 Q.  Did you hear Norberto at the police station?
23 A.  Just apologizing.  That's it.  Yelling out.
24 Q.  So he was in a cell as well?

Page 157

1  A.  Yes.
2  Q.  And he was apologizing to you?
3  A.  Yes.
4  Q.  Did you see him?
5  A.  No.
6  Q.  So you never saw him while you were at the
7    police station?  You just heard him?
8  A.  That is correct.
9  Q.  During the interview were your handcuffs
10   removed?
11 A.  Yes, during the interview I did not have the
12   handcuffs on.
13 Q.  Who removed your handcuffs?
14 A.  I'm not even sure.  I can't even remember
15   when they took it off.
16 Q.  During your interview you didn't have
17   handcuffs?
18 A.  That is correct.
19 Q.  Did anyone ever tell you that you were under
20   arrest?
21 A.  No one would even tell me anything, much less
22   I didn't even understand what was going on.
23 Q.  So no one told you that you were under
24   arrest?

40 (Pages 154 to 157)

Page 158

1   A.  No.
2   Q.  Were any of your belongings removed from you?
3   A.  I didn't have any belongings on me.  I just
4       had boxers and a little shirt, a little tank
5       top.
6   Q.  About a month ago do you recall being at a
7       deposition involving one of the defendants,
8       my client, Detective Sergeant Keeler?
9   A.  Yes.
10  Q.  And do you recall being at that deposition
11      and stating that you did not recognize him?
12  A.  That is correct.
13  Q.  And you did not recognize him from being
14      there that evening?
15  A.  I'll be honest with you, I don't think I'll
16      recognize almost anybody.
17  Q.  But you did not recognize him?
18  A.  No, I didn't.
19  Q.  In fact, you had said at that deposition you
20      had never seen him before?
21  A.  No, I did not see him before.
22  Q.  And you don't know the names of any of the
23      other officers that were involved?
24  A.  No, I don't know any names.

Page 159

1           MR. RHONES:  Don't miss a question.
2           MS. LITSAS:  Well, I'm thorough,
3       Stephen.
4           MR. RHONES:  Well, I think you've
5       gone over it enough times.
6           MS. LITSAS:  I'm almost done,
7       Stephen.  If you'll just let me finish, I'll
8       be done in probably just a minute.
9   Q.  You didn't see any search of your apartment
10      at any point during the evening; is that
11      right?
12  A.  That's correct.  I was --
13          MR. RHONES:  Just answer yes or no.
14      We'll go much faster that way.
15  Q.  Did the officers leave anything behind after
16      they left?
17  A.  I don't recall.
18  Q.  Do you know what time they left?  How soon
19      after did the officers leave after you
20      arrived at the scene?
21  A.  It was a little while.
22  Q.  More than an hour?  Less than an hour?
23  A.  I don't know.
24  Q.  More than a half hour?

Page 160

1   A.  I would say more than a half hour.
2   Q.  But less than an hour?
3   A.  Yes.
4   Q.  And Norberto never stayed in your house again
5       after that incident?
6   A.  No.
7   Q.  Do you know a Dan Miller?
8   A.  No.
9   Q.  Do you know a Robert Ward?
10  A.  No.
11  Q.  Did anyone go with you during your interview
12      with Internal Affairs?
13  A.  No.
14  Q.  You went by yourself?
15  A.  That is correct.
16  Q.  At what point did you hire Mr. Rhones as your
17      attorney?
18  A.  I don't remember exactly what day I hired
19      him.
20  Q.  Was it a month after the incident or a couple
21      of months?
22  A.  I don't remember.
23  Q.  Do you know how you heard about Mr. Rhones?
24  A.  Yes.

Page 161

1   Q.  How?
2   A.  A friend of mine.
3   Q.  And who was your friend?
4   A.  I'm trying to remember his name.  His name is
5       Ivan.  I can't remember his last name.
6   Q.  You don't know his last name.  And he told
7       you about Mr. Rhones?
8   A.  That is correct.
9   Q.  Was Mr. Rhones your attorney while you were
10      interviewing at Internal Affairs?
11  A.  That is correct.
12  Q.  So he did come with you to Internal Affairs?
13  A.  No, he did not come with me.
14  Q.  But he was your attorney at that point?
15  A.  Yes.
16  Q.  Have you ever given anybody else, other than
17      your attorney and Internal Affairs and
18      myself, any statements about what happened?
19  A.  No.
20  Q.  Any written statements?
21  A.  Not that I can remember.
22  Q.  Any transcribed statements?
23  A.  As far as I know, no.
24  Q.  Are there any other witnesses that you're

41  (Pages 158 to 161)

Page 166

1  Q.  And why wouldn't they tell you if they saw
2       you?
3  A.  I don't know why they wouldn't tell me.
4       Probably -- I mean, I would stay quiet too if
5       I would see something like that for a friend.
6       I would just be there for him.  That's it.
7              MR. RHONES:  I have nothing
8       further.
9              MS. LITSAS:  I have no further
10      questions.
11             Thank you, Carlos.
12
13             (Whereupon, the deposition
14      concluded at 1:32 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 168

1       ATTACH TO THE DEPOSITION OF CARLOS PINEDA
2       CASE:  PINEDA V. DANIEL KEELER ET ALS.
3              ERRATA SHEET
4   INSTRUCTIONS:  After reading the transcript of your
5   deposition, note any change or correction to your
6   testimony and the reason therefore on this sheet.
7   DO NOT make any marks or notations on the transcript
8   volume itself.  Sign and date this errata sheet
9   (before a Notary Public, if required).  Refer to
10  Page 167 of the transcript for errata sheet
11  distribution instructions.
12  PAGE  LINE
13  ____  ____  CHANGE: _____
14              REASON: _____
15  ____  ____  CHANGE: _____
16              REASON: _____
17  ____  ____  CHANGE: _____
18              REASON: _____
19  I have read the foregoing transcript of my
20  deposition and except for any corrections or changes
21  noted above, I hereby subscribe to the transcript as
22  an accurate record of the statements made by me.
23          _____
24          CARLOS PINEDA          DATE

Page 167

1       DEPONENT'S ERRATA SHEET
2       AND SIGNATURE INSTRUCTIONS
3
4       The original of the Errata sheet
5   has been delivered to Stephen Rhones, Esq.
6       When the Errata Sheet has been
7   completed by the deponent and signed, a copy
8   thereof should be delivered to each party of
9   record and the ORIGINAL delivered to Helen
10  Litsas, Esq. to whom the original deposition
11  transcript was delivered.
12
13      INSTRUCTIONS TO DEPONENT
14
15      After reading this volume of your
16  deposition, indicate any corrections or
17  changes to your testimony and the reasons
18  therefore on the Errata Sheet supplied to you
19  and sign it.  DO NOT make marks or notations
20  on the transcript volume itself.
21
22  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
23  COMPLETED AND SIGNED ERRATA SHEET WHEN
24  RECEIVED.

Page 169

1           C E R T I F I C A T E
2   COMMONWEALTH OF MASSACHUSETTS    PLYMOUTH, SS.
3
4       I, Marie T. Williams, a Professional Court
5   Reporter and Notary Public in and for the
6   Commonwealth of Massachusetts, do hereby certify
7   that the foregoing deposition of Carlos Pineda was
8   taken before me on Wednesday, May 17, 2006.  The
9   said witness was properly identified with his
10  Massachusetts driver's license and duly sworn before
11  the commencement of his testimony; that the said
12  testimony was taken audiographically by myself and
13  then transcribed under my direction.  To the best of
14  my knowledge, the within transcript is the complete,
15  true and accurate record of said deposition.
16      I am not connected by blood or marriage
17  with any of the said parties, nor interested
18  directly or indirectly in the matter in controversy.
19      In witness whereof, I have hereunto set my
20  hand and Notary Seal this _____ day of _____,
21  2006.
22      _____
23      Marie T. Williams, Notary Public
24      My Commission Expires:  April 7, 2011

43  (Pages 166 to 169)

# Exhibit F

Page 1

VOLUME:        I

PAGES:    1-201

EXHIBITS:   1-22

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS    C.A. NO. 05-10216JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CARLOS PINEDA and ALEXANDRA PEREZ,     \*

        Plaintiffs,                    \*

v.                                     \*

DANIEL KEELER, DENNIS HARRIS,          \*

JOSEPH R. WATTS, JOSEPH P. TOOMEY,     \*

WILLIAM J. GALLAGHER, EDWARD GATELY,   \*

JANINE BUSBY, and THE CITY OF BOSTON,  \*

        Defendants.                    \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        DEPOSITION of ALEXANDRA PEREZ, a witness

called on behalf of the Defendants, taken pursuant

to the Massachusetts Rules of Civil Procedure

before Marie T. Williams, Professional Court

Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at the City of

Boston Law Department, City Hall, Room 615,

Boston, Massachusetts, Wednesday, May 17, 2006,

commencing at 2:18 p.m.

Page 2

1    A P P E A R A N C E S
2
3    Stephen Hrones, Esquire
4    Hrones and Garrity
5    Lewis Wharf - Bay 232
6    Boston, Massachusetts 02110-3927
7    (617)227-4019
8    rhones@masscrimnallawyer.com
9        Counsel for the Plaintiffs
10
11   Helen Litsas, Esquire
12   City of Boston Law Department
13   City Hall, Room 615
14   Boston, Massachusetts 02201
15   (617)635-4040
16   helen.litsas@cityofboston.gov
17       Counsel for the Defendants
18
19   Also Present:
20   Carlos Pineda, Plaintiff
21   MaryBeth Cucik, Esq., City of Boston
22   Barbara Schaffer, Paralegal, City of Boston
23
24

Page 3

1        I N D E X
2    WITNESS    DIRECT CROSS REDIRECT RECROSS
3    CARLOS A. PINEDA
4    (By Ms. Litsas)    197
5    (By Mr. Rhones)    193
6
7
8
9        E X H I B I T S
10   NO.                    PAGE
11   1   Diagram of Apartment.....................24
12   2   Diagram of Outside of Apartment............68
13   3-22 Color Photocopies of Photographs...........113
14
15
16
17
18
19
20
21
22
23
24

Page 4

1        P R O C E E D I N G S
2        ALEXANDRA PEREZ, first having been
3    properly identified and duly sworn, under oath,
4    deposes and says as follows:
5    DIRECT EXAMINATION BY MS. LITSAS:
6    Q.  Good afternoon, Ms. Perez.  Again, before we
7        begin, I just want to apologize on the
8        record.  There was a delay, unfortunately,
9        with your deposition and your husband, Carlos
10       Pineda's deposition because of a
11       miscommunication with the court reporter and
12       my office.  So on behalf of myself and the
13       City of Boston, we'd like to apologize to
14       you.  We appreciate you extending the
15       courtesy of continuing to stay for today's
16       deposition.
17           Before we begin, can you just state
18       your name and spell your name for the record.
19   A.  Alexandra Perez, A-l-e-x-a-n-d-r-a, and my
20       last name is P-e-r-e-z.
21   Q.  And Ms. Perez, where do you reside?
22   A.  11 Fermoy Heights.
23   Q.  How long have you resided at that address?
24   A.  Been there for years now, since I was eight

Page 5

1    years old.
2        MS. LITSAS:  Off the record.
3        (A discussion was held off the
4    record.)
5        MS. LITSAS:  Back on the record.
6    Q.  Ms. Perez, can you please state your date of
7        birth?
8    A.  3/11/82.
9    Q.  What is your social security number?
10   A.  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.
11       MS. LITSAS:  Before we go any
12       further, Stephen, usual stipulations?  Same
13       as Mr. Pineda's?
14       MR. RHONES:  Yes.
15   Q.  And Ms. Perez, you were here during
16       Mr. Pineda's deposition this morning?
17   A.  Yes.
18   Q.  So you understand --
19       MR. RHONES:  We might as well put
20       it on the record because they may be
21       separate, you know, the two.
22       MS. LITSAS:  Oh, the stipulations?
23       MR. RHONES:  Yeah.  Why don't you
24       put it on the record --

2 (Pages 2 to 5)

Page 14

1   A.   Junior. Jose Perez, Jr.
2   Q.   Who was the signatory before that?
3   A.   My mother.
4   Q.   Why did your brother leave that location?
5   A.   Because my mother left him my custody
6       basically. I was underage during that time,
7       and he was older. He's older than me.
8   Q.   So he [sic] was in your [sic] custody?
9   A.   Yeah.
10   Q.   Were you living at that address with just
11       your brother at one point?
12   A.   Yes.
13   Q.   Were you living with anyone else other than
14       your brother?
15   A.   My father.
16   Q.   Jose Perez?
17   A.   Yes.
18   Q.   Does your brother still live at that address
19       at 11 Fermoy heights?
20   A.   No.
21   Q.   When did your brother no longer live there?
22   A.   In the year 2000, the lease transferred to
23       me.
24   Q.   So in 2000 the lease was transferred from

Page 15

1       your brother to you?
2   A.   Yes.
3   Q.   Where does your brother live now?
4   A.   Right now he lives in Lynn, but I don't know
5       the physical address either.
6   Q.   In 2003 on the date of this incident, was
7       your brother living with you at that time?
8   A.   No.
9   Q.   Had he been living with you at that time?
10   A.   No.
11   Q.   Any time prior?
12   A.   No. Besides -- before the lease transferred
13       to me.
14   Q.   Okay. On the date of the incident, who was
15       living with you?
16   A.   Carlos, my kids, and my father was staying
17       with me; and Norberto Serrano stayed with us
18       for a couple of days.
19   Q.   And your father is Jose Perez, Sr.?
20   A.   Correct.
21   Q.   And how long had he been living with you?
22   A.   Since he had the stroke. Like he will stay
23       off and on with either me or my brother, but
24       mainly with me.

Page 16

1   Q.   And your brother had been living in Lynn at
2       that time?
3   A.   Correct.
4   Q.   Did your father have any other address other
5       than your house and your brother's address?
6   A.   No.
7   Q.   How many children do you have?
8   A.   Two.
9   Q.   And what are their names?
10   A.   Leilani and Damien.
11   Q.   And how old are they currently?
12   A.   Damien is five and Leilani is three.
13   Q.   And do you have any other children other than
14       those two children?
15   A.   No.
16   Q.   And those were the same two children that
17       were living with you at the time of the
18       incident?
19   A.   Yes.
20   Q.   Can you tell me a little bit about your
21       educational background?
22   A.   Graduated from West Roxbury High School, went
23       to Bryman Institute for Medical Assistant;
24       and I'm currently working as a medical

Page 17

1       assistant.
2   Q.   When did you graduate high school?
3   A.   2000.
4   Q.   This was West Roxbury High School?
5   A.   Correct.
6   Q.   And you went to what school after that?
7   A.   Bryman Institute.
8   Q.   Can you spell that for me?
9   A.   B-r-y-m-a-n; Institute, I-n-s-t-i --
10   Q.   Yeah. I've got that.
11   A.   Yeah.
12   Q.   Where is that located?
13   A.   Brighton.
14   Q.   Did you graduate from that institute with a
15       degree?
16   A.   A certificate for medical assistant.
17   Q.   And how long was that program?
18   A.   Eight months.
19   Q.   And when did you start that program?
20   A.   When did I stop?
21   Q.   Start.
22   A.   Start. February of 2002.
23   Q.   When did you finish? In December of 2002?
24   A.   No.

5 (Pages 14 to 17)

Page 50

1  Q.  And what time was that?
2  A.  From 8:30 to 9:00.  Anywhere from 8:30 to
3      9:00.
4  Q.  At the time of the incident, where were the
5      kids sleeping?
6  A.  My son was in his bed, toddler bed.
7          (Brief interruption.)
8          MS. LITSAS:  Excuse me.  Off the
9      record.
10         (Off the record.)
11         MS. LITSAS:  What was the last
12     question?
13         (The requested question was read
14     back by the court reporter.)
15 A.  My son was in his room in his toddler bed.
16 Q.  And your daughter was sleeping?
17 A.  In my room in her crib.
18 Q.  And had she always slept in your room since
19     she was born?
20 A.  Since she was born?  Yes.
21 Q.  And you went to bed around eight or nine
22     o'clock?
23 A.  That's the time that -- 9:30 or so.
24 Q.  And what time did your father go to bed?

Page 51

1  A.  I don't know.
2  Q.  During the course of the day, had you seen
3      Norberto at all?
4  A.  No, except for in the morning.
5  Q.  At any point during the course of the day,
6      did Norberto return?
7  A.  No.
8  Q.  Did you hear him come back?
9  A.  No.
10 Q.  I'm sorry.  Where was your father at the
11     time?  Did he go to sleep?
12 A.  I don't know where he was.
13 Q.  Was your father with you when you returned
14     home with Carlos?
15 A.  I wouldn't know.
16 Q.  What happened after you went to sleep?
17 A.  After I went to sleep?
18 Q.  Was there anybody with you?
19 A.  Yes.
20 Q.  And who was with you?
21 A.  Carlos.
22 Q.  And where was your daughter?
23 A.  In her crib.
24 Q.  Was your son asleep?

Page 52

1  A.  Yes.
2  Q.  And you don't know where your father was?
3  A.  No.
4  Q.  And you didn't know where Norberto was?
5  A.  No.
6  Q.  What happened next after you went to sleep?
7  A.  After I went to sleep, I woke up.  I looked
8      out the window.  I see that the car is not
9      where we -- he parked it.
10         I shake him, and tell him, "Carlos,
11     Carlos.  The car's missing."
12         And then I see the lights and the
13     flashlights all over the place outside.
14 Q.  Do you know what time this is?
15 A.  I don't know the exact time, no.
16 Q.  What's the thing that woke you up?
17 A.  The commotion.
18 Q.  And what commotion was it?
19 A.  Outside, the sirens, people screaming.  Like,
20     cops running, talking out loud.
21 Q.  Did you see how many cars were outside,
22     police cars?
23 A.  I didn't see the police cars.  I only saw the
24     lights.

Page 53

1  Q.  Did you see a lot of lights or a few lights?
2  A.  A lot of lights.
3  Q.  Who was screaming that you know of?
4  A.  There wasn't screaming.  I could just hear
5      them talking out loud.
6  Q.  And what were they saying?
7  A.  Like, I really don't know because they were
8      running and just talking to each other.
9  Q.  So you can hear what they were saying?
10 A.  I couldn't hear what they were saying.
11 Q.  And your apartment is on the third floor?
12 A.  Yes.
13 Q.  And there are three flights of stairs to the
14     ground?
15 A.  Yes.
16 Q.  What made you look out the window?  The
17     commotion?
18 A.  The commotion.
19 Q.  And you said you noticed that your car was
20     missing?
21 A.  Yes.
22 Q.  Why did you -- how could you notice that?
23     Where was your car parked?
24 A.  Behind our building.

14  (Pages 50 to 53)

## Page 54

1  Q.  And is that where you typically parked your
2      car?
3  A.  Yes.
4  Q.  Did you have an assigned spot?
5  A.  I don't remember if I had a sticker or not.
6  Q.  But did you have an assigned spot with your
7      apartment?
8  A.  No.
9  Q.  And what happened after you saw the cops --
10     you saw the lights and heard the noise?  What
11     did you do?
12 A.  I woke up Carlos and told him that the car
13     wasn't there.
14 Q.  And what did he say?
15 A.  He basically didn't understand what I was
16     saying because he was, like, into a deep
17     sleep.
18 Q.  And what did you do after that?
19 A.  After that, I just went to the living room to
20     look out the window.
21 Q.  And what happened after that?  What did you
22     see?
23 A.  Then I noticed that Carlos came behind me,
24     and then I heard footsteps coming up the

## Page 55

1      stairs.
2  Q.  And did Carlos say anything when he came to
3      you in the living room?
4  A.  He was still, like, kind of, like, half
5      asleep.  He was like "Huh, huh."  Like
6      basically, what are you talking about?  Like
7      he didn't know what was going on.
8  Q.  Did you see Norberto at that point?
9  A.  No.
10 Q.  Had you seen Norberto at any point since you
11     had woken up?
12 A.  No.
13 Q.  At any point did you hear sirens?
14 A.  Yes.
15 Q.  And when did you hear those sirens?
16 A.  When I opened the door to my room.
17 Q.  Was your door closed to your bedroom?
18 A.  Yes.
19 Q.  Did you typically close the door to your
20     bedroom?
21 A.  Yes.
22 Q.  Was the door closed to your son's room?
23 A.  Yes.
24 Q.  Was the door closed to your father's room?

## Page 56

1  A.  Yes.
2  Q.  Was there a door to your living room?
3  A.  No.
4  Q.  Did you notice anything else other than --
5      strike that.
6          What did you see outside the living
7      room window?
8  A.  Just the lights and the police cars.
9  Q.  What were you thinking when you saw that?
10 A.  What's going on?
11 Q.  What did you do next after you saw the
12     window, saw the commotion outside the window?
13 A.  That's when Carlos came behind me, and I told
14     him that the car's gone.  And then we heard
15     the knocking on the door.
16 Q.  And then what happened next?
17 A.  We opened the door.
18 Q.  What type of knock was it?
19 A.  Bang, bang.
20 Q.  And did you hear anything else other than the
21     knock?
22 A.  No.
23 Q.  Where were you when you heard the knock?
24 A.  I was in the living room.

