UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARLOS PINEDA and ALEXANDRA PEREZ, )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>DANIEL KEELER, DENNIS HARRIS, JOSEPH R.)<br>WATTS, JOSEPH P. TOOMEY, WILLIAM J. )<br>GALLAGHER, EDWARD GATELY, JANINE )<br>BUSBY, and the CITY OF BOSTON, )<br>Defendants. )<br> ) | C.A. No. 05-10216-JLT |

## PLAINTIFFS' L.R. 56.1 STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS WATTS AND TOOMEY'S MOTION FOR SUMMARY JUDGMENT

The Plaintiffs hereby submit the following statement of material facts in dispute:

1. Although the responding officers were looking for a white van that was traveling with an unspecified model of Honda, when they turned onto Melnea Cass Boulevard, they saw only a white Honda Civic. There was no sign of any white van. Depo. Gallagher, June 8, 2007, pg. 10, attached hereto as Exhibit A.

2. Despite not seeing the white van that was said to have been at the scene of the shooting, officers began to follow the Honda. When they tried to pull it over, the driver fled. At that time, Officer Foley was able to identify the driver as someone known to the police, a Norberto Serrano, aka Luis Cruz. Foley now knew that the driver of the Civic was not Plaintiff Pineda. Ex. A, pg. 12; Incident Report, attached hereto as Exhibit B.

3. When the Honda finally stopped, police followed one, and only one, occupant into 11 Fermoy Heights, the Plaintiffs' apartment. Ex. A, pg. 16. The other two occupants were female and did not go into the apartment. Report of Coyne, April 28, 2003, attached hereto as Exhibit C.

4.  When the police announced their presence, Plaintiffs Pineda and Perez were asleep. Depo. Perez, May 17, 2006, pg. 52, attached hereto as Exhibit D.

5.  Pineda answered the door and told the police that his car "was gone."  Ex. D, pg. 57.

6.  As the officers stormed in, one asked whether the missing car was "a white Honda Civic." Ex. D, pg. 64.

7.  When Pineda said yes, officers immediately grabbed him, pushed him against the wall, and handcuffed him.  Ex. D, pg. 57, 65.  While handcuffing him, an officer slammed Pineda against the wall twice, face-first.  Pineda IAD Statement, pg. 12, attached hereto as Exhibit E; Depo. Pineda, May 17, 2006, pg. 72, attached hereto as Exhibit F.

8.  The arresting officer was a Boston Police officer.  Ex. D, pg. 71, Ex. E, pg. 82.

9.  At this time, there were fifteen officers in the Plaintiffs' house.  Ex. D, pg. 78.  All of the officers were from the Boston Police Department except one, who was a Massachusetts State Trooper.  Ex. D, pg. 78.

10. At one point during the night, Perez went into her son's bedroom and saw that a mattress had been thrown on the floor and that everything else was out of place.  Ex. D, pg. 90.

11. She later observed that the police had opened drawers and flipped other mattresses as well.  Ex. D, pg. 109, 111.  It seemed like everything they owned had been thrown on the floor. Ex. D, pg. 110.

12. Police also flipped over a "potty" that the Plaintiffs' young son used, causing the floor to be covered in feces.   Ex. E, pg. 18.

13. The Plaintiffs' kept their apartment neat, cleaning it twice a week.  Ex. F, pg. 130

14. At the time of the search, the individual the police actually admit to arresting, Serrano, was already handcuffed, Ex. D, pg. 94, as was Pineda.  Ex. F, pg.135.

15. Perez did not agree to the search until after Serrano and Pineda had been arrested and until after the searches had already begun.  Ex. D, pg. 194.

16. In addition, the police told her they would get a warrant whether she agreed to their request or not.  Ex. D, pg. 194.

17. Serrano later admitted that he had taken the Plaintiffs' Honda without permission.  Ex. D, pg. 127.

18. Defendant Watts was the supervising sergeant of the patrol officers on the night in question.  Depo. Watts, June 8, 2007, pgs. 11, 17, attached hereto as Exhibit G.

19. Toomey was his equal in terms of authority and responsibility.  Ex. G, pg. 11.

20. Watts arrived at the scene of the arrest early enough to see the first officers run into the Plaintiffs' residence.  Ex. G, pg. 17.

21. When he entered the apartment, Watts was in charge.  Ex. G, pg. 20.

22. Although he claims he did not see anyone arrested, Ex. G, pg. 21, his role as a supervisor was to make sure no one's rights were violated, and to know who was arrested.  Ex. G, pg. 25.

23. Despite being the supervisor in charge and being from the district in which the arrest took place, Watts claims to have given no orders to anyone that night.  Ex. G, pg. 31.

24. Watts' lack of "accountability" caused the Plaintiff Pineda to be arrested without "just cause," according to the Department.  See IAD Assessment, attached hereto as Exhibit H.

25. Toomey's role as supervisor was to make sure everyone was doing their job.  Depo. Toomey, June 1, 2006, pg. 17, attached hereto as Exhibit I.

26. Toomey claims that he does not know who was in charge at the apartment on that night.  Ex. I, pg. 24.

27. He claims that he has no knowledge of what happened to Pineda.  Ex. I, pgs. 36, 46.

28. He did state, however, that patrol supervisors, such as Watts and himself, should know

who is and is not arrested at the scene of an alleged crime.  Ex. I, pg. 46.

29. Toomey's lack of supervision caused the unjustified arrest of Pineda.  Ex. I, pg. 80.


Respectfully Submitted,
Plaintiffs Carlos Pineda and Alexandra Perez,
By their attorneys,

//s// Michael Tumposky
Stephen Hrones
BBO No. 242860
Jessica D. Hedges
BBO No. 645847
Michael Tumposky
BBO No. 660618
Hrones, Garrity & Hedges
Lewis Wharf – Bay 232
Boston, MA 02110-3927
T) (617) 227-4019


## CERTIFICATE OF SERVICE

I, Michael Tumposky, hereby certify that, on this the 11th day of July, 2007, I have caused to be served a copy of this document, where unable to do so electronically, on all counsel of record in this matter.