## Page 57

1  Q.  And who was with you at that time?
2  A.  Carlos.
3  Q.  And what did you do when you heard the knock?
4  A.  I told him that somebody was knocking.
5  Q.  And what did he say?
6  A.  He went to open the door.
7  Q.  And did you go with him?
8  A.  Yes.
9  Q.  Where were you standing when Carlos was at
10     the door?
11 A.  Behind him.
12 Q.  What happened next?
13 A.  He opened the door.  And he said that the car
14     was gone, our car was missing.  And they
15     grabbed him.  They pushed him against the
16     wall and then handcuffed him.
17 Q.  When the door opened, did you hear -- at any
18     point did you hear anyone identify
19     themselves?
20 A.  No.
21 Q.  Did you hear the words "Boston Police" at any
22     point?
23 A.  I don't recall.
24 Q.  Did you hear any other words like "Police" at

Page 58

1    that time?
2    A.  They were knocking at other doors too, and I
3       heard them say that, yeah.
4    Q.  How do you know there were other doors?
5    A.  Because I heard them knocking on the doors
6       downstairs.
7    Q.  What were you thinking at that point?
8    A.  What's going on?
9    Q.  Were you thinking anything else?
10   A.  No.
11   Q.  When Carlos opened the door, who was at the
12      entranceway?
13   A.  Cops.
14   Q.  And what did they look like?
15   A.  I don't recall.
16   Q.  Do you know if they were in uniform or in
17      plain clothes?
18   A.  They were in uniform.
19   Q.  And what did the uniforms look like?
20   A.  I don't recall.
21   Q.  Were they blue?
22   A.  They were blue.
23   Q.  Did they have any patches on them or labels?
24   A.  I know they had patches on them, but I don't

Page 59

1    remember what the patches said.
2    Q.  Do you know if there were Boston Housing
3       Police there?
4    A.  No.
5    Q.  Do you know if there were State Police
6       officers there?
7    A.  After the fact of everything happening, yeah,
8       I found out.  But I didn't know during that
9       time.
10   Q.  At the time did you know there were Boston
11      Police officers there?
12   A.  Yes.
13   Q.  And how did you know that?
14   A.  The badges.
15   Q.  And where were the badges?
16   A.  The one that they wear here on their --
17   Q.  You're pointing to your --
18   A.  -- shoulder.  On their shoulder or chest.  I
19      don't remember where exactly, where they put
20      it.
21   Q.  Are you pointing diagonally above your
22      heart --
23   A.  Yeah.
24   Q.  -- for the record?

Page 60

1        How many officers were at the door
2       when Carlos opened the door?
3    A.  I can't say a number.
4    Q.  Was it more than one?
5    A.  More than one.
6    Q.  More than two?
7    A.  More than two.
8    Q.  More than five?
9    A.  Not more than five.
10   Q.  So more than two but less than five?
11   A.  Mm-hmm.
12   Q.  Do you know what they looked like in terms of
13      their ethnicity?
14   A.  No.
15   Q.  Were they Caucasian?
16   A.  One of them, yes.
17   Q.  What did the Caucasian officer look like?
18   A.  Tall.
19   Q.  What color hair did he have?
20   A.  Probably like brown, blondish brown.
21   Q.  Did he wear glasses?
22   A.  No.
23   Q.  Did he have any facial hair?
24   A.  I don't remember if he had facial hair.

Page 61

1    Q.  Do you know what his name was?
2    A.  No.
3    Q.  Was there any other Caucasian officers at the
4       door?
5    A.  There was a lot of them that came afterwards.
6    Q.  But at the door?
7    A.  At the door, I only remember one.
8    Q.  The other officers that were standing at the
9       door, what did they look like?
10   A.  I don't remember.
11   Q.  You don't know if they were tall or short?
12   A.  I only know the one that I remember, which is
13      tall.
14   Q.  And you don't know what their weight was?
15   A.  I can't say his weight, no.
16   Q.  And you don't know if these other officers
17      had facial hair either?
18   A.  No.
19   Q.  Did you notice anything about the officers
20      when you opened the door?
21   A.  Notice anything else about them?  I just
22      heard their walkie-talkies, the conversation
23      on the walkie-talkies.  That's it.  And their
24      guns and their flashlights too were out.

16 (Pages 58 to 61)

Page 62

1   Q.  Where were the guns located?
2   A.  They were in their hands.
3   Q.  And where were they pointed, if at all?
4   A.  I don't remember where they were pointed at
5       that time.
6   Q.  Do you know if they were pointed down towards
7       the ground?
8   A.  I don't remember them being pointed towards
9       the ground.
10  Q.  Do you remember them pointed in any other
11      direction?
12  A.  I remember one of them, one of the cops
13      specifically, had his gun like midsize on his
14      body, like on his, like, chest.
15  Q.  And what you're doing is for the record --
16  A.  Like his stomach or his chest.
17  Q.  -- putting your hands to demonstrate where
18      the gun was at your belt level?
19  A.  Mm-hmm.
20  Q.  Is that correct?
21  A.  Like at the belt level, yes.
22  Q.  And do you know what officer was doing that?
23  A.  I don't remember.  I don't remember his face.
24  Q.  And did the officers say anything -- strike

Page 63

1       that.
2           And the officers were also carrying
3       flashlights?
4   A.  Yes.
5   Q.  Were all the officers at the door carrying
6       flashlights?
7   A.  Yes.
8   Q.  And were the flashlights on?
9   A.  Yes.
10  Q.  So were all of the officers carrying guns in
11      their hands?
12  A.  All the officers that entered my apartment,
13      yeah.  They all had guns in their hands and
14      flashlights.
15  Q.  But also at the door, were all of the
16      officers carrying a gun and a flashlight?
17  A.  At the door?
18  Q.  Yes.
19  A.  The only one that I remember, no.
20  Q.  So at the door --
21  A.  I only remember one cop at the door.  I don't
22      remember the rest of them.
23  Q.  So you don't know what the other cops were
24      doing --

Page 64

1   A.  No.
2   Q.  -- in terms of guns and flashlights?
3   A.  When they entered my apartment, I knew they
4       had their guns out and their flashlights.
5   Q.  But at the door --
6   A.  At the door --
7   Q.  Let us just focus on the door.
8   A.  At the door, I don't remember none of the
9       rest except for that one.
10  Q.  When Carlos opened the door, did he say
11      anything to the officers?
12  A.  Yes.
13  Q.  What did Carlos say to the officers?
14  A.  My car is gone.
15  Q.  What did the officers say, if anything, to
16      Carlos?
17  A.  They said, "A white Honda Civic?"
18  Q.  And who said that?
19  A.  The cops.
20  Q.  Which cop?
21  A.  The one that was at the door.
22  Q.  That you remember?
23  A.  Yes.
24  Q.  The Caucasian officer?

Page 65

1   A.  Yes.
2   Q.  And what happened next?
3   A.  He grabbed Carlos and handcuffed him.
4   Q.  Who grabbed Carlos and handcuffed him?
5   A.  The white, tall Caucasian male I remember.
6   Q.  Before that, did Carlos say anything to him?
7   A.  He said, "Why are you arresting me?  What's
8       going on?"
9   Q.  Is that before?
10  A.  During the process of him handcuffing him.
11  Q.  Prior to the handcuffing, did Carlos say
12      anything to the officer?
13  A.  Yes.  "My car is gone."
14  Q.  And then he said, "The white Honda Civic"?
15  A.  The cops said, "The white Honda Civic?"
16  Q.  And then what was said after "The white Honda
17      Civic?"
18  A.  He asked if it was our car.
19  Q.  Carlos asked that?
20  A.  No, the cop.
21  Q.  And what did Carlos say?
22  A.  Yes.
23  Q.  What did the officer say after that?
24  A.  He just grabbed him.  He didn't say anything

17 (Pages 62 to 65)

Page 70

1   A.  Directly behind him.
2   Q.  Were you standing there the entire time?
3   A.  Yes.
4   Q.  After Carlos was taken over to the star
5       location, where were you?
6   A.  I was in the hallway, just in the middle,
7       outside my door.
8   Q.  Can we call this star 1?
9   A.  Mm-hmm.
10  Q.  Put a "1" with that star.
11  A.  (Witness marking document.)
12  Q.  And then put another star, and call that star
13      2, where you were after Carlos was taken.
14  A.  (Witness marking document.)
15  Q.  And were you able to see Carlos and the
16      officer from the star 2 location?
17  A.  Yes.
18  Q.  And what did you see?
19  A.  I saw when he had him against the wall.
20  Q.  And how was he being held against the wall?
21  A.  He, the officer, basically had his force
22      against him so he wouldn't be able to move
23      off the wall.
24  Q.  Was Carlos face first or his back to the

Page 71

1       wall?
2   A.  Face first to the wall.
3   Q.  What did the officer who was doing this look
4       like?
5   A.  Tall, Caucasian.
6   Q.  And what type of uniform did he have on?
7   A.  I just noticed the blue uniform.  I didn't
8       know what type.
9   Q.  You don't know if it was a Boston Police --
10  A.  Boston Police, yeah.
11  Q.  You don't know if it was that or a Boston
12      Housing Authority --
13  A.  He was a Boston Police.
14  Q.  How do you know it was a Boston Police
15      uniform?
16  A.  Because of the little badge they wear.
17  Q.  So you saw a badge that said "Boston Police"?
18  A.  Mm-hmm.
19  Q.  What did you see this officer do while Carlos
20      was face first against the wall?
21  A.  He was just -- he had his force against him
22      just so he wouldn't be able to move.
23  Q.  I guess what do you mean by force?
24  A.  Like making sure -- keeping him still, making

Page 72

1       sure that he wasn't able to go anywhere, move
2       anywhere.
3   Q.  How was he doing that?
4   A.  By putting his force against him -- putting
5       his body basically -- forcing Carlos' body
6       basically against the wall.
7   Q.  And so was the officer's body against Carlos'
8       body?
9   A.  It sure looked that way.  It seemed that way,
10      yes.
11  Q.  And were you facing in their direction?
12  A.  Yes.
13  Q.  Were they to your right or directly in front
14      of them?
15  A.  They were to my right, directly in front
16      them.  I wasn't behind them.
17  Q.  You were behind them, but they were --
18  A.  To my right behind them.
19  Q.  Okay.  And you couldn't see Carlos' face at
20      that point, or could you see Carlos' face?
21  A.  I did see his face, yeah.
22  Q.  And what did you see?
23  A.  Confusion.
24  Q.  What did Carlos say, if anything, to the

Page 73

1       officer that you could hear?
2   A.  "What's going on?  Why are you doing this?"
3   Q.  And what did the officer say?
4   A.  Nothing.
5   Q.  What was the distance between you and Carlos
6       and the officer?
7   A.  Not even feet.
8   Q.  So less than a few feet?
9   A.  Yeah, less than a few feet.
10  Q.  What were the other officers doing at that
11      point that had been at the door?
12  A.  They were already in the apartment.
13  Q.  Where there any other officers with you in
14      the hallway other than the officer that was
15      with Carlos?
16  A.  I don't remember.
17  Q.  Did you see -- after Carlos was against the
18      wall with the officer, what happened next?
19  A.  Our neighbors opened the door -- one of our
20      neighbors opened her door.
21  Q.  And who was that?
22  A.  I don't know her by her name exactly.  Just
23      by face.
24  Q.  And where did she live?

19 (Pages 70 to 73)

Page 74

1  A.  She lived in the apartment that was right
2      next to me.
3  Q.  And where was that on Exhibit 2?
4  A.  To the right of me.  To the right of me -- of
5      my door.
6  Q.  Can you just place a "Y" at that location?
7  A.  (Witness marking document.)
8  Q.  And circle it just so we don't get confused.
9  A.  (Witness marking document.)
10 Q.  Thank you.
11     And did she say anything to you?
12 A.  Yes.
13 Q.  What did she say?
14 A.  "Give me the kids."
15 Q.  And what did you do?
16 A.  I tried to.
17 Q.  What do you mean you tried to?
18 A.  I tried to, but they wouldn't let me grab my
19     children.
20 Q.  Who wouldn't let you?
21 A.  The rest of the cops that were searching the
22     apartment.
23 Q.  Who did you ask about that?
24 A.  I didn't even ask them.  I just tried to go

Page 75

1      in and grab them.
2  Q.  And so you didn't ask the officers to go get
3      your kids.  You just went to try to --
4  A.  I screamed -- yeah.  I told them, "There are
5      kids in there.  There's kids in there."  And
6      they would not listen to me.
7  Q.  And what did you do next?
8  A.  I tried to go in and grab them.
9  Q.  And who -- what happened when you tried to do
10     that?
11 A.  They were blocking my way.
12 Q.  Who was blocking your way?
13 A.  I remember a black African-American female
14     cop.
15 Q.  And do you know what her name was?
16 A.  I don't remember her name, no.
17 Q.  Do you know -- what did her uniform look
18     like?
19 A.  She was a Boston Police officer.
20 Q.  And how do you know she was a Boston Police
21     officer?
22 A.  Because I saw her badge.
23 Q.  Did she identify herself at any point?
24 A.  No.

Page 76

1  Q.  What did she say to you when you tried to go
2      get your kids?
3  A.  She said, "You're not going anywhere."
4  Q.  What happened next?
5  A.  I basically kept on screaming at them, and
6      telling them, "My kids are in there.  My kids
7      are in there."  I was paranoid.  I was
8      nervous.  And I saw that they had their guns
9      out while my kids were sleeping in the room.
10 Q.  And what happened after that?
11 A.  After that, she grabbed my information.  And
12     she basically told me, "Oh, you're not going
13     anywhere.  Your kids are going to DSS right
14     now."
15 Q.  And what did you say?
16 A.  I said, "What's going on?  I never done
17     anything.  I'm not a criminal.  I don't have
18     a record or anything."  And then her response
19     was, "Not for long."
20 Q.  Did she say anything else to you?
21 A.  Nothing else that I can remember, no.
22 Q.  What information did you give her?
23 A.  I gave her my driver's license.
24 Q.  Did you give her any other information?

Page 77

1  A.  No.
2  Q.  Did she take any notes?
3  A.  She just took my information down.  I don't
4      know what other --
5  Q.  On a notepad?
6  A.  Yeah.  I don't know what other notes she
7      took.
8  Q.  And where was she taking this information?
9  A.  She had me in the kitchen.
10 Q.  And were you sitting, standing?
11 A.  Standing.
12 Q.  And where there any other officers in the
13     kitchen with you?
14 A.  In the kitchen with me, no.  Only her.
15 Q.  Were there any other officers in your
16     apartment?
17 A.  Yes.
18 Q.  How many were in your apartment?
19 A.  I can't say an exact number, but I know there
20     was a lot of them.
21 Q.  Was there more than five?
22 A.  Definitely more than five.
23 Q.  More than ten?
24 A.  Definitely more than ten.

20 (Pages 74 to 77)

Page 78

1  Q.  More than 15?
2  A.  Around that number, probably.
3  Q.  So around 15 officers?
4  A.  Mm-hmm.
5  Q.  Do you know if they were -- do you know what
6      agency they belonged to?
7  A.  I just knew -- the rest of them, no.  I just
8      knew the ones that I seen, that I conversated
9      with, that I talked to.
10  Q.  And what agency did those officers belong to?
11  A.  Boston Police.
12  Q.  And do you know of any other agencies that
13      were at that location?
14  A.  At that time, no.
15  Q.  Do you know if there were Boston Housing
16      police officers there?
17  A.  At that time, no.
18  Q.  Do you know if there were State Police
19      troopers there?
20  A.  Not at that time.
21  Q.  Did you see any?
22  A.  Not at that time.
23  Q.  At any time did you see State troopers?
24  A.  A State trooper, I remember seeing a State

Page 79

1      trooper.
2  Q.  And when did you see a State trooper?
3  A.  When they were leaving.
4  Q.  Leaving where?
5  A.  Down the stairs.  When they passed me, when
6      they passed the kitchen.  During the whole
7      time, I was in the kitchen.
8  Q.  So you were -- looking at Exhibit 1 -- you
9      were in the kitchen over here?
10  A.  Mm-hmm.
11  Q.  Could you see outside your apartment with the
12      door open?
13  A.  No.  They were already inside, and they were
14      coming out, passing the hallway off the
15      kitchen.
16  Q.  So State troopers were in your apartment?
17  A.  I saw one, from the kitchen, leave out the
18      door.
19  Q.  And do you know what his name was?
20  A.  I don't know his name.
21  Q.  Do you know if it was a male or female?
22  A.  I know it was a male.
23  Q.  Do you know if he was Caucasian, African-
24      American?

Page 80

1  A.  I don't remember.
2  Q.  Do you know if he was tall or short?
3  A.  I just grabbed a glance at the uniform and
4      the hat.
5  Q.  Have you ever filed a lawsuit against the
6      State Police?
7  A.  No.
8  Q.  What about the Boston Housing Authority?
9  A.  No.
10  Q.  Do you know why you haven't filed a lawsuit
11      against them?
12  A.  Because they are not the ones that arrested
13      Carlos.
14  Q.  Do you know what was the name of the
15      individual who arrested Carlos?
16  A.  No.
17  Q.  Do you know -- strike that.
18          While you were in the kitchen, that
19      was when the female officer was taking your
20      information down?
21  A.  Yes.
22  Q.  What did she look like?
23  A.  She was black African-American.
24  Q.  Was she tall or short?

Page 81

1  A.  I'd say she was like about my height.
2  Q.  And what color hair did she have?
3  A.  It was in braids.  I don't remember the type
4      of color.
5  Q.  Did she have a uniform on?
6  A.  Yes.
7  Q.  Was there anyone else with her taking down
8      her information?
9  A.  Not with her, but there was a cop behind her
10      making sure I wouldn't go anywhere.
11  Q.  And who was that?
12  A.  I just know he was a Caucasian cop.
13  Q.  And was he a Boston Police officer?
14  A.  I didn't see his uniform or badge.
15  Q.  And do you know -- why do you say that he was
16      there to make sure I wasn't going anywhere.
17      What do you mean by that?
18  A.  They was making sure that I wouldn't go
19      anywhere, that I wouldn't go out to grab my
20      kids.
21  Q.  How did they do that?
22  A.  By not letting me go.  By getting in my way.
23      By blocking my way.
24  Q.  And who blocked your way?

21 (Pages 78 to 81)

Page 82

1   A.  Him and the male Caucasian cop.
2   Q.  And what about the female officer?  Did she
3       block you?
4   A.  She also, yes.
5   Q.  How many times did you try to go get your
6       kids?
7   A.  I tried to pass them, just basically once
8       until they grabbed me.  And they said,
9       "You're not going anywhere."  They held me in
10      the kitchen.
11  Q.  Who said, "You're not going anywhere"?
12  A.  The black African-American cop.
13  Q.  The female?
14  A.  Yes.
15  Q.  Did the male officer that was in the kitchen
16      say anything to you?
17  A.  He just nodded his head and say, No.  Like,
18      yeah, you're not going anywhere, after she
19      said it.
20  Q.  So you tried once.  And after that she took
21      your information?
22  A.  Mm-hmm.
23  Q.  And did you try again at any other point to
24      try to get your children?

Page 83

1   A.  Yes.
2   Q.  And when did you do that?
3   A.  When I finally realized that they got into my
4       son's room.
5   Q.  And when did you realize that?
6   A.  When my father called me.
7   Q.  And what did he say?
8   A.  "Ally, Ally."
9   Q.  What did you do when you heard that?
10  A.  I ran to grab my son.
11  Q.  And where was your son?
12  A.  He was in his toddler bed sleeping.
13  Q.  And who was in his room at that point?
14  A.  Norberto.
15  Q.  And where was Norberto?
16  A.  He was behind a door, I believe.  I'm not
17      sure.
18  Q.  Was there anyone with you in the kitchen --
19      was there anybody who was with you in the
20      kitchen that followed you to the kids' room?
21  A.  Yes.
22  Q.  Who?
23  A.  The cops.
24  Q.  Which cop?

Page 84

1   A.  The black African-American and the male cop,
2       the white Caucasian male cop.
3   Q.  That was with Carlos?
4   A.  That was with me.
5   Q.  In the kitchen?
6   A.  Yes.
7   Q.  So you leave to go to your son's room when
8       you hear your father?
9   A.  Yes.
10  Q.  Before that, how long had you been in the
11      kitchen for with the female officer?
12  A.  Minutes.
13  Q.  Was it more than two minutes?
14  A.  Probably like four minutes.
15  Q.  And where was your father calling you from?
16  A.  From the hallway out his -- out the room
17      where he was staying in.
18  Q.  Do you recall where you saw him?
19  A.  Yes.  He was standing there.
20  Q.  And could you just point for me on Exhibit 1
21      where that was?
22  A.  (Indicating.)
23  Q.  Can you just draw an "X" for me on Exhibit 1.
24  A.  (Witness marking document.)