//s// Michael Tumposky
Michael Tumposky

1    a white van.

2          Q.       Was the white van one of the --

3    were the guys charged with a murder in a white

4    van?

5          A.       Suspects were seen leaving the

6    scene in a white van.

7          Q.       And when they stopped the white

8    van, not the Honda later on, what -- let me

9    change that.

10               When they stopped the guys who were

11   charged with the murder, were they in a white

12   van?

13         A.       I wasn't there.

14         Q.       You weren't involved at all with

15   that?

16         A.       I wasn't involved in that, no.

17         Q.       In any event, you see a white

18   Honda?

19         A.       Yes.

20         Q.       And what's it doing?

21         A.       It's traveling towards us on Cass

22   Boulevard, but it's all by itself, there's not a

23   white mini van with it.

24         Q.       And what did you do?

**CATUOGNO COURT REPORTING SERVICES**

Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

a46c2ca1-fa7f-4dc6-aec6-f03b8b162561

1      Q.      Well, who got away?

2      A.      The other people in the car.

3      Q.      Who are the other people in the

4  car?

5      A.      I wasn't -- I wasn't -- I don't

6  know who got out.

7      Q.      So what did you do then?

8      A.      We stayed at the car.

9      Q.      For how long?

10     A.      Twenty minutes to half an hour.

11     Q.      And then where did you go?

12     A.      We were ordered by a superior to go

13  upstairs to the -- to the apartment.

14     Q.      What superior ordered?

15     A.      I'm not sure, sir.

16     Q.      You're from D-4?

17     A.      Yes.  It wasn't one of ours, I know

18  that.  I didn't recognize the voice on the

19  radio.

20     Q.      Oh, someone on the radio ordered

21  you up there?

22     A.      Yes.

23     Q.      Someone who was in the apartment?

24     A.      I don't know.

WILLIAM J. GALLAGHER
June 8, 2007

Page 12

1    Q.    You followed him.

2    A.    Yes, we did.

3    Q.    Was anyone else following him?

4    A.    No, not at that time.

5    Q.    Did others join you later?

6    A.    Yes.  I was on the radio that night

7    my partner was driving, and I informed the

8    dispatcher that we were chasing a car that could

9    possibly be involved in a shooting down at

10   Albany and Mass.

11   Q.    Did you see who was driving?

12   A.    I didn't, no.  My partner got a

13   good look, but I did not.

14         THE REPORTER:  Your partner got a

15   good look?

16         THE WITNESS:  Yes.

17   Q.    (By Mr. Hrones)  Who is your

18   partner?

19   A.    Patrick Foley (phonetic).

20   Q.    He was in the same police cruiser?

21   A.    Correct.

22   Q.    He got a good look?

23   A.    Correct.

24   Q.    And did he identify him later on as

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

a46c2ca1-fa7f-4dc6-aec6-f03b8b162561

JUN-05-2003 12:23 BOSTON POLICE DEPT 343 Page 2 of 2
Case 1:05-cv-10213-JLT Document 66-3 Filed 07/11/2007 Page 1 of 2
Page 1 of 2

489

# BOSTON POLICE
## INCIDENT REPORT

Attachment #3

ORIGINAL ☒  SUPPLEMENTARY ☐

**KEY SITUATIONS**

| TYPE OF INCIDENT | | CRIME CODE | | STATUS | COMPLAINT NO. 030217876 | | REPORT DIST. B2 | CLEARANCE DIST |
|---|---|---|---|---|---|---|---|---|
| VAL | | 0 | | | DATE OF OCCUR. A.04/28/03 | | B. | |

**LOCATION OF INCIDENT:** CASS BL , KERR WY

| APT. | DISPATCH TIME | TIME OF OCCUR. A.03:00 AM | B. |

**VICTIM-COMP. (LAST, FIRST, MI):** COMM OF MASS

| PHONE (617)-343-4250 | SEX | RACE | MARITAL STATUS |

| ADDRESS | | APT. | OCCUPATION | | AGE 0 | D.O.B. |

**PERSON REPORTING:** GALLAGHER,WILLIAM

**ADDRESS:** 650 HARRISON AVE,BOSTON,MA,00000-0000

| APT. | PHONE (617)-343-4250 |

**WAS THERE A WITNESS TO THE CRIME**

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | RES ☒ NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | BUS |

**NUMBER OF PERPETRATORS: 1 - CAN SUSPECT BE IDENTIFIED AT THIS TIME**

**P E R S O N S**

| STATUS ARRESTED | NAME (LAST, FIRST, MI) CRUZ,LUIS | | S.S. NO. 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 | BOOKING NO. 20030077604 | PHOTO NO. ALIAS | ☒ ☐ YES NO |
|---|---|---|---|---|---|---|
| WARRANT NO. | ADDRESS 1 SHANDON RD,DORCHESTER,MA,02124-0000 | | SEX MALE | RACE WHITE HISPANIC | AGE 20 | HEIGHT 5-04 | D.O.B 2/23/83 |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | WEIGHT 140 | BUILD MEDIUM | HAIR DARK BROWN | EYES BROWN |

**CAN SUSPECT VEHICLE BE DESCRIBED**

**V E H I C L E S**

| STATUS STOLEN TOWED SUSPECT VEHICLE | REG. STATE MA | REG. NO. 8482YE | PLATE TYPE | YEAR(EXP) 2005 | MODEL CIVIC | ☐ ☒ YES NO |
|---|---|---|---|---|---|---|
| VEHICLE MAKE YEAR HONDA - 1990 | VEHICLE NO. 2HGED7360LH552067 | | STYLE HATCHBACK | | COLOR(TOP-BOTTOM) WHITE - WHITE | |
| OPERATOR'S NAME CRUZ,LUIS | | | LICENSE NO. | OPERATOR'S ADDRESS 1 SHANDON RD,DORCHESTER,MA,00000-0000 | | |
| OWNER'S NAME PEREZ-ROJAS, ALEXANDRA | | | OWNER'S ADDRESS 1 SHANDON RD,DORCHESTER,MA,00000-0000 | | | |