Page 85

1   Q.  Can you just circle that for me.
2   A.  (Witness marking document.)
3   Q.  Did the other officers let you go to your
4       son's room when you left the kitchen when you
5       heard your father call your name?
6   A.  I basically just went by them.
7   Q.  And did you run or walk?
8   A.  I ran.
9   Q.  What was your father saying at that point?
10  A.  "Ally, Ally.  El nene, nene" in Spanish.
11  Q.  What does that mean?
12  A.  Ally, Ally.  The boy, the boy.
13  Q.  Was your son's bedroom door open or closed
14      when you got there?
15  A.  It was open.
16  Q.  And who was in the bedroom when you were
17      there?
18  A.  When I was there, Norberto and my son.
19  Q.  Was there any officers in there at that time?
20  A.  Yes.
21  Q.  How many officers?
22  A.  I can't say a number.
23  Q.  And where were the officers standing in your
24      son's room when it happened?

22 (Pages 82 to 85)

Page 86

1   A. They were inside the room and some were
2      standing outside the doorway.
3   Q. And how many officers were in your son's
4      room?
5   A. I can't give an exact number.
6   Q. And where was Norberto?
7   A. I heard scuffling. So I guess they were,
8      like, trying to apprehend him, grab him.
9   Q. But you had said earlier when you had walked
10     into the room, you just saw your son and
11     Norberto. I'm a little confused.
12   A. When I walked into the room, I said that
13     Norberto -- when I was running to the room, I
14     said that Norberto and my son was in the
15     room.
16   Q. Okay. So when you were running, it was just
17     Norberto and your son?
18   A. The cops were already in the room. My father
19     was calling me because the cops were already
20     in the room while my son was in there.
21   Q. And Norberto was in there as well?
22   A. Yes.
23   Q. And where's the first place that you saw
24     Norberto in your son's room?

Page 87

1   A. I didn't see him.
2   Q. You didn't see him at all?
3   A. No.
4   Q. How do you know that Norberto was in your
5     son's room?
6   A. Because I heard him, like, screaming.
7   Q. And what was he saying?
8   A. "Ouch, ouch."
9   Q. And where was Norberto calling from that you
10     heard?
11   A. My son's room.
12   Q. Does your son have a closet?
13   A. Yes.
14   Q. Just point for me on Exhibit 1 where the
15     closet is?
16   A. Right here.
17   Q. Can you just draw and write "closet" for
18     that?
19   A. (Witness marking document.)
20   Q. And was Norberto calling from that direction
21     of the closet?
22   A. I don't know in what part of the room he was.
23   Q. What kind of closet is in your son's room?
24     Is it a --

Page 88

1   A. It doesn't have a door. It's an open closet.
2   Q. So it's a walk-in closet?
3   A. Yes.
4   Q. Is it a large closet, small?
5   A. It's small.
6   Q. Is there any other closets in your son's
7     room?
8   A. No.
9   Q. When you walked into the room, you --
10   A. I didn't walk into the room.
11   Q. You ran into the room?
12   A. I was outside running into the room.
13   Q. And you ran inside. Where was your son at
14     that point?
15   A. When I was running towards the room, one of
16     the cops realized that my son was in the bed
17     and passed him on to my dad. And then that's
18     when I grabbed him.
19   Q. And when you say the officer realized that
20     your son was in the bed, what do you mean by
21     that?
22   A. He realized that my son was in the bed. They
23     didn't know he was in there.
24   Q. What was the officer doing with the bed when

Page 89

1     you walked in?
2   A. They were -- I heard the scuffling, the
3     noises. And my son's bed, when I finally saw
4     it, it was moved out of place.
5   Q. And where was it moved to?
6   A. It was just moved out of place, like, to the
7     middle of the room.
8   Q. Can you just point for me where you had
9     placed your son's bed at the time on Exhibit
10     '1?
11   A. This is the door. Like right here in the
12     corner.
13   Q. Okay. That's where it was usually.
14   A. Mm-hmm.
15   Q. And where had it been moved to?
16   A. Like right over here?
17   Q. Can you just draw a circle 1 and a circle 2
18     for where -- No. 1 denotes where it was
19     typically. And then a No. 2 is where it was
20     moved to.
21   A. (Witness marking document.)
22   Q. Your son's bed just moved out of place or had
23     it been --
24   A. It was moved out of place and the mattress

23 (Pages 86 to 89)

## Page 90

1    was out of place.
2  Q. When you say "out of place," was it off the
3    bed; or was it on the floor? Can you just
4    tell me a little bit about that.
5  A. The mattress was off on the floor and the
6    entire bed, the wooden part, was out of
7    place, out of where I normally put it.
8  Q. So the frame was moved?
9  A. The frame, yes.
10 Q. And was the mattress on the floor?
11 A. Yes.
12 Q. Where was your son at that point?
13 A. He was given to my dad.
14 Q. When you walked into the room --
15 A. When I was going towards the room, I saw the
16   cop giving him to my dad after the fact of
17   the scuffling and --
18 Q. Did you see any of the scuffling?
19 A. No, but I heard it.
20 Q. You heard scuffling?
21 A. Mm-hmm.
22 Q. And what is it that you saw when you -- when
23   you first made contact with your son's room,
24   what is the first thing that you saw?

## Page 91

1  A. The mess in the room.
2  Q. And the officer was handing your son over
3    to --
4  A. My father.
5  Q. Your father. Was your son awake or asleep?
6  A. He was half asleep.
7  Q. Was your son crying or upset in any way?
8  A. He was upset and scared. He pee-peed on
9    himself during the time.
10 Q. During the time of the incident?
11 A. When he saw everything going on, yes. He was
12   wet when I grabbed.
13 Q. He was wet when you grabbed him?
14 A. Yeah.
15 Q. Had your son wet the bed before?
16 A. Before he did, but not like in the middle of
17   the night like that. Usually in the morning
18   or so, right before I wake him up.
19 Q. Was your son still potty training at that
20   time?
21 A. Yes, mm-hmm.
22 Q. And the officer who gave your son to your
23   father, what did he look like?
24 A. I don't recall what he looked like.

## Page 92

1  Q. Do you know if he was a Boston Police officer
2    or a Boston Housing officer or a State Police
3    officer?
4  A. I don't recall.
5  Q. Do you know if he was in uniform?
6  A. He was in uniform.
7  Q. Do you know what kind of uniform it was?
8  A. I just -- all I can remember is just the blue
9    color. That's it.
10 Q. Do you know if it was a male officer?
11 A. It was a male officer.
12 Q. Did he have anything in his hands other than
13   your son?
14 A. Other than my son, I don't remember if he had
15   anything else in his hands.
16 Q. And where did you hear the scuffling?
17 A. In my son's room.
18 Q. And what type of scuffling sound was it?
19 A. The screaming, the ouching. Saying the
20   ouching. Things being moved. Things being
21   thrown.
22 Q. And did you see anything being thrown?
23 A. No. I just heard it.
24 Q. Did you see any scuffling?

## Page 93

1  A. When they were bringing him out of the room.
2  Q. From what direction did they bring him out of
3    your son's room?
4  A. From what direction? I don't remember.
5  Q. So you don't know if it was around your son's
6    room or --
7  A. I don't know what part of the room he was in
8    my son's room. I just saw from the doorway
9    on because all the cops were just blocking my
10   way.
11 Q. So where did you go immediately when you ran
12   into the room? To your son?
13 A. I went to grab my son from my father.
14 Q. And did you grab your son from your father?
15 A. Yes.
16 Q. Did you say anything to your father?
17 A. I don't remember me saying anything to him.
18 Q. Did you say anything to the officer?
19 A. I kept on asking him, "What's going on?
20   What's going on?"
21 Q. When you said you saw Norberto being taken
22   out of your son's room, what exactly did you
23   see? Did you see him handcuffed?
24 A. Yes.

24 (Pages 90 to 93)

Page 94

1  Q.  Did you see Norberto in handcuffs at that
2      time?
3  A.  Yes.
4  Q.  And how many officers were with him at that
5      time?
6  A.  I don't remember the number.
7  Q.  Do you know what type of uniforms they had
8      on?
9  A.  I just remember the blue color, not any
10     distinctive marks on the uniforms.
11 Q.  Do you know if they were Caucasian, African-
12     American or Hispanic?
13 A.  (The witness shakes her head.)
14 Q.  Do you know if they were from the Boston
15     Housing Authority or the Boston Police?
16 A.  I don't remember, no.
17 Q.  Did Norberto say anything to you?
18 A.  No.
19 Q.  Did Norberto say anything to anybody else
20     while he was being escorted out?
21 A.  I just remember him saying, "Ouch. It
22     hurts."
23 Q.  Did you see him actually with the handcuffs
24     on, or did you see the handcuffs being placed

Page 95

1      on him?
2  A.  I saw him with the handcuffs on already.
3  Q.  Did you see any altercation between the
4      officers and Norberto?
5  A.  Besides -- no. I didn't see anything besides
6      the handcuffs on and while they were taking
7      him out of our apartment.
8  Q.  How many officers did you say were with
9      Norberto coming out of your son's room?
10 A.  I can't get a number.
11 Q.  Was it more than one?
12 A.  It was more than one.
13 Q.  More than two?
14 A.  More than two.
15 Q.  More than five?
16 A.  Probably like around five.
17 Q.  Does that include the officer that was giving
18     your son to your father?
19 A.  Yes.
20 Q.  After you saw Norberto being escorted out of
21     the room, what happened next?
22 A.  They were still looking.
23 Q.  Who was looking?
24 A.  The rest of the cops that were inside.

Page 96

1  Q.  And what were they looking for?
2  A.  They were telling me -- they were asking me,
3      "Where's the gun? Where's the gun?"
4  Q.  And what did you say?
5  A.  I said, "I don't know what you're talking
6      about."
7  Q.  And what did they say when you said that?
8  A.  They ignored my question.
9  Q.  Who asked you about the gun?
10 A.  All of them that were there.
11 Q.  Every single officer in your apartment asked
12     you about the gun?
13 A.  Mm-hmm.
14 Q.  And that includes Boston Police officers,
15     State troopers and Boston Housing Authority?
16 A.  I don't remember if they were Boston Police
17     or what department they were, yeah.
18 Q.  How long do you think you were in your son's
19     room for?
20 A.  I wasn't in my son's room. I was outside.
21 Q.  You never went into your son's room?
22 A.  I never went into my son's room. They didn't
23     let me.
24 Q.  Your father was allowed to get into your

Page 97

1      son's room?
2  A.  No, he was outside of his room.
3  Q.  So when the officer gave your son to your
4      father, was that outside the room?
5  A.  Outside in the hallway, yes.
6  Q.  So you never saw the room -- where's the door
7      to your son's room? Can you just draw that
8      for me?
9  A.  (Witness marking document.)
10 Q.  When did you see the bed -- the officer
11     transferring your son to your father?
12 A.  While I was on my way to his room.
13 Q.  And where were they?
14 A.  They were out -- he was out here in a
15     doorway, and my father was outside of his
16     doorway.
17 Q.  Can you just put an "F" for where you saw the
18     father -- your father give your son to
19     your --
20 A.  Where I am or where they are?
21 Q.  Where they were. And circle it.
22 A.  (Witness marking document.)
23 Q.  And that denotes where your father
24     transferred -- okay. So now you draw two

25 (Pages 94 to 97)

| Page 106 |
|---|

1  A.  On the couch.
2  Q.  What did you do while you were sitting there?
3  A.  I just basically hugged him and held him.
4  Q.  Did you say anything to him?
5  A.  To him, yeah. I said it's going to be okay.
6      Everything's okay. I tried to put him back
7      to sleep.
8  Q.  And were there any officers with you in the
9      living room?
10 A.  Yes.
11 Q.  And how many officers were in the living room
12     with you?
13 A.  I remember watching over us, after all the
14     cops had left and everything, there was two
15     officers.
16 Q.  But in the living room with you when you were
17     with your son?
18 A.  I don't remember.
19 Q.  You don't remember how many officers were
20     with you at the time?
21 A.  At the time, no. I was concentrating on my
22     son. I wasn't --
23 Q.  Was it more than one?
24 A.  More than one, yes.

| Page 107 |
|---|

1  Q.  Were there more than two?
2  A.  Mm-hmm.
3  Q.  More than three?
4  A.  Mm-hmm.
5  Q.  More than five in the living room?
6  A.  In the living room -- in the living room,
7      like, towards the hallway. Because the
8      living room and the hallway, they're, like,
9      attached.
10 Q.  But I'm just talking about the living room
11     though?
12 A.  They were standing in the hallway looking up
13     at me.
14 Q.  So there were none in the living room with
15     you?
16 A.  Yeah, they were just standing looking at me
17     in the hallway.
18 Q.  Did you say anything else to them during that
19     time?
20 A.  No.
21 Q.  What happened after you were talking to your
22     son and trying to put him back to sleep? Did
23     you do anything else?
24 A.  I don't remember doing anything else, no.

| Page 108 |
|---|

1  Q.  What did you see during that time --
2  A.  During that time --
3  Q.  -- you were in the living room?
4  A.  There was just -- one of them was, the
5      detective, was outside the bathroom when my
6      dad was using the bathroom. And the rest of
7      them were just looking still.
8  Q.  The other people in your apartment?
9  A.  Yes. And they were talking upon themselves.
10 Q.  And do you know what they were saying?
11 A.  (No verbal response.)
12 Q.  Do you know how many officers were in your
13     apartment at that time? Was it about 15 you
14     said?
15 A.  Fifteen was at first. After that, some of
16     them had left in the whole I-grabbed-my-son
17     thing happened, some of them had already
18     left.
19 Q.  And you had seen them leave?
20 A.  Yes.
21 Q.  How many were in the apartment about the time
22     that you were sitting in the living room?
23 A.  Like about five or six.
24 Q.  And what were they doing? You said they were

| Page 109 |
|---|

1      looking around?
2  A.  Looking around and talking to themselves.
3  Q.  Looking around where?
4  A.  Just looking in the closets, opening the
5      drawers, flipping mattress.
6  Q.  What were they doing in your kitchen?
7  A.  In my kitchen they were looking in the
8      drawers.
9  Q.  And did they do anything in the kitchen other
10     than look in the drawers?
11 A.  I don't remember them doing anything in the
12     kitchen?
13 Q.  Did you see them look in the drawers in your
14     kitchen?
15 A.  The drawers when I remember them. When
16     everything happened, everything was opened
17     and out of place.
18 Q.  But my question is did you see them open the
19     drawers?
20 A.  I heard the drawers open and close. I didn't
21     see them visually, no.
22 Q.  What did they do in your son's room? Did you
23     see them do anything in your son's room?
24 A.  Everything was out of place in my son's room.

28  (Pages 106 to 109)

Page 110

1    They were looking through the toys, yes, for
2    the gun. They were. I had -- mm-hmm.
3  Q. So you saw them look for toys --
4  A. Through the basket of toys.
5  Q. -- in your son's room?
6  A. Yes.
7  Q. When did you see them do that?
8  A. During the whole -- when I was in that
9    hallway with my son standing.
10 Q. Is that before or after you talked to the
11   detective?
12 A. During when I was talking to the detective.
13 Q. Did you see them look through anything else
14   in your son's room?
15 A. That I could have seen, no.
16 Q. What about in your bedroom? Did you see them
17   do anything in your bedroom?
18 A. They were looking under the bed. They leaned
19   over to look under the bed. They had a box
20   of stuff in the closet. The box was emptied
21   out. Everything was on the floor.
22 Q. What did you see them do in your bedroom?
23 A. In my bedroom, I saw them look under the bed.
24 Q. And who did you see do this?

Page 111

1  A. One of the cops.
2  Q. And do you know what agency he belonged to?
3  A. No.
4  Q. Did you see this individual do anything else
5    other than look under your bed in your
6    bedroom?
7  A. From where I was, I could only see him look
8    under my bed.
9  Q. And you didn't seem him do anything else
10   other than that?
11 A. Other than the noises I heard of them
12   searching, no.
13 Q. In your father's bedroom -- did you see them
14   do anything in your father's bedroom?
15 A. Yes, they did.
16 Q. What did you see them do?
17 A. I saw them flip the mattress.
18 Q. And did you see them doing anything else
19   other than flip the mattress?
20 A. Looking inside the closet.
21 Q. In your father's room?
22 A. Yes.
23 Q. And did you see them do anything else other
24   than look in the closet and flip the mattress

Page 112

1    in your father's room?
2  A. No.
3  Q. What about the bathroom? Did you see them do
4    anything in your bathroom?
5  A. They were looking through the laundry.
6  Q. And where was the laundry?
7  A. Inside the closet.
8  Q. Was this a hamper or was --
9  A. A hamper.
10 Q. And did you see them do anything else other
11   than that?
12 A. No.
13 Q. What about the living room? Did you see them
14   do anything in the living room?
15 A. They took out the cushion -- the couch, out
16   of place. How do you call it? The cushion
17   out of the couch --
18 Q. The seat cushion?
19 A. -- the pillows and the cushion out of the
20   couch. Yeah, they threw them on the floor.
21 Q. And they threw them on the floor?
22 A. To look, yes.
23 Q. And you saw them do that?
24 A. Mm-hmm.

Page 113

1  Q. Who did you see do that?
2  A. The cops. I don't -- the cops.
3  Q. Do you know what agency they belonged to?
4  A. No.
5  Q. Do you know if they were male or female?
6  A. Male.
7  Q. Do you know if they were Caucasian, African-
8    American, or --
9  A. No, I don't remember.
10      MR. RHONES: Do you have much more?
11      MS. LITSAS: Do we need to take a
12 break?
13      MR. RHONES: Yeah. I have to go to
14 the men's room. Do you have much more?
15      MS. LITSAS: Sure, Stephen. Yeah,
16 I have a little bit more.
17      MR. RHONES: I'll be right back.
18      MS. LITSAS: Do you need to take a
19 break? Off the record.
20      (A short break was taken.)
21      (Color Photocopies of Photographs
22      marked Deposition Exhibit Nos. 3
23      through 22 on the break.)
24 Q. Ms. Perez, I'm showing you what's been marked

29 (Pages 110 to 113)

Page 114

```
 1      as Exhibit 3.
 2          What do you recognize that as?
 3   A.  My son's bed.
 4   Q.  And do you know who took these pictures?
 5   A.  Yes.
 6   Q.  Who took those pictures?
 7   A.  Me and Carlos.
 8   Q.  When did you take those?
 9   A.  The morning after the incident happened.  Not
10       the morning after, sorry.  The same morning.
11   Q.  Was that after you guys had went to bed and
12       then woke up --
13   A.  No.
14   Q.  -- or was it after?
15   A.  That was the same day, yeah.
16   Q.  And why did you take photographs?
17   A.  Just to have.
18   Q.  To have for what?
19   A.  Proof.
20   Q.  Of what?
21   A.  Of what they had done.
22   Q.  Who had done that?
23   A.  The cops.
24   Q.  And whose idea was it to take photographs?
```

Page 116

```
 1   Q.  And prior to taking these pictures, did you
 2       and Carlos talk about filing a lawsuit?
 3   A.  No.
 4   Q.  Did you talk to anybody prior to taking these
 5       pictures?
 6   A.  Prior to taking the pictures, no.
 7   Q.  What times were the pictures taken?
 8   A.  I know it was the same day.  I can't give you
 9       an exact time.
10   Q.  Do you know what time the officers left?
11   A.  Probably like around four or three o'clock in
12       the morning, 5:00 maybe.
13   Q.  And how long had they been there?
14   A.  The whole thing I guess started like two
15       o'clock.
16   Q.  So they had been there about two to three
17       hours?
18   A.  Mm-hmm.
19   Q.  And how do you know that?  Did you look at
20       the time at any point?  Did you have a watch
21       on?
22   A.  I didn't have a watch on, no.
23   Q.  So how do you know what time it was?
24   A.  From reading the reports.
```

Page 115

```
 1   A.  I always take photographs of everything.
 2   Q.  So whose idea was it to take photographs?
 3       Was it yours or Carlos'?
 4   A.  It was actually my dad's suggestion.
 5   Q.  And when you said you like to take
 6       photographs of everything, why is that?
 7   A.  Because you never know.
 8   Q.  You never know about what?
 9   A.  You never know what might come up.
10   Q.  What do you mean by that?
11   A.  You just never know.
12   Q.  Is that based on prior experiences?
13   A.  From car -- like car -- like car crashes, car
14       accidents, things like that.
15   Q.  Had you ever been in a lawsuit involving a
16       car crash or a car accident?
17   A.  No.
18   Q.  Had anything like this ever happened to you
19       before?
20   A.  No.
21   Q.  This is a picture that you took or Carlos
22       took?
23   A.  Me and Carlos took pictures.  I can't really
24       tell which one is whose or what.
```

Page 117

```
 1   Q.  The police reports?
 2   A.  Mm-hmm.
 3   Q.  And outside of that you don't know what time
 4       it was?
 5   A.  No.
 6   Q.  And so this is a picture of your son's
 7       bedroom --
 8   A.  Yes.
 9   Q.  -- in Exhibit 3?
10   A.  Yes.
11   Q.  And what does this picture show --
12   A.  My son's bed.
13   Q.  -- in Exhibit 3?  And is there anything there
14       that has been moved?
15   A.  Yeah, the bed.
16   Q.  Is there anything else that had been moved?
17   A.  You can see toys on the floor.  You can see
18       toys on top of a mattress.  You can see the
19       drawers opened.
20   Q.  Had the drawers been opened prior to the
21       police arrival?
22   A.  No.
23   Q.  Were the toys at that location prior to the
24       police's arrival?
```