**CAN PROPERTY BE IDENTIFIED**

**P R O P E R T Y**

| STATUS | TYPE OF PROPERTY | SERIAL OR IDENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | OUR | ☐ ☒ YES NO |
|---|---|---|---|---|---|---|---|

**IS THERE A SIGNIFICANT M.O.**

**M O**

| TYPE OF WEAPON-TOOL | NEIGHBORHOOD | | TYPE OF BUILDING | PLACE OF ENTRY | ☐ ☒ YES NO |
|---|---|---|---|---|---|
| WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | | VICTIM'S ACTIVITY | |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | | RELATIONSHIP TO VICTIM | |

**IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)** ☒ ☐ YES NO

**IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)** ☐ ☒ NO

**BLOCK NARRATIVE AND ADDITIONAL INFORMATION**

ABOUT 3:00 AM OFFICERS FOLEY AND GALLAGHER IN THE D102A UNIT WERE RESPONDING TO A RADIO CALL FOR A PERSON SHOT AT THE MOBIL GAS STATION ON EAST BERKELEY ST. WHILE ENROUTE FROM THE FENWAY OFFICERS WERE FLAGGED DOWN BY B/N FEMALE DRIVING AN OLDER MODEL GREEN FORD TAURUS AT THE INTERSECTION OF MASS AVE AT TREMONT ST. THE OPERATOR OF THE TAURUS SAID " ARE YOU LOOKING FOR THE CARAVAN ? " " IT IS AT ALBANY AND CASS BLVD.... IT IS ON CASS BLVD NOW AND THERE IS WHITE HONDA WITH IT ". OFFICERS FOLEY AND GALLAGHER PROCEEDED TO CASS BLVD VIA TREMONT ST. OFFICER FOLEY SPOTTED A WHITE HONDA TAKE A LEFT ONTO KERR WAY FROM CASS BLVD. OFFICERS FOLLOWED THE HONDA MASS REG 8482YE UNTIL IT PULLED OVER AT THE CURB AND THE DRIVER'S DOOR OPENED. OFFICERS ACTIVATED THE BLUE LIGHTS AT THAT TIME AND EXITED THEIR CRUISER. AS THE OFFICERS APPROACHED THE WHITE HONDA THE OPERATOR SPED AWAY DOWN KERR WAY TOWARD SHAWMUT AVE WHERE IT PROCEED THE WRONG WAY FOR SEVERAL BLOCKS. OFFICERS USING THEIR RADIO BROADCAST THE DIRECTION OF THE WHITE HONDA AND THE LICENSE PLATE OVER THEIR DEPARTMENT RADIO WHILE FOLLOWING WITH THEIR BLUE LIGHTS AND SIREN ON. DURING THIS TIME OFFICERS OBSERVED THE WHITE HONDA TO BE TRAVELING WELL ABOVE THE SPEED LIMIT OF 30 MPH, FAILING TO STOP FOR RED LIGHT AT COLUMBIA RD AND DUDLEY ST. OFFICERS WERE JOINED BY UNITS FROM C-11, B-2, B-3, C-6, D-4, ASA WELL AS STATE POLICE. OFFICERS TOOK SUSPECT LUIS CRUZ INTO CUSTODY AT 11 FERMOY HEIGHTS APT 81. PO FOLEY POSTIVELY IDENTIFIED DRIVER LUIS CRUZ AS THE OPERATOR OF THE WHITE HONDA. PO FOLEY SAW THE SUSPECT'S FACE AT KERR WAY BEFORE THE CAR FLED. MR LUIS CRUZ DOES NOT HAVE A LICENSE TO OPERATE A MOTOR VEHICLE. AT 11 FERMOY ST OFFICERS SPOKE TO ALEXANDRA PEREZ 3/11/82 AND HER HUSBAND CARLOS PINEDA 10/16/83 WHO STATED THAT LUIS CRUZ HAS LIVED WITH THEM FOR ABOUT A MONTH AND THEY DID NOT

GIVE HIM PERMISSION TO USE THEIR CAR, AND HE MUST HAVE TAKEN THE KEYS FROM MR PINEDA'S JACKET WHITE HONDA MASS REG 8482YE TOWED TO BOSTON POLICE HQ BY AUTO SERVICES CLAIM # 2386. PO PANKIEVICH ACCOMPANIED THE CAR TO ID UNIT AT BOSTON POLICE HQ. MASS UNIFORM CITATIONS K30678301-2-3-4 ISSUED TO DRIVER LUIS CRUZ.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | PT |
|---|---|---|---|---|---|
| D102A | 1 | WILLIAM J GALLAGHER | 11687 | | NO |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | TELETYPE NO. |
|---|---|---|---|---|
| 04/28/03 | IDENTIFICATION UNIT | | | |

| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | DUTY SUP. ID |
|---|---|---|---|---|
| 07:44 AM | | | LARRY C HOBSON | 7445 |

# BostonPolice

*D E P A R T M E N T*

1 Schroeder Plaza, Boston, MA 02120-2014

Date: April 28, 2003

To:    Captain Albert Goslin, Commander Area B-2/BFS

From:  Police Officer James A. Coyne, ID #10952

Subject: Death Investigation CC# 030217815

Sir,

  I, PO James Coyne, respectfully submit that at approximately 0242 hr while assigned as the B454A assisted in the pursuit of MA 8482YE (White Honda Civic Coupe Hatchback). This vehicle was wanted concerning a Double shooting/ Homicide that had occurred on D-4 on Berkeley St.