30 (Pages 114 to 117)

Page 122

```
1      damage?
2   A.  Because they hit the car.
3   Q.  Who hit the car?
4   A.  The cops did.
5   Q.  Did you see them hit the car?
6   A.  I was told.
7   Q.  My question is did you see them hit the car?
8   A.  No, I did not see them hit the car.
9   Q.  Who told you that the cops hit the car?
10  A.  They told me themselves.
11  Q.  Who did?
12  A.  The cops did.
13  Q.  And who was that?  Which police officer?
14  A.  I don't remember who specifically, no.
15  Q.  Do you know what his name was?
16  A.  No.
17  Q.  Was it a male?
18  A.  I don't remember.
19  Q.  Do you know if it was a female?
20  A.  I don't remember.
21  Q.  Do you know if he was tall or short?
22  A.  Uh-uh.
23  Q.  Do you know if he was Caucasian, African-
24      American or Hispanic or any other ethnicity?
```

Page 123

```
1   A.  Uh-uh.
2   Q.  When were you told this?
3   A.  When was I told this?  I don't remember the
4       exact time.  I just know that they told me
5       that they tried to stop the vehicle and they
6       basically blocked it, in all sides, from the
7       back, the sides.
8   Q.  Was this told to you on the day of the
9       incident or after the incident?
10  A.  I don't remember if it was after or what.
11  Q.  And you weren't driving that car, this car,
12      on the day of the incident; is that correct?
13  A.  No.
14  Q.  Do you know who was driving your car after
15      you went to sleep?
16  A.  After I went to sleep, I found out later that
17      Norberto was driving the car.
18  Q.  And who told you that Norberto was driving
19      the car?
20  A.  The cops did.
21  Q.  Did Norberto ever tell you that he drove the
22      car?
23  A.  Yes.
24  Q.  When did he tell you that?
```

Page 124

```
1   A.  When he apologized for taking the keys.
2   Q.  When did he apologize?  When he told you he
3       was taking the keys?
4   A.  When he called once at home.
5   Q.  And when was that?
6   A.  After he was already in jail.
7   Q.  Was that a couple of days after that incident
8       or more than that?
9   A.  That was a couple of days.
10  Q.  Did he say anything else to you?
11  A.  He just kept on saying to me over the phone,
12      "I'm sorry.  I'm so sorry."
13  Q.  Did he say anything else other than "I'm so
14      sorry"?
15  A.  No.  Because at that point I just passed on
16      the phone to Carlos.
17  Q.  Were you upset with him?
18  A.  Yes.
19  Q.  Why were you upset?
20  A.  Just of the fact of him bringing all this to
21      my home.
22  Q.  Did you have any other interactions with
23      Norberto after that conversation?
24  A.  After that, after he reappeared again after a
```

Page 125

```
1       year or so.
2   Q.  And when was that?
3   A.  I don't remember the exact time.
4   Q.  And how did he reappear?  Did he come to your
5       house?
6   A.  Actually, Carlos was with him one day.
7   Q.  And this was about a year ago?
8   A.  Mm-hmm.
9   Q.  And what were he and Carlos doing?
10  A.  They were working on Carlos' car.
11  Q.  What does Carlos' car look like?
12  A.  He had a green Civic.
13  Q.  Was it also a low-rider?
14  A.  Yes.
15  Q.  Did Carlos and Norberto have any other
16      interactions other than that?
17  A.  Just hanging out.
18  Q.  And this was after the incident?
19  A.  Mm-hmm.
20  Q.  And how often did they hang out together?
21  A.  I don't know.
22  Q.  Was it more than once?
23  A.  More than once.
24  Q.  More than twice?
```

32 (Pages 122 to 125)

## Page 126

1  A.  More than twice.
2  Q.  More than three times?
3  A.  Probably.
4  Q.  More than 10 times?
5  A.  I don't remember more than 10 times.
6  Q.  So somewhere between three and 10?
7  A.  Mm-hmm.
8  Q.  And this is following the incident?
9  A.  Mm-hmm.
10  Q.  And do you know what they did when they hung
11     out together? ·
12  A.  Just worked on their cars.
13  Q.  How'd that make you feel that they were
14     hanging out together after this incident?
15  A.  I felt fine.
16  Q.  It didn't upset you?
17  A.  No.
18  Q.  Did Norberto ever try to make up to you or
19     Carlos the incident on April 28, 2003?
20  A.  He just apologized.
21  Q.  And that was it?
22  A.  Yeah.
23  Q.  He didn't pay you any money or do anything
24     else for you?

## Page 127

1  A.  Uh-uh.
2  Q.  No?
3  A.  No.
4  Q.  Have you had any other interaction other than
5     that first reappearance Norberto had about a
6     year ago with Carlos?
7  A.  No.
8  Q.  Did he ever stay at your house again after
9     that?
10  A.  No.
11  Q.  Would you allow him to stay at your house
12     again?
13  A.  No.
14  Q.  And why wouldn't you allow him to stay at
15     your house again?
16  A.  Because of the first experience.
17  Q.  And what was that?
18  A.  The whole thing happening with the cops and
19     taking the car without our permission.
20  Q.  Turning your attention to now Exhibit 5.
21     Does the picture show anything else other
22     than your vehicle and the damage to the
23     bumper?
24  A.  Other than to the bumper and the damage to

## Page 128

1     the plate, nothing else.
2  Q.  I'm showing you Exhibit 6.  Is this a picture
3     that you took?
4  A.  I don't remember who took what picture.
5  Q.  And what does the picture show?
6  A.  The picture -- you can't actually see it in
7     the picture.  But you can see it in the real
8     picture, it shows a blue scratch where the
9     car -- from the police officer's car.
10  Q.  So this picture doesn't show the blue
11     scratch, but there was a blue scratch?
12  A.  There is a blue scratch on the real picture.
13  Q.  Do you still own the car?
14  A.  No, I don't own the car no longer.
15  Q.  Who owns this car now?
16  A.  I don't know.
17  Q.  Was this car ever repaired following the
18     incident?
19  A.  No, no.
20  Q.  Does this picture show anything else other
21     than what you've just told me?
22  A.  No.
23  Q.  I'm showing you what's been marked as Exhibit
24     7.  What is this a picture of?

## Page 129

1  A.  A picture of gloves.
2  Q.  And whose gloves are those?
3  A.  Police officer gloves.
4  Q.  How do you know that?
5  A.  I'm just saying that's what they wear when
6     they were searching the vehicle.
7  Q.  Did you see them search the vehicle?
8  A.  I was told they were going to search the
9     vehicle.
10  Q.  Who told you that?
11  A.  I don't remember what cop told me that, but I
12     know I was told.
13  Q.  But did you see them search your vehicle?
14  A.  No.
15  Q.  Did you see someone actually wearing those
16     gloves?
17  A.  No.
18  Q.  Does this picture show anything else other
19     than that?
20  A.  No.
21  Q.  Did you ever give officers consent to search
22     your vehicle?
23  A.  No.
24  Q.  Did you ever say that they could search your

Page 146

```
 1        MS. LITSAS:  Back on the record.
 2   Q.  You said that your husband visits with your
 3        children four times a week.  Do they ever
 4        sleep over with your husband?
 5   A.  No.
 6   Q.  Does your son react the way you've described
 7        in Exhibit 22 each time your husband leaves?
 8   A.  Not now as he was during that time.
 9   Q.  So how long did your son react that way
10        following this incident?
11   A.  As he got older, he improved.
12   Q.  But how long from the date of the incident in
13        April of 2003 to what time did your son --
14        was it more than a month, less than a month,
15        couple of months?
16   A.  I'd say, like, probably like two months.
17   Q.  Now, I think that the last time we were
18        talking about the night of the incident, you
19        had said that you were in the living room
20        with your son.  Were you talking with any
21        officers during that time?
22   A.  The only officers that I recall talking to
23        are the two white male Caucasians that stayed
24        looking over us after all the other rest of
```

Page 147

```
 1        the cops left.
 2   Q.  How long were just the two officers there?
 3   A.  I can't give -- I don't know how long.  I
 4        didn't know what time it was.  I didn't keep
 5        track of time.
 6   Q.  So there were two officers at one point?
 7   A.  That stayed.
 8   Q.  That stayed.  And was it more than a half an
 9        hour?
10   A.  It was more than a half hour.
11   Q.  How long were more than two officers in your
12        apartment for?
13   A.  Probably like two hours.
14   Q.  Two hours.  So there's more than two
15        officers?
16   A.  Mm-hmm.
17   Q.  And at some point how did you know that there
18        were just two officers in your apartment?
19   A.  Because they told me that they were going to
20        stay to look after us there waiting for the
21        warrant.
22   Q.  And did they say anything else to you other
23        than that?
24   A.  In regards to what was going on, no.
```

Page 148

```
 1   Q.  Anything else did they talk to you about?
 2   A.  They just said, "What's going on?"  And I
 3        said, "I don't know.  I just know they took
 4        my husband.  That's it.  That's all I know."
 5   Q.  Did they ever give you any Miranda warnings?
 6   A.  No.
 7   Q.  Have you signed any forms at any point?
 8   A.  No.
 9   Q.  At any point did you agree to let them inside
10        your apartment?
11   A.  I never told them they could go in.  They
12        just rushed in while I was in the hallway
13        with Carlos when they had him arrested.
14   Q.  At any point did you agree to let them come
15        in?
16   A.  I didn't tell them to come in, no.
17   Q.  Did you at any point ever give consent to let
18        them search your apartment?
19   A.  I told them, "Go ahead.  Do what you want.
20        There's no gun here."
21   Q.  And when did you say that?
22   A.  I don't remember during what exact time I
23        said that.
24   Q.  And who did you say that to?
```

Page 149

```
 1   A.  I said that to the Spanish detective.
 2   Q.  And what was his name?
 3   A.  I don't remember his name.
 4   Q.  And was he a Boston Police officer?
 5   A.  Yes.
 6   Q.  How did you know he was a Boston Police
 7        officer?
 8   A.  Because I knew.
 9   Q.  Based on what?
10   A.  Because after all the other departments left,
11        the ones that were there were all Boston
12        Police officers.
13   Q.  And what were the other departments that had
14        left?
15   A.  I don't know who they were.  After my dad
16        told me who they were.
17   Q.  And what did your dad say to you?
18   A.  He said that they were Municipal Police
19        officers, Boston Housing police officers,
20        State troopers.
21   Q.  And how did your dad know that?
22   A.  Because he said he saw them by the uniform.
23   Q.  And what was your dad doing while you were in
24        the living room with the police officers?
```

38 (Pages 146 to 149)

| Page 150 |
| --- |

1  A.  He sat next to me.
2  Q.  So during the time you were with your son in
3      the living room, your father was sitting next
4      to you?
5  A.  He was in the bathroom first, and then he
6      walked into the living room, yes.
7  Q.  And did he say anything to you?
8  A.  No.
9  Q.  So you guys weren't talking during that time?
10 A.  During that time, no.
11 Q.  Were you doing anything else?  Watching TV?
12 A.  We were watching TV.
13 Q.  Did you see anything on the news or anything
14     else relating to this incident?
15 A.  The news weren't even on during that time.
16 Q.  What were you watching?
17 A.  I don't even remember.
18 Q.  What was your son doing at this time?
19 A.  At the time he was just grabbing stuff,
20     playing around.  He was grabbing a
21     flashlight, putting it into the police
22     officer's face.  Throwing things at them.
23 Q.  Was he doing anything else?
24 A.  No.

| Page 151 |
| --- |

1  Q.  At any point during this time other than in
2      your son's room, had you seen Norberto?
3  A.  No.
4  Q.  Had you ever heard Norberto come back into
5      the apartment that night?
6  A.  No.
7  Q.  Did you know where Norberto was?
8  A.  No.
9  Q.  Had Norberto ever come into your apartment
10     late at night?
11 A.  That I recall, no.
12 Q.  You don't recall any other time that he came
13     to your apartment late at night?
14 A.  No.
15 Q.  After a certain period of time, did Carlos
16     return home?
17 A.  That night?
18 Q.  Yes.
19 A.  No, he came home with me.  He stayed home
20     with me.
21 Q.  I don't think you understand my question.
22     And while you were in the living room with
23     the officers after some time had elapsed, did
24     Carlos return home to your apartment?

| Page 152 |
| --- |

1  A.  Yes, he returned home.
2  Q.  And who did he come home with?
3  A.  Detective Harris.
4  Q.  How do you know it was a Detective Harris?
5  A.  Because he introduced himself.
6  Q.  And what did he say?
7  A.  He said, "I'm Detective Harris.  I'm so
8      sorry.  I apologize.  Everything's been
9      cleared."
10 Q.  What did you say when he told you that?
11 A.  I didn't say anything to him.  I just hugged
12     Carlos and started crying.
13 Q.  Did Detective Harris stay there for a while
14     or did he leave?
15 A.  He was talking to the two officers that were
16     there in the kitchen.
17 Q.  What happened after that?
18 A.  After that the phone rang, and I heard him
19     talking.
20 Q.  What was he talking about?
21 A.  He was talking to whoever it was on the other
22     end telling them that everything's okay; that
23     Carlos is all set; that the other guy
24     testified or something like that; that Carlos

| Page 153 |
| --- |

1      didn't take the car and he was free to go.
2  Q.  Did you hear this detective say anything else
3      on the phone?
4  A.  No.
5  Q.  What happened after that phone call?
6  A.  He said, "Carlos, you're all set.  I'm
7      sorry."  Gave him his hand.  And that's it.
8  Q.  Did they shake hands?
9  A.  Yes.
10 Q.  Did Detective Harris leave after that?
11 A.  Yes.
12 Q.  What about the other two officers?
13 A.  They left with him.
14 Q.  Did they say anything to you or Carlos?
15 A.  No.
16 Q.  Did they leave anything behind in the
17     apartment?
18 A.  No.
19 Q.  About what time was this?
20 A.  I say close to 5:00 in the morning, because
21     after that I remember watching the news.
22 Q.  What did you see on the news?
23 A.  The footage of Carlos.
24 Q.  And what was in the footage?

Page 154

1   A.  You could see Carlos being walked over to the
2       police car and being put into the car.
3   Q.  And what was he wearing at that time?
4   A.  A tan top.
5   Q.  Anything else?
6   A.  And boxers.
7   Q.  At any point during the night had you offered
8       or told the police to get Carlos some
9       clothing?
10  A.  No.
11  Q.  Did you hear Carlos ask for any clothing at
12      any point?
13  A.  No.
14  Q.  And what did you think when you saw the news
15      footage?
16  A.  We were both in shock.
17  Q.  What do you mean you were both in shock?  Was
18      that you and Carlos?
19  A.  Yes.
20  Q.  Did your father also see the news footage?
21  A.  Yes.
22  Q.  Did you guys talk about the news footage?
23  A.  Yes.
24  Q.  What did you talk about?

Page 155

1   A.  Just like he can't believe that he didn't
2       realize when the cameras were out there that
3       they grabbed -- that they actually took
4       pictures and grabbed footage of him.
5   Q.  What did you say about that news footage?
6   A.  Basically, my first thought in my mind what
7       is people going to think.
8   Q.  Did anyone ever say anything to you about the
9       news footage?
10  A.  Yes.
11  Q.  And who said something to you?
12  A.  As soon as we walked into our kids' day care
13      that morning, we heard people whisper,
14      pointing fingers, and looking at us in a
15      weird way.
16  Q.  Who were these people?
17  A.  Our children's teachers, case worker, social
18      workers, counselors.
19  Q.  And do you know what their names were?
20  A.  Yes.
21  Q.  What are their names?
22  A.  Jeanine Mohammed.
23  Q.  And who is she?
24  A.  She's my counselor.

Page 156

1   Q.  What type of counselor --
2   A.  Like social worker.
3   Q.  And what did she say to you?
4   A.  She basically said what's going on.  People
5       came up to her and told her what they saw.
6   Q.  What is it that they said they saw?
7   A.  Carlos on the news.
8   Q.  And what did you tell her?
9   A.  We told her that it was a misunderstanding.
10  Q.  What did she say to you?
11  A.  She just said, "Are you guys okay?  Do you
12      guys need anything?"
13  Q.  And what did you say in response to that?
14  A.  Like, we don't know what to do.  Like, we
15      wanted to complain.
16  Q.  And did she say anything to you after that?
17  A.  After that, no.
18  Q.  Did you follow up on making a complaint?
19  A.  Yes.
20  Q.  How did you know how to make a complaint?
21  A.  People in the day care, our counselors.  They
22      advised us and they told us.
23  Q.  What did they tell you to do?
24  A.  They told us that what they did wasn't right,

Page 157

1       and we should do something about it.
2   Q.  Who was it that told you this?
3   A.  Our social worker.
4   Q.  And what's her name or his name?
5   A.  This is Susan Brister.  She's the supervisor.
6   Q.  At ABCD?
7   A.  Yes.
8   Q.  And does she still work there?
9   A.  I don't remember.  My kids are no longer in
10      there.
11  Q.  What did you do when she told you this
12      information?
13  A.  She said, yeah, you're right.
14  Q.  What did you do after hearing this
15      information?
16  A.  After hearing this information, we went to an
17      agency.  I don't remember the name.
18  Q.  What was the type of agency?
19  A.  It's just advocacy.
20  Q.  What kind of advocacy agency?  Where was it
21      located?
22  A.  In Egleston, I believe.
23  Q.  In the high school?
24  A.  No, further down.

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 186

```
 1  Q.  And whose white pants were those?
 2  A.  He asked me whose pants are these, and I said
 3      Carlos'.
 4  Q.  What happened to the pants?
 5  A.  They took them.
 6  Q.  Who took them?
 7  A.  The police officer.
 8  Q.  And did the police officer go down the
 9      stairs?
10  A.  Yes.
11  Q.  And were those the pants Carlos was wearing
12      that day?
13  A.  Yes, yes.
14  Q.  And where were those pants originally?
15  A.  I don't remember where they were originally.
16  Q.  Do you know what ever happened to those
17      pants?
18  A.  No.
19  Q.  Did you ever see the pants again?
20  A.  No.
21  Q.  At the time that Carlos is being handcuffed,
22      what were you thinking?
23  A.  What's going on?  Why is this happening?
24  Q.  When you're outside in the hallway, what is
```

Page 187

```
 1      your father doing?
 2  A.  I don't know what he was doing.
 3          MR. RHONES:  Helen, you don't have
 4      to ask every little question.  I mean, we're
 5      on a time crunch.  Can't you just focus on --
 6          MS. LITSAS:  Thanks, Stephen.
 7  Q.  At any point were you ever told you were
 8      under arrest, Ms. Perez?
 9  A.  No.
10  Q.  The swearing that you talked about from the
11      Hispanic detective, was that just one
12      incident?
13  A.  Yes.
14  Q.  Did you ever go outside and follow Carlos?
15  A.  No.
16  Q.  Did you ever see the TV cameras outside?
17  A.  No.
18  Q.  Do you know a Martha Jiminez?
19  A.  No.
20  Q.  Do you know a Lieutenant Kelly?
21  A.  Don't recall that name.
22  Q.  Was there any Latino detective in your
23      apartment?
24  A.  Yes.
```

Page 188

```
 1  Q.  Do you know what he looked like or she looked
 2      like?
 3  A.  Yes.
 4  Q.  And what did she look like?
 5  A.  It's a he.
 6  Q.  A he?  And did he say or do anything to you?
 7  A.  He was the one that swore at me in Spanish.
 8  Q.  He was the one that swore at you?
 9  A.  Yes.
10  Q.  Was there any tall black cop in your
11      apartment?
12  A.  Yes.
13  Q.  Was there anything in particular about that
14      tall black cop that did anything?
15  A.  That I could remember, no.
16  Q.  Did you see him or her do anything?
17  A.  I remember him looking.
18  Q.  Looking where?
19  A.  In the couches.
20  Q.  Did you see him do anything else?
21  A.  No.
22  Q.  Do you recall how long Carlos was gone for?
23  A.  No.
24  Q.  You cannot identify any officer that was at
```

Page 189

```
 1      your house other than what you've told me
 2      today?
 3  A.  Other than what I told you today?
 4  Q.  Yes.
 5  A.  No.
 6  Q.  You attended about a month ago the deposition
 7      of Sergeant Detective Danny Keeler?
 8  A.  Yes.
 9  Q.  Did you recognize him prior to that date?
10  A.  No.
11  Q.  Had you ever seen him before?
12  A.  No.
13          MR. RHONES:  Wait.  You said had
14      she recognized him prior to that date.  What
15      do you mean?
16  Q.  Had you ever seen him before that day of the
17      deposition?
18  A.  No.
19  Q.  Did you ever see him in your apartment?
20  A.  No.
21  Q.  Did you ever see him on the night of the
22      incident?
23  A.  That I remember, no.
24  Q.  At any point did Norberto say anything to you
```

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 198

1  A.  I saw when they were taking them.
2  Q.  Were they taken outside of your apartment?
3  A.  Yes.
4  Q.  And do you know who took the white pants?
5  A.  A male Caucasian officer.
6  Q.  And do you know what agency he belonged to?
7  A.  No.
8        MS. LITSAS:  Thank you.  Nothing
9  further.
10       (Whereupon, the deposition
11  concluded at 5:32 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 199

1        DEPONENT'S ERRATA SHEET
2        AND SIGNATURE INSTRUCTIONS
3
4        The original of the Errata sheet
5  has been delivered to Stephen Rhones, Esq.
6        When the Errata Sheet has been
7  completed by the deponent and signed, a copy
8  thereof should be delivered to each party of
9  record and the ORIGINAL delivered to Helen
10 Litsas, Esq. to whom the original deposition
11 transcript was delivered.
12
13       INSTRUCTIONS TO DEPONENT
14
15       After reading this volume of your
16 deposition, indicate any corrections or
17 changes to your testimony and the reasons
18 therefore on the Errata Sheet supplied to you
19 and sign it.  DO NOT make marks or notations
20 on the transcript volume itself.
21
22 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
23 COMPLETED AND SIGNED ERRATA SHEET WHEN
24 RECEIVED.