  Operations had broadcast motor vehicle possibly fleeing onto Dst. 02. The D102A stopped said m/v on Kerr Way at which time it fled. The B453A picked up said m/v and began pursuing it. Said m/v was pursued by multiple units ending at 23 Shandon Road at which time operator, tentatively I'D -(Norberto Serrano) fled on foot. Suspect was attired in black boots, gray pants and gray long-sleeve shirt with design on front. PO Coyne engaged in a foot pursuit of suspect who entered 11 Fermoy Heights and was observed entering Unit #81.Responding officers made peaceful entry and located suspect, now unclothed, hiding behind the bedroom door. The clothing was located discarded on the floor at the feet of the suspect. Suspect was positively ID by PO Coyne and officers in the D102A-PO's Foley and Gallagher. Suspect arrested by PO Fay and Coyne. Transported to Dst 4 and booked see booking # 03-00776-04. Clothing recovered by PO Coyne and placed in BPD Brown Paper Evidence Bags.

  Upon return to Dept#2015, the HK01A-PO's Roby and B. Griffiths informed officers that on arrival they observed a female standing outside MA 8482YE. This female Identified as Marta E. Jimenez DOB 10/25/1987 1849 Columbus Ave. #2AQ Roxbury, MA was detained and seated in the rear of cruiser. Ms. Jimenez was advised of her Miranda Warning, waiving them and stated she was the rear seat passenger of m/v and that " Berto" was driving. She stated that her girlfriend, tentatively I'D as Irma Ramos 8 Ernst St. #2 was the front seat passenger. Jimenez stated she was picked up by "Berto" about 1 hour before the pursuit and no other persons had entered or exited said m/v. Jimenez further stated that Irma just walked away after the car stopped and "Berto" fled.

  Jimenez was detained until the arrival of Homicide. Homicide Sgt. Det. Keeler V902 and Det. Harris V811 and arrived and were given an oral report of actions. Jimenez was taken to Homicide Unit for questioning were she FIO'd and released pending further investigation. The clothing recovered was transported to Homicide and relinquished to Det Harris of Homicide for chain on custody. Per the V902 Sgt. Det Keeler, this officer remained at Homicide assisting investigators with multiple witnesses and suspects. At approximately 1400 hr I was relieved of duty and returned to District 2 and completed this report.

Respectfully submitted,

PO James A. Coyne
Squad 5 / Tour 1

Mayor Thomas M. Menino  •  Commissioner Paul F. Evans

1   A.   Yes.

2   Q.   And you don't know where your father was?

3   A.   No.

4   Q.   And you didn't know where Norberto was?

5   A.   No.

6   Q.   What happened next after you went to sleep?

7   A.   After I went to sleep, I woke up.  I looked

8        out the window.  I see that the car is not

9        where we -- he parked it.

10            I shake him, and tell him, "Carlos,

11       Carlos.  The car's missing."

12            And then I see the lights and the

13       flashlights all over the place outside.

14  Q.   Do you know what time this is?

15  A.   I don't know the exact time, no.

16  Q.   What's the thing that woke you up?

17  A.   The commotion.

18  Q.   And what commotion was it?

19  A.   Outside, the sirens, people screaming.  Like,

20       cops running, talking out loud.

21  Q.   Did you see how many cars were outside,

22       police cars?

23  A.   I didn't see the police cars.  I only saw the

24       lights.

Page 57

1    Q.    And who was with you at that time?

2    A.    Carlos.

3    Q.    And what did you do when you heard the knock?

4    A.    I told him that somebody was knocking.

5    Q.    And what did he say?

6    A.    He went to open the door.

7    Q.    And did you go with him?

8    A.    Yes.

9    Q.    Where were you standing when Carlos was at

10         the door?

11   A.    Behind him.

12   Q.    What happened next?

13   A.    He opened the door.  And he said that the car

14         was gone, our car was missing.  And they

15         grabbed him.  They pushed him against the

16         wall and then handcuffed him.

17   Q.    When the door opened, did you hear -- at any

18         point did you hear anyone identify

19         themselves?

20   A.    No.

21   Q.    Did you hear the words "Boston Police" at any

22         point?

23   A.    I don't recall.

24   Q.    Did you hear any other words like "Police" at

Page 64

1   A.   No.

2   Q.   -- in terms of guns and flashlights?

3   A.   When they entered my apartment, I knew they

4        had their guns out and their flashlights.

5   Q.   But at the door --

6   A.   At the door --

7   Q.   Let us just focus on the door.

8   A.   At the door, I don't remember none of the

9        rest except for that one.

10  Q.   When Carlos opened the door, did he say

11       anything to the officers?

12  A.   Yes.

13  Q.   What did Carlos say to the officers?

14  A.   My car is gone.

15  Q.   What did the officers say, if anything, to

16       Carlos?

17  A.   They said, "A white Honda Civic?"

18  Q.   And who said that?

19  A.   The cops.

20  Q.   Which cop?

21  A.   The one that was at the door.

22  Q.   That you remember?

23  A.   Yes.

24  Q.   The Caucasian officer?

Page 65

1    A.    Yes.

2    Q.    And what happened next?

3    A.    He grabbed Carlos and handcuffed him.

4    Q.    Who grabbed Carlos and handcuffed him?

5    A.    The white, tall Caucasian male I remember.

6    Q.    Before that, did Carlos say anything to him?

7    A.    He said, "Why are you arresting me?  What's

8          going on?"

9    Q.    Is that before?

10   A.    During the process of him handcuffing him.

11   Q.    Prior to the handcuffing, did Carlos say

12         anything to the officer?

13   A.    Yes.  "My car is gone."

14   Q.    And then he said, "The white Honda Civic"?

15   A.    The cops said, "The white Honda Civic?"

16   Q.    And then what was said after "The white Honda

17         Civic?"

18   A.    He asked if it was our car.

19   Q.    Carlos asked that?

20   A.    No, the cop.

21   Q.    And what did Carlos say?

22   A.    Yes.

23   Q.    What did the officer say after that?

24   A.    He just grabbed him.  He didn't say anything

Page 71

1        wall?