Page 200

1    ATTACH TO THE DEPOSITION OF ALEXANDRA PEREZ
2    CASE: PINEDA V. DANIEL KEELER ET ALS.
3        ERRATA SHEET
4  INSTRUCTIONS:  After reading the transcript of your
5  deposition, note any change or correction to your
6  testimony and the reason therefore on this sheet.
7  DO NOT make any marks or notations on the transcript
8  volume itself.  Sign and date this errata sheet
9  (before a Notary Public, if required).  Refer to
10 Page 199 of the transcript for errata sheet
11 distribution instructions.
12 PAGE  LINE
13 ____  ____  CHANGE: _____
14       REASON: _____
15 ____  ____  CHANGE: _____
16       REASON: _____
17 ____  ____  CHANGE: _____
18       REASON: _____
19 I have read the foregoing transcript of my
20 deposition and except for any corrections or changes
21 noted above, I hereby subscribe to the transcript as
22 an accurate record of the statements made by me.
23
24    ALEXANDRA PEREZ          DATE

Page 201

1        C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS      PLYMOUTH, SS.
3
4        I, Marie T. Williams, a Professional Court
5  Reporter and Notary Public in and for the
6  Commonwealth of Massachusetts, do hereby certify
7  that the foregoing deposition of Alexandra Perez was
8  taken before me on Wednesday, May 17, 2006.  The
9  said witness was properly identified with her
10 Massachusetts driver's license and duly sworn before
11 the commencement of her testimony; that the said
12 testimony was taken audiographically by myself and
13 then transcribed under my direction.  To the best of
14 my knowledge, the within transcript is the complete,
15 true and accurate record of said deposition.
16       I am not connected by blood or marriage
17 with any of the said parties, nor interested
18 directly or indirectly in the matter in controversy.
19       In witness whereof, I have hereunto set my
20 hand and Notary Seal this _____ day of _____,
21 2006.
22 _____
23    Marie T. Williams, Notary Public
24    My Commission Expires:  April 7, 2011

51  (Pages 198 to 201)

# Exhibit G

COPY

**DANIEL KEELER**
**March 22, 2006**

Page 1

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                          C.A.NO.:  05-10216JLT

4    * * * * * * * * * * * * * * * * * * * * * * * * * * * *

5    CARLOS PINEDA and                *

6    ALEXANDRA PEREZ,                 *

7         Plaintiffs                  *

8      vs.                            *

9    DANIEL KEELER, DENNIS HARRIS,    *

10   JOSEPH R. WATTS, JOSEPH P.       *

11   TOOMEY, WILLIAM J. GALLAGHER,    *

12   EDWARD GATELY, JANINE BUSBY,     *

13   and the CITY OF BOSTON,          *

14        Defendants                  *

15   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

16             DEPOSITION OF DANIEL KEELER

17                 HRONES & GARRITY

18            LEWIS WHARF BAY, SUITE 232

19               BOSTON, MASSACHUSETTS

20            MARCH 22, 2006    10:30 a.m.

21

22

23       Before:  Karen J. Anderson-Gruchy

24            Certified Court Stenographer

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DANIEL KEELER**
**March 22, 2006**

```
                                                      Page 2

 1    APPEARANCES:

 2          .

 3

 4    Representing the Plaintiff:

 5          HRONES & GARRITY

 6          Lewis Bay Wharf, Suite 232

 7          Boston, MA  02110

 8          BY:  STEPHEN HRONES, ESQ.

 9          (617) 227-4019        FAX:  (617) 227-3908

10

11

12    Representing the Defendant:

13          CITY OF BOSTON LAW DEPARTMENT

14          City Hall, Room 615

15          Boston, MA  02110

16          BY:  HELEN LITSAS, ESQ., and

17               SUSAN WEISE, ESQ.

18          (617) 635-4023        FAX:  (617) 635-3199

19

20

21    ALSO PRESENT:

22          Carlos Pineda, Plaintiff

23          Alexandra Perez, Plaintiff

24          Angharad Tardo, Law Student
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DANIEL KEELER**
**March 22, 2006**

Page 5

1    homicide side?

2         A.    Down on Harrison Avenue,

3    approximately going on two years.

4         Q.    Do you remember the incident that

5    occurred on April 29th of 2001?

6         A.    I do.

7              MS. LITSAS:  It was actually the

8    28th.

9              MR. HRONES:  Oh, at 3:00 a.m.

10    Fine.  The 28th.

11        Q.    (By Mr. Hrones)  What time did

12    you go on duty that night?

13        A.    Five o'clock.

14        Q.    And you were on duty until what

15    time?

16        A.    Approximately, 3:00 a.m.

17        Q.    And did you get a call relative to a

18    shooting?

19        A.    Yes.

20        Q.    Where did you go, when you got that

21    call?

22        A.    Albany and East Berkley Street.

23        Q.    What did you find?

24        A.    I found a couple that had been shot.

DANIEL KEELER
March 22, 2006

Page 7

1    Q.    At some point, did you leave the

2  scene of the shooting?

3    A.    I did.

4    Q.    Where did you go?

5    A.    I was at the hospital, for a short

6  period of time.

7    Q.    From the scene, you went with the

8  hospital, where the victims were?

9    A.    And eventually to Shandon Road.

10    Q.    And how did you come to go to

11  Shandon Road?

12    A.    I don't know if it was operations or

13  a police office, but I got a call requesting me

14  to go up there.

15    Q.    Did they tell you what it was about?

16    A.    They didn't know whether or not they

17  had a stop up there that was related to the

18  incident I was investigating.

19    Q.    So, did you go right up there?

20    A.    I did.

21    Q.    Was Detective Harris with you?

22    A.    No.

23    Q.    Was he there when you arrived?

24    A.    No.

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DANIEL KEELER**
**March 22, 2006**

Page 8

1    Q.    **What did you do when you arrived?**

2    A.    I spoke to police officers that were

3    there.

4    Q.    **Was that down on the street or at**

5    **the door to the apartment?**

6    A.    This was in the street.

7    Q.    **Do you remember who you talked to?**

8    A.    One of the officers I talked to was

9    Officer Coyne, C-O-Y-N-E.

10    Q.    **What district is he from?**

11    A.    I'm not sure, sir.

12    Q.    **Did you know him before?**

13    A.    I knew he was a police officer.  I

14    had seen him around.

15    Q.    **Had you talked to him?**

16    A.    I don't know specific conversations

17    I had with him before.  I knew he was a cop.

18    I'd seen him.

19    Q.    **Did you recognize anyone else at the**

20    **scene, when you arrived?**

21    A.    There was a number of officers

22    there.

23    Q.    **Any State Police?**

24    A.    I don't recall seeing any.

**DANIEL KEELER**
**March 22, 2006**

Page 9

1      Q.      What did you do then, after you

2    arrived at the scene?

3      A.      I had a conversation with the

4    officers that were there.

5      Q.      Then, where did you go?

6      A.      I left and went to Park Street in

7    Dorchester.

8      Q.      What did the officers tell you at

9    the scene?

10      A.      I was told there had been a chase of

11    a car that started down in District 2, and it

12    had culminated up there.

13      Q.      Was the car there?

14      A.      Yes.

15      Q.      You saw the car?

16      A.      Yes.

17      Q.      What color was it?

18      A.      White.

19      Q.      Was anyone in the car?

20      A.      Not that I recall.

21      Q.      And you left there to go where?

22      A.      Park Street in Dorchester.

23      Q.      Did the officers at the scene tell

24    you what happened?

**DANIEL KEELER**
**March 22, 2006**

Page 12

1      A.      I was summoned over there.

2      Q.      **For what purpose?**

3      A.      There was a car stop of individuals

4   in the van.

5      Q.      **Relative to the murder?**

6      A.      Possibly connected to the murder.

7      Q.      **Did you get there after the stop?**

8      A.      Yes, sir.

9      Q.      **And what did you do there?**

10      MS. LITSAS:  Objection.

11      THE WITNESS:  I --

12      MR. HRONES:  What did he do

13   there?  What's the objection?

14      MS. LITSAS:  It's only relative

15   if it is what he did at the scene at

16   Fermoy Heights.

17      MR. HRONES:  Any questions can

18   be asked, and there can't be any

19   objections.

20      MS. LITSAS:  No objections?

21      MR. HRONES:  This is during the

22   time period when --

23      MS. LITSAS:  I made my

24   objection.  Go ahead.

DANIEL KEELER
March 22, 2006

Page 13

1       Q.      (By Mr. Hrones)  What happened

2   when you arrived at the scene?

3       A.      I conducted an investigation.

4       Q.      Was Detective Harris there?

5       A.      No.

6       Q.      What do you mean you "conducted an

7   investigation"?

8       A.      I conducted an investigation to

9   determine relevancy of the stop to the crime I

10  was investigating.

11      Q.      Did you find anything related to

12  relevancy?

13      A.      I did, sir.

14      Q.      And what was the relevancy?

15      MS. LITSAS:  Objection.  Can we go

16  off the record?

17      MR. HRONES:  No.

18      Q.      (By Mr. Hrones)  Go ahead.

19      A.      The relevancy, in terms of specifics

20  of the criminality of the people involved?

21      Q.      Right.

22      A.      That's a pending homicide case.  I

23  can't discuss that with you now.

24      Q.      You have to answer the question.

**DANIEL KEELER**
**March 22, 2006**

Page 20

| | | |
|---|---|---|
| 1 | A. | He did arrive there. |
| 2 | Q. | **Did you talk to him?** |
| 3 | A. | Briefly. |
| 4 | Q. | **And then, you left at that point --** |
| 5 | A. | Yes, sir. |
| 6 | Q. | **-- without entering the apartment?** |
| 7 | A. | Yes, sir. |
| 8 | Q. | **And where did you go?** |
| 9 | A. | Park Street. |
| 10 | Q. | **How long did you stay there?** |
| 11 | A. | I'm not sure of the exact amount of |
| 12 | time, sir. | |
| 13 | Q. | **What did you do after that?** |
| 14 | A. | I went to homicide. |
| 15 | Q. | **Where did you interview these** |
| 16 | **people?** | |
| 17 | MS. LITSAS:  Objection. | |
| 18 | THE WITNESS:  Which people? | |
| 19 | Q. | **(By Mr. Hrones)  The four people in** |
| 20 | **the van?** | |
| 21 | MS. LITSAS:  Asked and answered. | |
| 22 | Move on. | |
| 23 | MR. HRONES:  Look, I mean, | |
| 24 | object, but you can't tell me that -- | |

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DANIEL KEELER**
**March 22, 2006**

Page 23

1    Q.    Did you leave homicide at some

2    point?

3    A.    Yes, I did.

4    Q.    Where did you go?

5    A.    I went home, sir.

6    Q.    Home for the night?

7    A.    I'm not sure whether I came back in.

8    I know I went home to rest and change.  I don't

9    recall.

10    Q.    Did you go back to Shandon Road?

11    A.    No, sir.

12    Q.    Were you ever in the apartment at

13    Shandon Road?

14    A.    No, sir.

15    Q.    Did you ever give, for the record,

16    directions to anyone at Shandon Road?

17    A.    Specifically, sir?

18    Q.    I'm just saying:  Did you give

19    directions to anyone?

20    A.    Yes.  I asked Detective Harris to go

21    to District 3.

22    Q.    For what purpose?

23    A.    To find out if there was any

24    relationship with those individuals there and

**DANIEL KEELER**
**March 22, 2006**

Page 25

1        was my understanding they were going

2        to try to get an understanding if

3        there was any link from the people

4        there to the homicide we were

5        investigating.

6            Q.     (By Mr. Hrones)   Were they

7    handcuffed when they left?

8            A.     I didn't see them, sir.

9            Q.     Did you see them at all?

10           A.     To clarify, they could have been in

11   the car, I could have glanced over to them, but

12   I didn't speak to any individuals there at the

13   scene or see them in handcuffs or put in the

14   car.

15               MS. LITSAS:   Just in regard to

16        clarification, what road are you

17        talking about?

18               THE WITNESS:   Shandon Road.

19               MR. HRONES:   Okay.  Fine.

20               MS. LITSAS:   Thank you.

21           Q.     (By Mr. Hrones)   Now, did you

22   order anyone to be arrested?

23           A.     At Shandon Road, sir?

24           Q.     Yes.

**DANIEL KEELER**
**March 22, 2006**

Page 26

1          A.      No, sir.

2          Q.      Did you order anyone, in specific,

3    to be taken to District 3?

4          A.      No, sir.

5                  MS. LITSAS:  Objection.  You can

6          answer.

7                  THE WITNESS:  No, sir.

8          Q.      (By Mr. Hrones)  Did you order

9    any clothes to be taken there?

10         A.      I don't recall doing that, sir.  If

11   anyone -- as I said prior, if anyone said to me

12   "What do you want me to do with those?  Do they

13   go with them?"  I could have said that.  I don't

14   recall.

15         Q.      But you were in charge, at that

16   point, in terms of the homicide investigation,

17   correct?

18                 MS. LITSAS:  Objection.  You can

19         answer.

20                 THE WITNESS:  Sir, to be

21         perfectly clear on that, in the scope

22         of my authority, I had responsibility

23         there.  I was clearly in charge of the

24         homicide.  That was my supervisory

**DANIEL KEELER**
**March 22, 2006**

Page 27

1    capacity that evening.

2         But, in terms of Shandon Road,

3    I never took command of that scene or

4    issued any directions to anyone there.

5    There were at least three other

6    sergeants there at the time.

7         My understanding of Shandon

8    Road was there had been a chase.  It

9    was undetermined whether there was any

10   connection between that chase and the

11   homicide.

12        My sole direction, after

13   Shandon Road, was to Detective Harris

14   to attempt to determine if there was

15   any connection between that chase and

16   the homicide.

17        Detective Harris got back to

18   me, after an interview, and said he

19   couldn't establish any connection, nor

20   did he believe there was one.

21        Q.    (By Mr. Hrones)  At what point

22   did he tell you that?

23        A.    I received a phone call from him.

24        Q.    From District 3?

**DANIEL KEELER**
**March 22, 2006**

Page 28

1          A.     I don't know where he was when he

2    called me, but I received a phone call.  I was

3    on Shandon Road, sir, for a matter of five or so

4    minutes, when I was summoned to Park Street on

5    another stop.

6                And that Park Street connection

7    proved to be a connection to the homicide.  That

8    was the focus of my attention that evening and

9    in the following days.

10         **Q.     Now, do you recognize this gentleman**

11   **here, Mr. Pineda?**

12         A.     No, I don't.

13                MR. PINEDA:  I don't recognize him

14         either.

15                MR. HRONES:  Heah.  You will

16         get your chance to talk.

17                MR. PINEDA:  I'm sorry about

18         that.

19                THE WITNESS:  For the record,

20         did your client just say to me he

21         didn't recognize me either?

22                MR. HRONES:  Just keep quiet.

23         You will get your turn.

24         **Q.     (By Mr. Hrones)  Do you recognize**

**DANIEL KEELER**
**March 22, 2006**

Page 29

1    the woman sitting there?

2        A.    No, I don't.

3        Q.    So, you weren't in command in any

4    capacity when you got there?

5        A.    Sir, as a sergeant, I have a certain

6    authority, but there were three other sergeants

7    there.

8              I never chose to take command of

9    that, or conversely at Park Street.  When we

10   started to develop a nexus, then, I did take

11   command.

12       Q.    Well, when homicide arrives at the

13   scene where there may be evidence of the

14   homicide, doesn't homicide take over the

15   investigation?

16             MS. LITSAS:  Objection.  You can

17       answer.

18             THE WITNESS:  Well, your

19       question is too broadbased.  I mean,

20       in homicide, we deal with specifics.

21             If there is a nexus that is

22       established, hypothetically, that that

23       car was somehow linked to the scene,

24       for ballistics evidence or

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DANIEL KEELER**
**March 22, 2006**

Page 34

1          THE WITNESS:  I don't know who

2     went there.  I didn't know who went

3     there that night.

4          I subsequently had learned that

5     he was one of them, but I didn't have

6     that specific knowledge that evening,

7     as to who was there.

8     Q.     (By Mr. Hrones)  Was he -- were

9     they under arrest when they were taken down

10    there?

11          MS. LITSAS:  Objection.

12          THE WITNESS:  I can't speak to

13    that.  As I told you, I didn't see any

14    individuals cuffed or put in the

15    cruisers.  I have no understanding of

16    the circumstances.

17          My -- and because of that, and

18    because of not knowing that, that's

19    why I instructed Detective Harris,

20    Dennis, go down there and see if he

21    could find a link to them and what

22    we're investigating.

23    Q.     (By Mr. Hrones)  Have you

24    subsequently learned whether or not the

**DANIEL KEELER**
**March 22, 2006**

Page 58

1    A.    Are you speaking of Shandon Road?

2    **Q.    Right.**

3    A.    I'm a sergeant, sir.  My rank gives

4    me authority over other patrolman.

5    **Q.    You don't have any authority to take**

6    **charge and tell people what to do, including**

7    **sergeants?**

8    A.    I tried to clarify that earlier.

9    Let me see if I can do it again.

10    If we determine that Shandon Road or

11    some other address, Park Street if you would,

12    was related to the homicide, then I would assume

13    command like that and make the decisions.

14    I didn't at Shandon Road.  As I

15    said, I was there for five minutes.  I did

16    direct Detective Harris to determine if there

17    was a nexus there.  He said there wasn't.

18    In answer to your question, I never

19    ordered any sergeants to do anything there, and

20    I never took command there.  I was in and out of

21    there in five minute.

22    **Q.    Detective Harris didn't tell you**

23    **when you first arrived that there was no nexus,**

24    **did he?**

**DANIEL KEELER**
**March 22, 2006**

Page 85

1                      C E R T I F I C A T E

2

3        I, KAREN J. ANDERSON-GRUCHY, a Notary Public,

4   do hereby certify that Daniel Keeler came before me

5   and satisfactorily identified himself on the 22nd

6   day of March, 2006, at Lewis Wharf, Bay 232, Boston,

7   Mass., 02110, and was duly sworn by me to testify to

8   the truth and nothing but the truth as to his

9   knowledge touching and concerning the matters in

10  controversy in this cause; that he was thereupon

11  examined upon his oath and said examination reduced

12  to writing by me; and that the statement is a true

13  record of the testimony given by the witness, to the

14  best of my knowledge and ability.

15       I further certify that I am not a relative or

16  employee of counsel/attorney for any of the parties,

17  nor a relative or employee of such parties, nor am I

18  financially interested in the outcome of the action.

19       WITNESS MY HAND on this 7th day of April,

20  2006.

21

22  _Karen J. Anderson-Gruchy_

23  Karen J. Anderson-Gruchy      My Commission Expires:

24  Notary Public                 October 16, 2006

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CA No. 05-10216JLT

CARLOS PINEDA and ALEXANDRA PEREZ,　　　　)

　　　Plaintiffs　　　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　　　　　　)

v.　　　　　　　　　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　　　　　　)

DANIEL KEELER, DENNIS HARRIS, JOSEPH R.　　)

WATTS, JOSEPH P. TOOMEY, WILLIAM J.　　　　)

GALLAGHER, EDWARD GATELY, JANINE BUSBY,　　)

and the CITY OF BOSTON,　　　　　　　　　　　)

　　　Defendants　　　　　　　　　　　　　　　　)


　DEPOSITION OF DENNIS HARRIS, taken on
behalf of the Plaintiffs, pursuant to the
applicable provisions of the Federal Rules
of Civil Procedure, before Anita E.
D'Antonio, a Notary Public in and for the
Commonwealth of Massachusetts, at the
offices of Hrones, Garrity & Hedges, Lewis
Wharf, Bay 232, Boston, Massachusetts, on
Wednesday, August 30, 2006, commencing at
2:07 p.m.　　　COPY

APPEARANCES:

Hrones, Garrity & Hedges
 Stephen B. Hrones, Esq.
 Lewis Wharf - Bay 232
 Boston, Massachusetts 02110-3927
 (617) 227-4019
 Hrones@masscriminallawyer.com
 For the Plaintiffs

City of Boston Law Department
 Helen G. Litsas, Esq.
 Boston City Hall
 Room 615
 Boston, Massachusetts 02201
 (617) 635-4023
 Helen.Litsas@cityofboston.gov
 For the Defendants
Also present:
        Ali Aalaei
        Carlos Pineda

1   A.   No.

2   Q.   That who made out?

3   A.   I think it may have been an officer assigned

4        to B-3.

5   Q.   Booking officer?

6   A.   I don't know.

7   Q.   Did you review anything else?

8   A.   No, sir.

9   Q.   Did you review Detective Keeler's testimony?

10  A.   No, I did not.

11  Q.   So what was your assignment on that day?

12  A.   April 28, the year 2003, I was assigned to

13       homicide unit, sir.

14  Q.   And are we talking about the incident was,

15       you were on a homicide investigation, were

16       you not?

17  A.   On that particular evening?            ,

18  Q.   Yeah.

19  A.   Specifically the time, on the 28th?

20  Q.   Yes, that day, that period of duty?

21  A.   Yes, the incident that I prepared for was

22       April 28, 2003, I think somewhere in the

23       area of 3 a.m. I was asked to respond to a

24       particular section of the city, yes.

1       you're talking about.

2   Q.  No, but at 3 o'clock you weren't on call

3       anymore, theoretically?

4   A.  At 3 a.m., yes, that's correct. If nothing

5       occurs between the hours of 1 a.m. and

6       3 a.m., at 3 a.m. I'm technically off duty,

7       yes.

8   Q.  So that early morning you received a call?

9   A.  Correct.

10  Q.  And you were at home?

11  A.  Correct.

12  Q.  And as a result of that call, what did you

13      do?

14  A.  As I said, I left my home and I traveled to

15      a, to Albany and East Berkeley Street,

16      started in that direction.

17  Q.  And what happened after you started in that

18      direction?

19  A.  While I was en route, I was asked to, I was

20      redirected to the Franklin Hill development.

21  Q.  By whom?

22  A.  Sgt. Daniel Keeler.

23  Q.  Did you go to the development?

24  A.  I did.

1       sure.

2   Q.  Did you know him before that night,

3       personally?

4   A.  Yes, I know Sgt. Toomey.

5   Q.  How did you know him?

6   A.  Just throughout different incidents in my

7       career.

8   Q.  And what did you do when you first arrived?

9   A.  I had a conversation with some of the

10      officers that were there.

11  Q.  And what was that about?

12  A.  About the events that had unfolded and led

13      them to that location.

14  Q.  And before you got there, did you know any

15      of the events that led up to your arriving

16      at that location?

17  A.  No, sir.

18  Q.  Detective Keeler said simply, Go to this

19      location?

20  A.  It was a very brief statement, I believe.

21      It was over the phone, just asking me to go

22      to Franklin Hill, that there were something

23      developing at Franklin Hill.

24  Q.  Relative to --

1    A.    Relative to the Berkeley and Albany Street.

2    Q.    The murder at Berkeley and Albany?

3    A.    Yes.

4    Q.    So what were you told by these officers when

5          you arrived?

6    A.    That there had been a chase from the South

7          End, that the operator or the chase ended

8          there, and that the officers were led to an

9          apartment.  That there were two people taken

10         from an apartment and brought to area B-3

11         where they were waiting to be interviewed.

12   Q.    All that happened before you arrived?

13   A.    No.  I thought you were asking me about a

14         conversation that was taking place once we

15         arrived.

16   Q.    Yeah, just after you arrived, you said you

17         talked to certain officers?

18   A.    Yes.

19   Q.    And what did you learn at that point?

20   A.    That's what I just related.

21   Q.    Oh. So when you arrived, they already said

22         that two people had been taken out of the

23         apartment?

24   A.    When I arrived --

1   Q.   Right.

2   A.   -- and I made those initial observations --

3   Q.   Right.

4   A.   -- there were police officers there.  As a

5        result of a conversation I had while there,

6        I learned the information that I just

7        relayed.

8   Q.   And how long after you arrived on the scene

9        did you learn that two people had been

10       arrested?

11  A.   Well, first of all, I didn't learn that two

12       people had been arrested.  I learned that

13       there were two people taken from an

14       apartment and that they were at area B-3

15       waiting to be interviewed.  Shortly after

16       arriving I learned that.

17  Q.   That they were already at B-3 at that point?

18  A.   When I got there?

19  Q.   Yeah.

20  A.   Yes, sir.

21  Q.   And what did you do at that point?

22  A.   After learning that?

23  Q.   Right.

24  A.   I had further conversation with Sgt. Keeler