2   A.   Face first to the wall.

3   Q.   What did the officer who was doing this look

4        like?

5   A.   Tall, Caucasian.

6   Q.   And what type of uniform did he have on?

7   A.   I just noticed the blue uniform.  I didn't

8        know what type.

9   Q.   You don't know if it was a Boston Police --

10  A.   Boston Police, yeah.

11  Q.   You don't know if it was that or a Boston

12       Housing Authority --

13  A.   He was a Boston Police.

14  Q.   How do you know it was a Boston Police

15       uniform?

16  A.   Because of the little badge they wear.

17  Q.   So you saw a badge that said "Boston Police"?

18  A.   Mm-hmm.

19  Q.   What did you see this officer do while Carlos

20       was face first against the wall?

21  A.   He was just -- he had his force against him

22       just so he wouldn't be able to move.

23  Q.   I guess what do you mean by force?

24  A.   Like making sure -- keeping him still, making

Page 78

1    Q.    More than 15?

2    A.    Around that number, probably.

3    Q.    So around 15 officers?

4    A.    Mm-hmm.

5    Q.    Do you know if they were -- do you know what

6          agency they belonged to?

7    A.    I just knew -- the rest of them, no.  I just

8          knew the ones that I seen, that I conversated

9          with, that I talked to.

10   Q.    And what agency did those officers belong to?

11   A.    Boston Police.

12   Q.    And do you know of any other agencies that

13         were at that location?

14   A.    At that time, no.

15   Q.    Do you know if there were Boston Housing

16         police officers there?

17   A.    At that time, no.

18   Q.    Do you know if there were State Police

19         troopers there?

20   A.    Not at that time.

21   Q.    Did you see any?

22   A.    Not at that time.

23   Q.    At any time did you see State troopers?

24   A.    A State trooper, I remember seeing a State

Page 90

1        was out of place.

2 Q.    When you say "out of place," was it off the

3        bed; or was it on the floor?  Can you just

4        tell me a little bit about that.

5 A.    The mattress was off on the floor and the

6        entire bed, the wooden part, was out of

7        place, out of where I normally put it.

8 Q.    So the frame was moved?

9 A.    The frame, yes.

10 Q.   And was the mattress on the floor?

11 A.    Yes.

12 Q.   Where was your son at that point?

13 A.    He was given to my dad.

14 Q.   When you walked into the room --

15 A.    When I was going towards the room, I saw the

16        cop giving him to my dad after the fact of

17        the scuffling and --

Q.    Did you see any of the scuffling?

A.    No, but I heard it.

Q.    You heard scuffling?

       Mm-hmm.

       And what is it that you saw when you -- when

       you first made contact with your son's room,

       what is the first thing that you saw?

Page 109

1      looking around?

2   A.   Looking around and talking to themselves.

3   Q.   Looking around where?

4   A.   Just looking in the closets, opening the

5        drawers, flipping mattress.

6   Q.   What were they doing in your kitchen?

7   A.   In my kitchen they were looking in the

8        drawers.

9   Q.   And did they do anything in the kitchen other

10       than look in the drawers?

11  A.   I don't remember them doing anything in the

12       kitchen?

13  Q.   Did you see them look in the drawers in your

14       kitchen?

15  A.   The drawers when I remember them.  When

16       everything happened, everything was opened

17       and out of place.

18  Q.   But my question is did you see them open the

19       drawers?

20  A.   I heard the drawers open and close.  I didn't

21       see them visually, no.

22  Q.   What did they do in your son's room?  Did you

23       see them do anything in your son's room?

24  A.   Everything was out of place in my son's room.

Page 110

1      They were looking through the toys, yes, for

2      the gun.  They were.  I had -- mm-hmm.

3  Q.  So you saw them look for toys --

4  A.  Through the basket of toys.

5  Q.  -- in your son's room?

6  A.  Yes.

7  Q.  When did you see them do that?

8  A.  During the whole -- when I was in that

9      hallway with my son standing.

10 Q.  Is that before or after you talked to the

11     detective?

12 A.  During when I was talking to the detective.

13 Q.  Did you see them look through anything else

14     in your son's room?

15 A.  That I could have seen, no.

   Q.  What about in your bedroom?  Did you see them

       do anything in your bedroom?

   A.  They were looking under the bed.  They leaned

       over to look under the bed.  They had a box

       of stuff in the closet.  The box was emptied

       out.  Everything was on the floor.

       What did you see them do in your bedroom?

       In my bedroom, I saw them look under the bed.

       And who did you see do this?

Page 111

1   A.   One of the cops.

2   Q.   And do you know what agency he belonged to?

3   A.   No.

4   Q.   Did you see this individual do anything else

5        other than look under your bed in your

6        bedroom?

7   A.   From where I was, I could only see him look

8        under my bed.

9   Q.   And you didn't seem him do anything else

10       other than that?

11  A.   Other than the noises I heard of them

12       searching, no.

13  Q.   In your father's bedroom -- did you see them

14       do anything in your father's bedroom?

15  A.   Yes, they did.

16  Q.   What did you see them do?

17  A.   I saw them flip the mattress.

18  Q.   And did you see them doing anything else

         other than flip the mattress?

    A.   Looking inside the closet.

    Q.   In your father's room?

    A.   Yes.

    Q.   And did you see them do anything else other

         than look in the closet and flip the mattress

Page 94

1    Q.    Did you see Norberto in handcuffs at that

2          time?

3    A.    Yes.

4    Q.    And how many officers were with him at that

5          time?

6    A.    I don't remember the number.

7    Q.    Do you know what type of uniforms they had

8          on?

9    A.    I just remember the blue color, not any

10         distinctive marks on the uniforms.