```
1          and other officers there.

2    Q.    What was the nature of the conversation?

3    A.    Just as far as further direction.

4    Q.    Now, when did Sgt. Keeler arrive on the

5          scene?

6    A.    I believe he may have been there when I got

7          there.

8    Q.    And what did you do after that, talking with

9          Sgt. Keeler?

10   A.    At what point, sir?

11   Q.    Well, after you were told what was going on,

12         what did you do then?

13   A.    I, before leaving, I believe I went to the

14         apartment in question which was no. 81 --

15   Q.    You actually entered the apartment?

16   A.    I actually went to that location, yes.

17   Q.    And what did you see when you arrived?

18   A.    There were additional police officers there.

19   Q.    And what else, did you see any individuals

20         who weren't police officers?

21   A.    Yes.

22   Q.    Who did you see?

23   A.    I believe there were two small kids, and I

24         believe there was a female present also.
```

1  A.  A potential suspect for the homicide?

2  Q.  Yeah.

3  A.  Yes, we were, I was there at that particular

4      scene because it was, that scene was

5      developing.  We were trying to figure out

6      what was going on.

7  Q.  You froze the scene, did you not?

8  A.  I didn't freeze the scene.

9  Q.  Didn't you testify to internal affairs that

10     when you arrived, you froze the scene, told

11     everybody not to do anything until, at that

12     point, because homicide was there?

13          MS. LITSAS: Objection.

14 Q.  You don't remember saying that?

15          MS. LITSAS: Objection.

16 Q.  Yes or no, do you remember that?

17 A.  If you're referring to testimony in internal

18     affairs in a statement I made regarding

19     apartment 81?

20 Q.  Yes.

21 A.  It was a statement that would have been

22     made at the tail end of that incident, not

23     when the scene would have been frozen.  That

24     scene was frozen before I got there.  So I

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

1      don't know --

2   Q.  Who was it frozen by?

3   A.  Before I got there.  I don't know who froze

4      it, sir.

5   Q.  You didn't order it to be frozen?

6   A.  The scene was frozen when I got there.

7   Q.  What made you think it was frozen when you

8      got there?

9   A.  What made me think that?

10  Q.  Yes.

11  A.  I was told --

12          MS. LITSAS: Objection.

13  A.  I was told when I got there that two people

14     were taken from that apartment and brought

15     down to area B-3.  I also had occasion prior

16     to leaving the scene to go by and take note

17     of the fact that there were police officers

18     present at that apartment.  That dictated to

19     me, in my understanding, that that apartment

20     was frozen.

21  Q.  Why would it be frozen if you learned that

22     two people were taken away and there were

23     police officers in the apartment?

24          MS. LITSAS: Objection. You can

1   Q.   I thought you said police -- you mean when

2        it's frozen, police officers can still go

3        in?

4   A.   Police do the freezing, yes.  And it depends

5        on the police officer, you know, who is

6        actually doing the freezing.  Yes, by all

7        intents and purposes, the police officer, if

8        he's freezing a scene, manages that

9        apartment.  And he's supposed to take names

10       of people who come and go.  But specifically

11       he's not allowing anybody to move anything

12       around or leave the apartment with anything

13       that might be of an evidentiary value.

14       That's the purpose of it all.

15  Q.   Who was in charge when you arrived?'

16  A.   When I arrived, I don't know.

17  Q.   You have no idea?

18  A.   No.

19  Q.   Well, you were the only homicide officer on

20       the scene?

21  A.   Sgt. Keeler was there.

22  Q.   He was in the apartment?

23  A.   Are we talking about the scene, sorry, when

24       you say "the scene," to me the scene is --

1    Q.   All right, excuse me.

2    A.   -- all-inclusive 81, the apartment 81.  But

3         the scene itself is the outside scene.

4    Q.   Was Sgt. Keeler in the apartment?

5    A.   I don't recall the answer to that, sir.  I

6         don't know the answer to that.  He may have

7         been.  I know when I went up there, I wasn't

8         paying attention to Sgt. Keeler.

9    Q.   He was your supervisor?

10   A.   He was.

11   Q.   And you weren't paying attention to him?

12   A.   At that particular moment, sir, no, I was

13        not.

14   Q.   And why were you going up?

15   A.   I was going up there to just, to get a feel

16        or get a look around, because I was going

17        down to conduct a couple of interviews.  I

18        wanted to have a mental picture of what the

19        place looked like.

20   Q.   So you entered in the role of investigating

21        a homicide?

22   A.   At that particular time?  I'm a homicide

23        investigator, yes, that's my role, yes.

24   Q.   Right. And at that point you were

1      not a homicide scene.

2  Q.  So you're saying if it's not a homicide

3      scene, but it's a spot where the suspects

4      may be hiding out, homicide doesn't have

5      control of that?

6  A.  We have control up until a certain point if

7      we so choose.

8  Q.  So you could have taken control of that

9      apartment since you were looking for murder

10     suspects?

11 A.  That's correct, I could have.

12 Q.  But you chose not to?

13 A.  No, the apartment was also controlled for

14     what it was.  What it was was the resting

15     point of an occupant who fled a motor

16     vehicle and discarded clothing.  So it was a

17     scene that the arriving initial officers

18     determined to be a scene.  What type of a

19     scene was yet to be determined.  So it was

20     under control.  There was no action needed

21     on my part when I walked into that apartment

22     for the first time.

23 Q.  My question was did you have the authority

24     to take control in the sense that you might

1        " to me.  I just wanted to see what it looked

2          like, what I was dealing with, that's all.

3    Q.  But at that point you didn't know whether or

4          not the murder suspects were the ones that

5          were in that apartment and taken out?

6    A.  Exactly.

7    Q.  So in that sense, there was a lot to be done

8          or could have been done in terms of

9          investigating the scene, taking

10         fingerprints, that type of thing, wasn't

11         there?

12                    MS. LITSAS: Objection.  You may

13         answer.

14   A.  That all remains to be seen, and the

15         apartment was controlled and frozen, for all

16         intents and purposes, until future

17         notification.                                    ,

18   Q.  Wasn't it frozen when you left to go to B-3,

19         didn't you issue the orders to freeze at

20         that point?

21   A.  No, sir.

22   Q.  So you didn't freeze the scene?
                                                    ⸲
23   A.  No, sir.

24   Q.  You told internal affairs you did, didn't

1        and looked around, did you not?

2                    MS. LITSAS: No --

3   A.   Sir, you are, for purposes of the record,

4        you keep digressing to an incident before I

5        left B-3. I'm talking about a conversation

6        that occurred at 5 a.m. For purposes of the

7        record, you're confused, sir.

8   Q.   Okay, forget 5 a.m. I'm saying when you

9        first arrived on the scene, did you give any

10       directives?

11  A.   No, sir, for the tenth time, no, sir.

12                   MS. LITSAS: And I'm going to object

13       to anymore further questioning, Stephen.

14       You cannot ask the same question again and

15       again and again.  So, please, let's move on,

16       Stephen, so we're not here until 5 o'clock.

17                   MR. HRONES: You're the last one to

18       talk about time. I let you have complete

19       freedom to ask questions when you were

20       questioning at a deposition.

21                   MS. LITSAS: Let's just move on to

22       the next question, please.

23  Q.   Did anyone order you to go to B-3?

24  A.   Yes.

1   Q.   Who was that?

2   A.   Sgt. Keeler.

3   Q.   And did he tell you why he wanted you to go

4        there?

5   A.   Yes.

6   Q.   And what did he tell you?

7   A.   To conduct the two interviews of the two

8        gentlemen that were taken from the apartment

9        to that station.

10  Q.   For what purpose?

11  A.   To interview them.

12  Q.   For what purpose, interview them for what

13       purpose?

14  A.   To see what they had to say, if anything.

15  Q.   About what?

16  A.   About what may have happened.

17  Q.   Relative to the homicide?

18  A.   Relative to, yes, relative to the homicide.

19  Q.   And did you go to B-3?

20  A.   I did, sir.

21  Q.   And what did you see when you arrived?

22  A.   What did I see?

23  Q.   Yes.

24  A.   I saw the police station.  When I went

1    Q.   Now, do you need probable cause to detain

2         somebody?

3    A.   Yes, there has to be some articulable facts,

4         yes.

5    Q.   There has to be probable cause?

6    A.   I would say so.

7    Q.   So what was the probable cause to detain

8         Mr. Pineda?

9              MS. LITSAS: Objection.

10   A.   Again, Mr. Pineda was detained prior to my

11        arrival.  What the probable cause was you'd

12        have to ask the officers that detained him.

13   Q.   Well, didn't you attempt to determine what

14        the probable cause is when you heard that

15        two individuals had been taken to the

16        station?

17   A.   I did not, sir.  I received a fact pattern

18        when I arrived in the area.  As a result of

19        receiving that fact pattern, I conducted

20        interviews.

21   Q.   So you personally didn't determine whether

22        there was probable cause when you went to

23        B-3 on the order of Detective Keeler?

24   A.   No, sir.

1    A.    I don't know the answer to that, whether or

2          not he gave anybody any other orders other

3          than what he gave me.

4    Q.    No, I'm saying are you aware of any other

5          orders?

6    A.    No, sir.

7    Q.    Okay, fine.  Now, at some point did you

8          interrogate either one or both of the two

9          individuals that were at B-3?

10   A.    Yes, sir.

11   Q.    And whom did you interrogate first?

12   A.    First I interrogated Luis Cruz.

13   Q.    And who did you interrogate second?

14   A.    Second, Carlos Pineda.

15   Q.    How was he brought into the interrogation

16         room?

17   A.    How was he brought in?  I don't know.  He

18         was walked in.

19   Q.    By whom?

20   A.    I don't remember who it was.

21   Q.    And where was he before he was walked in?

22   A.    I don't know the answer to that.

23   Q.    And you say you don't know that he was

24         locked up in a cell?

Page 57

1    maybe somebody sitting with him, waiting for

2    my arrival.  There are several different

3    circumstances.  It all depends on what

4    district, where the location is, it depends.

5    Q.  So you have no idea whether he was

6        handcuffed to anything once he arrived at

7        the station?

8    A.  As I said, I have no idea, sir.

9    Q.  You issued no orders as to what should be

10       done with him?

11   A.  That's correct.

12   Q.  And you don't know where he was when you

13       arrived?

14   A.  That's correct.

15   Q.  Did you see him at all before he came into

16       the interrogation room?

17   A.  No, I did not, sir.

18   Q.  Did he have handcuffs on when he came into

19       the interrogation room?

20   A.  I have no memory of that, sir, if he did.

21   Q.  But if he did come in with handcuffs, you

22       would have taken them off?

23   A.  Absolutely.

24   Q.  Did you read him his rights before you

1              talked to him?

2     A.   I don't believe I did.

3     Q.   And why didn't you?

4     A.   Because I had previously interviewed his

5              cousin, Luis Cruz, as a result of the fact

6              pattern that was provided to me.  I did not

7              need to read him his rights.

8     Q.   Why was that?

9     A.   Because I determined that he was not

10             involved in that, number one, either the

11             homicide and/or the motor vehicle chase.

12    Q.   So you believe, what's his name Santiago, is

13             that who we're talking about?

14    A.   Cruz.

15    Q.   Oh, he had, yeah, that was his alias, Cruz,

16             you believed what he said relative to the

17             involvement of Pineda?

18    A.   Yes.

19    Q.   And why did you believe him?

20    A.   I did, I believed him.

21    Q.   Then why did you interrogate Mr. Pineda?

22    A.   Because I wanted to see what he had to say.

23    Q.   And so you weren't convinced that he wasn't

24             involved?

1                    MS. LITSAS: Objection.

2    A.   I interviewed him for the fact that he was

3         there, and I just wanted to see what his

4         version was.

5    Q.   And what happened after you talked to him?

6    A.   After I talked to him, we had a

7         conversation, and then he was given some

8         clothes.  I gave him a ride to his home.

9    Q.   But let me backtrack.  Why was he given

10        clothes?

11   A.   Because he was there in his boxer shorts and

12        a tank top, I believe.

13   Q.   Do you know why he was in boxer shorts?

14   A.   Do I know why he was?

15   Q.   Yes.

16   A.   Because that's the way he was brought there.

17   Q.   Yeah, do you know he was bought there in

18        boxer shorts?

19   A.   Yes.

20   Q.   Is that the normal procedure when you arrest

21        someone in their own home, not to let them

22        dress?

23                   MS. LITSAS: Objection.  You may

24        answer.

1    A.   I don't follow your question, sir.

2    Q.   Okay.  You didn't order the fingerprinting?

3    A.   I did not, sir.

4    Q.   And is it ever appropriate to fingerprint

5         someone if they're not booked?

6    A.   There are a host of reasons as to why one

7         would be fingerprinted without being booked.

8    Q.   Well, in your opinion, under the

9         circumstances of this case, should

10        Mr. Pineda have been fingerprinted?

11   A.   I'm not aware that he was fingerprinted.

12   Q.   No, assuming he was.

13   A.   Assuming he was under the circumstances in

14        which I had anything to do with it that

15        night?

16   Q.   Right.

17   A.   No, there were no circumstances that should

18        have dictated his fingerprinting.

19   Q.   Or his picture being taken?

20   A.   I don't know anything about his picture.  If

21        his picture was taken in a booking

22        capacity?  He wasn't booked as far as I was

23        concerned.  He wasn't placed under arrest as

24        far as I was concerned. So none of those

COMMONWEALTH OF MASSACHUSETTS    )
SUFFOLK, SS.                     )

I, Anita E. D'Antonio, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 30th day of August 2006 the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand this 3rd day of September, 2006.

_____
Anita E. D'Antonio, Notary Public

My commission expires:
June 29, 2012

# Exhibit J

**JOSEPH R. WATTS**
**June 8, 2007**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

***************************

CARLOS PINEDA and             *

ALEXANDRA PEREZ,              *

      Plaintiffs,        *

Vs.                          * C.A. No. 05-10216JLT

DANIEL KEELER, DENNIS        *

HARRIS, JOSEPH R. WATTS,     *

JOSEPH P. TOOMEY, WILLIAM *

J. GALLAGHER, EDWARD         *

GATELY, JANINE BUSBY,        *

and the CITY OF BOSTON,      *

      Defendants.        *

***************************

DEPOSITION OF:  JOSEPH R. WATTS

HRONES, GARRITY & HEDGES

Lewis Wharf Bay, Suite 232

Boston, Massachusetts

June 8, 2007                 10:00 a.m.

Dawn L. Halcisak

Certified Shorthand Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

**JOSEPH R. WATTS**
**June 8, 2007**

3 (Pages 6 to 9)

### Page 6

1    W-A-T-T-S, Sergeant, Boston Police.
2
3
4    EXAMINATION BY MR. HRONES:
5
6    Q.    Are you a Red Sox fan?
7    A.    Well, I did buy some furniture from
8    Jordan Marsh this year hoping they win, so --
9    Q.    Oh, you did?
10    A.    I did. I did.
11    Q.    That's a no-lose situation.
12    A.    For them. It could be for me.
13    Q.    What's your name?
14    A.    Joseph Watts.
15    Q.    And your profession?
16    A.    I'm a sergeant with the Boston
17    Police Department.
18    Q.    And how long have you been a
19    sergeant?
20    A.    A sergeant? I've been -- May of
21    2000, I was promoted to sergeant.
22    Q.    And how long have you been with the
23    police department?
24    A.    Since July 20, 1987. So between

### Page 7

1    there -- since July.
2    Q.    Where did you grow up?
3    A.    South Boston.
4    Q.    Where did you go to high school?
5    A.    South Boston High School.
6    Q.    Did you graduate?
7    A.    Yes, I did.
8    Q.    And what year was that?
9    A.    1977.
10    Q.    Okay. And what did you do after
11    that -- directly after that?
12    A.    I worked some construction. I went
13    to work for the City of Boston. I worked there
14    for seven years.
15    Q.    Doing what?
16    A.    I worked for the Boston Water and
17    Sewer Commission.
18    THE REPORTER:  The Water and Sewer?
19    THE WITNESS:  Boston Water and
20    Sewer Commission, yes.
21    THE REPORTER:  Thank you
22    Q.    (By Mr. Hrones) Until you became a
23    police officer, you did that?
24    A.    Yes.

### Page 8

1    Q.    Are you married?
2    A.    Yes, I am.
3    Q.    How long have you been married?
4    A.    I'd say 15 years, I believe.
5    Q.    Do you have any children?
6    A.    Yes, I do.
7    Q.    What ages?
8    A.    Twenty and twenty-one.
9    Q.    This is the second marriage?
10    A.    Yes, it is.
11    Q.    And where are you stationed now?
12    A.    District 6, South Boston.
13    Q.    Okay. And at the time of this
14    incident, where were you?
15    A.    B-3, Mattapan.
16    Q.    And were you ever in any
17    specialized unit?
18    A.    Yes, I was.
19    Q.    In what unit?
20    A.    I was in the city-wide anti-crime
21    unit.
22    Q.    When was that?
23    A.    Around 1988 -- '89. Then it became
24    the gang unit. Then I was on the K-9. And then

### Page 9

1    I got promoted when I was in the K-9.
2    Q.    Now, do you remember the incident
3    at issue here that took place at Shandon Road in
4    Dorchester --
5    A.    Yes.
6    Q.    -- on April 28, 2003?
7    A.    Yes.
8    Q.    And when did you begin work that
9    evening, if you remember?
10    A.    We called it the "Last-Half Shift,"
11    so it would have been 11:45 to 7:00 -- to
12    7:45 -- until -- I'm sorry -- until 7:30 a.m.
13    Q.    Have you reviewed any documents
14    before coming in here?
15    A.    Yes.
16    Q.    And what did you review?
17    A.    My internal affairs transcript.
18    Q.    And anyone else's transcript?
19    A.    No.
20    Q.    And the complaint?
21    A.    No.
22    Q.    Did you make any -- write out any
23    report?
24    A.    No.

**JOSEPH R. WATTS**
**June 8, 2007**

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1  Q.    So how did you become involved in<br>2  the entrance into the apartment at 25 Shandon<br>3  Street?<br>4       A.    Can you just ask me that question,<br>5  again, please? The entrance? How did I get<br>6  into the apartment? Is that what you're asking<br>7  me?<br>8       Q.    Well, I'll rephrase it.<br>9            You came on duty at 11:45?<br>10     A.    Yes.<br>11     Q.    And what did you do once you came<br>12 on duty?<br>13     A.    I did roll call. Went out in the<br>14 streets.<br>15     Q.    Alone?<br>16     A.    In the beginning of the evening, I<br>17 did.<br>18     Q.    And was there another sergeant --<br>19     A.    Yes, there was.<br>20     Q.    -- on duty?<br>21     A.    Yes, there was.<br>22     Q.    Who was that?<br>23     A.    Sergeant Joseph Toomey.<br>24            THE REPORTER: Could you spell | 1  specific time, but it was after midnight when I<br>2  heard it.<br>3       Q.    Fine. And what did you do -- what<br>4  did you hear, actually?<br>5       A.    I just heard -- I was listening on<br>6  the radio, I heard a car chase. Sounded like it<br>7  was on another district, coming -- the direction<br>8  coming onto the district that I was working, my<br>9  district that evening.<br>10     Q.    And what district is that?<br>11     A.    District B-3.<br>12     Q.    So what did you do?<br>13     A.    I was driving. I -- Sergeant<br>14 Toomey and, I believe, we were in the station<br>15 when the call came in, and we said to each other<br>16 "Maybe we should start heading up there." And<br>17 we got -- we got into a marked cruiser. I was<br>18 driving. And we started heading inbound on Blue<br>19 Hill Avenue towards where this chase -- this<br>20 pursuit was happening.<br>21     Q.    Did anyone order you to go to<br>22 that --<br>23     A.    No --<br>24     Q.    -- site? |

| Page 11 | Page 13 |
|---|---|
| 1  that, please? Toomey?<br>2            THE WITNESS: T-O-O --<br>3            THE REPORTER: That's okay. I<br>4  wasn't sure which way it was. Thank you.<br>5       Q.    (By Mr. Hrones) Were you -- were<br>6  you supervising attorney --<br>7       A.    Yes.<br>8       Q.    -- I mean, supervising sergeant?<br>9       A.    Yes, I was.<br>10     Q.    And what's the name that you<br>11 referred to that as, your responsibility?<br>12     A.    The PS, patrol supervisor.<br>13     Q.    Patrol supervisor?<br>14     A.    Yes; short is PS.<br>15     Q.    Okay. And who is superior to whom,<br>16 in terms of you and Toomey?<br>17     A.    We were equal.<br>18     Q.    Equal?<br>19     A.    Yes.<br>20     Q.    All right. So did there come a<br>21 time when you heard about a car chase?<br>22     A.    Yes.<br>23     Q.    And when was that?<br>24     A.    That was -- I can't give you a | 1       A.    -- no.<br>2       Q.    You just did it on your own, since<br>3  you --<br>4       A.    Yes.<br>5       Q.    -- were the patrol supervisor?<br>6       A.    Yes.<br>7            MR. DONOHUE: You have to wait for<br>8  him to finish.<br>9            THE WITNESS: I'm sorry -- I'm<br>10 sorry.<br>11           MR. DONOHUE: I might have to<br>12 object, for the record, and it will give<br>13 the court reporter time to be able to<br>14 write it down.<br>15           THE WITNESS: I understand.<br>16           THE REPORTER: What was the name of<br>17 that street? Did you say "Blue Hill"?<br>18           THE WITNESS: Blue Hill Avenue.<br>19           THE REPORTER: Thank you.<br>20     Q.    (By Mr. Hrones) So you and<br>21 Sergeant Toomey proceeded together in one car.<br>22 Where did you go?<br>23     A.    Yes. The question -- the answer is<br>24 "yes." |

**JOSEPH R. WATTS**
**June 8, 2007**

5 (Pages 14 to 17)

| Page 14 |
|---|
| 1    Q.    Where did you go? |
| 2    A.    We headed, again, Blue Hill Avenue |
| 3  inbound, toward the chase, where we thought the |
| 4  chase was going to go. |
| 5    Q.    Did you ever pick up the chase? |
| 6    A.    Yes, we did. |
| 7    Q.    And where was that? |
| 8    A.    I first visualized it when I was |
| 9  inbound around Blue Hill Avenue and Harvard |
| 10  Street. |
| 11    Q.    Were there already police cars |
| 12  chasing it -- chasing the white car? |