11   Q.    Do you know if they were Caucasian, African-

12         American or Hispanic?

13   A.    (The witness shakes her head.)

14   Q.    Do you know if they were from the Boston

15         Housing Authority or the Boston Police?

16   A.    I don't remember, no.

17   Q.    Did Norberto say anything to you?

18   A.    No.

19   Q.    Did Norberto say anything to anybody else

20         while he was being escorted out?

21   A.    I just remember him saying, "Ouch.  It

22         hurts."

23   Q.    Did you see him actually with the handcuffs

24         on, or did you see the handcuffs being placed

1     look around at some point?

      A.   They had already looked around.

2     Q.   Yes, but when did it come up.  When did that

3          issue of consent come up?  At what point

4          during the incident?

5     A.   They had already taken Carlos and Norberto by

6          that time.

7

8     Q.   Had they already started searching by then?

9     A.   Yes.

10    Q.   And what actually did the officer say to you?

11    A.   They said that they were going to get a

12         warrant.

13    Q.   Anyway?

14    A.   Yes.

                    MS. LITSAS:  Objection.
15

16    Q.   Okay.  But what did they say more than that

17         they were going to get a warrant?

                    MS. LITSAS:  Objection.
18

19    A.   That they were going to come back and search

20         some more with the warrant.

21    Q.   So how did that relate to the consent issue?

                    MS. LITSAS:  Objection.
22

23    A.   It didn't.

24    Q.   But did you give them consent to search?

Page 127

1   A.   Uh-uh.

2   Q.   No?

3   A.   No.

4   Q.   Have you had any other interaction other than

5        that first reappearance Norberto had about a

6        year ago with Carlos?

7   A.   No.

8   Q.   Did he ever stay at your house again after

9        that?

10  A.   No.

11  Q.   Would you allow him to stay at your house

12       again?

13  A.   No.

14  Q.   And why wouldn't you allow him to stay at

15       your house again?

16  A.   Because of the first experience.

17  Q.   And what was that?

18  A.   The whole thing happening with the cops and

19       taking the car without our permission.

20  Q.   Turning your attention to now Exhibit 5.

21       Does the picture show anything else other

22       than your vehicle and the damage to the

         bumper?

    A.   Other than to the bumper and the damage to

12

1    Q.   Did you tell them that?

2    A.   They didn't give me a chance.

3    Q.   Oh, they didn't give you a chance to ask it?

4    A.   Yeah.

5    Q.   And what did they do, they grabbed you?

6    A.   Yeah.

7    Q.   And what did they do?

8    A.   I know they slammed me against the wall twice.

9    Q.   They slammed you against the wall?

10   A.   Yeah.

11   Q.   And did they handcuff you?

12   A.   The second time they slammed me that's when they

13        handcuffed me.

14   Q.   So you were slammed up against the wall twice and

15        then they handcuffed you?

16   A.   Yes.

17   Q:   What happened after that?

18   A.   They rushed into my house.  I think that's when

19        they pulled Noberto out or whatever.

20   Q.   So the police officers then rushed into your

21        apartment?

22   A.   Yeah.

23   Q.   And did you see what they did while they were in

24        there, because you were in a hallway outside;

18

1   Q.  Let's talk about that.  What was the condition of

2        your apartment when you came back home?

3   A.  (Laughs)  Everything was flipped over.

4   Q.  Everything was flipped over?

5   A.  The potty -- because I was potty training my son

6        during that time -- was flipped over and there was

7        shit on the floor, you know.  All his clothes were

8        out of his drawers.  Do you know what I mean?

9   Q.  Was it in that condition before they came in?

10  A.  No.

11  Q.  Your house was pretty clean?

12  A.  Yeah.  My house is very clean, you know.

13  Q.  Yeah.  So they had gone through drawers and left

14       clothes on the floor.  Do you know what happened

15       or were they searching for something do you think?

16  A.  My wife told me that there was an officer trying

17       to -- well, harassing her, that's what she said,

18       saying like, "Oh, where's the gun?  Where's the

19       gun?"  He was accusing us of having a gun in the

20       house.  Do you know what I mean?

21  Q.  Um-hum.

22  A.  So by then I was already extremely upset, you know

23       what I mean, so I just sat down and tried to relax

24       a little bit, because I did have a long night that

Page 72

1    really.  They just asked -- see that's the

2    problem.

3           I'm really kind of shady about

4    remembering because I really don't remember

5    much about what happened, except for the fact

6    that I think I asked in regards to my car.

7    They just grabbed me, threw me against the

8    wall; and then they threw me against the wall

9    face first.  Then they just cuffed me after

10   that.  And then they just took me down.

11 Q.  What happened after that?

12 A.  That's when I was being brought down to the

13   vehicle.  He apologized or whatever, yelling

14   out loud.  I was thrown in the vehicle --

15 Q.  Who apologized?

16 A.  Norberto.  And then they put me in the

17   vehicle.  And I sort of recall everybody just

18   pointing fingers at me saying, "Yeah.  He's

19   the one that was driving the car.  That's

20   him.  That's him."

21          And then again, mind you, I was in

22   boxers barefooted.  I only had, like, a

23   little tank top on.  They moved me into a

24   wagon, again, on foot, walking about a block

State Police?

A.    I guess not.

Q.    No?

A.    No.

Q.    And why's that?

A.    Because as far as I know I was arrested by a

Boston Police officer.  And they're the ones,

you know, that threw me against the wall --

and both.

Q.    How do you know that?

A.    Because the guy that was -- I can't remember

his face either.  The thing is that his badge

said Boston Police Department.  That's the

first thing that I looked at.

        The first thing they did is just

threw me against the wall first and just

started pointing fingers.  And then they just

grabbed me and threw me against the other

wall, which is in the hallway.  If you want

any description as to that, that's about all

I remember.  The rest of that I didn't -- I

mean, all I know is I just landed face first

against that other wall.