| 13    A.    Yes. |
| 14    Q.    And how many were already in the |
| 15  chase? |
| 16    A.    Can't say for sure, Counselor. |
| 17    Q.    More than one? |
| 18    A.    Yes. |
| 19    Q.    And what did you do, at that point? |
| 20    A.    I had -- I had to drive -- the |
| 21  chase went by me. I had to drive to the next |
| 22  opening because there's an island on Blue Hill |
| 23  Avenue. And I had to turn around and make a |
| 24  U-turn, almost, and get in behind the other |

| Page 16 |
|---|
| 1  Heights. |
| 2    Q.    Who were those officers? |
| 3    A.    I don't -- I don't have any names |
| 4  for you. I don't know. |
| 5    Q.    Was some of your officers from B-3 |
| 6  there? |
| 7    A.    Yes. |
| 8    Q.    Who was there? |
| 9    A.    I remember a female police officer |
| 10  named Janine Busby, I believe, was there. I, |
| 11  also, remember a -- Janine Busby, that's who I |
| 12  remember, as far as B-3. |
| 13    Q.    That's all you remember, just her? |
| 14    A.    Pretty much. |
| 15    Q.    So did you approach the white car? |
| 16    A.    No. |
| 17    Q.    Did you see who was in the car? |
| 18    A.    I did not. |
| 19    Q.    So what did you do when you saw |
| 20  these police officers running? |
| 21    A.    I went into 11 Fermoy Heights. |
| 22    Q.    And there was B-3? |
| 23    A.    This was B-3, yes. |
| 24    Q.    And so when something happens in |

| Page 15 |
|---|
| 1  vehicles -- police vehicles that were in |
| 2  pursuit -- |
| 3    Q.    Did you stay in that -- |
| 4    A.    -- so I was probably the last car, |
| 5  Counsel. |
| 6    Q.    Did you stay in that position until |
| 7  the white car stopped? |
| 8    A.    Yes. |
| 9    Q.    And where did it stop? |
| 10    A.    It stopped in the Franklin Hill -- |
| 11  is it the Franklin Field? I'm not sure -- |
| 12  housing development in the courtyard -- Fermoy |
| 13  Heights. |
| 14    THE REPORTER: What is that? |
| 15    THE WITNESS: Fermoy, F-E-R-M-O-Y, |
| 16  I believe. |
| 17    THE REPORTER: Thank you. |
| 18    Q.    (By Mr. Hrones) And when you |
| 19  arrived, what's the first thing you saw? |
| 20    A.    A lot of police officers running. |
| 21    Q.    Running? |
| 22    A.    Running, yes. |
| 23    Q.    Where were they running? |
| 24    A.    They were running into 11 Fermoy |

| Page 17 |
|---|
| 1  B-3, there's an incident, you were the parole |
| 2  [sic] supervisor in charge, were you not? You |
| 3  and Officer Toomey? |
| 4    A.    Yes. |
| 5    MR. DONOHUE: Objection. |
| 6    Q.    (By Mr. Hrones) And Sergeant |
| 7  Toomey. |
| 8    So, at that point, when you arrived |
| 9  and saw them running, you were the patrol |
| 10  supervision -- supervisor in charge? |
| 11    A.    Yes. |
| 12    Q.    So what did you do then, when you |
| 13  saw them running? |
| 14    A.    I followed. |
| 15    Q.    And where did you follow them to? |
| 16    A.    Into 11 Fermoy Heights. |
| 17    Q.    And from where -- |
| 18    A.    Into -- |
| 19    Q.    -- where did you follow them? |
| 20    A.    -- into the hallway. And then I |
| 21  eventually went into the apartment. |
| 22    Q.    Do you know why they were going |
| 23  into that address? |
| 24    A.    Yes. |

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH R. WATTS**
**June 8, 2007**

6  (Pages 18 to 21)

## Page 18

1    Q.    And why were they going in there?
2    A.    Because of an incident that took
3  place on District 4, in the South End.
4    Q.    No. But why were they going in
5  that particular entryway, as opposed to some
6  other entryway in the complex?
7    A.    I was assuming that's where the
8  suspects ran into.
9    Q.    But you didn't see them run in?
10   A.    No, I did not.
11   Q.    So when you got there, what did you
12  do?
13         MR. DONOHUE: Object to the form.
14   Q.    (By Mr. Hrones)  Well, let me
15  rephrase that.
16         When you got into the building,
17  what did you do?
18   A.    I eventually went into the
19  apartment.
20   Q.    And you went right up the stairs
21  behind the others?
22   A.    Yes. Yes, I did.
23   Q.    And when you went in the apartment,
24  who was there?

## Page 19

1    A.    Numerous police officers, myself,
2  of course. I don't recall if Sergeant Toomey
3  was with me in that part or not, and there was a
4  middle-aged gentleman and, I believe, a
5  middle-aged woman.
6    Q.    And there was a man in there?
7    A.    Middle-aged man, I believe, yes.
8    Q.    You mean Carlos Pineda?
9    A.    I don't know. I don't know Carlos
10  Pineda.
11   Q.    When you arrived, you didn't see --
12  you saw only one individual?
13   A.    Yes.
14   Q.    Did you see --
15   A.    No.
16         THE REPORTER: Wait for him to
17  finish.
18         MR. DONOHUE: Object to the form.
19   Q.    (By Mr. Hrones)  Let me rephrase
20  that.
21         You say a "middle-aged man"?
22   A.    Yes.
23   Q.    You don't mean an old man, do you?
24   A.    No.

## Page 20

1    Q.    Did you see an old man in there?
2    A.    No.
3    Q.    You saw a woman in there?
4    A.    Yes.
5    Q.    And how many children?
6    A.    I didn't see any children.
7    Q.    And where did you see the
8  middle-aged man?
9    A.    Right in the kitchen of the
10  apartment.
11   Q.    Did you see anyone at the door, as
12  you went in?
13   A.    No, I don't recall.
14   Q.    Did you see anyone in the hallway,
15  other than police officers?
16   A.    No, I did not.
17   Q.    And so you were in charge, as the
18  patrol supervisor, when you entered the
19  apartment?
20   A.    Yes.
21   Q.    All right. And was Sergeant Toomey
22  there?
23   A.    I don't recall.
24   Q.    So what did you do when you got

## Page 21

1  into the apartment?
2    A.    I spoke to this gentleman.
3    Q.    Yes.
4    A.    And then I observed.
5    Q.    What did you say to the gentleman?
6    A.    I don't recall exactly what I said,
7  Counselor.
8    Q.    Did he speak English?
9    A.    No. There was -- no, I don't
10  believe he did. I remember having a
11  language-barrier problem.
12   Q.    So how did you speak to him, then?
13   A.    I didn't. The conversation ended.
14   Q.    Did you speak to anyone else?
15   A.    No.
16   Q.    You didn't speak to the woman?
17   A.    I don't believe I did, no.
18   Q.    Now, as you were going up the
19  stairs, did you see anyone who'd been arrested,
20  at that point?
21   A.    No.
22   Q.    Did you ever see anyone arrested in
23  that apartment?
24   A.    I did not.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

JOSEPH R. WATTS
June 8, 2007

7 (Pages 22 to 25)

**Page 22**

1  Q.  You didn't see the driver of the
2  car arrested?
3  A.  I did not.
4  Q.  And how long did you stay in the
5  apartment?
6  A.  It was only minutes.
7  Q.  Yeah.
8  A.  It wasn't long, at all.  I couldn't
9  give you the exact time.
10  Q.  But as the patrol supervisor, you
11  were supposed to supervise what was going on
12  there, weren't you?
13  MR. DONOHUE:  Objection.
14  THE WITNESS:  Does that mean I can
15  speak and answer the question?
16  MR. DONOHUE:  Yes.
17  THE WITNESS:  Okay.  Yes.
18  Q.  (By Mr. Hrones) So are you saying
19  you left after a few minutes, when they were
20  still in the apartment, the other officers?
21  A.  Yes.
22  Q.  And why did you leave, at that
23  point?
24  A.  I felt everything was okay, under

**Page 23**

1  control.
2  Q.  And what do you mean by that?
3  A.  No one was doing anything that I
4  would object to.
5  Q.  Well, they --
6  A.  Everybody was under control.
7  Q.  -- the officers went into that
8  apartment because they were chasing after the
9  driver --
10  A.  Yes.
11  Q.  -- right?  So you wanted to know if
12  the driver was in there, didn't you?
13  MR. DONOHUE:  Object to the form.
14  THE WITNESS:  Excuse me?
15  MR. DONOHUE:  I'm just objecting,
16  for the record.
17  You can answer.
18  THE WITNESS:  Okay.  I don't know,
19  necessarily, the driver, but someone in
20  that car.
21  Q.  (By Mr. Hrones) Was in there?
22  A.  I don't know if they were in there.
23  Q.  But, basically, the officers were
24  going in there --

**Page 24**

1  A.  Yes.
2  Q.  -- so he didn't know for sure?
3  A.  That's correct.
4  Q.  But you assumed that someone was in
5  there?
6  A.  Yes.
7  Q.  And when you went in, didn't you
8  make it your business to determine if, in fact,
9  the individual was in there?
10  A.  Yes.
11  Q.  And did you determine if the
12  individual was in there?
13  A.  No.
14  Q.  Didn't -- well, did you make an
15  effort to determine?
16  A.  No --
17  Q.  Hmm --
18  A.  -- I didn't.
19  Q.  So you saw no one being marched out
20  in handcuffs?
21  A.  I didn't.  I did not.
22  Q.  And so you -- are you saying you
23  left the apartment without knowing whether or
24  not the individual they were chasing was in

**Page 25**

1  there?
2  A.  I don't believe he was in there.
3  I'm not sure if he was in there because there
4  was other things going on.
5  Q.  So you're not sure whether the
6  officers found the individual in there?
7  A.  Excuse me -- (witness drinking
8  water)
9  That's correct -- I'm not sure.
10  Q.  Well, as the patrol supervisor it
11  was your business to see whether or not he was
12  in there; was it not?
13  A.  Not necessarily.  There was --
14  there was other things going on, Counselor, as
15  well.
16  Q.  What was your role, as patrol
17  supervisor, once you arrived at the apartment?
18  A.  To, just, oversee everything; make
19  sure no one gets hurt; make sure no one's rights
20  are violated; make sure they're working within
21  the law and rules and regulations and everything
22  else.
23  Q.  So it was your obligation to
24  determine whether anyone was arrested?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH R. WATTS**
**June 8, 2007**

8 (Pages 26 to 29)

## Page 26

1    A.    Not necessarily, on this particular
2    case.
3    Q.    I thought you indicated that your
4    job was to see whether procedures were performed
5    and whether Miranda warnings were given --
6    A.    Correct.
7    Q.    -- and that type of thing?
8        MR. DONOHUE: Object to the form.
9        You can answer.
10       THE WITNESS: Correct.
11   Q.    (By Mr. Hrones) Are you -- are you
12   testifying that it wasn't your responsibility to
13   determine whether anyone had been arrested?
14   A.    I -- I guess it was.
15   Q.    You would certainly want to know
16   about it if someone had been arrested in that
17   apartment; would you not?
18   A.    Yes, I would.
19   Q.    Now, could someone have been
20   arrested in that apartment without your
21   authority, prior to the arrest?
22   A.    Yes.
23   Q.    But after the arrest, you were
24   supposed to know that the arrest had taken

## Page 27

1    place; were you not?
2    A.    I suppose so, yes.
3    Q.    Now, was Sergeant -- are you saying
4    you never discovered or determined whether
5    anyone was arrested in that apartment?
6    A.    I don't recall anyone being
7    arrested in that apartment.
8    Q.    And what -- was Sergeant Toomey
9    there?
10   A.    He -- he was -- he was there with
11   me. I don't know where he was at this
12   particular scene -- this particular time, but we
13   did go together.
14   Q.    And did you leave together?
15   A.    Yes.
16   Q.    And you left when there were still
17   other officers in the apartment?
18   A.    I don't know if they were still in
19   the apartment or not.
20   Q.    You can't remember whether when you
21   left there were other officers in the apartment?
22   A.    No.
23   Q.    I thought you testified you left
24   when things were still going on in the

## Page 28

1    apartment.
2        MR. DONOHUE: Object to the form.
3    Q.    (By Mr. Hrones) Didn't you
4    testify --
5    A.    I guess I -- I guess I did, yeah.
6    I -- I don't know if there was people still left
7    in there, but I'm -- when I left, they were
8    still there, but I don't know how long they
9    stayed. I don't know much after that. I really
10   don't.
11   Q.    What was the state of the apartment
12   when you went in?
13       MR. DONOHUE: Object to the form.
14       THE WITNESS: What I recall was it
15   was pretty messy. It was unkempt. It
16   didn't seem too clean.
17   Q.    (By Mr. Hrones) Was any -- any
18   search done of the apartment?
19   A.    I would call it a "protective
20   sweep."
21   Q.    Did you order the protective sweep?
22   A.    I did not.
23   Q.    Do you know who ordered it?
24   A.    I don't know if anyone has to order

## Page 29

1    that.
2    Q.    Was there a search, apart from a
3    protective sweep --
4    A.    Not in my presence.
5        THE REPORTER: You have to wait for
6    him to finish the question.
7        THE WITNESS: I'm sorry.
8        THE REPORTER: Okay. Was there a
9    search --
10       THE WITNESS: I apologize.
11   Q.    (By Mr. Hrones) Would a search,
12   beyond a protective search, have been
13   appropriate under those facts?
14       MR. DONOHUE: Object to the form.
15       THE WITNESS: Under the facts?
16   Q.    (By Mr. Hrones) Of this case?
17       In other words: Would the officers
18   be authorized to, if they chased after the
19   suspect going in there, to go into bureau
20   drawers and other places that weren't in open
21   view?
22   A.    Yes.
23   Q.    They would be allowed to do that?
24   A.    If there was a gun involved, it's

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

JOSEPH R. WATTS
June 8, 2007

9 (Pages 30 to 33)

**Page 30**

1  possible, yes.
2      Q.   But did they do that?
3      A.   No.
4      Q.   Okay.
5      A.   They were looking in rooms. They
6  did a protective sweep, from what I recall, but
7  I didn't see anyone looking any deeper than
8  that.
9      Q.   But you said they could have, if
10 they wanted to, because they thought this guy
11 might have been the shooter?
12     A.   Yes --
13          MR. DONOHUE: Object to the form.
14      Now, you may answer.
15          THE WITNESS: Yes.
16     Q.   (By Mr. Hrones) Did you go into
17 any of the bedrooms?
18     A.   I don't recall. I don't know if I
19 did or not. I really don't.
20     Q.   Well, where were you positioned
21 when you went in?
22     A.   I walked right in. The first room
23 is a living room, and then there's an open
24 kitchen right there (indicating), so I stood at

**Page 31**

1  the kitchen. I could observe -- there was
2  rooms, I believe, on the side, doors open. I
3  could, kind of, observe everything from my
4  vantage point.
5      Q.   Did you try to talk to the woman
6  that was there?
7      A.   I don't recall. I don't think I
8  did, though.
9      Q.   Okay. Why wouldn't you talk to
10 her?
11     A.   I don't know.
12     Q.   So you didn't talk to anyone in
13 there that would give you any information as to
14 what was going on, or their role?
15     A.   Correct.
16     Q.   Now, did you give any orders that
17 day?
18     A.   No.
19     Q.   You gave absolutely no orders?
20     A.   No.
21     Q.   You just stood around as a patrol
22 supervisor and watched?
23     A.   Pretty much, yes.
24     Q.   And you're sure of that?

**Page 32**

1      A.   Yes, pretty sure of it.
2      Q.   Did any officers come up and ask
3  you questions about what to do?
4      A.   No.
5      Q.   Now, were you disciplined, as a
6  result of your activities that night, by the
7  Boston Police?
8      A.   Yes, I was.
9      Q.   And why was that?
10     A.   Why?
11     Q.   Yes.
12     A.   I'm not quite sure, to tell you the
13 truth. But I know it was, I believe, failure
14 to -- failure to supervise properly.
15          THE REPORTER: Failed?
16          THE WITNESS: Failure.
17          THE REPORTER: Thank you.
18     Q.   (By Mr. Hrones) And you did fail
19 to supervise properly, didn't you?
20          MR. DONOHUE: Objection.
21          THE WITNESS: I don't know. I
22 don't know if that's true or not.
23     Q.   (By Mr. Hrones) What do you mean
24 you don't know whether it's true or not?

**Page 33**

1      A.   Well, there's a lot of different
2  circumstances involved in this. It wasn't just
3  my call, at the time.
4      Q.   But you were the patrol supervisor?
5      A.   I was one of them, yes.
6      Q.   Okay. And you and Sergeant Toomey,
7  because this was in B-3, were supposed to be in
8  charge?
9      A.   That's where it ended. It came to
10 a conclusion on District B-3.
11     Q.   Right. So you were supposed to be
12 in charge, at that point?
13          MR. DONOHUE: Objection.
14          THE WITNESS: Not necessarily.
15      Somewhat, but not totally.
16     Q.   (By Mr. Hrones) I thought you
17 admitted earlier that --
18     A.   Yes. I was in charge --
19          MR. DONOHUE: I object to the form,
20      and he's not finished with his question,
21      either.
22          THE WITNESS: Excuse me?
23          THE REPORTER: He's not finished
24      with his question.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

JOSEPH R. WATTS
June 8, 2007

11 (Pages 38 to 41)

Page 38

1       (Exhibit 1, Channel 3 Operations
2       Tape Recording, marked for
3       identification)
4
5       Q.    (By Mr. Hrones)  So just read that
6   to see if it refreshes your memory as to whether
7   you called in and said those things.
8       A.    (Witness viewing document)  No, it
9   doesn't refresh my memory.
10          MR. DONOHUE:  This looks to me like
11  a -- is it a summary that IAD put
12  together?
13          THE REPORTER:  IAD?
14          MR. DONOHUE:  IAD.
15          MR. HRONES:  I'm just asking if
16  he -- it refreshes his memory.
17          MR. DONOHUE:  Okay.
18          MR. HRONES:  There is a tape
19  recording.  Someone put it together, but
20  I'm not sure who.
21      Q.    (By Mr. Hrones)  So you're sure you
22  were the "906"?
23      A.    No, I'm not sure.
24      Q.    Let me show you this document.

Page 39

1   Does that refresh your memory as to whether you
2   were the "906"?
3       A.    (Witness viewing document)
4   According to this, I am.  I -- but I don't
5   remember my call sign over there.  I've had many
6   call signs and that one -- I just don't
7   remember --
8       Q.    Well, how long --
9       A.    -- except the one -- the one I have
10  now, of course.
11      Q.    Well, how long were you in that
12  particular --
13      A.    I went there --
14      Q.    -- B-3 position?
15      A.    -- 2000 and left in 2004, so four
16  years.
17      Q.    So you had the same Charlie number
18  for those four years?
19      A.    Yes, I would have.
20      Q.    And you can't remember what it was?
21      A.    I don't remember, no.
22      Q.    Do you know what Sergeant Toomey's
23  number was?
24      A.    I do not.

Page 40

1       Q.    Do you remember, on Channel 3,
2   making a communication, quote, Do we have two
3   shooting victims here?  Dispatch your answers.
4   Yes, we do and homicide is going to be notified.
5   That's all on District 4 off of East Berkeley
6   Street.
7           Do you remember that?
8       A.    I do not remember that.
9       Q.    Do you remember this communication
10  that you gave:  "I'm going to need a -- I'm
11  going to need a service unit here from 3.  I
12  have a service unit from 4.  We're going to
13  freeze this 81 -- apartment 81.  I want to have
14  another unit with them"?
15          MR. DONOHUE:  I object to the form.
16          Go ahead and answer.
17          THE WITNESS:  I do not remember
18  that.
19      Q.    (By Mr. Hrones)  But that would be
20  a supervisor's position, to call in and order a
21  freeze; would it not?
22      A.    Yes, it would.
23      Q.    You're not denying you might have
24  said that, are you?

Page 41

1           MR. DONOHUE:  Object to the form.
2           THE WITNESS:  No.
3           MR. HRONES:  Can that be marked as
4   Exhibit 2?
5
6           (Exhibit 2, Citations, marked for
7           identification)
8
9       Q.    (By Mr. Hrones)  Let me show you
10  the citations.
11          MR. DONOHUE:  Does he need to see
12  this first?
13          THE WITNESS:  I know what it is.
14          MR. DONOHUE:  Okay.
15      Q.    (By Mr. Hrones)  Can you tell who
16  gave that citation or made it out from the
17  signature at the bottom?
18      A.    (Witness viewing document)  No.
19      Q.    Okay.
20          THE REPORTER:  Do you need that one
21  marked, as well?  That photocopy?
22          MR. DONOHUE:  Yeah.  We marked --
23          MR. HRONES:  No, I'm not going to
24  mark it -- oh, you want --

JOSEPH R. WATTS
June 8, 2007

15 (Pages 54 to 57)

Page 54

1    THE REPORTER: Off the record?
2    MR. HRONES: Yes.
3
4    (Off record discussion)
5
6    Q.    (By Mr. Hrones) Did you, at any
7    later time, learn whether anyone was handcuffed
8    and taken out of the apartment?
9    A.    Yes.
10    Q.    And how did you learn that?
11    A.    Internal affairs.
12    Q.    You didn't know until internal
13    affairs interviewed you that that had taken
14    place?
15    MR. DONOHUE: Object to the form.
16    THE WITNESS: That's the only time
17    I recall remembering that. Prior to that,
18    I don't remember.
19    Q.    (By Mr. Hrones) You didn't look
20    into what had happened after you left?
21    A.    No.
22    Q.    Did you later find out that Carlos
23    Pineda was taken out in his boxer shorts, and
24    handcuffs, and taken to the B-3 for

Page 55

1    interrogation?
2    MR. DONOHUE: Object to the form.
3    THE WITNESS: Yes.
4    Q.    (By Mr. Hrones) When did you learn
5    that?
6    A.    When I went to internal affairs to
7    answer the complaint.
8    Q.    And that was several months
9    after --
10    A.    I don't know when it was after
11    that.
12    MR. DONOHUE: You, also, forgot
13    that your client had a shirt on.
14    MR. HRONES: Yeah. I mean, I
15    don't -- the officer -- excuse me -- off
16    the record.
17
18    (Off record discussion)
19
20    Q.    (By Mr. Hrones) Do you know Marie
21    Donahue (phonetic)?
22    A.    Yes.
23    Q.    Is she still with the police
24    department?

Page 56

1    A.    I believe she is.
2    Q.    Is she still a deputy
3    superintendent?
4    A.    I don't know.
5    THE REPORTER: Is she still, what?
6    MR. HRONES: A deputy
7    superintendent.
8    THE REPORTER: Thank you.
9    THE WITNESS: I don't know that.
10    Q.    (By Mr. Hrones) Now, who gave you
11    the reprimand?
12    A.    Captain Paul Russel.
13    Q.    Captain Russel.
14    Do you realize -- do you know what
15    the recommendation and findings were of the
16    Intentional Affairs investigation?
17    A.    No. On me?
18    Q.    Yes.
19    A.    No.
20    Q.    Do you -- does this refresh your
21    memory on the recommendations or -- as follows:
22    "Sergeant Toomey and Sergeant Watts were
23    accountable for the area under their
24    supervision. They allowed the complainant,

Page 57

1    Mr. Carlos Pineda to be handcuffed and
2    transported to A-3. He was ultimately released,
3    having been arrested without just cause.
4    Consequently, this investigation has determined
5    that a lack of supervision existed at the
6    scene." And it goes on.
7    Do you remember that finding?
8    MR. DONOHUE: Object to the form.
9    THE WITNESS: No. It was -- I
10    never heard or read anything like that.
11    THE REPORTER: You never heard of
12    it read like that?
13    THE WITNESS: Heard or read
14    anything like that.
15    THE REPORTER: Thank you.
16    Q.    (By Mr. Hrones) So it was only
17    when you got to internal affairs that you heard
18    that Carlos Pineda had been handcuffed and taken
19    out of that apartment?
20    MR. DONOHUE: Objection.
21    THE WITNESS: Yes.
22    Q.    (By Mr. Hrones) Didn't you make it
23    your business to find out, as patrol supervisor,
24    exactly what happened that night?

**JOSEPH R. WATTS**
**June 8, 2007**

16 (Pages 58 to 61)

Page 58