Q.    And this was a male police officer that was

Page 130

1   A.   Yes.

2   Q.   And how many times did you clean it a week?

3   A.   I don't know.  Between both of us, I think we

4        both, you know, put our hands on it at least

5        twice a week.

6   Q.   And how old were your kids at that time?

7   A.   Again, my son --

8   Q.   Six months and --

9   A.   No.  My daughter was not even six months old,

10       and my son was turning -- I think, yeah, he

11       was turning three that year.  It was two

12       thousand -- yeah.

13  Q.   And when you came to the apartment, did

14       Detective Harris say anything to you?

15  A.   I think he said something but I can't

16       remember exactly what he said to me.  I do

17       remember that the two officers that were

18       there did say to me that they were waiting

19       for a warrant or something to search the

20       house.  I remember me making a smart comment.

21       "How are you going to wait for a warrant if

22       you guys already did?"

    Q.   Did they say anything to you after you said

         that?

Page 135

A.    My son.

Q.    How old was your son?  The three year old?

A.    Yes.

Q.    What kind of bed did you have for your son?

A.    I think it was a little toddler bed.  You
know, he could he just jump in whenever he
wants to and stuff like that.

Q.    And is this something that your wife saw
someone do?

A.    Again, she only told me brief details.

Q.    But she had told you something about your son
being flipped in bed?

A.    As far as I know, that's what she saw.  As
far as I know.

Q.    Did you see your son get flipped in the bed?

A.    Of course not.  I wasn't there.

Q.    Was your son hurt in any way?

A.    Probably emotionally the most, if anything.

Q.    Do you know if your son was physically hurt
in any way?

A.    Thank God, I guess not, because I didn't see
any bruises or nothing on him.

Q.    Did -- when you say your son was hurt
emotionally, what do you mean by that?

1    that, please?  Toomey?

2              THE WITNESS:  T-O-O --

3              THE REPORTER:  That's okay.  I

4    wasn't sure which way it was.  Thank you.

5        Q.    (By Mr. Hrones)  Were you -- were

6    you supervising attorney --

7        A.    Yes.

8        Q.    -- I mean, supervising sergeant?

9        A.    Yes, I was.

10       Q.    And what's the name that you

11   referred to that as, your responsibility?

12       A.    The PS, patrol supervisor.

13       Q.    Patrol supervisor?

14       A.    Yes; short is PS.

15       Q.    Okay.  And who is superior to whom,

16   in terms of you and Toomey?

17       A.    We were equal.

18       Q.    Equal?

19       A.    Yes.

20       Q.    All right.  So did there come a

21   time when you heard about a car chase?

22       A.    Yes.

23       Q.    And when was that?

24       A.    That was -- I can't give you a

1    B-3, there's an incident, you were the parole

2    [sic] supervisor in charge, were you not?  You

3    and Officer Toomey?

4           A.    Yes.

5                 MR. DONOHUE:  Objection.

6           Q.    (By Mr. Hrones)  And Sergeant

7    Toomey.

8                 So, at that point, when you arrived

9           and saw them running, you were the patrol

10          supervision -- supervisor in charge?

11          A.    Yes.

12          Q.    So what did you do then, when you

13   saw them running?

14          A.    I followed.

15          Q.    And where did you follow them to?

16          A.    Into 11 Fermoy Heights.

17          Q.    And from where --

18          A.    Into --

19          Q.    -- where did you follow them?

20          A.    -- into the hallway.  And then I

21   eventually went into the apartment.

22          Q.    Do you know why they were going

23   into that address?

24          A.    Yes.

**JOSEPH R. WATTS**
**June 8, 2007**

Page 20

1     Q.    Did you see an old man in there?

2     A.    No.

3     Q.    You saw a woman in there?

4     A.    Yes.

5     Q.    And how many children?

6     A.    I didn't see any children.

7     Q.    And where did you see the

8 middle-aged man?

9     A.    Right in the kitchen of the

10 apartment.

11     Q.    Did you see anyone at the door, as

12 you went in?

13     A.    No, I don't recall.

14     Q.    Did you see anyone in the hallway,

15 other than police officers?

16     A.    No, I did not.

17     Q.    And so you were in charge, as the

18 patrol supervisor, when you entered the

19 apartment?

20     A.    Yes.

21     Q.    All right.  And was Sergeant Toomey

22 there?

23     A.    I don't recall.

24     Q.    So what did you do when you got

3dc1dddc-f092-4a80-b73e-2499836cab60

JOSEPH R. WATTS
June 8, 2007

Page 21

1    into the apartment?

2         A.    I spoke to this gentleman.

3         Q.    Yes.

4         A.    And then I observed.

5         Q.    What did you say to the gentleman?

6         A.    I don't recall exactly what I said,

7    Counselor.

8         Q.    Did he speak English?

9         A.    No.  There was -- no, I don't

10   believe he did.  I remember having a

11   language-barrier problem.

12        Q.    So how did you speak to him, then?

13        A.    I didn't.  The conversation ended.

14        Q.    Did you speak to anyone else?

15        A.    No.

16        Q.    You didn't speak to the woman?

17        A.    I don't believe I did, no.

18        Q.    Now, as you were going up the

19   stairs, did you see anyone who'd been arrested,

20   at that point?

21        A.    No.

22        Q.    Did you ever see anyone arrested in

23   that apartment?

24        A.    I did not.

3dc1dddc-f092-4a80-b73e-2499836cab60

**JOSEPH R. WATTS**
**June 8, 2007**

Page 25

1  there?

2      A.    I don't believe he was in there.

3  I'm not sure if he was in there because there

4  was other things going on.

5      Q.    So you're not sure whether the

6  officers found the individual in there?

7      A.    Excuse me -- (witness drinking

8  water)

9            That's correct -- I'm not sure.

10     Q.    Well, as the patrol supervisor it

11 was your business to see whether or not he was

12 in there; was it not?