```
 1          MR. DONOHUE: Object to the form.
 2     Asked and answered. We've been over this.
 3     You can answer.
 4     Q.    (By Mr. Hrones) Didn't it make
 5     you -- didn't you make it your business to find
 6     out what happened that night?
 7     A.    No, I didn't.
 8     Q.    Why not, as patrol supervisor?
 9     A.    I believed I was there as an
10     assistant, assisting other supervisors from
11     other districts because it happened on my
12     district -- it didn't happen on my district. It
13     ended on my district and that's when I was
14     notified of my internal affairs complaint and
15     given the reason you just stated.
16     Q.    Didn't you testify that you were in
17     charge as the patrol supervisor?
18     A.    To you?
19     Q.    Yes.
20     A.    Yes.
21          MR. HRONES: I don't have anything
22     else.
23          MR. DONOHUE: I just have a couple
24     questions.
```

Page 59

```
 1
 2
 3     EXAMINATION BY MR. DONAHUE:
 4
 5     Q.    Were other supervisors on the scene
 6     when you arrived?
 7     A.    Yes.
 8     Q.    And you had testified earlier that
 9     as the patrol supervisor you should have been in
10     charge of the that scene. When, exactly, did
11     you learn that?
12          MR. HRONES: Objection.
13          THE WITNESS: At my internal
14     Affairs -- when I got this internal
15     affairs complaint and -- and the oral
16     reprimand.
17     Q.    (By Mr. Donohue) When you
18     responded to the scene, what was your
19     understanding of your duties as a supervisor
20     there?
21     A.    That particular night, I assumed I
22     was assisting another crime -- assisting other
23     supervisors and patrol officers for a crime that
24     happened in a different district.
```

Page 60

```
 1     Q.    Okay.
 2     A.    I assumed they were in charge of a
 3     lot more than I was.
 4     Q.    Okay. Why did you think that?
 5     A.    It happened on another district and
 6     when I got there, there was, you know, three --
 7     three supervisors from District 2 and one
 8     supervisor from District 4.
 9     Q.    Let me make sure I have this right.
10     The murder and shootings took place in District
11     4; is that right?
12     A.    That's what I believe to have
13     happened, yes.
14     Q.    And then the chase started in
15     District 4 and proceeded through District B-2
16     and ended in District B-3?
17     A.    Yes.
18     Q.    And did that chase bring officers
19     with it from all those districts?
20          MR. HRONES: Objection.
21          THE WITNESS: Yes, it did.
22     Q.    (By Mr. Donohue) In the line of
23     officers following this white Honda to the scene
24     where Plaintiff's apartment is located, where
```

Page 61

```
 1     were you in those line of officers arriving at
 2     the scene?
 3          MR. HRONES: Asked and answered.
 4     Q.    (By Mr. Donohue) Go ahead.
 5          THE REPORTER: You can answer.
 6          THE WITNESS: I believe I was the
 7     last vehicle to show up --
 8     Q.    (By Mr. Donohue) Okay --
 9     A.    -- in the line.
10     Q.    When you arrived at the scene as
11     the last vehicle, why didn't you take over as
12     the head supervisor at the scene?
13     A.    You don't walk in there and say
14     "I'm in charge" when there's other supervisors
15     there, already, from another district.
16     Q.    Okay. You received --
17     A.    That's what I have to say.
18     Q.    You understand that you received
19     an -- an oral reprimand?
20     A.    Yes.
21     Q.    Did you appeal that?
22     A.    No, I did not.
23     Q.    Why not?
24     A.    There is no appeal process on an
```

**JOSEPH R. WATTS**
**June 8, 2007**

17 (Pages 62 to 65)

---

Page 62

1  oral reprimand.
2      Q.    Is it your understanding that's the
3  lowest level of appeal that you can receive as
4  a -- I'm sorry.
5          Is it your understanding that's the
6  lowest level of discipline you can receive as a
7  Boston Police Officer?
8      A.    Yes.
9      Q.    I believe you testified earlier
10 that you didn't give any orders at the scene?
11     A.    I believe so.  I believe I did not.
12     Q.    Why didn't you?
13     A.    I -- I -- felt it wasn't my -- my
14 call.
15     Q.    What did you do after you left the
16 apartment?
17     A.    I assumed patrol on the streets,
18 supervising -- the patrol supervisor on the
19 streets.
20     Q.    So you went back to patrolling the
21 streets?
22     A.    Yes, I did.
23          MR. DONOHUE:  Could I see the
24     exhibits, please?

---

Page 63

1          MR. HRONES:  Here's -- here's
2      another one.
3          MR. DONOHUE:  Thank you.
4          MR. HRONES:  There's one right over
5      there.
6          MR. DONOHUE:  Do you have six
7      exhibits?
8          THE REPORTER:  Yes, we do, sir.
9      Exhibit 6 was Rule 102, Section 6.
10     Q.    (By Mr. Donohue) I'm showing you
11 what's been marked at your deposition as . . .
12         MR. DONOHUE:  Let's go off the
13     record for one second.
14         THE REPORTER:  Okay.
15
16         (Off record discussion)
17
18
19         (Exhibit 7, Black and white
20         Photocopy of Photograph, marked for
21         identification)
22
23     Q.    (By Mr. Donohue) Okay.  I'm
24 showing you the Exhibits 4 and 7, which Attorney

---

Page 64

1  Hrones showed you earlier.  And Exhibit 7 is a
2  blowup of Exhibit No. 4, on the face of what
3  appears to be a white officer.  I'm showing you
4  Exhibit No. 7.  Is that you?
5      A.    (Witness viewing document) No,
6  that's not me.
7      Q.    Are you sure that's not you?
8      A.    (Witness viewing document) I'm
9  sure.
10     Q.    And I'm showing you Exhibit No. 4.
11 Do you appear in that photograph?
12     A.    (Witness viewing document) No, I
13 do not.
14         MR. DONOHUE:  Let me just check my
15     notes.
16
17         (Brief pause)
18
19         MR. DONOHUE:  I don't have anymore
20     questions.
21
22
23
24

---

Page 65

1          FURTHER EXAMINATION BY MR. HRONES:
2
3      Q.    If you weren't the supervisor in
4  charge, who was?
5          MR. DONOHUE:  Object to the form.
6      Go ahead and answer.
7          THE WITNESS:  I don't know.
8      Q.    (By Mr. Hrones) Well, who was
9  issuing orders that night?
10     A.    I'm not sure, but there was other
11 supervisors there.
12     Q.    But wasn't it your responsibility,
13 at least as a patrol supervisor from B-3, to --
14 to know who was issuing the orders?
15     A.    Yes.
16     Q.    In fact, according to police
17 procedures, you were the patrol supervisor who
18 should have been in charge because this
19 particular apartment -- incident occurred in
20 B-3?
21     A.    Yes.
22         MR. DONOHUE:  Object to the form.
23     Go ahead.
24         THE WITNESS:  Sorry -- yes.

---

**JOSEPH R. WATTS**
**June 8, 2007**

18  (Pages 66 to 69)

Page 66

```
 1       Q.   (By Mr. Hrones)  So you're saying
 2   you neglected your responsibilities by not being
 3   in charge?
 4           MR. DONOHUE:  Objection.
 5           THE WITNESS:  No.  They're saying
 6   that.
 7       Q.   (By Mr. Hrones)  They're -- but
 8   they're not --
 9       A.   I'm not saying it.
10       Q.   They're saying that.  But you're
11   saying that you didn't issue any orders?
12           MR. DONOHUE:  Objection.  He said
13   that.
14           THE WITNESS:  No.
15       Q.   (By Mr. Hrones)  No.  And you say
16   you weren't in charge?
17           MR. DONOHUE:  Objection.
18           THE WITNESS:  I was in charge.
19           THE REPORTER:  "Was" or "was not"?
20           THE WITNESS:  I was in charge.  I'm
21   a supervisor, yes.
22       Q.   (By Mr. Hrones)  From B-3?
23       A.   Yes.
24       Q.   Do you know why internal affairs
```

Page 67

```
 1   didn't reprimand the other supervisors there?
 2           MR. DONOHUE:  Objection.
 3           THE WITNESS:  No.
 4       Q.   (By Mr. Hrones)  Wasn't it because
 5   you and Sergeant Toomey were from B-3?
 6       A.   I don't -- I don't know why --
 7           MR. DONOHUE:  Object to the form.
 8           THE WITNESS:  I'm sorry -- I don't
 9   know why.
10           MR. HRONES:  I have nothing
11   further.
12           MR. DONOHUE:  Okay.  Thanks for
13   coming, Sergeant.
14           MR. HRONES:  Thank you, sir.
15           THE WITNESS:  Thank you.
16
17           (Deposition concluded at 11:16 a.m.)
18
19
20
21
22
23
24
```

Page 68

```
 1       I, DAWN L. HALCISAK, a Notary Public, do
 2   hereby certify that JOSEPH R. WATTS appeared
 3   before me, satisfactorily identified himself, on
 4   the 8th day of June, 2006, at the offices of
 5   HRONES, GARRITY & HEDGES, Lewis Wharf Bay, Suite
 6   232, Boston, MA., and was by me duly sworn to
 7   testify to the truth and nothing but the truth
 8   as to his knowledge touching and concerning the
 9   matters in controversy in this cause; that he
10   was thereupon examined upon his oath and said
11   examination reduced to writing by me; and that
12   the statement is a true record of the testimony
13   given by the witness, to the best of my
14   knowledge and ability.
15       I further certify that I am not a relative
16   or employee of counsel/attorney for any of the
17   parties, nor a relative or employee of such
18   parties, nor am I financially interested in the
19   outcome of the action.
20       WITNESS MY HAND this 10th day of June, 2007.
21
22
23   Dawn L. Halcisak      My Commission expires:
24   Notary Public      October 2, 2009
```

Page 69

```
 1   Today's date:  June 10, 2007
 2   To:         STEPHEN HRONES, ESQ.
 3   Copied to:      THOMAS R. DONOHUE, ESQ.
 4   From:       Dawn L. Halcisak
 5   Deposition of:  JOSEPH R. WATTS
 6   Taken:        JUNE 8, 2007
 7   Action:       PINEDA
 8                vs.
 9                KEELER
10
11       Enclosed is a copy of the deposition of
12   JOSEPH R. WATTS.  Pursuant to the Rules of
13   Civil Procedure, Mr. Watts has thirty days to
14   sign the deposition from today's date.
15       Please have Mr. Watts sign the enclosed
16   signature page.  If there are any errors, please
17   have him mark the page, line and error on the
18   enclosed correction sheet.  He should not mark
19   the transcript itself.  This addendum should be
20   forwarded to all interested parties.
21       Thank you for your cooperation in this
22   matter.
23
24
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

**JOSEPH R. WATTS**
**June 8, 2007**

Page 70

```
 1        UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3    ****************************
 4    CARLOS PINEDA and        *
 5    ALEXANDRA PEREZ,         *
 6         Plaintiff,          *
 7    Vs.                      * C.A. No. 05-10216JLT
 8    DANIEL KEELER, DENNIS    *
 9    HARRIS, JOSEPH R. WATTS, *
10    JOSEPH P. TOOMEY, WILLIAM *
11    J. GALLAGHER, EDWARD     *
12    GATELY, JANINE BUSBY,    *
13    and the CITY OF BOSTON,  *
14         Defendants.         *
15    ****************************
16        I, JOSEPH R. WATTS, do hereby certify,
17    under the pains and penalties of perjury, that
18    the foregoing testimony is true and accurate, to
19    the best of my knowledge and belief.
20        WITNESS MY HAND, this____day of_____,
21    2007.
22
23            _____
               JOSEPH R. WATTS
24    DLH
```

Page 71

```
 1            CORRECTION SHEET
 2    DEPONENT:   JOSEPH R. WATTS
 3    CASE:     PINEDA VS. KEELER
 4    DATE TAKEN:  JUNE 8, 2007
 5    *******************************************
 6    PAGE / LINE /  CHANGE OR CORRECTION AND REASON
 7    *******************************************
 8    ____/____/_____
 9    ____/____/_____
10    ____/____/_____
11    ____/____/_____
12    ____/____/_____
13    ____/____/_____
14    ____/____/_____
15    ____/____/_____
16    ____/____/_____
17    ____/____/_____
18    ____/____/_____
19    ____/____/_____
20    ____/____/_____
21    ____/____/_____
22    ____/____/_____
23    ____/____/_____
24    ____/____/_____
```