13     A.    Not necessarily.  There was --

14 there was other things going on, Counselor, as

15 well.

16     Q.    What was your role, as patrol

17 supervisor, once you arrived at the apartment?

18     A.    To, just, oversee everything; make

19 sure no one gets hurt; make sure no one's rights

20 are violated; make sure they're working within

21 the law and rules and regulations and everything

22 else.

23     Q.    So it was your obligation to

24 determine whether anyone was arrested?

**JOSEPH R. WATTS**
**June 8, 2007**

Page 31

1   the kitchen.  I could observe -- there was

2   rooms, I believe, on the side, doors open.  I

3   could, kind of, observe everything from my

4   vantage point.

5         Q.      Did you try to talk to the woman

6   that was there?

7         A.      I don't recall.  I don't think I

8   did, though.

9         Q.      Okay.  Why wouldn't you talk to

0   her?

1         A.      I don't know.

2         Q.      So you didn't talk to anyone in

3   there that would give you any information as to

4   what was going on, or their role?

5         A.      Correct.

6         Q.      Now, did you give any orders that

7   day?

8         A.      No.

9         Q.      You gave absolutely no orders?

0         A.      No.

1         Q.      You just stood around as a patrol

2   supervisor and watched?

3         A.      Pretty much, yes.

4         Q.      And you're sure of that?

1      equally in charge --

2                MS. LITSAS:  Objection.

3    Q.   -- is that right?

4    A.   I'm not understanding where you're --

5    Q.   Okay.  Sergeant Watts was at the scene,

6         right?

7    A.   Yes.

8    Q.   You both were.  And you both were in the

9         apartment?

10   A.   Yes.

11   Q.   And who was the person that had to make the

12        decisions as to how to handle the activity

13        in the apartment?

14                MS. LITSAS:  Objection.

15   A.   There was already a supervisor in control.

16   Q.   Who was the supervisor in control?

17   A.   I don't know who that was.

18   Q.   So you played no role as a supervisor --

19                MS. LITSAS:  Objection.

20   Q.   -- is that true?

21                MS. LITSAS:  Objection.

22   A.   I don't understand what you mean.

23   Q.   Did you play any role as a supervisor there?

24   A.   I assisted the other supervisor who was

1    Q.   Have you appealed this?

2    A.   There is no appeal.

3    Q.   There is no appeal for a reprimand?

4    A.   I contacted my union, and they told me there

5         was no appeal of an oral reprimand.

6    Q.   Did you want to appeal?

7    A.   Yes.

8    Q.   And do you believe that's correct, you can't

9         appeal an oral reprimand?

10   A.   I was told by my union officials and their

11        attorney on it, yes.

12   Q.   Now, you don't know to this day who the

13        supervisor in control was?

14                  MS. LITSAS:  Objection.

15   A.   I'm not sure.

16   Q.   Didn't you try to find out who was in

17        control when it was alleged that you were

18        responsible?

19   A.   The only thing I requested was that they

20        listen to the audiotapes.

21   Q.   Today don't you have some idea of who was in

22        control?

23   A.   I'm not sure who it was.

24   Q.   No, but who do you think -- who are the

1       not?

2    A.   No, sir.

3    Q.   Haven't you heard that he was arrested?

4    A.   No, sir.

5              MS. LITSAS:  Objection.

6    Q.   You have never heard that Pineda was

7         arrested?

8    A.   No, sir.

9    Q.   How do you define an arrest?

10             MS. LITSAS:  Objection.

11   Q.   No, you can answer.

12   A.   When someone's booked.

13   Q.   When they're handcuffed and led away

14        handcuffed, are they arrested?

15             MS. LITSAS:  Objection.

16   A.   Not all the time.

17   Q.   So you're saying that if you handcuff

18        someone, they're not under arrest?

19             MS. LITSAS:  Objection.

20   A.   That's correct.

21   Q.   Why aren't they under arrest when you

22        handcuff them?

23             MS. LITSAS:  Objection.

24   A.   You can place people in handcuffs for safety

WORD INDEX
CONDENSED TRANSCRIPT

1    A.    They should.

2    Q.    So your answer is yes, that the patrol

3          supervisor should know whether or not

4          someone has been arrested even if he doesn't

5          do the arrest or order the arrest?

6    A.    Yes.

7                    MS. LITSAS:  Objection.

8    Q.    Do you know who made the arrest that night?

9    A.    Mr. Cruz, Officers Foley and Gallagher.

10   Q.    Well, who made the arrest of Carlos Pineda?

11   A.    I don't know.

12   Q.    Who put handcuffs on him?

13   A.    I don't know.

14   Q.    But the patrol supervisor should have known

15         that, shouldn't he --

16                   MS. LITSAS:  Objection.

17   Q.    -- as a part of his responsibility?

18                   MS. LITSAS:  Objection.

19   A.    No.

20   Q.    So you're saying the patrol supervisor

21         doesn't have to know whether anyone was

22         arrested under his watch at an apartment

23         where he was present?

24                   MS. LITSAS:  Objection.

1  Q.  And didn't you ask him what you did wrong?

2  A.  In so many words.

3  Q.  And what did he say?

4  A.  He said that they came to the decision that

5      I was to receive an oral reprimand.

6  Q.  He didn't give you any details as to the

7      basis of the decision?

8  A.  No.

9  Q.  Don't you have a right to know why you're

10     given an oral reprimand under the rules of

11     the union?

12 A.  He said I violated Rule 102, Section 6,

13     accountability.

14 Q.  You don't have any right to know more about

15     the basis?

16 A.  I am not --

17          MS. LITSAS:  Objection.

18 A.  I'm not sure on that, but when I was told

19     that I couldn't appeal it...

20 Q.  So it's your testimony today that today you

21     have no idea what was the basis according to

22     Internal Affairs that you were given a

23     reprimand --

24          MS. LITSAS:  Objection.